NIMALKA R. WICKRAMASEKERA (SBN: 268518)
nwickramasekera@winston.com
DAVID P. DALKE (SBN: 218161)
ddalke@winston.com
WINSTON & STRAWN LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543
Telephone:   (213) 615-1700
Facsimile:    (213) 615-1750

GEORGE C. LOMBARDI (*pro hac vice*)
glombardi@winston.com
BRIAN J. NISBET (*pro hac vice*)
bnisbet@winston.com
SARANYA RAGHAVAN (*pro hac vice*)
sraghavan@winston.com
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601-9703
Telephone: (312) 558-5600
Facsimile: (312) 558-5700

CORINNE STONE HOCKMAN (*pro hac vice*)
chockman@winston.com
WINSTON & STRAWN LLP
800 Capitol Street, Suite 2400
Houston, TX 77002-2529
Telephone: (713) 651-2600
Facsimile: (713) 651-2700

Attorneys for Defendants
ALPHATEC HOLDINGS, INC. AND ALPHATEC SPINE, INC.

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA - SAN DIEGO DIVISION

| | |
|---|---|
| NUVASIVE, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>ALPHATEC HOLDINGS, INC., a Delaware corporation and ALPHATEC SPINE, INC., a California corporation,<br><br>Defendants. | **Case No. 18-CV-00347-CAB-MDD**<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>**Judge:** Hon. Cathy Ann Bencivengo<br>**Courtroom:** 4C<br><br>PER CHAMBERS RULES, NO ORAL ARGUMENT UNLESS SEPARATELY ORDERED BY THE COURT |

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ...................................................................................... 1

II.    BACKGROUND ........................................................................................ 2

    A.    The '156 and '334 Patents .............................................................. 2

        1.    The asserted claims and indefinite terms ........................... 2

        2.    The common specification ................................................... 4

    B.    The Intrinsic Record and Claim Construction ............................... 7

        1.    "at a position proximate to said medial plane" ('156 patent, claim 1) ........................................................................... 7

        2.    "central region" ('334 patent, claims 1, 16) .................... 9

        3.    "approximately 18 mm" ('334 patent, claim 18)........... 11

    C.    NuVasive's Expert Testimony Regarding the Indefinite Terms ............. 11

        1.    "at a position proximate to said medial plane" ('156 patent, claim 1) ......................................................................... 11

        2.    "central region" ('334 patent, claims 1, 16) .................. 13

        3.    "approximately 18 mm" ('334 patent, claim 18)........... 14

III.    LEGAL STANDARDS ............................................................................ 15

    A.    Summary Judgment ...................................................................... 15

    B.    Indefiniteness .............................................................................. 16

IV.    THE ASSERTED CLAIMS ARE INDEFINITE.......................................... 18

    A.    "At A Position Proximate to Said Medial Plane" Lacks Objective Boundaries (All Asserted Claims of the '156 Patent)........................... 18

    B.    The Claimed "Central Region" Lacks Objective Boundaries (All Asserted Claims of the '334 Patent) .......................................... 25

    C.    "Approximately 18 mm" Lacks Objective Boundaries (Claim 18 of the '334 Patent) ........................................................................ 30

V.    CONCLUSION ...................................................................................... 34

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdou v. Alphatec Spine, Inc.,*
No. 12-CV-1804-BEN-RBB, 2014 WL 6611422 (S.D. Cal. Nov. 19, 2014) ................................................................................................ 23, 30, 32

*Advanced Aerospace Techs., Inc. v. United States,*
124 Fed. Cl. 282 (2015) ..................................................................... *passim*

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ................................................................................. 16

*Ave. Innovations, Inc. v. E. Mishan & Sons Inc.,*
310 F. Supp. 3d 457 (S.D.N.Y. 2018), *aff'd*, 829 F. App'x 529 (Fed. Cir. 2020) .............................................................................................. 30

*Berkheimer v. HP Inc.,*
881 F.3d 1360 (Fed. Cir. 2018) ............................................................... 17

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ................................................................................. 16

*Chef Am., Inc. v. Lamb-Weston, Inc.,*
358 F.3d 1371 (Fed. Cir. 2004) ............................................................... 18

*In re Collier,*
397 F.2d 1003 (C.C.P.A. 1968) ................................................................. 7

*Datamize, LLC v. Plumtree Software, Inc.,*
417 F.3d 1342 (Fed. Cir. 2005) ........................................................... 2, 18

*Dominion Assets LLC v. Masimo Corp.,*
No. 14-CV-03002-BLF, 2017 WL 10592326 (N.D. Cal. Jan. 20, 2017) .................................................................................................. *passim*

*Dow Chem. Co. v. Nova Chems. Corp. (Canada),*
803 F.3d 620 (Fed. Cir. 2015) ................................................................. 17

*GE Lighting Sols., LLC v. Lights of Am., Inc.,*
663 F. App'x 938 (Fed. Cir. 2016) ........................................................... 22

ii

*Honeywell Int'l, Inc. v. Int'l Trade Comm'n*,
   341 F.3d 1332 (Fed. Cir. 2003) ..................................................... 23, 30

*HZNP Medicines LLC v. Actavis Labs. UT, Inc.*,
   940 F.3d 680 (Fed. Cir. 2019) ............................................ 17, 23, 30

*Interval Licensing LLC v. AOL, Inc.*,
   766 F.3d 1364 (Fed. Cir. 2014) ...............................................*passim*

*Matsushita Elec. Inds. Co., v. Zenith Radio Corp.*,
   475 U.S. 574 (1986)...................................................................... 16

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
   572 U.S. 898 (2014)...................................................................*passim*

*In re Neurografix ('360) Patent Litig.*,
   201 F. Supp. 3d 206 (D. Mass. 2016)..................................... 20, 32

*Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co. Matal*,
   868 F.3d 1013 (Fed. Cir. 2017) ........................................................ 9

*In re NuVasive, Inc.*,
   841 F.3d 966 (Fed. Cir. 2016) ........................................................ 9

*In re Nuvasive, Inc.*,
   842 F.3d 1376 (Fed. Cir. 2016) ...................................................... 8

*Prolifiq Software Inc. v. Veeva Sys. Inc.*,
   No. 13-CV-03644-SI, 2014 WL 3870016 (N.D. Cal. Aug. 6, 2014)......2, 17, 18, 20

*RideApp, Inc. v. Lyft, Inc.*,
   No. 18-CV-07152-JST, 2019 WL 7834175 (N.D. Cal. Oct. 16, 2019) ................. 20

*Samsung Electronics America, Inc. v. Prisua Engineering Corp.*,
   948 F.3d 1342 (Fed. Cir. 2020) ...................................................... 7

*Standard Oil Co. v. Am. Cyanamid Co.*,
   774 F.2d 448 (Fed. Cir. 1985) ........................................................ 7

**Other Authorities**

Fed. R. Civ. P. 56(a) ...................................................................... 16

# I.    INTRODUCTION

Alphatec moves for summary judgment that the asserted claims of U.S. Patent Nos. 8,187,334 and 8,361,156 are invalid as indefinite.

The '334 and '156 patents are related and share the same specification.  Both patents claim a spinal fusion implant having certain dimensions and radiopaque markers placed in certain locations in the implant.  Alphatec challenges the definiteness of three terms.  First, all asserted claims of the '156 patent require radiopaque markers that extend into the sidewalls of the implant "at a position proximate to said medial plane."  Second, all asserted claims of the '334 patent require radiopaque markers that are positioned in the "central region" which is "generally centrally" located in the implant.  Third, one asserted claim of the '334 patent additionally requires the implant be "approximately 18 mm" wide.

As confirmed by the testimony of NuVasive's expert, Dr. Youssef, all asserted claims are indefinite as a matter of law because none "inform, with reasonable certainty, those skilled in the art about the scope of the invention."  *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).  Dr. Youssef—a surgeon who claims to be the most knowledgeable person remaining at NuVasive and who has submitted thousands of pages of testimony regarding these patents in this proceeding and before the Patent Trial & Appeal Board ("PTAB")—confirmed under oath that determining whether each of the three challenged terms is met in the context of these patents and for purposes of infringement is a "subjective analysis" that will vary from surgeon to surgeon. Ex. 12[1] (Youssef Dep. Tr.) at 102:3–12 ("I don't think there is an objective boundary.") ("at a position proximate to said medial plane" term); Ex. 13 (Youssef Dep. Tr.) at 79:7–80:20 ("So I don't know that there is objective.  It's more subjective; right? . . . I think you have to be somewhat subjective in recognizing that that is truly within the scope of claim language . . . .") ("central region" term); Ex. 14 (Youssef Dep. Tr.)

---

[1] All exhibits are to the Declaration of Brian J. Nisbet In Support of Defendants' Motion for Summary Judgment filed concurrently herewith.

at 45:3–46:3 ("I think that approximately 18 millimeters is -- has some subjectivity within it.  No question.") ("approximately 18 mm" term).  He also could not identify any objective measure by which a skilled artisan could assess whether a radiopaque marker placed at a certain location on the implant would fall inside or outside the claim scope, or whether an implant is approximately 18 mm wide within the context of these patents.  *Id.*  Thus, it is undisputed that the challenged terms are subjective and their limits are not defined anywhere in the specification or prosecution history of the patents.

Given this unequivocal testimony, NuVasive has no evidence to show that "[t]he claims, when read in light of the specification and the prosecution history," have "objective boundaries for those of skill in the art," *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014), or that the claim scope is not subject to the "unrestrained, subjective opinion of a particular individual purportedly practicing the invention," *Prolifiq Software Inc. v. Veeva Sys. Inc.*, No. 13-CV-03644-SI, 2014 WL 3870016, at *5 (N.D. Cal. Aug. 6, 2014) (quoting and finding instructive *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1350 (Fed. Cir. 2005)).

All asserted claims are, therefore, invalid as indefinite.

## II.     BACKGROUND

### A.     The '156 and '334 Patents

#### 1.     The asserted claims and indefinite terms

NuVasive alleges infringement of claims 1, 5, 10, 18, and 24 of the '156 patent and claims 16 and 18 of the '334 patent.  Ex. 6 (Youssef Opening Rpt.) ¶ 2.  The '156 and '334 patents each have one independent claim, reproduced below with the indefinite terms in bold.  Independent claim 1 of the '156 patent (from which all asserted claims depend) recites:

> 1. A spinal fusion implant of non-bone construction positionable within an interbody space between a first vertebra and a second vertebra, said implant comprising:
>
> an upper surface including anti-migration elements to contact said first vertebra when said implant is positioned within the interbody space, a lower surface including anti-migration elements to contact said second

vertebra when said implant is positioned within the interbody space, a distal wall, a proximal wall, a first sidewall, and a second sidewall generally opposite from the first sidewall, wherein said distal wall, proximal wall, first sidewall, and second sidewall comprise a radiolucent material;

wherein said implant has a longitudinal length extending from a proximal end of said proximal wall to a distal end of said distal wall, said implant has a maximum lateral width extending from said first sidewall to said second sidewall along a medial plane that is generally perpendicular to said longitudinal length, and said longitudinal length is greater than said maximum lateral width;

at least a first fusion aperture extending through said upper surface and lower surface and configured to permit bone growth between the first vertebra and the second vertebra when said implant is positioned within the interbody space, said first fusion aperture having: a longitudinal aperture length extending generally parallel to the longitudinal length of said implant, and a lateral aperture width extending between said first sidewall to said second sidewall, wherein the longitudinal aperture length is greater than the lateral aperture width; and

at least first and second radiopaque markers oriented generally parallel to a height of the implant, wherein said first radiopaque marker extends into said first sidewall **at a position proximate to said medial plane**, and said second radiopaque marker extends into said second sidewall **at a position proximate to said medial plane**.

Doc. No. 110-38 ('156 patent) at cl. 1.[2]

Independent claim 1 of the '334 patent[3] (from which both asserted claims 16 and 18 depend) recites:

1. A spinal fusion implant of non-bone construction positionable within an interbody space between a first vertebra and a second vertebra, said implant comprising:

an upper surface including anti-migration elements to contact said first vertebra when said implant is positioned within the interbody space, a lower surface including anti-migration elements to contact said second vertebra when said implant is positioned within the interbody space, a distal wall, a proximal wall, a first sidewall and a second sidewall, said distal wall, proximal wall, first sidewall, and second sidewall comprising a radiolucent material;

wherein said implant has a longitudinal length greater than 40 mm extending from a proximal end of said proximal wall to a distal end of said distal wall;

---

[2]  Unless otherwise noted, all emphasis is added.
[3]  As discussed below, claim 1 of the '334 patent, along with 18 dependent claims, have been deemed invalid as obvious by the Federal Circuit. An additional three dependent claims of the '334 patent have been deemed invalid as obvious by the PTAB.

wherein **a central region of said implant includes portions of the first and second sidewalls positioned generally centrally between the proximal wall and the distal wall, at least a portion of the central region defining a maximum lateral width of said implant extending from said first sidewall to said second sidewall**, wherein said longitudinal length is at least two and half times greater than said maximum lateral width;

at least a first fusion aperture extending through said upper surface and lower surface and configured to permit bone growth between the first vertebra and the second vertebra when said implant is positioned within the interbody space, said first fusion aperture having: a longitudinal aperture length extending generally parallel to the longitudinal length of said implant, and a lateral aperture width extending between said first sidewall to said second sidewall, wherein the longitudinal aperture length is greater than the lateral aperture width; and

at least three radiopaque markers; wherein a first of the at least three radiopaque markers is at least partially positioned in said distal wall, a second of said at least three radiopaque markers is at least partially positioned in said proximal wall, and **a third of said at least three radiopaque markers is at least partially positioned in said central region**.

Doc. No. 110-48 ('334 patent) at cl. 1.  Dependent claim 16 of the '334 patent also includes the indefinite "central region" term, further requiring "a **fourth radiopaque marker** . . . **positioned in said central region** at a position spaced apart from said third radiopaque marker."  *Id.* at cl. 16.  Dependent claim 18 of the '334 patent includes an additional indefinite term, which is reproduced below with the indefinite term in bold:

18. The spinal fusion implant of claim 1, wherein said maximum lateral width of said implant is **approximately 18 mm**.

*Id.* at cl. 18.

Apart from the indefinite dimensional term of claim 18 of the '334 patent, all the indefinite terms pertain to where to position claimed radiopaque markers in the implant.

### 2.   The common specification

The '156 and '334 patents are related and share a specification that was not filed until March 2005, but NuVasive is claiming priority to a provisional application filed in March 2004. *See* Doc. No. 110-38 at 1:1–15; Doc No. 110-48 at 1:1–13.  The patents are titled "Systems and Methods for Spinal Fusion."  *Id.*[4]   Both patents were

---

[4] Citations to the common specification are to the earlier filed '334 patent.

expeditiously allowed with no substantive rejections.  Ex. 2 ('156 Patent Prosecution History) at NUVA_ATE00022976–978 (allowed roughly eight months after filing); Ex. 3 ('334 Patent Prosecution History) at ATEC_LLIF000051702–703 (allowed roughly one year after filing).

The patents relate to "a system and method for spinal fusion comprising a spinal fusion implant of non-bone construction . . . to introduce the spinal fusion implant into any of a variety of spinal target sites."  Doc. No. 110-48 at 2 (Abstract).  The implants are made of radiolucent material and have four walls, shown below—a "distal wall" (the implant's leading end farthest from the surgeon during insertion), a "proximal wall" (the implant's trailing end closest to the surgeon during insertion), and two "sidewalls":



*Id.* at Fig. 2 (annotated).

As the specification explains, "Figure 2 is a perspective view of a lumbar fusion implant," (*id.* at 3:36), which may be "introduc[ed] into the disc space via a lateral (trans-psoas) approach to the spine" or "in a variety of approaches, such as posterior, anterior, antero-lateral, and postero-lateral," (*id.* at 5:29–33), and is made from a radiolucent material, such as PEEK (poly-ether-ether-ketone).  *Id.* at 5:10–15.  It "includes anti-migration features designed to increase friction between spinal fusion implant 10 and adjacent contacting surfaces of vertebral bodies", (*id.* at 6:21–25), such as ridges 6 and spike elements 7–9.  *Id.* at 6:26–35; Figs. 2–3.

The provisional application to which NuVasive claims priority does not disclose

radiopaque "markers," their purpose, or where to position them. Nor does it describe the contours of a medial plane or central region of the implant, or any purpose for these features. It only illustrates anti-migration spike elements in the proximal wall, distal wall, and middle of the sidewalls, and, in a single sentence, notes these anti-migration spike elements "may be manufactured from any of a variety of suitable materials, including but not limited to a metal, ceramic, and/or polymer material, preferably having radiopaque characteristics." Ex. 1 (Provisional Application) at 14:4–14.

The issued specification adds extensive new matter disclosing the use of anti-migration spike elements as "markers"—*i.e.*, that they are "observable under X-ray and fluoroscopy[,] such that a surgeon may track the progress of the implant 10 during implantation and/or the placement of the implant 10 after implantation." Doc. No. 110-48 at 6:49–56; *see also id.* at Figs. 18–23, 2:53–3:11, 4:40–53, 6:49–56, 9:65–10:9, 11:48–12:11 (new matter added to the specification). But even with these additional disclosures, the specification does not disclose where to place a radiopaque marker such that it is "at a position proximal to said medial plane" or in the "central region", beyond being directly in the middle of the implant. It provides no objective boundaries for these terms as they relate to marker positioning.

The specification purports to improve on the prior art because the disclosed implants are made from "any suitable non-bone composition," such as plastic, metal, ceramic, or composites. *Id.* at 1:66–2:11. According to the specification, the prior art primarily used autologous or allograft bone grafts (*i.e.*, bone harvested from the patient or others), which had "drawbacks" the claimed invention "overcomes" with "non-bone construction." *Id.* at 1:37–2:2. Neither the provisional application nor the specification identifies the implant's dimensions or positioning of radiopaque markers as novel. In fact, the specification emphasizes the "implant of the present invention may be provided in any number of suitable shapes and sizes depending upon the particular surgical procedure or need," (*id.* at 2:12–14), "dimensioned for use in the cervical and/or lumbar spine without departing from the scope of the present invention," (*id.* at 2:14–17), and

6

1  "provided with any number of features for enhancing the visualization of the implant

2  during and/or after implantation into a spinal target site," including "spike elements

3  used for anti-migration" which may "take any of a variety of suitable shapes." *Id.* at

4  2:53–3:10.

5  **B.    The Intrinsic Record and Claim Construction**

6  NuVasive has not proposed any specific construction for the indefinite terms.  As

7  discussed below, the parties agreed to the construction of one related term, and the

8  parties, the Federal Circuit, and the PTAB previously addressed the invalidity of claims

9  including these terms but did not otherwise address their scope.[5]

10  **1.    "at a position proximate to said medial plane" ('156 patent,
           claim 1)**

11

12  As discussed above, claim 1 of the '156 patent requires first and second

13  radiopaque markers extending into each sidewall "at a position proximate to said medial

14  plane."  Doc. No. 110-38 at cl. 1.  The parties agreed that a separate, but related claim

15  term, "medial plane that is generally perpendicular to said longitudinal length," means

16  a "plane that is generally perpendicular to and intersects with said longitudinal length

17  at the middle or midline of the longitudinal length."  Doc. No. 133-2 at 21–23.  The

18  parties' agreed-upon construction identifies where the "medial plane" is located (in the

19  middle of the implant), but it does not address the objective boundaries of the term "at

20  a position proximate to said medial plane."

21  In considering a previous decision by the PTAB invalidating claim 1 of the '156

22  patent, the Federal Circuit stated that it understood "proximate to said medial plane" to

23

24

---

25  [5] The PTAB may not cancel claims for indefiniteness in an *inter partes* review ("IPR")
    proceeding.  *Samsung Electronics America, Inc. v. Prisua Engineering Corp.*, 948 F.3d
26  1342, 1350–51 (Fed. Cir. 2020).  But claims may be found both obvious and indefinite.
    *Id.* at 1355 (citing *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 453–55 (Fed.
27  Cir. 1985) (upholding decision that claim was invalid for both indefiniteness and
    obviousness) and *In re Collier*, 397 F.2d 1003, 1004–06 (C.C.P.A. 1968) (rejecting
28  claim on grounds of indefiniteness and obviousness)).

mean "near the middle of the implant,"[6] but did not determine the objective boundaries of the term. *In re Nuvasive, Inc.*, 842 F.3d 1376, 1384 (Fed. Cir. 2016). In that appeal, the Federal Circuit addressed whether the PTAB had sufficiently articulated its reasoning in its Final Written Decision for why a person of ordinary skill in the art ("POSA") would have been motivated to combine the radiopaque markers shown in the middle of one prior art implant (U.S. Patent Application Publication No. 2003/0028249 ("Baccelli")) with implants disclosed in other prior art references to meet the dimensional limitations of the claims. *In re NuVasive*, 842 F.3d at 1382–85. However, there was no dispute that Baccelli disclosed radiopaque markers in the middle of the implant, which is included within "near the middle of the implant." *See id.* The Federal Circuit, therefore, provided some meaning to the indefinite term—near the middle of the implant—but did not determine the objective boundaries of that term.[7] *Id.* at 1384.

In December 2018, Alphatec filed a petition for IPR of the asserted claims of the '156 patent, relying on the same Baccelli reference disclosing radiopaque markers in the middle of the implant to meet the requirement of having radiopaque markers extending into the sidewalls "at a position proximate to said medial plane." Doc. No. 136-1, Ex. A (IPR2019-00362, Petition) at 16, 64–67. Consistent with the Federal Circuit's understanding, the PTAB explained that "'proximate' means 'near' and that the phrase 'proximate to said medial plane' means near or approximately at the midpoint of the longitudinal length consistent with our understanding of 'longitudinal length.'" Doc. No. 288-1 (IPR2019-00362, Paper 57 [Final Written Decision]) at 20. But because Baccelli disclosed radiopaque markers in the middle of the sidewalls, the PTAB did not determine the objective boundaries of the term. *See Id.* (PTAB noting "Patent Owner

---

[6] Alphatec and its expert, Dr. Barton Sachs, applied this understanding of the Federal Circuit to the indefiniteness analysis. *See* Ex. 4 (Sachs Opening Rpt.) ¶ 334.

[7] The Federal Circuit ultimately vacated the prior judgment because it could not "'reasonably discern' the PTAB's reasoning as to motivation to combine" and thus "judicial review cannot 'meaningfully [be] achieved.'" *In re NuVasive*, 842 F.3d at 1384–85. The court "remanded for additional PTAB findings and explanations." *Id.* at 1385. But because the parties to that IPR settled, there were no further proceedings before the PTAB.

provides no arguments related to the term 'proximate' and our construction."); *see Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co. Matal*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (discussing that the PTAB and courts "need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy'").[8]

Accordingly, no tribunal has determined the scope of the term "at a position proximate to said medial plane" as used in claim 1 of the '156 patent (and its dependent claims) or whether that term is indefinite. There is also nothing in the claims, specification, or prosecution history to provide a POSA any objective boundaries for placing a radiopaque marker "at a position proximate to said medial plane" or "near the middle of the implant." *See* Doc No. 110-38; Ex. 2.

## 2. *"central region"* ('334 patent, claims 1, 16)

The PTAB invalidated claims 1–5, 10, 11, 14, 15, and 19–28 of the '334 patent as obvious in a previous IPR filed by a third party, as affirmed by the Federal Circuit. *In re NuVasive, Inc.*, 841 F.3d 966, 967–68, 975 (Fed. Cir. 2016). The PTAB invalidated claims 6–9 of the '334 patent as obvious in the IPR proceedings filed by Alphatec. Doc. No. 288-2 (IPR2019-00361, Paper 59 [Final Written Decision]) at 3–4. In both IPR proceedings, the petitioners relied on prior art (Baccelli and U.S. Patent Application Publication No. 2002/0165550 ("Frey")) that disclose radiopaque markers in the middle of the implant as disclosing the claimed radiopaque markers in the "central region" of the implant. *See In re NuVasive*, 841 F.3d at 970; Doc. No. 136-1 Ex. B (IPR2019-00361, Petition) at 117–118 ("Frey"), 154 ("Baccelli"). Accordingly, the indefinite "central region" terms were not construed because their scope was not relevant to the dispute. *See* Doc. No. 288-2 at 20; *see also Nidec*, 868 F.3d at 1017.

---

[8] Ultimately, the PTAB concluded that Baccelli's radiopaque markers in the middle of its sidewalls were not on Baccelli's "maximum lateral width extending from said first sidewall to said second sidewall along a medial plane" because it concluded that Baccelli lacks a "longitudinal length [that] is greater than said maximum lateral width." Doc. No. 288-1 at 47–51. The PTAB's error is based, in part, on its erroneous construction of "longitudinal length," which conflicts with the claim language and is currently on appeal, but this dispute does not implicate the scope of the indefinite term "at a position proximate to said medial plane."

9

1    The remaining claims asserted by NuVasive here—clams 16 and 18 of the '334

2  patent—depend from invalid claim 1.  As with the previous term, neither the claims,

3  specification, nor prosecution history define or describe the indefinite "central region"

4  terms that appear in claim 1 (as it relates to positioning the third radiopaque marker) or

5  claim 16 (as it relates to positioning the fourth radiopaque marker).  *See* Doc. No. 110-

6  48; Ex. 3.  Nor does the intrinsic record provide guidance as to how to identify the

7  "central region" to position—or to avoid positioning—radiopaque markers as claimed.

8    For example, the specification states that, "[t]he spinal fusion implant of the

9  present invention may be provided with any number of features for enhancing the

10 visualization of the implant during and/or after implantation into a spinal target site . . .

11 [that] may take the form of the spike elements used for anti-migration, which may be

12 manufactured from any of a variety of suitable materials, including but not limited to a

13 metal, ceramic, and/or polymer material, preferably having radiopaque characteristics .

14 . . [so that] when the spike elements are provided having radiodense characteristics and

15 the implant is manufactured from a radiolucent material (such as, by way of example

16 only, PEEK and/or PEKK), the spike elements will be readily observable under X-ray

17 or fluoroscopy such that a surgeon may track the progress of the implant during

18 implantation and/or the placement of the implant after implantation."  Doc. No. 110-48

19 at 2:53–3:11.  The specification states, "by way of example only," that "FIG. 20

20 illustrates an implant 10 dimensioned particularly for use in a lateral approach," and

21 that "FIG. 21 illustrates the implant 10 of FIG. 20 from a side perspective via [sic] as

22 taken via X-ray or fluoroscopy techniques, clearly showing the location of the spike

23 elements, 7, 8, 9 relative to the implant 10 and visualization apertures 4."  *Id.* at 11:58–

24 66.  Thus, the only locations shown or disclosed in the specification for the radiopaque

25 markers are in the proximal wall, the distal wall, and the middle/midline of the sidewalls

26 of the implant.  No broader "region," central or otherwise, is disclosed or described to

27 objectively determine how far from the middle of the implant the markers may be placed

28 such that they fall inside or outside the scope of the indefinite "central region" term.

### 3. "approximately 18 mm" ('334 patent, claim 18)[9]

Dependent claim 18 of the '334 patent recites an implant with a maximum lateral width of "approximately 18 mm." *Id.* at cl. 18. The specification describes an implant that "may be dimensioned, by way of example only, having a width ranging between 9 and 18 mm, a height ranging between 8 and 16 mm, and a length ranging between 25 and 44 mm." *Id.* at 2:17–21.[10] The specification further discloses an implant "having (by way of example only) a width of approximately 18 mm." *Id.* at 11:58–63. The specification and prosecution history do not otherwise define "approximately" or the limits of "approximately 18 mm" within the context of the '334 patent.

### C. NuVasive's Expert Testimony Regarding the Indefinite Terms

NuVasive offers the testimony of its expert, Dr. Jim Youssef, regarding the indefinite terms in the asserted claims of the '156 and '334 patents. As discussed below, during deposition, Dr. Youssef confirmed that the indefinite terms lack objective boundaries and meaningful claim scope.

### 1. "at a position proximate to said medial plane" ('156 patent, claim 1)

Dr. Youssef agreed with Alphatec's expert, Dr. Sachs, that "'proximate to said medial plane' means 'near said medial plane.'" Ex. 7 (Youssef Rebuttal Rpt.) ¶ 201. Dr. Youssef further opined that "the markers need not be directly on the medial plane with mathematical precision, but they do need to be near the medial plane such that the surgeon can recognize and analyze the placement of the implant." *Id.* ¶ 202. During deposition, Dr. Youssef confirmed that there is no objective standard to determine whether these markers are proximate to the medial plane:

> Q. Is there an objective boundary that one of ordinary skill in the art

---

[9] Although Alphatec did not raise the indefiniteness of "approximately 18 mm" in its invalidity contentions, a dispute regarding this claim scope arose from the conflicting testimony of Dr. Youssef as discussed below, which demonstrates that the claim scope is unclear to POSAs.

[10] These dimensions are not disclosed in the 2004 provisional application to which NuVasive claims priority.

reading the claims and reading that claim language, at a position proximate to medial planes [sic], is there an objective boundary that a person of ordinary skill in the art could look to so they would know whether the marker is located inside or outside the medial plane?

A.  I don't think there is an objective boundary. I think this is it.

\*\*\*\*

Q.  No. No. That's fine. I'm trying to determine if there is some way, some objective way, other than you looking at a particular image and determining, based on your personal opinion, that it might fall within or outside. I'm just trying to see is there an objective standard to determine whether these markers fall or are proximate to the medial plane or not. Do you think there is an objective standard that one can use?

A.  I mean it's a subjective analysis using the claim language, the understanding of the claim language, the agreed-upon terms, and for those terms that don't have a construed definition, using the ordinary meaning of those terms. And for me, that's how I came to my opinions in my report and also those that are depicted in those exhibits.

Ex. 12 at 102:3–12[11] (objections omitted), 105:6–21.  Dr. Youssef also confirmed that he did not know whether this determination would vary amongst reasonable surgeons because, according to Dr. Youssef, "I can only make opinions for myself. I can't really comment for other surgeons."  *Id.* at 88:16–23.  Finally, Dr. Youssef confirmed that determining the boundary between what falls inside and outside the scope of "at a position proximate to said medial plane" was subjective:

Q. Okay. Can you help me understand where between the location of the markers in Exhibit 9 and Exhibit 10, help me understand how you came to the conclusion that 9 is -- 9 may be proximate to the medial plane but 10, Exhibit 10, definitely is not?

A.  I didn't say "definitely," but I came to the conclusion because one is further away from the medial plane than the other.

Q.  Okay. Is there some position between the two that might be the boundary?

A.  I think it's subjective.

Q.  You think it's subjective?  Is that what you said, Doctor?

A. I did.

*Id.* at 106:6–22 (objections omitted); Ex. 18 (Youssef Dep. Ex. 9); Ex. 19 (Youssef

---

[11]  Dr. Youssef's full testimony regarding the '156 patent claim term "at a position proximate to said medial plane" is contained in Ex. 12.

Dep. Ex. 10).

## 2.   "central region" ('334 patent, claims 1, 16)

For claim 1 of the '334 patent, Dr. Youssef opined that a POSA "would have no difficulty interpreting terms of approximation such as 'central region.'"  Ex. 7 ¶ 196. During deposition, however, Dr. Youssef confirmed that "it's hard to know" how close to the ends of the implant a POSA would need to place the radiopaque markers to position them outside the claimed "central region":

> Q. Okay. So with respect to the circle you've drawn here defining the central region, if you move the markers on the Alphatec Battalion Lateral Spacer that's depicted here so that they fall outside of the blue circle that you've drawn, would those be outside the central region?
>
> A.  No. Because as I said, my blue marker, my blue circle is just a depiction in static.  It could be moved and adjusted to still meet the limitations of the claim and still account for the central region.  So really to get a marker outside the boundary of the central region as defined by claim 1D would be pretty tough.  I think you'd have to put them closer to the proximal and distal walls to get them there.
>
> Q.  How close would you have to put them to the proximal and distal walls to get them out of the central region?
>
> A.  Well, it's hard to know.  One would ask, why would you put them there.  It wouldn't make a lot of sense. So there wouldn't be really a suitable alternative to the claims and the embodiments seen within these implants.  So I think that -- I don't have an answer for you. I don't know exactly how far out but much closer to the proximal distal wall than the circle that's shown on these drawings.

Ex. 13[12]  at 54:10–55:14 (objections omitted).  Dr. Youssef also confirmed there is no objective standard to determine the scope of the claimed "central region":

> Q.  And so how -- so we just walked through a number of iterations of implants together before we reached the bounds of what you considered to be the bounds of the claimed central region. So my question to you is, as a person of ordinary skill in the art, can you explain to me some objective standard that I could have used, without the benefit of speaking directly to you, where I could have determined how to design the implant so that the markers fall outside the central region?
>
> A. You, as a patent attorney, or you as a layperson? Or when you say you –
>
> Q. Me, as an engineer, an engineer or another surgeon who is designing

---

[12] Dr. Youssef's full testimony regarding '334 patent claim term "central region" is contained in Ex. 13.

the implant.

A. The process requires that you look at any prior art, you determine what's claimed in that claim language and that's in the prior art, and that you determine whether or not you can apply some sort of new invention, some sort of new location for the placement of these markers that don't infringe on the claimed language and that have a practical application. I don't think this should be taken in some sort of random hypothetical about "Well, great, I have my markers here, and now they are outside the claim language, and I want to create an implant like this." That, to me, makes no sense whatsoever. **So I don't know that there is objective. It's more subjective; right? I don't have a mathematical formula or, you know, a measuring device that could allow you to, you know, identify that boundary. I think you have to be somewhat subjective in recognizing that that is truly within the scope of claim language as it's defined which is including the maximum lateral width needs to be one criteria, and that goes from sidewall to sidewall. And as you draw that general central region, it should be inclusive of that one limitation.**

*Id.* at 79:7–80:20.

### 3. "approximately 18 mm" ('334 patent, claim 18)

Claim 18 of the '334 patent requires the implant to have a maximum lateral width of "approximately 18 mm." In his Opening Report served on November 20, 2020, Dr. Youssef opined that versions of Alphatec's Battalion™ Lateral Spacer and Transcend™ LIF PEEK Spacer having a width of 22 mm infringe claim 18 of the '334 patent because 22 mm wide "is approximately 18 mm." Ex. 8 (Ex. D to Youssef Opening Rpt.) at 68–73; *see also* Ex. 9 (Ex. E to Youssef Opening Rpt.) at 63 (accusing "all versions of the Transcend™ LIF PEEK having a width of . . . 22 mm); *see* Ex. 6 ¶ 267. Then, days before his deposition, on January 8, 2021, Dr. Youssef changed his opinion, deleting citations and references to the 22 mm Battalion™ Lateral Spacer as an accused instrumentality, but continuing to accuse the 22 mm Transcend™ LIF PEEK Spacer of infringing claim 18. Ex. 10 (Corrected (Redline) Ex. D to Youssef Opening Rpt.) at 68–73; Ex. 11 (Corrected (Redline) Ex. E to Youssef Opening Rpt.) at 63 (continuing to accuse the 22 mm Transcend™ implants of infringing claim 18 of the '334 patent).[13]

During his deposition, Dr. Youssef was asked why he changed his opinions as to

---

[13] A few days after Dr. Youssef's deposition, NuVasive's counsel confirmed that it no longer accuses any Alphatec 22 mm implants of infringing claim 18 of the '334 patent.

whether "approximately 18 mm" includes 22 mm wide implants.  Ex. 14[14] at 18:2–17.

Dr. Youssef testified that he changed his opinion to "remove" that "a 22 mm implant could infringe this claim 18 of the '334 patent," (Ex. 14 at 19:22–20:2), but added that "I think [the 22 mm implant] could [infringe the claim], I think, because of the word 'approximate' or 'approximately.' I guess, to be more specific." *Id.* at 20:3–10; *see also id.* at 29:12–16 (testifying that he is still accusing certain Battalion™ implants having a width of 22 mm as infringing claim 18 of the '334 patent).  Upon further questioning regarding the scope of the term "approximately 18 mm," Dr. Youssef responded that the term is "hard to define."  *Id.* at 35:25–36:16.  And when asked what width sizes would fall inside claim 18 of the '334 patent, Dr. Youssef testified: "I don't have an exact mathematical number for you because that's not how the claim language reads." *Id.* at 41:17–42:3.  Ultimately, Dr. Youssef was unable to explain the metes and bounds of the claim:

> Q. "Approximate" is the claim language. "Close to" is not the claim language. So is a 16 millimeter wide implant approximately 18 millimeters within --
>
> ***
>
> Q. -- as you understand it within the context of claim 18?
>
> ***
>
> A: I think that approximately 18 millimeters is -- has some subjectivity within it. No question. And the reality is that approximately 18 millimeters has chosen also a very specific number of 18 millimeters. And 17.5 --what your range is on either side of that 18 millimeters, 18.5, 22, the 16, those are ranges that, I think, could fall in the scope, and I think you'd have to be prepared to defend yourself if you decided to use that as your design-around. That's my answer.

*Id.* at 45:3–46:3 (objections and counsel's discussion omitted).

## III.   LEGAL STANDARDS

### A.   Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no

---

[14] Dr. Youssef's full testimony regarding the '334 patent claim term "approximately 18 mm" is contained in Ex. 14.

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden to show that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must construe all facts in a light most favorable to the non-moving party and draw reasonable inferences in that party's favor, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), but it should grant summary judgment when a claim or defense is factually unsupported, *Celotex*, 477 U.S. at 323–24, or when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," *Matsushita Elec. Inds. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### B.   Indefiniteness

According to the Supreme Court, indefiniteness "must be proved by 'clear and convincing evidence,'" but "this presumption of validity does not alter the degree of clarity that § 112, ¶ 2 demands from patent applicants." *Nautilus*, 572 U.S. at 912 n.10. "The Patent Act requires that a patent specification 'conclude with one or more claims *particularly pointing out and distinctly claiming* the subject matter which the applicant regards as [the] invention.'" *Id.* at 901. "[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Id.*; *see also id.* at 908 ("Patent claims . . . should be construed from an objective perspective of a [skilled artisan], based on what the applicant actually claimed, disclosed, and stated during the application process."). "Congress has enacted patent laws rewarding inventors with a limited monopoly. . . . [A]nd like any property right, its boundaries should be clear." *Id.* at 901–02 (internal quotations omitted).

"[A] patent must be precise enough to afford clear notice of what is claimed, thereby appris[ing] the public of what is still open to them." *Id.* at 909 (internal quotations omitted). "Otherwise there would be [a] zone of uncertainty which enterprise and experimentation may enter only at the risk of infringement claims." *Id.* at 909–10 (internal quotations omitted). "And absent a meaningful definiteness check

16

. . . patent applicants face powerful incentives to inject ambiguity into their claims." *Id.* at 910. "The definiteness requirement, so understood, mandates clarity, while recognizing that absolute precision is unattainable." *Id.* Nevertheless, there must be no more than a "modicum of uncertainty." *See id.* at 909. "It cannot be sufficient that a court can ascribe **some** meaning to a patent's claims." *Id.* at 911.

"The Supreme Court has repeatedly emphasized why the definiteness requirement demands clear notice of what is being claimed." *HZNP Medicines LLC v. Actavis Labs. UT, Inc.*, 940 F.3d 680, 694 (Fed. Cir. 2019). "A patent holder should know what he owns, and the public should know what he does not." *HZNP Medicines*, 940 F.3d at 694; *see also Prolifiq*, 2014 WL 3870016, at *6 ("[A] person skilled in the art must know not only what falls inside the scope of the claim term, but also what falls outside of it."). Thus, the indefiniteness requirement "guard[s] against unreasonable advantages to the patentee and disadvantages to others arising from uncertainty." *HZNP Medicines*, 940 F.3d at 694–95.

For that reason, "[t]he claims, when read in light of the specification and the prosecution history, must provide **objective boundaries** for those of skill in the art." *Interval Licensing*, 766 F.3d at 1371; *Dow Chem. Co. v. Nova Chems. Corp. (Canada)*, 803 F.3d 620, 630–31 (Fed. Cir. 2015) (same). Claims are indefinite "if the claim language might mean several different things and no informed and confident choice is available among the contending definitions." *Interval Licensing*, 766 F.3d at 1371 (internal quotations omitted). Indeed, "[t]he fact that [the patent holder] can articulate a definition supported by the specification . . . does not end the inquiry." *Id.* As the Federal Circuit explained, "a term of degree fails to provide sufficient notice of its scope if it depends on the unpredictable vagaries of any one person's opinion." *Id.* (internal quotations omitted); *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1364 (Fed. Cir. 2018) ("Our case law is clear that the objective boundaries requirement applies to terms of degree."). Moreover, according to the Federal Circuit, "[t]he scope of claim language cannot depend solely on the unrestrained, subjective opinion of a particular individual

17

purportedly practicing the invention." *Datamize*, 417 F.3d at 1350; *Prolifiq*, 2014 WL 3870016, *5 (N.D. Cal. Aug. 6, 2014) (finding *Datamize* instructive post-*Nautilus*). Thus, it is "not enough . . . to identify '**some standard** for measuring the scope of the phrase.'" *Interval Licensing*, 766 F.3d at 1370–71.

"Even if a claim term's definition can be reduced to words, the claim is still indefinite if a person of ordinary skill in the art cannot translate the definition into meaningfully precise claim scope." *Id.* at 1371. And "courts may not redraft claims, whether to make them operable or to sustain their validity." *Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004). Thus, courts may not accept invitations to "inject new or different requirements into claim terms—effectively a second-chance claim construction—to save . . . claims from indefiniteness." *Dominion Assets LLC v. Masimo Corp.*, No. 14-CV-03002-BLF, 2017 WL 10592326, at *5 (N.D. Cal. Jan. 20, 2017).

## IV.   THE ASSERTED CLAIMS ARE INDEFINITE

### A.   "At A Position Proximate to Said Medial Plane" Lacks Objective Boundaries (All Asserted Claims of the '156 Patent)

Independent claim 1 of the '156 patent recites an implant with "a maximum lateral width extending from said first sidewall to said second sidewall along a medial plane." Doc. No. 110-38 at cl. 1. It also requires the implant's first and second radiopaque markers extend into the sidewalls "at a position **proximate to** said medial plane." *Id.* Nothing in the claims, specification, or sworn testimony of the parties' experts tells a POSA what the limits of "proximate to" are or any standard for measuring whether a marker is or is not "at a position proximate to said medial plane." All asserted claims of the '156 patent include this indefinite term and are invalid.

It is undisputed that the term "at a position proximate to said medial plane" is not defined in the claims, specification, or prosecution history. *See* Doc. No. 110-38; Ex. 2. The '156 patent specification illustrates implants having radiopaque spikes in the middle of the sidewalls. Doc. No. 110-38 at 6–8 (Figs. 2–4). And it describes these

18

spikes as a "central spike element" (*Id.* at 11:54–58) that is "disposed within the central region of the implant," (*id.* at 6:27–32), without defining the "central region." The prosecution history does not address these spikes. *See* Ex. 2. In other words, the intrinsic record does not illustrate or describe any radiopaque spikes located in a "central region" of the implant that are not positioned directly in the middle of the sidewalls of the implant. NuVasive could have limited the claims to what is disclosed in the specification—implants having radiopaque markers in the middle—but chose not to. Instead, the applicants chose to claim radiopaque markers extending into the sidewalls "at a position **proximate to** said medial plane." *See Nautilus*, 572 U.S. at 910 (discussing that the "patent system fosters 'an incentive to be as vague and ambiguous as you can with your claims' and 'defer clarity at all costs'" but that "[e]liminating that temptation is in order, and 'the patent drafter is in the best position to resolve the ambiguity in . . . patent claims'").

In this deficient context, the PTAB observed that "the term **'proximate' means 'near'** and that the phrase 'proximate to said medial plane' means **near** or approximately at **the midpoint** of the longitudinal length consistent with our understanding of 'longitudinal length.'" Doc. No. 288-1 at 20. As did Dr. Sachs. Ex. 4 ¶ 334. Dr. Youssef reaches a similar conclusion—opining that "proximate to" means "close to." Ex. 12 at 88:5–9 ("Proximate means close to, ordinary plain English language.").

The various meanings assigned to the claim term—*e.g.*, "near" or "close to said medial plane"—suffer from the same deficiencies as the term itself. Like the term, the definitions are subjective and lack objective boundaries that define the scope of the term with any reasonable certainty. *See* Ex. 12 at 93:6–14 (testifying "close to is a relative term and has some subjectivity to it"); *see also Interval Licensing*, 766 F.3d at 1370–71. In view of the specification, it is undisputed that a POSA is left guessing how "proximate" the claimed radiopaque markers can be to the medial plane to infringe or not infringe the asserted claims. *RideApp, Inc. v. Lyft, Inc.*, No. 18-CV-07152-JST,

2019 WL 7834175, at *11 (N.D. Cal. Oct. 16, 2019) ("proximity" term in means-plus-function claim indefinite where "specification is silent on how proximity is to be calculated"); *see also* Ex. 4 ¶ 334 ("Is 'proximate' 1 mm, 2 mm, a percentage of the overall length, or some other measurement?").

Since there is no standard of measurement or objective boundary disclosed in the intrinsic evidence, the claim scope is left entirely to the "unpredictable vagaries of any one person's opinion." *Interval Licensing*, 766 F.3d at 1371 ("'purely subjective' claim phrase" indefinite where written description lacked sufficient guidance to provide objective boundaries); *see also Prolifiq*, 2014 WL 3870016, at *7–8 ("differently versioned" indefinite because its subjective boundaries "leav[e] the scope of the claims in a zone of uncertainty"); *In re Neurografix ('360) Patent Litig.*, 201 F. Supp. 3d 206, 223 (D. Mass. 2016) (finding "near" indefinite "[b]ecause nothing in the [asserted] patent shed[] light on the limits of proximity required by the" term).  Dr. Youssef's sworn testimony confirms this.  He testified that assessing whether a radiopaque marker is in fact "at a position proximate to said the medial plane" is "a subjective analysis" (Ex. 12 at 105:6–21) and "a subjective question" (*id.* at 96:2–16); that he did not know whether the determination would "differ amongst reasonable surgeons" (*id.* at 88:5–23; *see also id.* at 104:1–105:5); that he did not "have a number" he could give to define the objective boundary (*id.* at 90:4–16); that he "feel[s] like proximate to the medial plane means close to the medial plane" and therefore he would "rather err on inclusivity than exclusivity" in determining whether something falls within its scope (*id.* at 92:22–93:5); that "close to is a relative term and has some subjectivity to it" (*id.* at 93:6–14); that he did not "know the distance" that fell outside proximate to the medial plane (*id.* at 97:4–25); that there is no "objective boundary that a person of ordinary skill in the art could look to so they would know whether the marker is located inside or outside the medial plane" (*id.* at 102:3–12); and that defining "proximate to the medial plane" is "subjective." *Id.* at 106:6–22.

Further, in his expert report, Dr. Youssef identified, using green and blue circles,

examples of areas on an implant where a radiopaque marker would be "at a position proximate to said medial plane." Ex. 23 (Youssef Dep. Ex. 15) at 34–37; Ex. 12 at 99:19–100:17. But Dr. Youssef could not provide any objective standard that a POSA could use to draw these boundaries (which differ in size and location). Ex. 12 at 100:12–102:12. He also testified that one could "enlarge the circles" to capture more area, (*id.* at 99:19–100:10), but refused to take a position on whether a radiopaque marker outside these exemplary areas would infringe the claim. *E.g.*, *id.* at 94:10–24, 96:2–97:25. When shown a series of annotated images of Figure 3 of the '156 patent (below) with alternative positions for radiopaque markers (in red), Dr. Youssef was unable to provide any objective reason as to why the markers in Images 1, 2, and 3 fell inside the scope of term, but the markers in Image 4 fell outside the scope. *Id.* at 88:25–91:16, 102:14–103:25, 105:22–106:18.



**IMAGE 1**
Ex. 16 (Dep. Ex. 7)

**IMAGE 2**
Ex. 17 (Dep. Ex. 8)

**IMAGE 3**
Ex. 18 (Dep. Ex. 9)

**IMAGE 4**
Ex. 19 (Dep. Ex. 10)

Despite being unable to discern the scope of the term using any objective criteria, Dr. Youssef's report nevertheless maintains that "[a] POSA reading the '156 patent would understand that the radiopaque markers proximate to, or near, the medial plane allow a surgeon to confirm proper placement of an implant that is inserted via a lateral, trans-psoas lumbar fusion procedure." Ex. 7 ¶ 202; *see also id.* ¶ 200 (stating this is a

function and benefit of the invention).   Dr. Youssef's opinion impermissibly injects additional requirements (*e.g.*, "lateral, trans-psoas") into the claims.[15]   *See Dominion Assets*, 2017 WL 10592326, at *5.  But even if he is permitted to do so, it does not change the result.  While the patent describes using radiopaque markers to enhance visualization generally, it does not mention using radiopaque markers "at a position ***proximate to*** said medial plane" to confirm the position of the implant, nor does it provide any guidance as to how one could objectively determine where to place radiopaque markers "at a position proximate to said medial plane" and still confirm the position of the implant.  Doc. No. 110-38 at 11:48–12:11[16]; *see GE Lighting Sols., LLC v. Lights of Am., Inc.*, 663 F. App'x 938, 941 (Fed. Cir. 2016) ("Those general descriptions hardly provide the necessary 'objective boundaries' about the length or shape of an 'elongated' core.").  In any case, as discussed above, even accepting the touted functions and benefits of the purported invention, Dr. Youssef testified that for the disputed term, "I don't think there is an objective boundary," (Ex. 12 at 102:3–12), instead "I think it's subjective."  *Id.* at 106:15–18.  Dr. Youssef's testimony thus confirms, "[c]ompetitors trying to practice the invention or to design around it would be unable to discern the bounds of the invention." *Honeywell Int'l, Inc. v. Int'l Trade Comm'n*, 341 F.3d 1332, 1341 (Fed. Cir. 2003); *HZNP Medicines*, 940 F.3d at 694 ("A patent holder should know what he owns, and the public should know what he does not.").

Courts consistently invalidate similarly unbounded terms depending on the

---

[15]  Dr. Youssef suggests, for example, that claim 1 of the '156 patent is limited to implants inserted "via a lateral, trans-psoas lumbar fusion procedure." *See* Ex. 7 ¶ 202. The claims are not so limited.  Doc. No. 110-38 at 5:29–35 ("The implant 10 is particularly suited for introduction into the disc space via a lateral (trans-psoas) approach to the spine, but may be introduced in any of a variety of approaches, such as posterior, anterior, antero-lateral, and postero-lateral, without departing from the scope of the present invention (depending upon the sizing of the implant 10)."); *see also id.* at cl. 1 (requiring merely the "longitudinal length" of the implant to be greater than the "maximum lateral width."); *see also id.* at 11:48–54 (disclosing longer-than-wide implants for insertion from a posterior approach).
[16]  These disclosures were added to the application filed in March 2005.

context of the intrinsic record.  For example, in *Abdou v. Alphatec Spine, Inc.*, another court in this district held the claim term "in proximity to the first vertebral bone" to be indefinite.  No. 12-CV-1804-BEN-RBB, 2014 WL 6611422, at *7–10 (S.D. Cal. Nov. 19, 2014).  There, the asserted patent covered a method to conduct spine surgery that required identifying a target location within the spine that was "in proximity to a first vertebral bone."  *Id*. at *8 (emphasis removed).  The patentee argued that the practical application of the asserted claims sufficiently defined the scope of the invention.  *See id.* at *8–9.  The court agreed with the patentee that the challenged term was "limited by the necessity that the surgical site be accurately targeted."  *Id*. at *9.  Yet, the court still found the claim term to be indefinite in the context of that patent, even though the practical application ascribed some meaning to it: "[t]he limitation of accurately targeting the surgical site provides some guidance, but because nothing in the claims or specification tells a person of ordinary skill in the art what the . . . proximity should be to accurately target the surgical site, it is not sufficient under the [*Nautilus*] standard." *Id*.  "The 'in proximity to' language . . . does not state with reasonable certainty what that proximity is.  Absolute precision is not necessary, but some objective boundaries are required." *Id*.

Similarly, in *Dominion Assets*, the court construed the claim term "continuous spectrum" to mean "every wavelength within a range, or a large number of closely-spaced discrete wavelengths within the range."  2017 WL 10592326, at *4.  But the court ultimately held that the claim was invalid because "'large' and 'closely-spaced' do not have sufficient objective boundaries to save the claims from indefiniteness." *Id*. at *5.  The asserted patents in *Dominion Assets* related to "methods for non-invasively measuring the concentration of blood components using radiation."  *Id*. at *1.  The patentee argued that "large" and "closely-spaced" were not indefinite because a POSA would understand them to be "a sufficient amount to provide a 'mathematically complete description' under sampling theory."  *Id*. at *5.  The court rejected this notion, observing, "[t]he written description says nothing about a mathematically complete

description, or gives any indication that its reference to 'a large number of closely-spaced discrete wavelengths within a range' . . . is tied to this concept.  As such, 'large' and 'closely-spaced' do not require this gloss." *Id*.  But further, the court added that even if it were to accept this practical application, that would not make the claims definite: "The specification contains a single example of what would constitute a 'large' and 'closely-spaced' number of discrete wavelengths in a range . . . .  From this disclosure, a skilled artisan would know that 93-140 wavelengths is a 'large' number, and an interval within 10-15 nm is 'closely-spaced.'  However, this gives no indication of what point a set of discrete wavelengths stops being 'large' or 'closely-spaced.'  Is it 92 wavelengths? 9 wavelengths?  The claims, written description, and prosecution history provide no indication . . . .  As such the skilled artisan is left to 'consult the unpredictable vagaries of any one person's opinion.'"  *Id*.

And in *Advanced Aerospace Techs., Inc. v. United States*, the court held that the claim term "near the point of engagement" was indefinite.  124 Fed. Cl. 282, 292 (2015).  The patent at issue related to a launch and recovery system for unmanned aerial vehicles.  *Id*. at 286.  The court recognized that the term "near" had been held definite in other cases post-*Nautilus*, but observed that "just because a certain claim term is definite in the context of a different patent does not necessarily mean that it is here."  *Id*. at 291–92.  The court noted that "near" had been held definite in those prior cases because those specifications provided sufficient detail to allow the POSA to understand the claim scope, or because "an industry convention" provided "'strong evidence that the specification and claims apprise a [POSA] with reasonable certainty' of the scope of the term."  *Id*.  The court held, in contrast, that the patent at issue did not provide the same specificity in its specification and failed to include a "reasonably certain standard for measuring when the sensors are 'near' the point of engagement [or] examples of when the sensors would not be considered 'near.'"  *Id*. at 292.  There was also "no evidence" about "an industry convention that defines what 'near' would mean" to a POSA.  *Id*.  "As such, there was no context for a person of ordinary skill in the art to

understand the scope of the disputed term with 'reasonable certainty'" and the claim term was found indefinite.  *Id*.  The same is true here.  As Dr. Youssef's testimony confirms, the intrinsic record of the '156 patent fails to provide sufficient detail to allow a POSA to understand the scope of "at a position proximate to said medial plane."

Given the undisputed evidence in this case—including the testimony of NuVasive's expert—there is no genuine dispute of material fact that the '156 patent claims, specification, and prosecution history fail to provide any objective boundaries for a POSA to determine what falls inside and outside the scope of "at a position proximate to said medial plane."  Accordingly, NuVasive has no evidence to present to the jury on this issue, and claim 1 of the '156 patent, and all asserted dependent claims, are invalid as indefinite.

**B.    The Claimed "Central Region" Lacks Objective Boundaries (All Asserted Claims of the '334 Patent)**

All asserted claims of the '334 patent require an implant that has a "central region."  The "central region," as claim 1 recites, "includes portions of the first and second sidewalls positioned generally centrally between the proximal wall and the distal wall" and "at least a portion of the central region defining a maximum lateral width of said implant."  Doc. No. 110-48 at cl. 1.  Claim 1 requires the implant to have a third radiopaque marker "at least partially positioned in said central region," and claim 16 further requires the implant to have a fourth radiopaque marker "positioned in said central region."  *Id.* at cl. 1, cl. 16.  This term is indefinite for the same reasons discussed above regarding the term "at a position proximate to said medial plane" in the '156 patent.  Again, nothing in the claims, specification, prosecution history, or sworn testimony of the parties' experts tells a POSA what the limits of the claimed "central region" are, or any standard for measuring whether a marker is or is not in the "central region."  Accordingly, asserted claims 16 and 18 of the '334 patent are invalid because each includes this indefinite term by virtue of their dependence on claim 1.

As discussed above, the '156 and '334 patents share a specification and although

25

they mention the "central region" of the implant, none defines it or its objective boundaries. *See Id.* at 6:27–32 (describing "a pair of spike elements 9 disposed within the central region of the implant"), 11:54–58 (describing an embodiment that has "no central spike element"). The '334 patent prosecution history similarly does not address the "central region" term. *See* Ex. 3. Like with the '156 patent, although the '334 patent illustrates implants having radiopaque spikes located directly in the middle of the sidewalls, (Doc. No. 110-48 at 6–8 (Figs. 2–4)), the patent applicants did not limit their claims to what is disclosed. Instead, the claims require third and fourth radiopaque markers in the "central region," which Dr. Youssef, again, confirmed lacks objective boundaries.

Dr. Youssef testified under oath that the scope of the disputed term is "subjective" and cannot be measured or determined objectively. He described the "central region" as "the area in the ***approximate center portion*** of the implant between the proximal wall and the distal wall." Ex. 13 at 47:10–13; Ex. 15 (Youssef Dep. Ex. 6) at 31. But when asked for the standard or objective boundaries of the "central region," Dr. Youssef testified that it was not determined "out of any mathematical formula," that it could "be expanded either to the left or the right to the proximal or distal wall respectively," and that it "***could*** go all the way out***,*** you know, to most of those apertures, just the general central region as long as it includes the maximum lateral width." Ex. 13 at 51:13–52:14. Using Figure 3 of the '334 patent, Dr. Youssef further confirmed that the "central region" lacks objective boundaries: "if I was to draw circles around the central region . . . then I would say that ***my*** general central region would go all the way out to close to that boundary of 31. . . . So it ***might include*** where the number is 14 on the bottom. It ***might include*** where the number 18 is on the bottom. 31 gets a little further out. So, you know, I think the general central region . . . has ***a lot of real estate***." *Id.* at 63:24–64:18.

1
2
3
4
5
6
7
8



**FIG. 3**                                      <u>10</u>

9

Doc. No. 110-48 at Fig. 3.

10          Dr. Youssef was next asked how a POSA could position the third and fourth

11   radiopaque markers recited in claims 1 and 16 such that they fall outside the "central

12   region."  Dr. Youssef testified that a radiopaque marker placed **outside** the blue circle

13   he used to mark a "central region" in one of his reports (Ex. 15 at 31) still infringes and

14   is inside the "central region" because "my blue circle is just a depiction in static.  It

15   could be moved and adjusted to still meet the limitations of the claim and still account

16   for the central region.  So really to get a marker outside the boundary of the central

17   region as defined by claim 1D would be pretty tough.  I think you'd have to put them

18   closer to the proximal and distal walls to get them there."  Ex. 13 at 54:10–25.  When

19   asked how close to the proximal and distal walls you would have to put the markers to

20   get them out of the central region, he testified, "[w]ell, **it's hard to know**. . . . **I don't**

21   **have an answer for you**.  I don't know exactly how far out but much closer to the

22   proximal [and] distal wall than the circle that's shown in these drawings." *Id.* at 55:2–

23   14; *see also id.* at 56:10–21 (markers would "have to be pretty far over for them to be

24   outside the central region"); 56:22–57:25 (markers would "probably" have to be "closer

25   to the markers that are in the distal and proximal walls" to not read on the claims of the

26   '334 patent); 77:15–78:11 ("So I have a hard time just saying, well, these are within or

27   . . . outside the confines of the claim language without having some understanding of

28

why you would put them there.").  Dr. Youssef's testimony was the same when presented with a series of annotated images of Figure 3 of the '334 patent (below) showing alternative positions for the third and fourth radiopaque markers (in red). When asked whether those markers fall within the "central region," Dr. Youssef confirmed that the markers in Images 1–6 would infringe claims 1 and 16, but the markers in Image 7 would not. *Id.* at 55:15–56:7, 67:3–13, 67:23–68:20, 69:25–71:6, 71:7–72:1, 74:4–78:11, 78:12–79:6.



**IMAGE 1**
Ex. 16 (Dep. Ex. 7)

**IMAGE 2**
Ex. 17 (Dep. Ex. 8)

**IMAGE 3**
Ex. 18 (Dep. Ex. 9)

**IMAGE 4**
Ex. 19 (Dep. Ex. 10)

**IMAGE 5**
Ex. 20 (Dep. Ex. 11)

**IMAGE 6**
Ex. 21 (Dep. Ex. 12)

**IMAGE 7**
Ex. 22 (Dep. Ex. 13)

Critically, however, Dr. Youssef was unable to provide any objective reason why the markers shown in Image 7 are outside the "central region," confirming that his analysis is "subjective": "So I don't know that there is objective.  It's more subjective;

28

right? I don't have a mathematical formula or, you know, a measuring device that could allow you to, you know, identify that boundary. I think you have to be somewhat subjective in recognizing that that is truly within the scope of claim language as it's defined which is including the maximum lateral width needs to be one criteria, and that goes from sidewall to sidewall. And as you draw that general central region, it should be inclusive of that one limitation." Ex. 13 at 78:19–80:20. When asked whether "another designer might draw the circle [defining the central region] in a different place," Dr. Youssef admitted, "I have no idea. I'm not a mind reader." *Id.* at 68:17–20. Dr. Youssef ultimately resorted to "[b]ecause I'm telling you" as his justification for whether a radiopaque marker fell within the scope of the claim. *Id.* at 60:1–10.

As with the indefinite term "at a position proximate to said medial plane" in claim 1 of the '156 patent, Dr. Youssef attempts to save the "central region" term from indefiniteness by citing to an unclaimed "practical application." *Id.* at 55:24–57:25; *see also id*. at 53:1–54:9, 72:2–23. However, for the same reasons discussed above, these additional requirements cannot be imported into the claims and do not change the analysis. *See Dominion Assets*, 2017 WL 10592326, at *5. Indeed, Dr. Youssef testified that an implant having "structural features" that make it "impractical or otherwise less desirable for its intended purpose"—*e.g.*, third and fourth radiopaque markers in a "central region" that he deems to have limited "practical application"— would still fall within the scope of claim 1 of the '334 patent. Ex. 13 at 76:4–17.

Dr. Youssef's sworn testimony confirms that POSAs reading the claims and specification cannot "determine[e] the scope of the ["central region"] with reasonable certainty." *See Dominion Assets*, 2017 WL 10592326, at *6; *see also Advanced Aerospace*, 124 Fed. Cl. at 293 (finding the term "outboard portion" indefinite because "[e]ven if . . . a skilled artisan would understand that the 'ideal' hook placement on the 'outboard portion' of an aircraft wing is 'as close to the wing as possible,' the intrinsic evidence contains no guidance that would inform a skilled artisan, with reasonable certainty, as to where the 'outboard portion' begins and ends"); *id.* at 299–300 (finding

the term "inboard point" indefinite because the specification "provides no reference point . . . for distinguishing an 'inboard' portion from an 'outboard' portion of the wing"); *Interval Licensing*, 766 F.3d at 1371, 1374; *Abdou*, 2014 WL 6611422, at *9.

Dr. Youssef's testimony also confirms that POSAs are "unable to discern the bounds of the invention" such that they could design around the claims and improve upon the invention. *Honeywell*, 341 F.3d at 1341; *Ave. Innovations, Inc. v. E. Mishan & Sons Inc.*, 310 F. Supp. 3d 457, 464 (S.D.N.Y. 2018), *aff'd*, 829 F. App'x 529 (Fed. Cir. 2020) (claims indefinite because "a person skilled in the art . . . would still lack adequate notice of the parameters of the patentee's rights"). As a result, "[c]ompetitors trying to practice the invention or to design around it would be unable to discern the bounds of the invention." *Honeywell*, 341 F.3d at 1341; *see also HZNP Medicines*, 940 F.3d at 694. This is impermissible. *See Interval Licensing*, 766 F.3d at 1370 ("The definiteness standard 'must allow for a modicum of uncertainty' to provide incentives for innovation, but must also require '***clear notice*** of what is claimed, thereby appris[ing] the public of what is still open to them.'").

As with the previous term, the undisputed evidence—including the testimony of NuVasive's expert—demonstrates there is no genuine dispute of material fact that the '334 patent claims, specification, and prosecution history fail to provide any "informed and confident choice" or objective boundaries for a POSA to determine what falls inside and outside the scope of the "central region," which is a "highly subjective" determination. *See id.* at 1371. Accordingly, NuVasive has no evidence to present to the jury on this issue and claims 1, 16, and 18 are invalid as indefinite.

## C. "Approximately 18 mm" Lacks Objective Boundaries (Claim 18 of the '334 Patent)

Claim 18 of the '334 patent suffers from the same fatal flaws as the claims above: aside from describing one exemplary implant that has a width of "approximately 18 mm" in the specification, (Doc. No. 110-48 at 11:58–63), the intrinsic record is

otherwise devoid of any guidance on the scope of this term. *See id.*; Ex. 3. As discussed below, Dr. Youssef's opinions and testimony confirm there is not a "precise enough" scope in the context of the '334 patent "to afford clear notice of what is claimed." *Nautilus*, 572 U.S. at 909. Accordingly, the term "approximately 18 mm" is indefinite and claim 18 is invalid for this additional reason.

Dr. Youssef has testified under oath that the scope of "approximately 18 mm" in the context of claim 18 of the '334 patent is unclear. On November 20, 2020, Dr. Youssef opined that 22 mm was "approximately 18 mm." Ex. 8 at 69; *see also* Ex. 9 at 63 (accusing "all versions of the Transcend™ LIF PEEK having a width of . . . 22 mm"); *see* Ex. 6 ¶ 267. Days before his deposition, Dr. Youssef changed his opinion to remove references to 22-mm implants as infringing claim 18. *See* Ex. 10 at 68–73. At his deposition, Dr. Youssef confirmed that "approximately 18 mm" within the scope of claim 18 of the '334 patent lacks objective boundaries:

> I think that approximately 18 millimeters is -- has some **subjectivity within it. No question**. And the reality is that approximately 18 millimeters has chosen also a very specific number of 18 millimeters. **And 17.5** -- what your range is on either side of that 18 millimeters, **18.5, 22, the 16, those are ranges that, I think, could fall in the scope, and I think you'd have to be prepared to defend yourself** if you decided to use that as your design-around.

Ex. 14 at 45:3–46:3. Dr. Youssef's testimony confirms that he, as well as other POSAs, can reasonably consider the identical width—22 mm—to be both inside and outside the scope of "approximately 18 mm" within the context of the '334 patent. This demonstrates that the scope of "approximately 18 mm" in the '334 patent is unclear to POSAs like himself.

Even setting aside Dr. Youssef's inability to provide an objective standard for this term, because "approximately" is a term of degree and Dr. Youssef has confirmed that its scope is subjective and not supported by the intrinsic record of the '334 patent, it is indefinite. As the Federal Circuit has stated for terms of degree, "[a]lthough absolute or mathematical precision is not required, it is not enough, as some of the

language in our prior cases may have suggested, to identify '*some standard* for measuring the scope of the phrase.'" *Interval Licensing*, 766 F.3d at 1370–71.  Instead, "a term of degree fails to provide sufficient notice of its scope if it depends 'on the unpredictable vagaries of any one person's opinion.'" *Id.* at 1371.

As Dr. Youssef confirmed, the '334 patent offers no standard or any "disclosure of acceptable ranges" for "approximately 18 mm."  *Dominion Assets*, 2017 WL 10592326, at \*5; *see generally* Doc. No. 110-48 (reciting "approximately" but failing to provide any guidance on its scope).  Consequently, the term is subjective—a point confirmed by Dr. Youssef's inconsistent opinions (*e.g.*, that 22 mm is both inside and outside the claim scope) and inability to articulate any objective, reproducible boundaries.  *See* Ex. 14 at 43:10–44:5; *see also id.* at 45:3–46:3 ("No question" that "approximately 18 millimeters . . . has some *subjectivity* within it"); *see, e.g.*, *Neurografix*, 201 F. Supp. 3d at 222–223 (because nothing in the patent "shed[] light on the limits of proximity required by the 'near' term," which is "susceptible to subjective interpretation," the term is indefinite as a matter of law); *Advanced Aerospace*, 124 Fed. Cl. at 292 (finding "near the point of engagement" indefinite because there was "no reasonably certain standard" for evaluating "near"); *Abdou*, 2014 WL 6611422, at \*9 (finding "in proximity to" indefinite when the term "lack[ed] any quantitative parameters" and when specification never defined "what the proximity would be in any specific way").  Indeed, just like *Dominion Assets* found "closely-spaced discrete wavelengths" indefinite because the intrinsic record gave "no indication of what point a set of wavelengths stops being . . . 'closely-spaced,'" the '334 patent's record is devoid of any guidance on how far "approximately 18" can stretch.  2017 WL 10592326, at \*4, \*5.  The court there asked the very question that escapes skilled artisans here: when does another inventor go beyond the claim and when does it fall within?  *Id.* at \*5 ("Is it 92 wavelengths? 9 wavelengths? The claims, written description, and prosecution history provide no indication.").

Dr. Youssef was pressed similarly and asked what objective boundaries limit

32

"approximately 18" within the '334 patent, but could identify none. As stated by Dr. Sachs, "Dr. Youssef offers no written description or intrinsic evidence" or any explanation to support his moving-target definition of what "approximately 18 mm" encompasses. Ex. 5 (Sachs Rebuttal Rpt.) ¶¶ 259–60. Instead, when pressed on how others could "avoid[] the limitations of claim 18 . . . that [an implant] be approximately 18 millimeters wide," Dr. Youssef turned the inquiry on its head: "I think *you'd* have to define what approximately 18 millimeters was in your design drawings." Ex. 14 at 36:17–38:4; *see also id.* at 39:15–40:15 ("I guess *it would be up to you*, based on what *you feel* would work within the scope of these claims . . . ."). Dr. Youssef's testimony confirms that the '334 patent offers POSAs no confident standard for measuring what "approximately" means. Indeed, Dr. Youssef admits that, as a surgeon, he cannot define boundaries for the term. *See* Ex. 14 at 41:17–42:3 ("Q: And what range would fall within approximately 18 millimeters? . . . I think for me to -- that is a legal question, and *I'm a surgeon*. So *I'm not sure exactly*, but in my opinion, . . . I would say that, you know, measuring the maximum lateral width of that implant should be approximately 18 millimeters . . . ."). Dr. Sachs, too, could not decipher this claim with any reasonable certainty within the context of the '334 patent. *See* Ex. 5 ¶ 259. Taken together, the undisputed evidence in this case demonstrates there is "no context for a person of ordinary skill in the art to understand the scope of the disputed term with 'reasonable certainty.'" *Advanced Aerospace*, 124 Fed. Cl. at 292 (quoting *Nautilus*, 572 U.S. at 901).

Given NuVasive's expert's sworn testimony, the lack of meaningfully precise language in claim 18 of the '334 patent, and the lack of guidance in the intrinsic record of the '334 patent, there is no genuine dispute of material fact that claim 18 of the '334 patent is invalid as indefinite.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## V.     CONCLUSION

The Court should thus find that: (1) claim 1 of the '156 patent and all of its asserted dependent claims are invalid as indefinite; and (2) claims 16 and 18 of the '334 patent are invalid as indefinite.


Dated: January 26, 2021                    WINSTON & STRAWN LLP


                                           By:  /s/ *Nimalka R. Wickramasekera*
                                                NIMALKA R. WICKRAMASEKERA

                                           Attorneys for Defendants
                                           ALPHATEC HOLDINGS, INC. AND
                                           ALPHATEC SPINE, INC.

34

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was filed with the Court's CM/ECF system which will provide notice to all counsel deemed to have consented to electronic service. All other counsel of record not deemed to have consented to electronic service were served with a true and correct copy of the foregoing document by mail on this day.

I declare under penalty of perjury under the Laws of the United States of America that the above is true and correct. Executed this 26th day of January 2021 at Los Angeles, California.


Dated: January 26, 2021                    WINSTON& STRAWN LLP

                                           By:  /s/ *Nimalka R. Wickramasekera*
                                                NIMALKA R. WICKRAMASEKERA