UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NUVASIVE, INC.,<br><br>Plaintiff,<br><br>v.<br><br>ALPHATEC HOLDINGS, INC. et al.,<br><br>Defendants. | Case No.: 3:18-CV-347-CAB-MDD<br><br>**ORDER ON MOTIONS FOR SUMMARY JUDGMENT**<br><br>[Doc. Nos. 303, 304] |

Before the Court are the parties' motions for summary judgment of certain claims and defenses relating to United States Patent Nos. 8,361,156 and 8,187,334. Plaintiff NuVasive moves for judgment: (1) that Defendants Alphatec Holdings, Inc. and Alphatec Spine, Inc.'s (jointly, "Alphatec") accused devices – the Battalion Lateral Spacers, the Transcend LIF PEEK Spacer, and the Titec Coated LLIF Implants – infringe the asserted claims of the '156 patent and the '334 patent; (2) that these two patents are entitled to the priority filing date of March 29, 2004 of a related U.S. provisional patent application, No. 60/557,536: and (3) for dismissal of Alphatec's invalidity defense of indefiniteness. [Doc. No. 303.]

Alphatec argues that the motions should be denied because there are disputed material facts regarding both the alleged infringement of their accused devices and whether

NuVasive's 2004 provisional application provides a sufficient description of later claimed subject matter to reasonably convey that the inventor had possession of that subject matter as of the 2004 filing date. Alphatec also filed its own motion requesting a judgment of invalidity of both patents based on the indefiniteness of three claim terms. [Doc. No. 304.]

## I.  Legal Standard

The familiar standard for summary judgment applies to these motions. Where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law, summary judgment should be granted. Fed. R. Civ. P. 56(a). The nonmoving party must come forward with specific facts showing there is a genuine issue for trial. Fed. R. Civ. P. 56(e). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). It is not for the Court, however, to weigh the evidence presented and determine the truth of the matter. Instead, the Court must assess only whether there is sufficient evidence favoring the non-moving party, with reasonable inferences drawn in the non-movant's favor, such that a jury could return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).[1]

## II.  Infringement of the '156 Patent and '334 Patent

"Patent infringement, whether literal or by equivalence, is an issue of fact, which the patentee must prove by a preponderance of the evidence." *Siemens Med. Sols. USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1279 (Fed. Cir. 2011). To establish literal infringement of an asserted claim, NuVasive must demonstrate that every limitation recited in the claim is found in the accused devices.[2] *Akzo Nobel Coatings, Inc. v. Dow Chemical Co.*, 811 F3d 1334, 1341 (Fed. Cir. 2016). NuVasive argues that there

---

[1] NuVasive's objections to declarations Alphatec submitted in support of its opposition to NuVasive's summary judgment motion [Doc. No. 331, at 8] are denied.

[2] NuVasive's motion does not make an infringement claim based on the doctrine of equivalents, so the Court considers the sufficiency of Alphatec's evidence of a material dispute as to whether all the claim limitations are literally met by the accused devices.

are no material disputes that the accused Alphatec devices meet all the limitations of the asserted claims.[3]

Alphatec asserts several factual disputes challenging whether the accused implants meet all the limitations of the asserted claims. NuVasive argues that Alphatec's positions are factually incorrect. NuVasive may ultimately be right, but that is for a jury, not the Court, to decide. NuVasive's motion for summary judgment of infringement of the '154 patent and the '334 patent is therefore **DENIED**.

### III.  Priority Date

The '156 patent and '334 patent are continuations of U.S. Patent No. 7,918,891 with a filing date of March 29, 2005. Alphatec asserts an affirmative defense of on-sale bar, alleging commercial embodiments of the '891 patent were sold more than a year before the filing date of the '891 patent. 35 U.S.C.§ 102(b) (pre-AIA). NuVasive challenges Alphatec's evidence of prior invalidating sales.[4] NuVasive also seeks to establish a claim of priority to an earlier provisional application, No. 60/557,536, filed on March 29, 2004.

NuVasive bears the burden of proving by a preponderance of the evidence that the written description of the 2004 application supports and enables the claim limitations of the '891 patent. *See Speedfit LLC v. Woodway USA, Inc.*, 432 F. Supp. 3d 183, 208 (E.D.N.Y. 2020) ("[O]nce an accused infringer 'has established a prima facie case of invalidity and its burden is met,' the patentee bears the burden of coming forward with evidence to prove entitlement to claim priority to an earlier filing date.") (quoting

---

[3] Alphatec's opposition to NuVasive's motion for summary judgment of infringement contends in part that the motion must be denied because it broadly represents that all of Alphatec's implants infringe the asserted claims without distinguishing Alphatec's devices that clearly do not meet certain dimensional limitations of the claims. NuVasive however clarified its infringement assertion in its reply submission with a comprehensive list of the implants accused on a claim-by-claim basis. [Doc. No. 311-13.]

[4] NuVasive's Motion to Exclude the portion of Alphatec's expert report regarding NuVasive's sales that could constitute an on-sale bar [Doc. No. 302-1, at 5] was withdrawn at argument based on subsequently considered evidence. [Doc. No. 332, Hrg. Transcript at 61.] The remainder of NuVasive's motion to strike expert testimony [Doc. No. 302] was DENIED at the hearing for the reasons stated on the record. [Doc. No. 332, Hrg. Transcript at 60-64.]

*PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1305 (Fed. Cir. 2008)). To satisfy this burden, NuVasive must demonstrate that the 2004 application itself "describe[s] an invention ... in sufficient detail that one skilled in the art can clearly conclude that the inventor invented the claimed invention as of the filing date sought." *Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1359 (Fed. Cir. 2010) (quoting *Lockwood v. Am. Airlines*, 107 F.3d 1565, 1572 (Fed. Cir. 1997)). "In other words, the specification of the *provisional* [application] must 'contain a written description of the invention and the manner and process of making and using it, in such full, clear, concise, and exact terms,' 35 U.S.C. § 112 ¶ 1, to enable an ordinarily skilled artisan to practice the invention *claimed* in the *non-provisional* application." *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (quoting *New Railhead Mfg., L.L.C. v. Vermeer Mfg. Co.*, 298 F.3d 1290, 1294 (Fed. Cir. 2002) (*emphases* in original)); *see also Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364, 1371 (Fed. Cir. 2011) ("Consistent with 35 U.S.C. § 112 ¶ 1, the written description of the provisional application must enable one of ordinary skill in the art to practice the invention claimed in the non-provisional application.").

Whether the 2004 application discloses all the limitations of the '891 patent (and therefore the '156 patent and '334 patent) is contested by the experts. Further, NuVasive offers nothing in its motion on this issue to explain the significance (or lack thereof) of the addition of new material and multiple new figures to the application for the '891 patent, that disclose and describe the later claimed radiopaque marker limitation. Again, the Court will not weigh the competing opinions of the experts and determine which is more credible. These are factual disputes for a jury to decide.

NuVasive's motion for summary judgment of the 2004 priority filing date for the '154 patent and the '334 patent is therefore **DENIED**.

### IV. Affirmative Defense of Indefiniteness

A patent is presumed valid and the burden of establishing the invalidity of a patent or any claim thereof is on the party asserting such invalidity by clear and convincing

evidence. 35 U.S.C. § 282; *Microsoft Corp. v. I4I Ltd. P'ship*, 564 U.S. 91, 97 (2011) (holding that invalidity defenses must be proved by clear and convincing evidence). The patent's specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention. 35 U.S.C. §112. Section 112, ¶ 2 requires that "a patent's claim language, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.,* 572 U.S. 898, 134 S. Ct. 2120, 2129 (2014).

The parties agree with the Patent Trial and Appeal Board that a person of ordinary skill in the art regarding these patents is someone with a medical degree with two or three years of experience performing procedures using interbody spinal fusion implants. NuVasive represents that its designated expert, Dr. Jim Youssef, is a person of ordinary skill in the art regarding the '156 patent and the '334 patent. [Doc. No. 332, Hrg. Transcript at 9, 14.]

Based on the intrinsic evidence and the testimony of Dr. Youssef as a person of ordinary skill, Alphatec argues that the asserted claims of the '156 patent and the '334 patent fail to meet the statutory requirement of definiteness.

### A. The Scope of "Proximate to Said Medial Plane" is Not Reasonably Certain.

The '156 patent is directed at a spinal fusion implant with certain features, including radiopaque markers positioned in the implant to be readily observable under X-ray or fluoroscopy such that a surgeon may track the progress of the implant during implantation and/or determine the placement of the implant after implantation. [Doc. No. 110-38, at Col. 6:49-56.] The location of certain of these radiopaque markers is set forth in the claims.

Claim 1 of the '156 patent claims:

A spinal fusion implant of non-bone construction positionable within an interbody space between a first vertebra and a second vertebra, said implant comprising:

>an upper surface including anti-migration elements to contact said first vertebra when said implant is positioned within the interbody space, a lower surface including anti-migration elements to contact said second vertebra when said implant is positioned within the interbody space, a distal wall, a proximal wall, a first sidewall, and a second sidewall generally opposite from the first sidewall, wherein said distal wall, proximal wall, first sidewall, and second sidewall comprise a radiolucent material;
>
>wherein said implant has a longitudinal length extending from a proximal end of said proximal wall to a distal end of said distal wall, said implant has a maximum lateral width extending from said first sidewall to said second sidewall along a medial plane that is generally perpendicular to said longitudinal length, and said longitudinal length is greater than said maximum lateral width;
>
>at least a first fusion aperture extending through said upper surface and lower surface and configured to permit bone growth between the first vertebra and the second vertebra when said implant is positioned within the interbody space, said first fusion aperture having: a longitudinal aperture length extending generally parallel to the longitudinal length of said implant, and a lateral aperture width extending between said first sidewall to said second sidewall, wherein the longitudinal aperture length is greater than the lateral aperture width; and
>
>at least first and second radiopaque markers oriented generally parallel to a height of the implant, **where said first radiopaque marker extends into said first sidewall at a position proximate to said medial plane, and second radiopaque marker extends into said second sidewall at a position proximate to said medial plane**.

[*Id*., at Col. 12:32-67.]

All the asserted claims of the '156 patent include the limitation that the first and second radiopaque markers extend into the sidewalls of the implant "at a position proximate to [the] medial plane." [*Id*., at Col. 12:63-67.] The parties agree that the medial plane is the midline of the implant and proximate is understood to mean "near." The question presented, therefore, is what a person of ordinary skill in the art would understand to be the objective boundary of "near the midline."

The specification makes no reference to "markers." In the description of the anti-migration features of the implant, the specification discloses the option to include "spike elements" that may be disposed in the implant in its proximal, distal and central regions.[5] [*Id.*, at Col. 6:27-35.] The exemplary depictions in the patent's figures show these spike elements positioned at each end and at the midline of the implant. [See e.g., id., Fig. 3 (7), (8), and (9).]



FIG. 3

The specification teaches that when these anti-migration spike elements are made of radiodense materials and the implant is manufactured from a radiolucent material, the spike elements will be readily observable under X-ray or fluoroscopy such that a surgeon can use them to track the progress of the implant during implantation and/or determine the placement of the implant after implantation. [*Id.*, at Col. 2:53-Col. 3:10; 6:49-56; Col. 11:4-Col.12:11; Figs 2, 3, 20 and 21.] The limitation in claim 1 of a "radiopaque marker" therefore corresponds to the specification's disclosure of providing spike elements of

---

[5] The specification identifies the proximal end of the implant (22) with spike element 7 described as in the "proximal region." It also identifies the distal end of the implant (16) with spike element 8 described as in the "distal region." Spike element 9 is identified as in the implant's "central region." This is the extent of the discussion of "regions" of the implant in the specification. [*Id.*, at Col. 6:27-35.]

radiodense materials incorporated into a radiolucent implant for purposes of enhancing visualization of the implant by the surgeon during or after implantation. [*Id*., at Col. 2:53-62.]   Nothing further is disclosed to explain the significance or benefit of positioning the spike elements at any particular location within a "region" of the implant.  There is nothing disclosed identifying what portion of the implant is considered to be proximate to the midline.

Alphatec does not dispute that spike element (9) in Figs. 2, 3, 20 and 21, illustrates a radiopaque marker "proximate to the medial plane," as it appears to be at the midline of the implant.  However, in the absence of any intrinsic evidence in the specification and prosecution history as to what area constitutes proximate to the midline, Alphatec argues that the disclosure does not provide any way for a person of ordinary skill to objectively determine whether a marker is proximate to, or near, the medial plane if a marker is located farther away from the midline than depicted in the specification.  Specifically, the patent does not teach how far a marker can be moved from the midline and still be within the scope of the claim.

Alphatec acknowledges that mathematical precision is not required, but the patent must inform those skilled in the art with reasonable certainty of the scope of the claim. *Nautilus, Inc.,* 134 S.Ct. at 2129 ("The definiteness requirement mandates clarity, while recognizing absolute precision is unattainable.").  It must be precise enough to afford clear notice of what is claimed, thereby apprising the public of what is still open to them.  *Id.* Otherwise, there would be a "zone of uncertainty which enterprise and experimentation may enter only at the risk of infringement claims." *Id.* (citing *Union Carbon Co. v. Binney & Smith Co.,* 317 U.S. 228, 236 (1942)).  The claims must provide objective boundaries for those of skill in the art.  *Interval Licensing LLC v. AOL, Inc.,* 766 F.3d 1364, 1370-71 (Fed. Cir. 2014).  In this case, the specification and prosecution history provide no notice of the distance at which a marker could be placed away from the midline and still be proximate to the midline.

Definiteness is evaluated from the perspective of someone skilled in the relevant art. *Nautilus, Inc.,* 134 S.Ct. at 2128. Alphatec argues that the testimony of Dr. Youssef, NuVasive's expert witness, as a person of skill in this art, establishes that the patent does not disclose an objective boundary for one to determine whether a marker is near the middle or not.

Dr. Youssef testified that the practical application for the markers described in Claim 1 is to assist a surgeon in visualizing the location of the implant after insertion. [Doc. No. 304-23, at 57:1-10.] NuVasive argues that a marker positioned "proximate to the medial plane" is intended to provide the surgeon with a visual mark at or near the center of the implant. Dr. Youssef testified that such a marker should be "close" to the midline. However, when asked how to determine what constitutes "close," he testified that he could only offer an opinion for himself. Despite being designated as a person of ordinary skill, he did not feel he could comment for other surgeons as to whether a marker was close to the medial plane. [Doc. No. 304-22, at 88:5-23.]

When asked if there is an objective standard to determine whether a marker is at a position proximate to the medial plane, Dr. Youssef replied that "it's a subjective analysis using the claim language, the understanding of the claim language, the agreed-upon terms, and for those terms that don't have a construed definition, using the ordinary meaning of those terms." [*Id*., at 105:11-19.] He testified that he did not think that there is an objective boundary. [*Id*., at 102:3-12.]

At his deposition, Dr. Youssef was shown a series of annotated images of Figure 3 of the '156 patent.



Image 1 is of Fig. 3 as shown in the specification highlighting in red the first and second radiopaque markers (9) at the midline. In the subsequent images, those markers were moved gradually away from the midline. Dr. Youssef opined that the markers depicted in Image 2 fell within the scope of the claim and the markers depicted in Image 3 were "pretty close" to the medial plane and therefore, in his opinion, were still proximate to the medial plane. [*Id.*, 91:12-16; 102:18-103:25.] As to the markers depicted in Image 4, he concluded that they did not come within the scope of the claim. [*Id.*, at 104:25-106:5.] When asked why he concluded the markers in Image 3 were within the scope of the claim but those in Image 4 were not, he testified that he came to that conclusion "because one is further from the medial plane than the other." [*Id.*, at 106:6-14.] In response to the follow-

up question, "Is there some position between the two that might be the boundary?", he replied, "I think it's subjective." [*Id.*, at 106:15-18.]

While some modicum of uncertainty is allowed, a patent must be precise enough to afford clear notice of what is claimed, thereby apprising the public of what is still open to them. *Nautilus,* 134 S.Ct. at 2128-29. Claims cannot rely on the "unpredictable vagaries of any one person's opinion." *Interval Licensing LLC,* 766 F.3d at 1376.

When a word of degree is used, the specification must provide some standard for measuring that degree that one of ordinary skill would understand. The lone example in the specification depicts the markers at the midline and therefore provides no guidance as to what constitutes near or close to the midline. Dr. Youssef provided no functional explanation or other objective guidance to support his determination of when the distance from the midline no longer constitutes near or close, just his subjective opinion. While absolute precision is not required, such ambiguity and subjectivity does not provide the clarity needed to inform the public as to the scope of this claim.

Accordingly, based on the specification and prosecution history, and as acknowledged by Dr. Youssef, a person of ordinary skill in the art, the claim limitation "proximate to the medial plane" is a subjective limitation that fails to inform those skilled in the art about the scope of the invention with reasonable certainty.

Alphatec's motion for summary judgment of invalidity of the '156 patent for failure to meet the statutory requirement of definiteness is therefore **GRANTED**.

## B. The Scope of a Central Region Positioned Generally Centrally between the Proximal and Distal Walls is Disputed.

The '334 patent, which has the same specification as the '156 patent, is also directed at a spinal fusion implant with certain features including radiopaque markers positioned in the implant to be readily observable under X-ray or fluoroscopy such that a surgeon may track the progress of the implant during implantation and/or determine the placement of the implant after implantation. [Doc. No. 110-48, at Col. 6:49-56.] The location of certain of these radiopaque markers is set forth in the claims.

Claim 1 of the '334 patent claims:

A spinal fusion implant of non-bone construction positionable within an interbody space between a first vertebra and a second vertebra, said implant comprising:

   an upper surface including anti-migration elements to contact said first vertebra when said implant is positioned within the interbody space, a lower surface including anti-migration elements to contact said second vertebra when said implant is positioned within the interbody space, a distal wall, a proximal wall, a first sidewall, and a second sidewall, said distal wall, proximal wall, first sidewall, and second sidewall comprise a radiolucent material;

   wherein said implant has a longitudinal length greater than 40 mm extending from a proximal end of said proximal wall to a distal end of said distal wall;

   wherein a **central region of said implant includes portions of the first and second sidewalls positioned generally centrally between the proximal wall and the distal wall, at least a portion of the central region defining a maximum lateral width of said implant extending from said first sidewall to said second sidewall,** where said longitudinal length is at least two and half times greater than said maximum lateral width;

   at least a first fusion aperture extending through said upper surface and lower surface and configured to permit bone growth between the first vertebra and the second vertebra when said implant is positioned within the interbody space, said first fusion aperture having: a longitudinal aperture length extending generally parallel to the longitudinal length of said implant, and a lateral aperture width extending between said first sidewall to said second sidewall, wherein the longitudinal aperture length is greater than the lateral aperture width; and

   at least three radiopaque markers; wherein a first of the at least three radiopaque markers is at least partially positioned in said distal wall, a second of said at least three radiopaque markers is at least partially positioned in said proximal wall, and a **third of said at least three radiopaque markers is at least partially positioned in said central region**.

[*Id*., at Col. 12:32-Col. 13:4.]

All the asserted claims of the '334 patent include the limitation that a third radiopaque marker be "at least partially positioned in [the] central region" of the implant." [*Id*., at Col. 13:2-4.] The claim itself describes the "central region" as the portion of the implant "generally centrally" between the proximal and distal walls that includes the width

of the implant at its maximum width from side wall to side wall.  Alphatec argues that this claim language read in light of the specification fails to inform a person of ordinary skill as to an objective boundary of what area of the implant is "generally centrally" between the proximal and distal walls.

NuVasive disagrees, arguing that the specification teaches that a purpose of the radiopaque markers is to enhance a surgeon's ability to visualize the position of an implant within the interbody space.  In that context, NuVasive contends that a person of ordinary skill would understand that the portion of the implant that is "generally centrally" between the proximal and distal walls comprises that area of the implant in which the positioning of the third marker would assist the surgeon's visualization.  According to NuVasive, while not mathematically precise, the objective boundaries of the central region are ascertainable with reasonable certainty based on the functional purpose.  *See Biosig Instruments, Inc. v. Nautilus, Inc.,* 783 F.3d 1374, 1382 (Fed. Cir. 2015) ("The degree of precision necessary for adequate claims is a function of the nature of the subject matter.")

As noted *supra,* the patent specification identifies the proximal wall (22), distal wall (16) and sidewalls (14) of the implant.   In his expert report, Dr. Youssef illustrated on an accused device, markers that are positioned in the central region of an implant in accordance with the claim language.  His blue circle encompasses the markers and the maximum lateral width of the implant and a region "'positioned generally centrally



between the proximal and distal wall'–so that's generally center, between those two walls somewhere in the center." [Doc. No. 304-23, at 50:19-51:6; 54:4-7.]

In response to an inquiry at his deposition as to whether a marker placed outside this blue circle would not meet the claim limitation, Dr. Youssef responded that his circle was a general example. He testified that "for a marker to fall outside [the central] region, it would be necessary for them to be closer to the proximal or distal walls." [*Id*., at 52:5-8.]

> [M]y blue circle is just a depiction in static. It could be moved and adjusted to still meet the limitations of the claim and still account for the central region. So really to get a marker outside the boundary of the central region as defined by [the claim] would be pretty tough. I think you'd have to put them closer to the proximal and distal walls to get them there.

[*Id*., at 54:18-25.]

Dr. Youssef testified that the central region, as long as it includes the maximum lateral width, could be expanded to include the area to the left or the right up to either the distal or proximal wall. [*Id.,* 51:19-53:12.] The claim language allows that "the boundary could be fairly substantial." [*Id*., at 53:12-14.] However, he also clarified that although the general central region has "a lot of real estate," he did not consider the central region to be everything between the proximal and distal walls. [*Id*., at 64:16-23.]

Dr. Youssef explained that a person of ordinary skill in the art would understand the scope or breadth of the claimed central region in the context of the usefulness of the placement of a third radiopaque marker. [*Id*., at 74-77.] In his opinion, the third marker described in the claim is intended to provide a third reference point for the surgeon evaluating the placement of the implant. The breadth of the central region would therefore be understood in part by the positional purpose of the third marker. In other words, the third marker is no longer in the central region when it is positioned too close to the first or second marker of the claim limitation (which are positioned at least partially in the proximal or distal walls) to be of practical usefulness as a third reference point.

When asked how close to the proximal and distal walls a marker would need to be placed to be out of the central region, he responded, "Well, it's hard to know. . . . I don't

14

have an answer for you. I don't know exactly how far out but much closer to the proximal distal wall than the circle that's shown [in his drawing]." [*Id.*, at 55:11-14.]

To establish an objective boundary for the central region, that portion of the implant "generally centrally" between the proximal and distal walls, Dr. Youssef was shown Figure 3 from the specification with locations marked in red for placement of the third marker.



He testified that the markers depicted in Images 1-6 were positioned within his understanding of the central region – far enough from the proximal markers (7) to provide a useful third reference point. [*Id.*, at 67-78.] The markers depicted in Image 7, he testified, were not within his understanding of the central region because they were too close to the

15

markers in the proximal wall (7) and would therefore have no practical application. [*Id.*, at 79.]

Alphatec argues that Dr. Youssef's opinion regarding the area of the implant that constitutes the central region is subjective and lacks sufficient clarity to establish an objective boundary thereby rendering the claim indefinite. NuVasive argues that a skilled artisan could determine with reasonable certainty the inherent parameters of the central region based the claim language and the disclosed functional purpose for the placement of the third radiopaque marker.

There was no intrinsic evidence in the specification to aid in the determination of the scope of '156 patent's claim term "proximate to the medial plane." The only extrinsic evidence defining the scope was Dr. Youssef's subjective opinion. In contrast, the claim language of the '334 patent describes parameters for the scope of the claim term "central region" and Dr. Youssef's interpretation of those parameters is tied to the functional teachings disclosed in the specification. Whether he is correct that one of ordinary skill could determine with reasonable certainty the inherent parameters of the invention based on these disclosures is a factual dispute. The cross-motions for summary judgment on this invalidity defense for the '334 patent are therefore **DENIED**.

### C.  The Scope of Approximately 18 mm is Reasonably Certain.

The asserted claims of the '334 patent include limitations regarding the dimensions of the claimed spinal fusion implant. In accordance with Claim 1, the implant must have a longitudinal length greater than 40 mm from the proximal end of the proximal wall to the distal end of the distal wall. Further, that longitudinal length must be at least two and half times greater than the maximum lateral width. [*Id.*, at Col. 44-46, 52-54.]

Dependent Claim 18 of the '334 patent requires:

The spinal fusion implant of claim 1, wherein said maximum lateral width of said implant is **approximately 18 mm**.

[*Id.*, at Col. 14:11-13.]

Alphatec argues that a person of ordinary skill could not determine with reasonable certainty what is encompassed by the claim limitation that the maximum lateral width of the implant be approximately 18 mm. This contention was raised primarily due to Dr. Youssef's opinion that an implant with a maximum lateral width in a range of 16 mm to 22 mm "could fall in the scope" of approximately 18 mm as required by Claim 18. [Doc. No. 304-24, at 45:18-25.]

The use of a term of degree in the context of this claim does not render the claim indefinite. A person of ordinary skill would find "approximately" in this context of this claim to encompass a modest deviation from 18 mm. The specification describes an implant intended for use in lumbar fusion with dimensions ranging between 9 and 18 mm in width, 8 and 16 mm in height and a length ranging between 25 and 45 mm. [Doc. No. 110-48, at Col. 2:17-21; Col. 5:15-19; Col. 11:58-63.] A person of ordinary skill in the art would be able to reasonably ascertain from the examples in the specification that an implant with a maximum width of "approximately 18 mm," which correspondingly requires at least a 45 mm length in accordance with Claim 1, is described in the specification. Allowing for some modest deviation in either direction from 18 mm does not make the claim indefinite.

The Court rejects Dr. Youssef's assessment that the scope of "approximately 18 mm" includes a width up to 22 mm. His expansive inclusion of a width more than 22% greater than the claim's stated numerical width is more than a modest deviation and is without any support in the specification. Finding Dr. Youssef's opinion unsupported does not require the Court to find the claim indefinite.[6]

---

[6] The Court notes that NuVasive is not seeking to apply Dr. Youssef's expansive interpretation of Claim 18 and has conceded that Alphatec's accused devices that are wider than 18 mm do not come within the scope of this dependent claim.

17

NuVasive's motion for dismissal of Alphatec's affirmative defense of invalidity of Claim 18 of the '334 patent for failure to meet the statutory requirement of definiteness is therefore **GRANTED**.

### V. Disposition

In light of the foregoing, it is hereby **ORDERED** as follows:

1. NuVasive's motion for partial summary judgment is
   a. **DENIED** as to the infringement of Alphatec's Accused Devices;
   b. **DENIED** as to establishing the 2004 priority filing date for the '154 patent and the '334 patent;
   c. **DENIED** as to dismissal of Alphatec's affirmative defense of invalidity of the '156 Patent;
   d. **DENIED** as to dismissal of Alphatec's affirmative defense of invalidity of Claim 1 of the '334 Patent;
   e. **GRANTED** as to dismissal of Alphatec's affirmative defense of invalidity of Claim 18 of the '334 Patent;
2. Alphatec's motion for summary judgment is
   a. **GRANTED** as to its affirmative defense of invalidity of the '156 Patent;
   b. **DENIED** as its affirmative defense of invalidity of Claim 1 of the '334 Patent;
   c. **DENIED** as to its affirmative defense of invalidity of Claim 18 of the '334 Patent.

3. A telephonic status conference will be held on September 7, 2021, at 10:00 a.m. using the Court's AT&T Teleconference connection at (888)398-2342, access code: 1749358.

It is **SO ORDERED**.

Dated: August 31, 2021

_____
Hon. Cathy Ann Bencivengo
United States District Judge