1   NIMALKA R. WICKRAMASEKERA (SBN: 268518)
    nwickramasekera@winston.com
2   LEV TSUKERMAN (SBN: 319184)
    ltsukerman@winston.com
3   WILLIAM M. WARDLAW (SBN: 328555)
    wwardlaw@winston.com
4   WINSTON & STRAWN LLP
    333 S. Grand Avenue
5   Los Angeles, CA 90071-1543
    Telephone:   (213) 615-1700
6   Facsimile:    (213) 615-1750

7   GEORGE C. LOMBARDI (*pro hac vice*)
    glombardi@winston.com
8   BRIAN J. NISBET (*pro hac vice*)
    bnisbet@winston.com
9   SARANYA RAGHAVAN (*pro hac vice*)
    sraghavan@winston.com
10  WINSTON & STRAWN LLP
    35 West Wacker Drive
11  Chicago, IL 60601-9703
    Telephone: (312) 558-5600
12  Facsimile: (312) 558-5700

13  Attorneys for Defendants
    ALPHATEC HOLDINGS, INC. AND ALPHATEC SPINE, INC.
14

15              **UNITED STATES DISTRICT COURT**

16      **SOUTHERN DISTRICT OF CALIFORNIA - SAN DIEGO DIVISION**

| | |
|---|---|
| 17  NUVASIVE, INC., a Delaware corporation, | **Case No. 18-CV-00347-CAB-MDD** |
| 18 | **DEFENDANTS' BENCH** |
|            Plaintiff, | **MEMORANDUM REGARDING** |
| 19 | **SECONDARY CONSIDERATIONS** |
|        v. | |
| 20 | |
|    ALPHATEC HOLDINGS, INC., a | **Judge:** Hon. Cathy Ann Bencivengo |
| 21  Delaware corporation and | **Courtroom:** 4C |
|    ALPHATEC SPINE, INC., a | |
| 22  California corporation, | |
| 23          Defendants. | |

24

25

26

27

28

Alphatec respectfully submits that there is no nexus between the asserted claims and NuVasive's proffered evidence of secondary considerations of non-obviousness relating to the XLIF platform and procedure as a whole. A "patent claim is not coextensive with a product that includes a 'critical' unclaimed feature that is claimed by a different patent and that materially impacts the product's functionality." *Teva Pharms. Int'l GmbH v. Eli Lilly & Co.*, 8 F.4th 1349, 1361 (Fed. Cir. 2021). The undisputed evidence in this case—and governing Federal Circuit law—establishes that XLIF includes an unclaimed feature—**neuromonitoring**—that NuVasive and its witnesses have admitted is critical and required to perform XLIF, that materially impacts the product's functionality, and that is claimed by other patents in NuVasive's portfolio. Thus, the Court should (1) preclude NuVasive from presenting any evidence of secondary considerations, including commercial success, skepticism, industry praise, long-felt but unmet need, failure of others, teaching away, and unexpected results, and (2) limit NuVasive's evidence of copying to the patented features. To hold otherwise would apply different standards to proving infringement and invalidity. By the language of the asserted claims, NuVasive is not required to show that Alphatec's accused system includes all the components of XLIF for a finding of infringement. Yet permitting NuVasive to argue that XLIF is the claimed invention forces Alphatec to argue the invalidity of XLIF as a whole, as opposed to the asserted claims.

## I.    ARGUMENT

The Court cautioned NuVasive that it "cannot establish secondary considerations of non-obviousness by talking about the neuromonitoring system [that is part of XLIF] but is not part of the claim." 2/28/2022 Hr'g at 9:20–23; *see also id.* at 10:14-17 ("[NuVasive] can't get over any hump there by saying oh, and then with this neuromonitoring, which is not a claim that is asserted here, we have demonstrated that this is an advancement in the surgical art."). Yet NuVasive presented this exact argument to the jury during its opening statement, and the Court should preclude further attempts to attribute secondary indicia **regarding XLIF** to the asserted claims. Further,

1

NuVasive should not be permitted to disguise evidence regarding XLIF simply by calling it NuVasive's "lateral system."

### A.    The asserted claims do not require neuromonitoring

NuVasive asserts three patents against Alphatec: the '531 patent, the '801 patent, and the '832 patent. ***None*** of the asserted claims require neuromonitoring, a necessary component of NuVasive's XLIF platform and procedure. *See* '531 patent at claims 1, 39; '801 patent at claims 1, 2, 15, 16, 26; '832 patent at claims 1, 3, 9, 10. There is only one independent claim remaining in the case that remotely relates to neuromonitoring, and even that only requires conventional sequential dilators equipped with stimulation electrodes untied to any system with functionality that stimulates the electrodes, receives feedback, and actually monitors the nerves in the psoas muscle. *See* '832 patent, claim 1 ("wherein at least one instrument from the group consisting of said elongate inner element and said dilators includes *a stimulation electrode* that outputs electrical stimulation for nerve monitoring when the at least one instrument is positioned in the psoas muscle"). One dependent claim of the '801 patent requires the same. *See* '801 patent, claim 15 ("each of the plurality of sequential dilators includes *a stimulation electrode* at a distal region"). Notably, the asserted claims of the '531 patent simply recite a collection of known instruments without any capability of connecting to a neuromonitoring system.

The lack of neuromonitoring in the asserted claims is further highlighted by the fact that there are other claims in the asserted patents that ***do*** require neuromonitoring. *See*, *e.g.*, '801 patent, claim 7 ("further comprising *a control unit capable of electrically stimulating said at least one stimulation electrode*, sensing a response of a nerve depolarized by said stimulation, determining at least one of *proximity and direction* between said at least one stimulation electrode and said depolarized nerve based upon the sensed response, and communicating said at least one of proximity and direction to a user"), '832 patent, claim 11 ("further comprising *a monitoring system* that delivers an electrical stimulation signal to the stimulation electrode of the initial dilator, monitors

electromyographic activity detected by a set of sensor electrodes in leg muscle myotomes associated with nerves in the vicinity of the targeted spinal disc, and displays information on a display screen in response to the detection of said electromyographic activity via said set of sensor electrodes in said leg muscle myotomes"). None of these claims are asserted in this case.

**B.    There is no nexus between the asserted claims and XLIF**

The Federal Circuit has previously concluded that NuVasive's XLIF Surgical Technique ***requires*** the NeuroVision® System:

> [***T]he Guide specifically identifies*** the MaXcess® II Access System, MaXcess® XLIF System, and ***NeuroVision® System as part of the required instruments*** to successfully complete the technique… While the Guide does list the components of the 'XLIF Instrument System,' ***it is very clear that the actual XLIF surgical technique requires more than just these instruments***; ***it utilizes*** the MaXcess® II Access, MaXcess® XLIF, and ***NeuroVision® Systems in addition to general surgical tools*** such as nerve retractors, disc cutters, and curettes that are traditionally employed in interbody fusion procedures.

*NuVasive, Inc. v. Iancu*, 752 F. App'x 985, 995–996 (Fed. Cir. 2018) (emphasis added).

NeuroVision® is NuVasive's proprietary neuromonitoring system that "allows surgeons to monitor the placement of the surgical instruments relative to nearby neural structures." *Id.* at 989.  The trial record reflects the same: NuVasive's XLIF Surgical Technique (PTX-2763) expressly states that "[t]o successfully complete this technique, the following patient positioning supplies, instruments, implants, and fixation options are ***required*** . . . NVM5® . . . NVM5 EMG Module." *Id.* at 4 (emphasis added).  Step 5 of the XLIF Surgical Technique stresses the "importance of neuromonitoring." *Id.* at 12. It confirms that neuromonitoring is "***critical to the safety and reproducibility of any lateral transpsoas approach*** due to the lumbar plexus' positioning within the psoas." *Id.* at 13 (emphasis added).  "The XLIF® Procedure relies on the clinically validated dynamic EMG nerve avoidance mode of NVM5® to identify a safer docking position and working area." *Id.* at 12; *see also* PTX-59 at 17.

3

NuVasive's documents confirm that "the primary benefits of XLIF compared to conventional surgical approaches" and the "critical, differentiating factors that help to make XLIF reproducible" include the "use of automated, directionality stimulated electromyography (NVJJB®/M5®) with discrete threshold responses which provide information on the location and distance of instrumentation to motor nerves." PTX-2879 at 1. As confirmed by NuVasive's witness, Kyle Malone, this system includes a separately "patented Hunting Algorithm." PTX-2535 at 2; *see also* https://www.nuvasive.com/resources/virtual-patent-marking/.

Dr. Youssef has also told the jury that the "XLIF procedure has a very rote approach to the system, meaning you do each step, like I just described, which is very specific to that procedure." Trial Day 3 Rough Tr. (Youssef) at 101:2–4. Indeed, his demonstration to the jury on the XLIF procedure specifically referenced neuromonitoring using directional stimulated dilators. Trial Day 3 Rough Tr. at 31:9–18 ("that line is then emitting an impulse and you can hook up neuromonitoring … so I'm looking at the X-ray machine and I'm responding to the information I'm getting from the EMG machine."), 32:5–10 ("I'm placing the second dilator on and turning this on, once again, 360 degrees, confirming that no nerve is in the way… using the same neuromonitoring, I'm confirming I'm not near a nerve or on a nerve.").

In *NuVasive, Inc. v. Iancu*, the Federal Circuit found that nexus existed between the invention in U.S. Patent No. 7,691,057 and NuVasive's XLIF. However, unlike the asserted claims in this case, the '057 patent expressly claimed "neuromonitoring" (*i.e.*, "monitoring for resulting electromygraphic (EMG) activity after emission of each stimulation signal") by coupling the dilators equipped with stimulation electrode "to a control unit of a neuromonitoring system":

> ***performing neuromonitoring*** … ***wherein the neuromonitoring comprises*** causing the emission of a plurality of electrical stimulation signals from a stimulation electrode provided on a distal portion of at least one component of the distraction assembly and ***monitoring for resulting electromyographic (EMG) activity after the emission of***

*each stimulation signal*, and

wherein ***the component of the distraction assembly is coupled to a control unit of a neuromonitoring system*** that is capable of displaying to a user an indication of at least one of proximity and direction of a nerve to the stimulation electrode provided on the component of the distraction assembly based on the monitored resulting electromyographic (EMG) activity.

*Id.* at 988 ('057 patent, claim 17) (emphasis added).

By contrast, none of the asserted claims require neuromonitoring. While some of the asserted claims (claim 1 of the '832 patent and claim 15 of the '801 patent) require dilators equipped with a stimulation electrode, the claimed dilators are not coupled to any neuromonitoring system that "caus[es] the emission of a plurality of electrical stimulation signals from [the] stimulation electrode" and then "monitor[s] for resulting electromygraphic (EMG) activity after the emission of each stimulation signal." *Id.* Rather, the claimed dilators of the asserted patents are simply equipped with a piece of metal that is capable of conducting electricity. But without being coupled to a ***neuromonitoring*** system (*e.g.*, NeuroVision®), they are no different than conventional dilators and cannot contribute to the alleged inventiveness of XLIF—creating an operative corridor to the spine using a lateral transpsoas approach through the nerve-dense psoas muscle. *Id.* at 989 ("EMG electrodes mounted on the surgical instruments ***and connected to NuVasive's Neurovision system*** allows surgeons to ***monitor*** the placement of the surgical instruments relative to nearby neural structure.")  NuVasive does not—because it cannot—argue that Neurovision is unimportant. *Magseis FF LLC v. Seabed Geosolutions (US) Inc.*, 860 F. App'x 746, 751–52 (Fed. Cir. 2021) (affirming finding of no nexus because "Magseis does not argue that those unclaimed components are insignificant.").

### C.   NuVasive's evidence of secondary considerations relates only to XLIF

NuVasive intends to have its expert, Dr. Jim Youssef, present evidence relating to secondary considerations of non-obviousness based on the XLIF platform as a whole.

His testimony should be excluded, and NuVasive should be precluded from presenting any additional evidence or argument on objective indicia.

As demonstrated by each of NuVasive's witnesses to date, NuVasive's evidence of secondary considerations relates to XLIF as a whole and is primarily directed to the alleged inventiveness of its neuromonitoring system, NeuroVision®[1].   For example, NuVasive's first witness, Kyle Malone admitted that "the **key steps of the lateral procedure** that NuVasive have include what's called triggered or evoked electromyography through the psoas muscle," and that NuVasive "created a platform that uses standard technology for neuromonitoring, and then one of the things we did was utilize just an interface of providing that information in a new way on a computer screen."  Trial Tr. (Malone) 48:23–49:10.  *See also id.* at 21:1–6 ("we have these ideas of procedural solutions of specialized instruments, of **utilizing neuromonitoring**); 23:4–8 ("then that dilator is **enabled and integrated with neuromonitoring**"); 31:15–21 ("this is an example of that narrow monitoring [sic] being applied through the dilator").  PTX-2967 at NUVA_ATEC0286510 (including NeuroVision® computer output).

Dr. Youssef's secondary considerations opinions are also inextricably wedded to the XLIF platform as a whole, which indisputably includes NuVasive's proprietary and patented neuromonitoring system.  For example, Dr. Youssef disclosed XLIF-based opinions that include s**kepticism:** "NuVasive faced substantial skepticism from the spine surgeon community shortly after introducing XLIF." (Ex. A, Youssef Open Rpt. ¶ 1332); **industry praise:** "In particular, consistent with my own experience, such praise was a result of substantial commitments made by NuVasive to educate surgeons on the safety and reproducibility of XLIF." (Ex. A, Youssef Open Rpt. ¶ 1339); **long-felt unmet need/failure of others:** "Furthermore . . . when compared to interbody

---

[1] While there are various trade names for NeuroVision®, including NVM5, NuVasive's witness Kyle Malone testified that each refers to a version of the same NuVasive proprietary Neuromonitoring system.

fusion performed by other approaches, the systems used in XLIF procedures offer a number of benefits, including: XLIF is minimally disruptive to the soft tissues; XLIF is associated with a shorter revovery time and less hospital time . . ." (Ex. A, Youssef Open Rpt. ¶ 1350)**; "teaching away":** "For reasons discussed above, the Jacobson technique as discussed in Friedman and Kanter articles teaches away from a lateral approach to the lumbar spine and evidences the long-felt need for XLIF, which enabled a safe, lateral, trans-psoas approach to the spine." (Ex. A, Youssef Open Rpt. ¶ 1363.) Mr. Blake Inglish—who relies on Dr. Youssef to establish nexus—will be offered by NuVasive to testify to **commercial success**. His opinion is also rooted in the XLIF procedure. (Ex. B, 2019-11-1 Inglish Commercial Success Rep. at ¶ 17) ("NuVasive's revenue attributable to its XLIF procedure has continued to grow, such that it has generated approximately $130 million to $143 million annually from 2013-2018.")

Because NuVasive's secondary considerations evidence is tied to XLIF, which requires NeuroVision® by NuVasive's own admissions, rather than the claimed K-wire, sequential dilators, retractor, and/or intradiscal shim, these opinions should be excluded.

## II. CONCLUSION

It is indisputable that XLIF requires neuromonitoring to achieve its benefits and that the asserted claims do not require neuromonitoring. Because this functionality "materially impacts" XLIF and because NuVasive has no evidence of secondary considerations of the claimed instruments, Alphatec respectfully requests the Court to preclude NuVasive from presenting any evidence of secondary considerations at trial.

Dated: March 4, 2022              WINSTON & STRAWN LLP

By: /s/ *Nimalka R. Wickramasekera*
      NIMALKA R. WICKRAMASEKERA

Attorneys for Defendants
ALPHATEC HOLDINGS, INC. AND
ALPHATEC SPINE, INC.

7

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was filed with the Court's CM/ECF system which will provide notice to all counsel deemed to have consented to electronic service. All other counsel of record not deemed to have consented to electronic service were served with a true and correct copy of the foregoing document by mail on this day.

I declare under penalty of perjury under the Laws of the United States of America that the above is true and correct. Executed this 4th day of March 2022 at San Diego, California.


Dated: March 4, 2022                    WINSTON & STRAWN LLP

                                        By: */s/ Nimalka R. Wickramasekera*
                                        NIMALKA R. WICKRAMASEKERA