18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1                    UNITED STATES DISTRICT COURT

2                   SOUTHERN DISTRICT OF CALIFORNIA

3        BEFORE HONORABLE CATHY ANN BENCIVENGO, JUDGE PRESIDING

4

5   NUVASIVE, INC., a Delaware        )
    Corporation,                      )
6                                     )
                          Plaintiff,  )   CASE NO. 18CV0347-CAB-MDD
7                                     )
               vs.                    )   SAN DIEGO, CALIFORNIA
8                                     )
    ALPHATEC HOLDINGS, INC., a        )   MONDAY, MARCH 7, 2022
9   Delaware Corporation, and         )
    ALPHATEC SPINE, INC., a           )
10  California corporation,           )
                                      )
11                        Defendants. )

12

13

14

15

16      STENOGRAPHIC COURT REPORTER'S TRANSCRIPT OF PROCEEDINGS
                     JURY TRIAL DAY 5, VOLUME 5
17                         PAGES 1-254

18

19

20

21

22  Proceedings reported by stenography, transcript produced by CAT
    software
23  _____

24           Mauralee Ramirez, RPR, CSR No. 11674
           Federal Official Stenographic Court Reporter
25                  ordertranscript@gmail.com

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1    APPEARANCES:

2    For the Plaintiff:

3        Wilson Sonsini Goodrich and Rosati
         Wendy Lynn Devine
4        Natalie Jordana Morgan
         12235 El Camino Real, Suite 200
5        San Diego, CA 29130

6        Wilson Sonsini Goodrich and Rosati
         Morris Fodeman
7        1301 Avenue of the Americas, 40th Floor
         New York, NY 10019.

8

9

10   For The Defendants:

11       Winston & Strawn LLP
         Nimalka M. Wickramasekera
12       333 South Grand Avenue
         Los Angeles, California 90071
13
         Winston & Strawn LLP
14       George C. Lombardi
         Brian J. Nisbet
15       35 West Wacker Drive
         Chicago, IL 60601
16
         Winston & Strawn LLP
17       Robert Kang
         101 California Street
18       San Francisco, CA 94111

19

20

21

22

23

24

25

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1      San Diego, California; Monday, March 7, 2022; 8:30 a.m.

2      (Case 18CR0347-CAB called)

3      (Appearances stated)

4          THE COURT:  Thank you.  Good morning.  The Court

5    has -- well, I got your briefings.  We'll talk about that in a

6    second.  I have a quick question on your instructions just

7    because I'm trying to pare down stuff out of them that isn't

8    necessary.  There's a whole section, like a page and a half

9    where the defendants list all of the prior art, which is fine

10   except I don't know that I need to read a list of the prior

11   art.  Is there any debate that I'm going to hear that art

12   they're proposing isn't eligible to be prior art?  Because if

13   we don't need to go through that explanation, that's a chunk I

14   can cut out.

15         ATTORNEY DEVINE:  I have to check the jury

16   instructions, but I don't think so.  There's ten references and

17   they're actual obviousness combinations, except apply to some

18   patents and some --

19         THE COURT:  That's fine.  But we're not going to have

20   any evidence here that something they're relying on doesn't

21   qualify as art.

22         ATTORNEY DEVINE:  No, Your Honor.

23         THE COURT:  Then I'm just going to refer to the prior

24   art is being -- on this section about the question of

25   invalidity of a patent is determined from the perspective of a

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   person of ordinary skill in the art in the field of the

2   asserted invention as of the invention date of the asserted

3   patents.  And we'll just avoid -- just it's more stuff they

4   don't need to know in this particular case.

5           ATTORNEY WICKRAMASEKERA:  That sounds good.

6           THE COURT:  Okay.  Great.  With the briefs, thank you.

7   It was very helpful.  This is much like the damages expert said

8   on Friday, some of this is a little unusual, the way this

9   works.  There is a blurring to some extent between the system

10  that people use to do the surgery and the individual tools.  It

11  was helpful in some ways and also distinguishing in others.

12  The NuVasive case that came up from the PTO in the discussion

13  of nexus because that case involved the methods, and of course,

14  the method claims are broader in that they talk about the

15  entire system and do discuss the neuromonitoring in this step.

16  It is a question of fact for the jury whether or not there is a

17  nexus between the claimed invention and what's asserted to be

18  the commercial success and all the other secondary

19  considerations.

20          In this case, I think at this point, there is

21  sufficient evidence in the record that although to obtain the

22  ultimate goal here, this reproducible minimally invasive safe

23  procedure, you need more than just the specific tools that are

24  covered by the claims.  Those tools are part of the system,

25  certainly the retractor, there's been evidence the way it is

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1  designed to slide over or engage the dilator so that minimal

2  amount of tissue would be caught between the retractors and the

3  dilators to create the minimally invasive entry and then

4  evidence that the retractors in opening give a clearer vision

5  to the spine and, therefore, that is significant to the ability

6  to do the surgery, quickly, safely therefore.

7       So I think that the parts here -- there's sufficient

8  evidence for the jury to decide whether or not -- what

9  contribution they make that can be credited toward the success,

10  the commercial success.  I don't think it would be

11  inappropriate to discuss that.  The commercial success isn't

12  dependent on these parts alone, that certainly the system is

13  broader than what is alleged to be infringed in this particular

14  case, the claims.  But I will not as a matter of law exclude a

15  discussion at this point of secondary considerations, and you

16  know it is something for the jury to consider as part of the

17  factual basis of their analysis of obviousness.

18       Obviousness is at the end of the day a matter of law,

19  and I might have a different opinion at the end of the day than

20  the jury as to whether those secondary considerations really do

21  teach away or otherwise, you know, show that these tools would

22  not otherwise have been obvious to people performing surgery.

23  But I'm going to let them hear it and then we'll deal with it,

24  if we have to deal with it, at the end of the day.

25       ATTORNEY WICKRAMASEKERA:  Your Honor, just one

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1    comment.  We have never had an issue with respect presenting

2    secondary considerations regarding the actual components, the

3    retractor, the dilator.  If they have that issue, that's not an

4    issue for us.  The big issue for us is equating or conflating

5    XLIF with the claimed invention.  That puts us in the position

6    to argue to the jury that XLIF is obvious, and that's not our

7    burden.  And so that's the big issue that we have here.

8          We don't think there's any dispute in the record at

9    this stage that XLIF contains significant separately patented

10   components that are necessary for XLIF to function.  Their

11   witnesses admitted to it.  There's no dispute.  Every single

12   one of their witnesses in response to questions from their own

13   counsel about the lateral system we're all here to talk about

14   today, they all responded regarding XLIF.  The problem that we

15   have is that they're equating XLIF with the claimed invention,

16   and it's simply not.

17         So again, we don't have an issue with them presenting

18   secondary considerations regarding the MaXcess retractor and

19   the dilators.  Those are the components and whatever actual

20   components are in the claim.  Essentially we should be judged

21   by the same standard.  They've never put it in evidence that we

22   do XLIF because we don't.  And so they got an order from Your

23   Honor saying we infringe the '832 patent without any mention of

24   what the neuromonitoring was.  And so we think that's just an

25   issue.  It's an overall confusion for the jury because counsel

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1    is taking the word XLIF out of it and then asking their

2    witnesses about the lateral system, and there is no lateral

3    system for NuVasive.  That is simply the claimed components.

4    It's got significantly unclaimed components.  That's the big

5    issue we have.  Again, I understand Your Honor's comment, and

6    we agree, regarding the retractor and the claimed components,

7    that should be fair game.  We haven't seen any of that yet, but

8    XLIF is an issue.

9             THE COURT:  All right.

10            ATTORNEY DEVINE:  So the fact is that you cannot

11   divorce the retractor, all the tools from the word XLIF, right?

12    The word XLIF is not entirely synonymous with the

13   neuromonitoring.  You can't divorce it.  We have tried to

14   differentiate in our language and I can tell you we have no

15   intention of arguing or putting on evidence in an attempt to

16   argue that they have somehow failed to prove obviousness

17   because they didn't find our neuromonitoring box in the prior

18   art.  That's not what our argument is.  So, you know, to the

19   extent that we have secondary considerations that they think

20   are more related to the box than the retractor, then I'm sure

21   that can be addressed in the testimony.  But it seems to me, a

22   matter of semantics at this point.  You can't take the word

23   XLIF away from the retractor that is used to perform XLIF.

24            THE COURT:  Well, patent law is all about semantics.

25            ATTORNEY DEVINE:  Oh, I know.

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1     THE COURT:  And it is difficult because there is a

2  blur here.  The claim is for a system that does a certain thing

3  comprising, but then the actual limitations that are at issue

4  are essentially, you know, the shim a third tool.

5     ATTORNEY DEVINE:  Right.

6     THE COURT:  But those tools alone cannot do -- I mean,

7  I asked Dr. Youssef, could you do this surgery with just those

8  tools without any kind of monitoring, and I believe his answer

9  was no, you wouldn't do that?

10     ATTORNEY DEVINE:  Right.

11     THE COURT:  And so you come full circle back around to

12  yes, I understand those tools add to the efficiency and the

13  effectiveness of doing these surgeries.  Obviously the other

14  components are required.  So their situation here is, you know,

15  are they going to show the jury prior art of a three-bladed

16  retractor and be told well, no one would have thought of using

17  that in a lateral surgery because it doesn't connect to

18  neuromonitoring when none of the claims say these retractors

19  have to connect to neuromonitoring.

20     ATTORNEY DEVINE:  No, that is not neuromonitoring.

21     THE COURT:  I'm trying to guesstimate where we're

22  going.  So again, it's a factual question, you can put on the

23  secondary considerations.  If something goes sideways and you

24  want to object and I want to talk about it out of the presence

25  of the jury and if I need to strike it, I will, or we'll just

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   deal with it, but I'm not going to prohibit you from having

2   testimony on secondary considerations if not obviousness.

3           ATTORNEY DEVINE:  Thank you, Your Honor.

4           THE COURT:  Are we ready?

5           ATTORNEY DEVINE:  I believe we have an issue we need

6   to address about the first witness to testify.

7           THE COURT:  Okay.

8           ATTORNEY CARLSON:  Good morning, Your Honor.  Eric

9   Carlson.  The first issue -- or I believe the only issue this

10  morning is with two exhibits to be used with Ms. Howell's

11  direct.  These are exhibits are documents that were not

12  produced in discovery, they were not vetted through fact or

13  expert discovery, and they relate to Alphatec's new system

14  called Prone Trans-Psoas or PTP.  We expect, or we suspect,

15  that Alphatec may be trying to put forth PTP as a

16  non-infringing alternative, and it was never disclosed in a rog

17  response.  Their technical expert never addressed it in his

18  expert report, and we think Ms. Alphatec is going to use

19  Ms. Howell, an improper lay opinion, to create or backfill

20  whether or not this is a non-infringing alternative.  So we

21  object to the use of DTX-454 and 962.  These are PTP related

22  documents.

23          ATTORNEY FODEMAN:  And, Judge, I don't know how you

24  want to do this, there's a corollary issue to the first witness

25  too.

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1        THE COURT:  Let me hear their response before you

2    double team them.  Go ahead.

3        ATTORNEY WICKRAMASEKERA:  Good morning, Your Honor.

4    We are not going to use 962, so I don't think that's going to

5    be an issue.  With respect to 454 -- may I use the Elmo?  This

6    is testimony that NuVasive's counsel elicited on direct

7    examination of their expert witness, Dr. Youssef.  He

8    specifically referred to Alphatec's two-bladed prone

9    trans-psoas retractor, and he did so in the context of

10    explaining to the jury that Alphatec has no available

11    non-infringing alternatives, and he said that Alphatec's

12    two-bladed retractor does not have any published data and he's

13    implying that it's unacceptable.  So they elicited testimony on

14    PTP with their own expert on the issue of non-infringing

15    alternatives.

16        More importantly, there was a Daubert motion related

17    to the PTP retractor and Your Honor ruled against them.  We

18    have already gone through this.  We disclosed early and often

19    in the discovery process that we had two-bladed options

20    available to us.  There's been testimony we had a license to

21    the Branch patent, which both parties have a license to, and

22    that patent covers multiple blades, including two blades.

23        And the document they're referring to is simply a

24    document -- we're not going to be providing any expert

25    testimony on the two-bladed retractor.  It just is what it is.

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   They did ask our witnesses about it during discovery.  This

2   product launched after the discovery closed for the first

3   phase.  But they did actually ask our witnesses about it.

4            And the only thing that we have on this slide

5   presentation, Your Honor, which is an overview to assist

6   Ms. Howell with introducing the jury to Alphatec is just a

7   picture of the retractor that's up here.  And so it is simply

8   giving the jury a visual of what that retractor is that

9   Dr. Youssef referred to and telling the jury about Alphatec's

10  launch of that retractor.

11           So they opened the door to it in direct, Your Honor.

12  They implied that it was an unacceptable product.  They implied

13  that it has no published clinical data, and that's the

14  impression the jury has now.  But she's not going to be

15  providing expert testimony as it relates to this two-bladed

16  retractor in any patents.

17           THE COURT:  All right.  The only slide you want to use

18  out of this whole deck then is 21?

19           ATTORNEY WICKRAMASEKERA:  No.  We're going to use --

20  well, we're going to use the cover, Your Honor, and then we are

21  going to also use slide -- you have the slide up there.  We're

22  also going to use slide 15 -- 14 and 15 just to introduce the

23  products that Alphatec has.  So she's going to give them an

24  overview of the company, and this is a presentation that,

25  Ms. Howell gives frequently, and then she is going to use that

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1  slide regarding PTP, which is the slide I showed you, simply

2  introducing PTP to the jury and responding to some of the

3  comments that Dr. Youssef made whether surgeons would have used

4  PTP because he said that they wouldn't.

5         ATTORNEY CARLSON:  So, Your Honor, we don't have a

6  problem with them saying PTP is one of our products, generally

7  we're innovative.  Our concern is whether that crosses the line

8  putting this forth as a non-infringing alternative.  They don't

9  have expert testimony on that, so they shouldn't be allowed to

10 do it at trial.  I understand from counsel that they are not

11 going to be running 962, so that resolves that issue.  And then

12 the only other issue is the slide deck, and as I said, our only

13 concern there is that Ms. Howell doesn't stray into putting

14 this forth as a non-infringing alternative.

15        ATTORNEY WICKRAMASEKERA:  Your Honor, they addressed

16 it as a non-infringing.  It's in their expert report.  It's in

17 their -- their damages expert addresses the PTP retractor in

18 his report.  So there's been discovery on it, it's in the case,

19 and they brought it into the case.

20        THE COURT:  I'm going to allow it.

21        ATTORNEY CARLSON:  Okay.

22        THE COURT:  I'm going to allow it.  Anything else?

23        ATTORNEY FODEMAN:  Yeah, Judge.  The only other issue

24 I want to pull out for Your Honor with respect to Ms. Howell's

25 testimony relates to the possibility that her testimony, it

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1    appears, that it may stray into expert testimony.  Obviously

2    Ms. Howell is a very successful clinician with a very long

3    history, both at NuVasive and now Alphatec.  She has a number

4    of degrees, and she's obviously very accomplished.  What made

5    me concerned -- and I should also just to give you a sense of

6    what I expect you're going to hear, you may recall we called

7    Mr. Kyle Malone at the beginning of the case.  He worked for

8    Ms. Howell.

9            THE COURT:  Yes.  Mr. Malone and Mr. McClintock did a

10   lot of explaining to the jury about things they know or either

11   learned in their percipient knowledge that also could have been

12   arguably expert testimony.  I'm going on give them the

13   equivalent leeway.

14           ATTORNEY FODEMAN:  I totally get it.  I just want to

15   point out that when we got their exhibits, I see things like

16   PTX-199 it's a clinical study, Outcome of Fusion Rates over the

17   first 30 Extreme Lateral Interbody Fusions.  It's a scientific

18   document.  And then you go to 298, can trigger electromyography

19   monitoring throughout the retraction, predict post-operative

20   symptomatic neurapraxia after XLIF results from a perspective

21   multi-centered trial.  And there are three or four others that

22   are obviously very scientific documents that are otherwise

23   hearsay that you would typically have an expert walk through

24   and explain their significance.  If that's where this is

25   headed, I think that's a far cry from having Kyle Malone say

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1  what is ALIF, what is PLIF.  I haven't heard the testimony.
2  Obviously you haven't either.  I appreciate we're all at a
3  disadvantage here.  I did want to flag it in case we start
4  getting beyond what I understand was an issue with Mr. Malone
5  and way out here where we're talking about what is science,
6  total science.

7              ATTORNEY WICKRAMASEKERA:  Your Honor, unlike
8  Mr. Malone, Ms. Howell was the person who actually did the
9  research to pulling together those articles, so she's going to
10 be testifying from her personal knowledge as to what they did,
11 what they were trying to do, and what they personally put in
12 the articles.  She's not going to be providing any expert
13 testimony.  I really think this is not going to be an issue,
14 but I think they can object as we get the questions.

15             THE COURT:  I think he's flagging something, so we'll
16 keep it on the back burner until we get to her testimony.
17 Anything else?  No?  Good.  Because I want to get the jury.

18             ATTORNEY TANNER:  Your Honor, briefly, we do have a
19 couple of issues related to a couple of witnesses coming down
20 the pike.

21             THE COURT:  I don't want to do that now.  The jury is
22 here.  They're waiting.  It's Monday morning.  I don't want to
23 keep them any longer.  They have been very prompt.  So let's
24 get them in the box.

25             Who is the first witness?

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1          ATTORNEY WICKRAMASEKERA:  Ms. Howell, Your Honor.

2      (Pause in the proceedings)

3      (Jury entering at 8:33 a.m.)

4          THE COURT:  Good morning, everybody.  Welcome back.

5  Glad to see you all here this morning.  We are going to

6  commence with witnesses now from the defense side.

7          So if you would like to call your first witness to the

8  stand.

9          ATTORNEY WICKRAMASEKERA:  Thank you, Your Honor.  The

10  defendants call Ms. Kelli Howell.  Your Honor, may I approach

11  to put a bottle of water at the witness box?

12          THE COURT:  Yes, absolutely.

13      Kelli Howell, called as a witness, testified as follows:

14      (Witness given an oath)

15          THE CLERK:  Please state your name, spelling your last

16  name for the record.

17          THE WITNESS:  My name is Kelli Howell, H-O-W-E-L-L.

18          ATTORNEY WICKRAMASEKERA:  Your Honor, may I proceed?

19          THE COURT:  Yes, you may.

20                    **DIRECT EXAMINATION**

21  BY ATTORNEY WICKRAMASEKERA:

22  Q   Good morning, Ms. Howell.

23  A   Good morning.

24  Q   The jury has seen you in the courtroom today and they've

25  seen your video already, but could you please reintroduce

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   yourself to the jury?

2   A   Yes.  My name is Kelli Howell.

3   Q   Who are you employed by?

4   A   Alphatec Spine.

5   Q   What's your current title at Alphatec?

6   A   I'm executive vice president of clinical and scientific

7   affairs.

8   Q   And how long have you been with Alphatec?

9   A   Just about four years now.

10  Q   And how long have you been in the spine industry?

11  A   A little over 22 years.

12  Q   Where did you begin your career in spine?

13  A   I actually -- I started in an academic role, but my first

14  industry role was with NuVasive.

15  Q   We've heard a lot of testimony any XLIF in this case

16  already.  Were you involved in the development of XLIF?

17  A   I was.

18  Q   At a very high level?  How extensively?

19  A   Well, I was not a design engineer per se, I was not

20  creating engineering drawings, but I was part of the R&D team

21  providing insight as to what the development of those

22  instruments requires, working with surgeons, and providing

23  design criteria.

24  Q   What was your title when you left NuVasive?

25  A   I was vice president of research and health informatics.

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1  Q   Is that a similar role today to what you hold at Alphatec

2  today?

3  A   Yes.

4  Q   And we'll come back to that, but let's talk briefly about

5  your background.  Where did you go to the college?

6  A   I went to Dartmouth in New Hampshire.

7  Q   And what degree did you get?

8  A   It was Bachelors with a major in engineering sciences.

9  Q   And did you continue your education after Dartmouth?

10  A   I did.  I went to graduate school at Boston University.

11  Q   And what degree did you get?

12  A   It was a Masters in biomedical engineering.

13  Q   And are you originally from Boston?

14  A   I am.

15  Q   And what brought you to San Diego?

16  A   A boy, I guess.  I met my future husband while in graduate

17  school.  He is from San Diego and so when he finished his

18  degree, he wanted to live here to move close to his mom and

19  asked me to join him.  And it all worked out.  Two kids later,

20  it's home to me.

21  Q   Let's talk about your work at Alphatec.  How long have you

22  been vice president of clinical affairs?

23  A   Since I started with them, so just about four years.

24  Q   And what does your position involve?

25  A   It is responsibility over multiple subdepartments that

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   includes research, education, regulatory, and quality.

2   Q   And how many people do you oversee in your group?

3   A   It's about 65.

4   Q   Let's focus on your work in research and development for a

5   moment.  What are your day-by-day responsibilities like in that

6   area?

7   A   Like I said, I oversee several departmental functions, and

8   in a lot of respects, I'm supervising those roles, but where I

9   spend most of my day-to-day time is -- given my background in

10   research and education, I spend most of my time in that field.

11   Q   How does your work relate to product development?

12   A   There's a variety of functions.  There's a lot of

13   pre-commercialization work.  So in terms of providing that

14   insight and informing what the development design criteria

15   might need to be, working with surgeons to understand the

16   clinical demand and what products we may need to be developing

17   to create those solutions.  And then through the validation of

18   those in order to gain FDA clearance and ultimate clinical use,

19   and then following introduction into the market with clinical

20   use continuing to study those outcomes associated with those

21   products in order to feed that back into the R&D cycle.

22   Q   Do you work directly with surgeons?

23   A   I do, yes.

24   Q   Okay.  How frequently?

25   A   Daily.

1   Q    Give us an overview what's that like.   What do you do with

2   surgeons?

3   A    Sure.   As I was saying, collecting that information from

4   clinicians, working with surgeons on a regular basis to

5   understand what their challenges are, what we're trying to

6   solve -- what are the problems we're trying to solve, and then

7   whether the concepts that we're developing will be meaningful

8   to those issues.   So from a research perspective, again, on

9   that front end.

10       And then on the back end involved with them directly to

11  follow their patient outcome.   So collecting that data,

12  analyzing that data, helping them to publish that data and then

13  using that published data to teach other surgeons.   So from an

14  education perspective, it's sort of the other hand of

15  education, we study it and share those findings on the

16  education side through surgeons.

17  Q    And did you have a similar role while you were at NuVasive?

18  A    I did, yes.

19  Q    How would you describe Alphatec as a company today?

20  A    You know, I call it a restart.   It's not exactly a startup

21  because it's been around for a long time, but as you've heard

22  testimony already, it was a struggling company for many years.

23  In the last handful of years, had the opportunity to breathe

24  new life into the business through an influx of business,

25  influx of new management, new team members, new product

1   development that really makes it feel like a startup company,

2   so it's very dynamic, it's very innovation focused, it's very

3   clinically focused, very fast moving, growing.

4   Q    Where is Alphatec located?

5   A    Carlsbad.

6   Q    How many employees do you have today?

7   A    I think it's a little over 400 right now.

8   Q    When you started in Alphatec, that was 2018?

9   A    Correct.

10  Q    How many employees did they have?

11  A    I'm going to say about 120.

12  Q    As part of your work, do you provide corporate overviews to

13  surgeons?

14  A    I do, yes.

15  Q    Why is that important?

16  A    It's an introduction to the company.  When surgeons come to

17  visit us or if we're teaching a course, then we're explaining

18  who we are as a business and certainly some of our product

19  portfolio, but really understanding our vision and values.

20  Q    Okay.  And do you prepare presentations to a company, these

21  overviews?

22  A    I do, yes.

23  Q    Can we turn to DTX-4544.  Ms. Howell, do you recognize this

24  document?

25  A    Yes, do.

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1  Q   And what is this document?

2  A   This is a corporate overview presentation that I would have

3  given to surgeons visiting.

4  Q   Do you maintain this presentation and presentations like

5  this during the course of your work at Alphatec?

6  A   I do, yes.

7          ATTORNEY WICKRAMASEKERA:  Your Honor, we move to admit

8  DTX-454.  If you would like the specific pages, it's 1, 14, 15,

9  7, and 21 we'll be referring to.

10          THE COURT:  Objection?

11          ATTORNEY FODEMAN:  No objection.

12          THE COURT:  It's admitted.  Thank you, those pages.

13      (DTX-454, pages 1, 7, 14, 15, 21, admitted)

14          THE CLERK:  1, 7, 14, 15, and 21?

15          ATTORNEY WICKRAMASEKERA:  Yes.

16          We can perhaps put slide 1 up.

17  BY ATTORNEY WICKRAMASEKERA:

18  Q   So Ms. Howell, does Alphatec focus on one particular spine

19  condition?

20  A   No.  We're a full service spine company so we have products

21  that support all spine conditions.  The biggest group of

22  conditions that we treat is the biggest group of conditions

23  there is which is the degenerative category.  I think you've

24  heard a little about that already.  But we do have products for

25  deformity, tumor, trauma, infection within that degenerative

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   category.  Again, probably the largest volume of our case

2   support.

3   Q    What is degenerative disease that you refer to and how do

4   you treat that?

5   A    Yeah.  By that what we mean is as we age and our spines

6   wear and tear, we lose water content in the disc, the disc

7   might herniate, it might collapse, you impinge might impinge

8   nerves because of that, your might lose spinal alignment

9   because of that.  All of that happening because we're aging.

10  And that can lead to pain and disfunction.  And the way that we

11  generally overcome that is through some decompression of the

12  nerves that may be pinched, but then also immobilization of

13  that motion segment by fusing across two vertebra.

14  Q    You said "decompression of the nerve."  What is that?

15  A    Taking whatever is impinging away from the nerve.  So if

16  there is a disc herniation or the bones are collapsed and

17  pressing on the nerve, we need to fix that so the nerve is

18  freely moving .

19  Q    You said this is treated with a spinal fusion procedure?

20  A    Often, yes.

21  Q    Let's turn to slide 14.  Let me ask you, Ms. Howell, what

22  are the different types of spinal fusion procedures that

23  Alphatec supports?

24  A    All of them.  I think you've heard testimony already

25  explaining there are different ways to approach the spine.  But

1  with this graphic is showing is that Alphatec has products that

2  support all of those approaches and levels of the spine.  So we

3  have cervical or neck fusion solutions as well as in the middle

4  spine and the low spine.  Whether you come in from the front or

5  the back or the side, we have solutions that support all of

6  those procedures.

7  Q   What types of products does Alphatec provide to support

8  these various fusion procedures?

9  A   The types of products vary based on the procedure that's

10 done.  But we really like to take a procedural approach and

11 include solutions that range from diagnostic technologies to

12 how you position to the patient on the table to access tools to

13 the spacers and internal fixation that we've talked about as

14 well.  Those things that actually hold the spine together as

15 well as biologic materials, interactive neuromonitoring, and

16 other computer assisted technologies.

17 Q   How does Alphatec compare in size to its competitors?

18 A   We are a very small player.  We make up 1 and 2 percent of

19 the total spinal market and much less significant in the

20 lateral space.

21 Q   And what is Alphatec doing to grow its market share?

22 A   It is that startup mentality.  It is that culture of

23 innovation and dynamic growth and product innovation we have

24 kind of talked about who we are as a company.  It is that kind

25 of thing that really drives interest by surgeons to work with

1   an organization that is continuing to evolve its own product

2   line.  We like to talk about obsoleting ourselves.  Surgeons

3   are in this business to make patients better, and if there's

4   new technology that helps them to do that, they want to be a

5   part of that.

6   Q   Let's turn to slide 15, please.  Ms. Howell, can you tell

7   us how does innovation -- actually let me ask you this question

8   first, how does innovation help Alphatec drive sales?

9   A   I guess similar to what I was just describing.  The idea

10  that surgeons want to be involved with something that's

11  innovative.  And increasingly obsolete in our own products over

12  time means that we're trying to innovate.  Innovation comes

13  with continued development.  And so our willingness to commit

14  to that kind of exercise where we're creating new products all

15  of the time and hope that -- surgeons are hoping that those are

16  going to help their patients.  So it drives interest for sure

17  to use those products.

18  Q   Looking at slide 15 which the jury has in front of them as

19  well.  Can you tell us what you're showing here?

20  A   What this slide is really meant to show is not all the

21  products we offer at Alphatec, but the ones most recently

22  launched so between 2019 and 2020 on this slide.  It is meant

23  to show the breadth of the product portfolio as well as the

24  volume of new introductions to the market.  This is not typical

25  that spine companies would introduce 15 new products in a

1   single year.  And we are introducing those products across a

2   variety of the procedural platforms, again, from the neck down

3   to the sacrum.  And like I said, it's 15 new products in 2019,

4   11 new products in 2020, and 14 new products in 2021.

5   Q    Okay.  Thank you, Ms. Howell.  Let's focus on the lateral

6   procedures that we see on the slide.  How many different

7   lateral trans-psoas procedural solutions does Alphatec offer?

8   A    Two.

9   Q    Can you tell us what those are?

10  A    It's the information in right two columns of the slide

11  listed here as LLIF and PTP.  LLIF really meaning what we think

12  of as traditional laterals that you have been hearing about

13  with the patient lying on their side.  We call that LLIF LTP,

14  but it is the more very of lateral PTP alternative with the

15  patient lying prone or with the face down but still approaching

16  the spine from the side.

17  Q    Let's take each one in turn.  What kind of retractor is

18  used with Alphatec's traditional lateral trans-psoas procedure?

19  A    That LLIF LTP procedure uses the Squadron retractor.

20  Q    And do you provide surgeons with an overview of Squadron

21  retractor?

22  A    I do, yes.

23  Q    What features do you highlight?

24  A    We talk a lot about the differentiating factors of it, and

25  there are a lot of tools in this space.  Every company has a

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1    lateral procedure.  And the things we highlight are the things

2    that we see as different.  And for that, there are some unique

3    features of the mechanisms of that retractor that allow for.

4        First, of which is independent opening of those blades.

5    Rather than opening simultaneously top to bottom, those blades

6    can be opened independently top or bottom, and that can have a

7    real clinical impact when I think somebody else had described

8    you could be bumping up against the pelvis and so if you try to

9    open the retractor, both blades, it can have a tendency to push

10   the retractor towards the head and then you're off of the disc

11   space.  And so one opportunity independently moving blades is

12   that you can open only one and not get pushed, so you're still

13   sitting over the disc space.

14       Another feature of that retractor is what we called

15   LevelToe.  If you are up against that pelvis, you may need to

16   tilt the blades now going deep in -- tilt the blade under the

17   pelvis in order to reach the disc space.  A lot of retractors

18   have that feature, but what the Alphatec retractor does is do

19   it in a way that stays deep so it actually pushes down and out

20   so you don't get tissue creeping underneath the blade.  Really

21   all of these additional design features are about that

22   avoidance of tissue creep.  You've heard some people talk about

23   that too that there's a tendency for the surrounding tissue to

24   slip in under the exposure which you're trying to avoid.  And

25   some of these features help with that.

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1      Another is the ability to raise and lower the blades.  For

2  the same reason, you might need to come up and over some

3  anatomy so that you can create the clean exposure, or to remove

4  a blade entirely and replace it with a different length.

5  Q   And that would be during the surgery?

6  A   Yes.

7  Q   Does Alphatec offer an alternative to the Squadron

8  retractor for lateral?

9  A   We do.

10 Q   Let's turn to slide 21 so we can take a look at that a

11 little bit better.  Ms. Howell, what are we seeing here?  What

12 is PTP?

13 A   This is as I was describing an alternative way to do

14 lateral surgery with the patient laying face down as opposed to

15 on their side.  And what this slide is showing is a variety of

16 tools that may be used in that procedure, including a patient

17 positioner, a neuromonitoring platform, as well as a

18 specialized retractor for that procedure.

19 Q   Let's zoom in a bit on the retractor.  Can you tell us what

20 are some of the key features of this PTP retractor?

21 A   This is a two-bladed retractor.  You can see where it says

22 "A" and "P."  That's anterior and posterior, so those blades

23 open not top to bottom as has been described about some other

24 systems, but anterior and posterior so front to back.  And that

25 we also think is an important feature, the design of this

1   retractor.  They also move in those directions along a rack so

2   they can move independently and with discreet movement.

3   Q   Ms. Howell, do you recall testimony from NuVasive's expert,

4   Dr. Inglish, he talked about -- he had a list of 28 surgeons

5   that he said came to Alphatec for the Squadron retractor.  Do

6   you recall that?

7   A   I do, yes.

8   Q   Maybe if we can put that slide up.  I think it's slide 27.

9   There we go.

10      Ms. Howell, do you know the surgeons that are listed on

11  this slide, Mr. Inglish's slide?

12  A   I do.  I know all of them.

13  Q   Is it correct to say any of surgeons came to Alphatec

14  because of the Squadron retractor?

15  A   No, that is not true.

16  Q   Can you tell us why are they working with Alphatec today?

17           ATTORNEY FODEMAN:  Objection.  Speculation.

18           THE COURT:  Well, no.  To your knowledge.  Go ahead.

19           THE WITNESS:  To my knowledge, all of them are working

20  with us for a variety of different reasons.  The majority, more

21  than half of the surgeons on this list are actually PTP users,

22  and so their interest was in continuing to advance lateral

23  surgery and do it differently.  In fact, others who are on this

24  list who still do lateral decubitus lateral surgery interested

25  and came because they're interested in developing new systems

1    for allowing decubitus as well.  There are other surgeons in

2    this list who came because they were interested in developing

3    new technology for new procedures for CLIF procedures or for

4    cervical procedures.  All these surgeons are interested in

5    continued advancement for spine surgery.

6    BY ATTORNEY WICKRAMASEKERA:

7    Q    So, Ms. Howell, is the PTP retractor currently on the

8    market?

9    A    It is, yes.

10   Q    How has it been received by surgeons?

11   A    Exceedingly well.  It's really the reason surgeons are

12   coming right now to our office.  We offer PTP courses, and it's

13   the vast majority of interest in Alphatec.

14   Q    And are you aware of surgeons asking to use the two-bladed

15   PTP retractor instead of the Squadron for lateral?

16   A    Yes, I do.

17   Q    Ms. Howell, based on your experience and years at NuVasive

18   and Alphatec, are you familiar with competitor lateral

19   products?

20   A    Yes.

21   Q    What companies -- while you were at NuVasive, what

22   companies offered competitive lateral procedures?

23   A    Well, ultimately all of the spine -- large spine players

24   had developed a system kind of in order, if I can think back

25   from a timing perspective, probably the next entrant was

1    Medtronic, really the largest spine company, Globus, DePuy

2    Synthes, K2M, Stryker.  Again, all spine companies.

3    Q    Do you recall what the name of the Medtronic procedure was?

4    A    The procedure is called DLIF.

5    Q    While you were at NuVasive, were you aware of NuVasive

6    losing XLIF business to any of these competitors?

7    A    Yes.  Frequently.

8    Q    What competitors come to mind?

9    A    Again, all of those discreet examples of those who were

10   trained by NuVasive on XLIF but ultimately became Medtronic

11   users or Globus users or K2M users.

12   Q    And the Medtronic procedure, DLIF, how many blades does

13   that retractor have, if you know?

14   A    It is a two-blade retractor.

15   Q    Now how would you describe NuVasive's market share over the

16   years in lateral?

17   A    Well, I mean, it started as a hundred percent market share

18   but eventually incrementally lost market share to all of these

19   new entrants into the space.  If there were new options and

20   surgeons with those options available left the use of

21   NuVasive's products to work with those companies, and I suspect

22   for a variety of reasons.  Again, multiple options in the

23   space, but also some frustration as we became a bigger company,

24   I think you heard testimony about some frustration with the way

25   that the business was growing to beg company mentality, and the

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   slow pace of innovation by surgeons in the field.  But also

2   there is a -- remember, younger surgeons wanting to be part of

3   the first wave of new company's activity as opposed to riding

4   the wave already created at NuVasive.  So there was always an

5   emphasis to try to maintain our engagement with those surgeons,

6   but they left.

7   Q    Based on your experience with surgeons and working with

8   surgeons, did you consider these non-XLIF lateral procedures to

9   be unsafe?

10  A    No.

11  Q    Can you tell us why?

12  A    You know, I would say that there are preferences and biases

13  for how the procedure may be done, but the reality is that

14  these companies would not have continued market share if the

15  procedures were unsafe.  Surgeons would not continue to do

16  unsafe surgery.  And, you know, we are a regulated business.

17  If they were unsafe surgeries, the FDA might have something to

18  say about that.

19  Q    Ms. Howell, do you recall Dr. Youssef testifying that

20  Alphatec's lateral system is the most interchangeable with

21  XLIF?

22  A    I do, yeah.

23  Q    Did you agree with him?

24            ATTORNEY FODEMAN:  Objection.  Expert.  Foundation.

25            THE COURT:  Overruled.

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1          THE WITNESS:  Can you repeat the question?

2   BY ATTORNEY WICKRAMASEKERA:

3   Q    Yes.  Do you agree with Dr. Youssef that Alphatec's lateral

4   system is the most interchangeable with XLIF?

5   A    I don't.  You know, there are several similar devices on

6   the market, and really the biggest differentiator that NuVasive

7   had was in the neuromonitoring features of that procedure.

8   Q    Just as someone who developed XLIF and was involved with

9   its launch, what did you consider to be most critical on the

10  success of XLIF?

11  A    It always has been the neuromonitoring.

12  Q    What did you consider to be the most critical component to

13  the safety and repressibility of XLIF?

14  A    The neuromonitoring.

15  Q    When you joined Alphatec, did it have neuromonitoring?

16  A    No.

17  Q    Does it today?

18  A    We do.

19  Q    How is it different from NuVasive's?

20  A    It is a significantly different set of the algorithms for

21  how we monitor the continued health of the nerve, not simply

22  how you get their safely, but how we continue to monitor

23  whether the nerve is at risk during the remainder of the

24  surgery.  They're really different modalities, different

25  algorithms.

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1    Q   Ms. Howell, based on your experience, what factors do
2    surgeons consider when deciding what products to use?
3    A   I would say that it is a range of factors.  Certainly
4    surgeons are only going to use products that they believe are
5    going to be good for their patients so they've got to trust
6    that for sure.  But, you know, I have witnessed migration and
7    interchangeability of surgeons between companies based on a
8    variety of factors that include changes in the local sales
9    force and representation, pricing at a hospital.  I think that
10   came up in testimony earlier as well.  If the hospital denies
11   pricing to a company, then the surgeons are obligated to use
12   what the hospital allows.  And so there are those kind of
13   practical issues that might force a surgeon's hand in what
14   products they use as well.
15   Q   How does the relationship with the company factor in?
16   A   It can be significant.  I mean, the idea that they want to
17   be working with a company that is innovative and open to their
18   ideas and suggestions, it's an important factor.
19   Q   And based on your experience, how difficult is it for
20   surgeons to switch between different lateral systems?
21   A   Not technically difficult at all.  I think you heard
22   testimony by Dr. Youssef that he -- he was able to understand
23   how the Squadron retractor was used based on reading the
24   surgical technique.  The technical components of how those
25   systems work aren't a hurdle to that, it's probably more of

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   those practical issues of do I trust the salesperson who is

2   going to bring it in and what is the pricing and those kinds of

3   things.

4   Q    One question on pricing before I move on from this topic.

5   Ms. Howell, did you hear Mr. Inglish, NuVasive's damages

6   expert, say that Alphatec matches NuVasive's price for XLIF,

7   and he attributed that testimony to you.  Do you have any

8   response to that?

9   A    Yeah.  I would just say, mischaracterized my testimony,

10  which was not that -- it was in the context of whether Alphatec

11  might actually undercut the pricing of NuVasive by coming in at

12  a lower price, and my response to what was why would we do

13  that?  What we would do is to price the system where the market

14  would bear, and not specifically compare to NuVasive, but what

15  the market would bear.

16  Q    Does Alphatec sometimes price its product higher than

17  NuVasive?

18  A    Yes.

19  Q    Let's shift to talk about your work while you were at

20  NuVasive.  Can you tell us what years you worked at NuVasive?

21  A    I started there in 1999 and I left there in 2018.

22  Q    How big was the company, NuVasive, when you started?  How

23  many employees?

24  A    It was a very small startup company.  It was maybe 20

25  employees.

1   Q    Did NuVasive have any commercial products when you joined?

2   A    It did not.  I always say we had no products, only ideas.

3   Q    What was your role at NuVasive over the years?

4   A    Well, I mean, I started as a project manager.  So in those

5   early days with the -- the goal was to try to get our ideas

6   into clinical use.  And so what we were working toward was the

7   development and validation enough to get -- FDA clearance to

8   get those products on the market.  So my job was as project

9   manager help to usher that to commercialization.

10        And then through commercialization, my job started to

11   migrate into more clinical.  As those products became more

12   clinically used, my research became more clinically focused,

13   and meaning, following the outcomes after they were used to do

14   research projects associated with that, and then, as I

15   described, using that research to educate new customers on the

16   procedures.  So research and education.

17   Q    Was there any particular technology that NuVasive was

18   focused on in the early days?

19   A    NuVasive was really founded on the idea of coming up with a

20   minimally invasive solution to spine surgery.  I think maybe

21   something that isn't obvious throughout this conversation was

22   that that was not very common at the time in 1999.  It was done

23   but not super common.  And so the company was really trying to

24   find a way to -- to advance that.  And although we kind of to

25   go a few circuitous routes to as to what a solution would look

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1    like, we did appreciate what the difference would be.  When you

2    switch from an open procedure to a minimally invasive one, you

3    can't see the nerves.  The biggest challenge with spine surger

4    is nerves.  And if you can't see the nerves, then what could we

5    do to help that through small exposures.  And so what really

6    became a foundational technology for NuVasive was

7    intraoperative neuromonitoring directed to the surgeon during

8    those procedures.

9    Q    Was there a name for that neuromonitoring?

10   A    The first version of it was called INS 1, but it evolved

11   into what's became the NeuroVision platform which also through

12   iterations changed names to NVMV and now, most recently, Pulse.

13   Q    And was that technology ultimately used with XLIF?

14   A    Yes.

15   Q    Now, Ms. Howell, you were here for Dr. Youssef's testimony,

16   correct?

17   A    I was, yes.

18   Q    Do you agree with Dr. Youssef's characterization of the

19   state of minimally invasive spine surgery at the time in 2003

20   and before?

21           ATTORNEY FODEMAN:  Objection.  Expert.

22           THE COURT:  Overruled.

23           THE WITNESS:  So my impression of that assessment of

24   what was happening at the time was that minimally -- or

25   endoscopic approaches lateral were challenged, and nobody

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1    wanted to do them.  And I would disagree with that assertion

2    because the folks that we were working with to develop these

3    solutions were wanting to move it forward.  And their interest

4    in partnering with NuVasive was to continue to do the surgeries

5    that they were doing laterally minimally invasively but adding

6    this element of safety.  It's what drew them to collaborate

7    with NuVasive at the time.

8    BY ATTORNEY WICKRAMASEKERA:

9    Q    Did NuVasive consult with surgeons to develop XLIF?

10   A    Yes.

11   Q    Did you hold regular meetings with those surgeons/

12   A    We did, yes.

13   Q    What was your role at those meetings?

14   A    I was again, in this context of soliciting surgeon input to

15   our development effort, was really responsible for pulling

16   those surgeons together and then coordinating the discussions

17   and moderating the discussions, taking notes during those

18   meetings, so I could provide that feedback to the company.

19   Q    Let's turn to DTX-589.  Ms. Howell, do you recognize this

20   document?

21   A    I do, yes.

22   Q    Can you tell us what it is?

23   A    These are the notes, or the minutes of one of those such

24   meetings in September of 2003.

25   Q    Did you author these notes?

1   A    Not exactly.  These are the transcription of the notes that

2   I would have taken, but they were actually typed up by the

3   administrative assistant of one the surgeons who was

4   co-monitoring the discussion with me, who was Randy Betz.  So

5   his administrative assistant typed these up.

6   Q    Did you receive a copy of these notes?

7   A    I did, yes.

8   Q    Do these notes reflect your understanding of what occurred

9   at the 2003 meeting?

10  A    Yes.

11  Q    And who maintains these notes today?

12  A    These would have been left in my files at NuVasive when I

13  left.

14        ATTORNEY WICKRAMASEKERA:  Your Honor, I move to admit

15  DTX-589, and I'm going to be referring to, I think it's just

16  the first three pages.

17        ATTORNEY FODEMAN:  No objection.

18        THE COURT:  Do you want to just admit the first three

19  pages?

20        ATTORNEY WICKRAMASEKERA:  That's fine.

21        THE COURT:  Do you want the whole thing or just those

22  three pages?  Counsel.

23        ATTORNEY FODEMAN:  I think just the first three pages

24  at this point.  See where this goes.

25        THE COURT:  The Court will admit 589, pages 1 through

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1    3.

2        (DTX-589, pages 1-3 admitted)

3    BY ATTORNEY WICKRAMASEKERA:

4    Q    There we go.  Ms. Howell, of the surgeons you see listed on

5    this front page, how many of them before 2003 were doing

6    minimally invasive lateral trans-psoas surgeries?

7    A    Maybe a handful of them.  I know Neel Anand who was working

8    with John Regan.  They were approaching the spine laterally.

9    Paul McAfee.  Both Regan and McAfee had published on that

10   procedure.  I know Luiz Pimenta was doing lateral approach

11   surgery in Brazil.

12   Q    Okay.  Ms. Howell, let's actually turn to page -- I'm going

13   to look at the bottom of page two, top of page three.  There we

14   go.  Here it says that next, Pat Miles reviewed the progress

15   from the previous SEN meetings to the evolving of the current

16   MaXcess system.  He reviewed the history and then described the

17   current system which can provide for a minimal to maximal

18   access with an illuminated bifurcated speculum.  What is being

19   discussed here?

20   A    This is a 2003 meeting.  And we had meetings with this

21   group of surgeons since the year 2000.  And what they're

22   describing is an evolution in the conversations that had been

23   had working from tubular exposures to a split blade retractor

24   that ultimately was called MaXcess.

25   Q    And who was Pat Miles at this time?

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   A   He was head of our marketing department at NuVasive.

2   Q   And how was we involved in the development of XLIF and its

3   components?

4   A   As a lead on the marketing team, it would have been his

5   responsibility to define the design criteria for development.

6   Q   And when did NuVasive announce commercial release of XLIF?

7   A   In the fall of 2003.

8   Q   What products were launched with XLIF at that time?

9   A   It was the MaXcess retractor, the NeuroVision

10  neuromonitoring system, and the -- we had a bone allograft as a

11  spacer.

12  Q   So CoRoent -- the CoRoent implant we've heard about was not

13  launched at that time?

14  A   It was a little bit later.

15  Q   Was MaXcess designed for nonlateral procedures as well?

16  A   It was.  It was promoted for use for posterior approaches,

17  decompressions, and T-LIF procedures, as well as lateral.

18  Q   At the time of its launch, what did you think was different

19  about XLIF compared to the prior lateral systems?

20  A   Well, again, it was the interest by these surgeons who had

21  already had lateral access surgery experience that they were

22  looking for how to blend their experience with the technology

23  that we had at the time, which was neuromonitoring.  So really

24  that was the differentiation, and what we hoped would be a

25  differentiation in outcomes and a proceduralization associated

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   with neuromonitoring.

2   Q    Why was NeuroVision critical to the success of XLIF?

3   A    Because of the concerns of those nerves of the lumbar

4   plexus that live in that psoas muscle that we're traversing.

5   Q    Just to be clear, Ms. Howell, was neuromonitoring new to

6   spine surgery before XLIF?

7   A    No, no.  Neuromonitoring has been around for decades.  It's

8   been around for a hundred years but usually with a generic

9   system and a technician in the corner of the OR in the way you

10  would have an anesthesiologist monitoring the vitals of the

11  patient, you would have a neuromonitoring technician who is

12  monitoring for any disturbances in the nerves.

13       What NeuroVision did that was different was to automate

14  some of that analysis and provide it directly to the surgeon

15  and in a way that was specific in those algorithms to what was

16  exactly happening during the surgery.

17  Q    And, Ms. Howell, dilators with electrodes for use in

18  neuromonitoring, were those publicly used before XLIF?

19  A    It was a technology that we used before we even lunched

20  XLIF at NuVasive.

21  Q    Was that -- were those commercially for sale before XLIF?

22  A    They were.

23  Q    After XLIF launched, what was your involvement with the

24  procedure?

25  A    Like I said, I continued to do research but sort of

1    switching from that pre clinical research to now clinical

2    research, meaning following the outcomes of those patients and

3    conducting research, writing protocols, soliciting input from

4    surgeons in their case data to then publish under those results

5    and then translate it to education.

6    Q    Okay.  And was your research used by the marketing

7    department at NuVasive to help sell the product?

8    A    Sure.  If in a marketing brochure, for example, they wanted

9    to make a claim about the procedure, then they would need to

10   cite that or reference the study that proved that point.

11   Q    And have you heard other NuVasive witnesses talk already in

12   this case about some of the studies that you were personally

13   involved with?

14   A    Yes.  There were some journal articles and the textbooks

15   that were discussed.

16   Q    And what would you say was the technology focus of those

17   journal articles and textbooks?

18   A    The ones that were discussed here really focused on the

19   neuromonitoring features.

20   Q    Now you mentioned a textbook.  And was it an XLIF textbook?

21   A    Yes.

22   Q    What was your role in creating the textbook?

23   A    Sort of more of a project manager to try to identify with

24   the surgeon editors of that book who -- what chapters we might

25   include, where the topical content -- create a table of

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   contents for that book, identifying surgeons who had

2   experiences that would support the content of each of those the

3   chapters, reaching out to surgeons to become authors of those

4   chapters, and then managing them to completion of those

5   chapters, and getting that published through the publisher.

6   Q   Let's turn to DTX-231 in your binder.

7            ATTORNEY WICKRAMASEKERA:  So, Your Honor, DTX-231 is

8   already in evidence in the form of a book.  What I have here is

9   an electronic excerpt, and I'm going to be referring to a few

10  pages of those.

11           THE COURT:  I don't think that this is the book -- I

12  don't think it's been admitted.  It was displayed to the jury a

13  number of times.  If you want to admit certain pages, you can

14  discuss that.

15           ATTORNEY FODEMAN:  I think for ease, I would have no

16  objection to the whole book going into evidence.  I think that

17  would be easier than a bunch of different segments.

18           ATTORNEY WICKRAMASEKERA:  For this particular one, I'm

19  going to be referring to a few pages.  I think they may have

20  already put the book into evidence.

21           THE COURT:  No.  The book is not in evidence.  The

22  book has been displayed to people and identified.  I will now

23  admit the book so that you can use whatever pages you want in

24  the book.  DTX what?

25           THE CLERK:  It was Plaintiff's?

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1          ATTORNEY FODEMAN:  It was PDX-13.  We can make it

2    whatever.

3          THE COURT:  Just pick one.

4          ATTORNEY WICKRAMASEKERA:  We can make it DTX-231.  I

5    think that's our full electronic copy of it.

6          THE COURT:  That's better.

7          ATTORNEY WICKRAMASEKERA:  Thank you, Your Honor.

8      (DTX-231 admitted)

9    BY ATTORNEY WICKRAMASEKERA:

10   Q   Ms. Howell, were you personally involved in the creation of

11   this book?

12   A   Yes.

13   Q   Let's take a look at page 14 to start.  Let's look the

14   acknowledgments.  It says "At NuVasive, Kelli Howell has been

15   the engine running the vehicle, the book itself."  Are you that

16   Kelli Howell?

17   A   That sounds like me.

18   Q   Let's turn to page 19.  This is chapter 1.  Ms. Howell, can

19   you tell us what generally is this chapter about?  It's titled

20   "historical Background of Minimally Invasive Spinal Surgery" by

21   John Regan?

22   A   Yeah.  This is actually a reprinting of a chapter that

23   Dr. Regan had written about sort of his description and

24   experience of what was the evolution of minimally invasive

25   spine surgery at the time.  Dr. Regan was a proponent of

1    minimally invasive surgery, and so he was sort of following

2    that.

3    Q   Let's look at page. 20 at the bottom.  There we are.

4    Ms. Howell, in this paragraph in the book it says that -- it

5    refers to in 1998, the METRx MED system and it refers to

6    Medtronic.  Can you tell us what that system was?  Did it have

7    a retractor and sequential dilators?

8    A   Yes, it had both.

9    Q   So the book goes on to say "this metric system spawned the

10   development of other tubular retractor systems and the

11   advancement towards split blade retractors, the first of which

12   was MaXcess, which was introduced in 2003."  Do you see that?

13   A   I do, yes.

14   Q   Ms. Howell, at the time -- actually, what was the date this

15   book was published?

16   A   2008.

17   Q   Were you aware of any publications of minimally invasive

18   lateral trans-psoas surgeries using dilators, spit blade

19   retractors, and neuromonitoring?

20           ATTORNEY FODEMAN:  Objection, Judge.  This is classic

21   expert testimony.

22           THE COURT:  Overruled.

23           THE WITNESS:  At the time, I was not aware of that,

24   no.

25

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   BY ATTORNEY WICKRAMASEKERA:

2   Q    How did you -- you can take that down.

3        How did you first become aware of surgeries using those

4   components before XLIF?

5   A    I subsequently became aware of prior art in this space due

6   to a litigation between Medtronic and NuVasive.

7   Q    Was that first time you became aware that Medtronic had a

8   patent to a split blade retractor before XLIF?

9   A    Yes.

10  Q    Okay.  Did you ultimately publish a second edition of the

11  XLIF textbook?

12  A    We did.  In 2013.

13  Q    And does the second edition include the statement that we

14  just looked at about MaXcess being the first split blade

15  retractor?

16  A    Not to my knowledge, no.

17  Q    We have also heard testimony in this case from Kyle Malone.

18  Do you know Kyle Malone?

19  A    I do, yes.

20  Q    How do you know Kyle Malone?

21  A    I hired him to work on my team.

22  Q    We also heard testimony from Paul McClintock.  Do you know

23  Mr. McClintock?

24  A    I do.  I worked with him as NuVasive as well.

25  Q    Were either of them involved in development of XLIF?

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   A    No.  They came much later.

2   Q    And do you know Dr. Jim Youssef?

3   A    I do.

4   Q    Was Dr. Youssef involved in development or execution of

5   XLIF in 2003?

6   A    No, he was not.

7   Q    Was Dr. Youssef around?

8   A    No.  He was not a customer at that time.

9   Q    Let's talk now about your transition to Alphatec.  So why

10  after 20 years at NuVasive, did you decide to leave?

11  A     It was 18 years, a little over18 years at NuVasive.  But,

12  you know, it was -- it was a hard decision to make for sure.

13  This was a company that I was at from its very inception, had

14  an amazing opportunity to build a career -- professional career

15  with them and in an environment that was very rewarding,

16  professionally rewarding in terms of feeling like we really had

17  an impact in spine surgery, having the opportunity to see

18  patients get better, to be very clinically focused.

19       I agree with, you know, some of Mr. Malone's testimony

20  about in those early days, it was really a different company.

21  It was a startup environment, very clinically focused, very

22  innovative.  But not always.

23       Eventually that changed.  And for me, that evolution over

24  time came with a significant inflection point with a change in

25  senior leadership that started in 2015.  In 2015, there was a

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1    replacement of the CEO with a member of the board, and that new

2    CEO had a very different idea of how the company should be

3    managed.  So for many of us who had been there for a long time,

4    it became a very challenging place to be because all of your

5    ideals about who we were as a company and our culture really

6    were being challenged.  And as people left because there was

7    low morale, as you heard from Mr. McClintock's testimony as

8    well, people left.  People were asked to leave.

9        And as those people left, new people came in filling those

10   positions who had different experiences from other companies,

11   and not even spine related companies, and so it really felt

12   like it was evolving into one of those big companies that are

13   much more transactionally oriented and not so focused on the

14   clinical scenario.  And from a research and education

15   standpoint, if we're not innovating anymore then it doesn't

16   feel as rewarding to me because I only need to validate and

17   educate on new things.

18       And it was a hard decision to make, but ultimately --

19   although and I stayed from 2015 to 2018 trying to make it

20   better and really felt like that was a challenging thing to do,

21   it and really took a toll on my personal reflection, on my

22   experience, and so I was just unhappy, and I made a decision to

23   leave in 2018.

24   Q   And these issues that you talked about that arose 2015 up

25   until you left in 2018, how did those affect the day-by-day

1  operations at NuVasive, including your ability to sell?

2  A   I was not the only one who felt that way.  As I said, many

3  people had already left.  People were being asked to leave.  It

4  was very much an environment of us versus them, the old guard

5  with versus the new guard.  And that really seeped into

6  decision-making for the business on a daily basis and who was

7  making those decisions, where they the new folks who weren't as

8  clinically focused operationally.  You know, we were not

9  executing in the way that we needed to.  And so you started to

10  see this decline again, as others had testified, this slowdown

11  in innovation where surgeons were frustrated as well with our

12  pace of innovation that wasn't staying up to speed with how it

13  had been in the past.  So that happened regularly internally.

14  Q   And you saw, I think, Mr. McClintock echoed some of what

15  you're saying about the problems that were there in 2017.  Did

16  Pat Miles have anything to do with those problems?

17  A   So Pat, along with me and others who had been there for a

18  long time, were in this position to try to fix it, try to

19  continue to maintain our culture and move things forward.

20  Mr. McClintock's testimony sort of mischaracterized or

21  misstated the dates associated with that.  He sort of implied

22  that Pat Miles was responsible for products and operations in

23  2017, and so the morale in 2017 was his fault.  But Mr. Miles

24  was actually sidelined from the day-by-day operations in 2016

25  in the same capacity of sort of moving people out of these

1   roles.  He had no day-by-day operational function in the

2   business, in fact, had no office in the company any more in

3   2017 at all.  So his departure was really a consequence of

4   these changes not the precipitating event of them.

5   Q    Did Pat Miles leave NuVasive before you did?

6   A    He did.  He left in 2017.

7   Q    When did you finally decide to leave?

8   A    I resigned in February of 2018.  And I was asked to stay

9   for about another six weeks to transition my role, which I did

10  in mid-March 2018.

11  Q    Who did you transition your role to?

12  A    Kyle Malone.

13  Q    When you left, did you know you were going to Alphatec?

14  A    I did not, no.  I didn't have a job offer from any company.

15  I had spent a -- you know, good portion of my life with this

16  company and really wanted to make a clean break.  There had

17  already been significant contention about the people who left

18  and whether they were going to work for competitors.  I wanted

19  to sort of honor my experience with NuVasive by -- I was

20  unhappy and I just wanted to leave and separate cleanly and

21  then pursue other opportunities.

22  Q    And when did you decide to go to Alphatec?

23  A    So after I resigned, Is was trying to identify other

24  opportunities.  I had conversations with folks in the space.  I

25  had an 18-year career and figured I would have a place to land,

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   but I -- after actually leaving NuVasive in March, then I

2   started almost immediately with Alphatec.

3   Q   Why did you choose Alphatec?

4   A   It really was kind of an easy decision.  One, quite

5   frankly, because I could stay in San Diego.  My kids have grown

6   up here.  I wanted to stay local, but more importantly, have an

7   opportunity to continue to work with the people who I trusted

8   and respected and had experience growing a company with, and so

9   I -- I had a good optimism about what we could do together.

10  Q   Was this a risky decision for you personally when you

11  decided to go to Alphatec in 2018?

12  A   It was not a slam dunk for sure.  The company, as everyone

13  has testified to, was struggling at the time.  But the

14  opportunity was -- knowing that leadership team and being a

15  part of that and being able to influence that was an

16  opportunity.

17  Q   Are you happy with your decision to go to Alphatec?

18  A   I am.

19  Q   What do you think turned Alphatec around for you?

20  A   It that's that continued drive of innovation.  What we

21  really wanted to do is continue to make spine surgery better.

22  At some point, we felt stifled in this that opportunity at

23  NuVasive, and we get that opportunity going forward at

24  Alphatec.

25  Q   Do you recall, Ms. Howell, Dr. Youssef testifying about

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   whether this case matters to NuVasive?

2   A    I do?

3   Q    Does it matter to Alphatec?

4   A    Yes.  I mean, of course it matters.  I mean, we're a small

5   company.  You know, reputationally this matters to us and,

6   quite frankly, it just feels very personal as well.

7            ATTORNEY WICKRAMASEKERA:  I pass the witness, Your

8   Honor.

9            THE COURT:  Thank you.  Cross.

10            ATTORNEY FODEMAN:  Thank you Your Honor.

11                      **CROSS-EXAMINATION**

12   BY ATTORNEY FODEMAN:

13   Q    Good morning, Ms. Howell.

14   A    Good morning.

15   Q    How are you?

16   A    I'm fine.  Thank you.

17   Q    Just to be clear, you and I have never met other than in

18   this courtroom over the last week or so?

19   A    That's right.

20   Q    And you were deposed in this case a couple of times and

21   that wasn't by me; is that right?

22   A    No.

23   Q    Someone else from my firm?

24   A    I believe so.

25   Q    I wanted to cover a couple of things that you touched on

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1  that I wanted to explore with you this morning.  You are

2  currently vice president of clinical strategies; is that the

3  right title?

4  A   I am actually executive vice president, and I have recently

5  changed the title.  It means the same thing, but it may be in

6  some records as clinical strategies and in others as clinical

7  and scientific affairs.

8  Q   Okay.  I didn't mean to give you a demotion.  I just wanted

9  to get the area.  The area is largely focused -- largely,

10  because of your background, on clinical research, clinical

11  validation; is that fair?

12  A   That's fair.

13  Q   And that is a similar role than that which you played at

14  NuVasive for most of 18 years at the company; is that correct?

15  A   That's correct.

16  Q   And the job there, just to put a finer point on it, is to

17  sort of gather clinical research and evidence that proves or

18  turns out not to prove a particular device or medical procedure

19  is -- is safe and reproducible?  That's what the job is about;

20  is that fair?

21  A   Right.  I mean, your correction was correct in that we're

22  not necessarily trying to prove, but trying to understand, and

23  whether it proves or disproves and equally important.

24  Q   You want to understand essentially, does it work, in varied

25  layman's terms?

1   A    Yes.

2   Q    And it may not, it may, but I need to the find the proof?

3   A    Correct.

4   Q    That's your job?

5   A    Correct.

6   Q    The way you do that in part is to do some of the things

7   that you heard Kyle Malone talk about and some of the thing you

8   talked about, right?

9   A    Yes.

10  Q    For example, doing clinical research; is that fair to say?

11  A    Yes.

12  Q    Now the purpose in doing all of this sort of research may

13  be -- maybe it's obvious, but the idea is that you want to

14  gather the evidence and then present that evidence to potential

15  users of these products; is that fair to say?

16  A    Yes.

17  Q    I think what you said was then you use it to educate the

18  surgeon population; is that correct?

19  A    Yes.

20  Q    So in other words, while your sales folks are out there

21  trying to sell a particular product or convince surgeons to

22  utilize it, you want them to be able to be armed with the

23  clinical data that supports the safety and effectiveness of

24  that particular product; is that right?

25  A    Yes.  Or the alternative.

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   Q   Or the alternative, right.  Now -- and the reason why --

2   and you understand that one of the reasons why that is so

3   important, particularly in this sort of medical space, is in

4   order to get doctors to be convinced to use a particular

5   procedure, they're going to want to know is it safe; is that

6   fair?

7   A   Yes.

8   Q   They're going to want to see the proof?

9   A   Not always.  So some surgeons are sort of more forwardly

10  accepting of wanting to do something innovative and being on

11  that initial learning experience and crating that data.  Keep

12  in mind that we can't study it unless somebody is willing to do

13  it.

14  Q   Understood.  But is it fair to say that in your

15  experience -- and of course there are exceptions -- by and

16  large, surgeons put their patient's safety first; is that fair?

17  A   Of course.

18  Q   And a doctor, generally speaking, is not going to take some

19  incredibly highly experimental procedure that has been

20  completely untested and try it out on one of their patients

21  without knowing that this is something that is safe?  Is that

22  fair?  Generally.  I don't mean to draw a complete, you know,

23  across the board, but that is generally your impression; is it

24  not?

25  A   Well, I think an interpretation of what is safe is

1  dependent not necessarily on simply publications, but their

2  experience with something similar.  And so if there's an

3  intuitive nature of what could be safe in their own hands,

4  again that's how we get to do research on novel things because

5  some surgeons are willing to undertake that based on their

6  understanding of how that will operate and an interpretation of

7  what the risks to the patient are even if there isn't published

8  literature on it yet.

9  Q    You're going exactly where I want.  Thank you for that.  So

10 in other words -- let me break this down to make sure I

11 understood your answer.  Clinical data is important, certainly

12 in getting a surgeon comfortable on a particular device or

13 procedure, fair?

14 A    Sure.

15 Q    A surgeon may be willing to accept another device or

16 procedure if it is similar to something that is clinically

17 validated; that's also fair?

18 A    I would say the procedure itself -- you know, their

19 understanding of the anatomical risks that procedure based on

20 the tools available to them, not necessarily that every device

21 has to be similar, but that their understanding of the

22 techniques that they'll use will be -- they will be able to

23 mitigate any potential complications based on their own medical

24 and surgical experience.

25 Q    So going back to 2003, the set of devices, the set of tools

1   this procedure that NuVasive developed with your help, that was

2   new to surgeons, correct?

3   A   Come to find out that a lot of those tools actually were

4   available to surgeons.

5   Q   Well, "come to find out," I mean you -- you knew back then

6   that dilators were not something that NuVasive invented?

7   You're not suggesting that to the jury?

8   A   Correct.

9   Q   But the system that we've been talking about, this

10  three-bladed retractor, neuromonitoring, trans-psoas approach,

11  that, we can agree, was new in 2003; is that fair?  All

12  together?

13  A   No.  So -- a trans-psoas approach had been described.  And

14  as I say, come to find out, devices associated, dilators and

15  retractors for trans-psoas had been described.  Our ability to

16  couple that with neuromonitoring was something that was not

17  commercially common.

18  Q   Fair to say that this collection of tools and this system

19  that you had developed at NuVasive with the help of many

20  others, that was met with skepticism from surgeons; is that

21  fair to say?

22  A   Some.  As I say, we had to have enough of them to be

23  willing to try it, to study it, but others were later adopters.

24  Q   Let's just make sure we understand it.  When you went to

25  market in NASS, the North American Spine Society, that's when

1  this launched in 2003, right?

2  A    Correct.

3  Q    And I don't want to give a misimpression to the jury.  It

4  wasn't like folks just lined up at your booth to start using

5  XLIF at that day; is that fair?

6  A    That's fair.  I think it garnered a lot of interest, I'd

7  say.

8  Q    Right.  But it took the work that you and your team did and

9  many others to convince people this was safe and reproducible,

10  fair?

11  A    Sure.  We put a lot of energy into research and education.

12  Q    Certainly fair to say when you developed this system in

13  2003, you were excited about it?

14  A    Yes.

15  Q    And it was because, at least in your view, as it was put

16  together innovative; is that fair?

17  A    Again, there had been prior reports of lateral approach

18  surgery, but it was not commonly performed -- there was another

19  commercial system available, let me say that.

20  Q    Okay.  And I'm not sure you totally answered my question.

21  If you did, maybe we're talking past each other.  The question

22  was, you believed this system that NuVasive had come out with

23  in 2003 was innovative?

24  A    I thought that we had an opportunity to build a procedural

25  market space that was not, I think commercially available at

1   the time.

2   Q   Okay.  I've got this rule, I call it the Mo rule.  Three

3   times.  I'm going to try one last time, and if don't know the

4   answer, just let me know and we'll keep moving.

5        But you believe that this system that NuVasive came out

6   with was innovative?  Can you answer that yes or no, or no?

7   A   I don't know that I can.  The way I would say it is it was

8   not common to use those same approaches laterally in

9   conjunction with this specified neuromonitoring, which again

10  what I tried to explain is that's why they were interested --

11  those who were already doing lateral approach surgery were

12  interested in working with NuVasive because of that underlying

13  neuromonitoring.  So that was a new direction in that space.

14  Q   Have you ever heard Pat Miles in all the time you worked

15  with him at NuVasive, what 16 years or so --

16  A   Seventeen.

17  Q   I'm sorry.  I missed that.

18  A   Seventeen.

19  Q   Did you ever hear him say that this was an innovative

20  system, the XLIF system?

21  A   I don't recall exact words.

22  Q   Did you ever hear the term or the criticism that minimally

23  invasive spine surgery meant minimally effective spine surgery?

24  Did you ever hear that?

25  A   Yes.  It was something I communicated in our educational

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   training in those early days.

2   Q   And I'm sure you've heard Pat Miles say that phrase; is

3   that correct?

4   A   Likely it was part of our literature.

5   Q   And that's because that was the perception of the community

6   of surgeons, spine surgeons back in 2003 when you launched XLIF

7   that minimally invasive meant minimally effective; is that

8   correct?

9   A   At the time the procedure is being done, minimally

10  invasively were largely working through tubes.  So the

11  reflection of the ability to accomplish all of your goals

12  through a tube was challenging.  There were, again, a number of

13  surgeons doing that, and so it was not unheard of, but it was

14  still gaining traction and building opportunity to make that

15  more available to the masses.

16  Q   Is it fair to say that your job was to prove in part --

17  part of your job was to prove that that isn't so, that

18  minimally invasive does not have to mean minimally effective,

19  fair?

20  A   Yeah.  We definitely tried to do that.

21  Q   We talked about the ways you did that clinical research,

22  true?

23  A   Yes.

24  Q   Studies, true?

25  A   Yes.

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1  Q   Encouraging doctors to research this will new procedure --

2  this procedure, correct?

3  A   Yes.

4  Q   Write books written by surgeons about this procedure?

5  A   Yes.

6  Q   Sponsor spine societies where people would gather and

7  discuss and share ideas about this idea?

8  A   Yes.

9  Q   And, in fact, we've heard a little about SOLAS from

10 Dr. Youssef.  You were personally involved in that effort; is

11 that correct?

12 A   I was, yes.

13 Q   What was your title?

14 A   I was executive director for a number of years.

15 Q   In the early years, right?

16 A   Yes.

17 Q   Your job for nearly two decades was to prove that worked;

18 is that fair?

19 A   Yes.  Among others things.

20 Q   Among other things.  I don't want to take anything away.

21 And that's because not just doctors want proof, but patients,

22 hospitals, other stakeholders want proof that before you turn

23 them on their side and put a dilator through their side and go

24 through their psoas, that this going to be safe and effective;

25 is that fair?

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   A   Well, I think there are a number of components to that.

2   Again lateral surgery putting a patient on their side was not

3   novel.  Doing this procedure through the psoas muscle had been

4   demonstrated, but the concern was around the safety of the

5   nerves within that muscle.  And so, yes, wanting to show that

6   we could demonstrate results of that surgery with better

7   neurological outcomes, so fewer neurological complications

8   that-- compared to the procedures that had come before it.

9   Q   Is it fair to say that NuVasive spent a significant amount

10  of money and resources to build up that body of proof that

11  we're talking about; is that fair?

12  A   I think that's fair.

13  Q   Over time, you had a team of folks who worked with you in

14  that effort; is that fair to say?

15  A   That's true.

16  Q   Fair to say millions of dollars were spent in the very

17  effort we're talking about over time?

18  A   Sure.

19  Q   And it took years and years to gather that body of proof.

20  It wasn't something you did in a week or a month, fair?

21  A   Well, research increments on itself.  As we gain more

22  experience, we study new things, and add more data points to

23  the research that is published.

24  Q   And one of the people who helped you in that regard was

25  Kyle Malone?

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   A    That's true.

2   Q    The witness who testified first in the trial?

3   A    Yes.

4   Q    You worked with Mr. Malone from his time when he joined

5   NuVasive?

6   A    Yes.  I hired him in 2000, so.

7   Q    Okay.  I think he told us that that you were a mentor of

8   his; is that fair to say?

9   A    That was nice of him to say, yes.

10  Q    And you trained him?

11  A    Yes.

12  Q    And fair to say that you trusted him when he worked for

13  you?  Is that fair to say?

14  A    Sure.

15  Q    You heard him talk about that part of his job is to go out,

16  when he worked for you even, was to go out and do this spine

17  exam and teach folks about NuVasive and its products and

18  procedures; is that fair?

19  A    I did actually hear him say that which was actually a

20  mischaracterization.  Kyle started teaching that spine exam

21  program after I left.  I always taught that class myself.

22  Q    But with regard to preparing you do to that, he was part of

23  that effort; is that fair to say?

24  A    No.

25  Q    He never looked at the slides?

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1    A    Well, he had to take it, but he did not prepare --

2    Q    Beyond -- I'm sorry.

3    A    He did not prepare any of the content of that training.  I

4    prepared all of that and I handed it over to him when I left in

5    2018.

6    Q    Fair to say that in order to help you do the research that

7    we've talked about, to do that clinical validation, is it fair

8    to say that Kyle Malone had an understanding of the products

9    that we're talking about?

10   A    I think that Kyle Malone has a very good understanding of

11   the products as they were used but was not intimately aware the

12   details of the development of those products.

13   Q    Okay.  Now you said that you joined NuVasive in 1999,

14   right?

15   A    Correct.

16   Q    You said you were involved in the development of the

17   product, correct?

18   A    Yes.

19   Q    I think you said that you were not part of the design team

20   in the sense that you were drawing designs of specific tools;

21   is that correct?

22   A    I don't even know how to use CAD.

23   Q    Okay.  And CAD for the jury is a way of --

24   A    -- on the --

25   Q    -- drawing?

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1  A    Correct.

2  Q    I and you weren't down for example in Brazil with Pat Miles

3  and Dr. Pimenta when we heard about that, right?

4  A    Not initially but --

5  Q    Not initially.

6  A    Yeah.

7  Q    And not in 2003 --

8       (Stenographic court reporter request for speakers to speak

9  one at a time.)

10       THE COURT:  I'm going to ask you to keep your voice

11  up.

12  BY ATTORNEY FODEMAN:

13  Q    And you were not a named inventor on any of the patents

14  that we're here to talk about; is that fair.

15  A    Yeah, that's fair.

16  Q    Now you certainly, of course, have an understanding of

17  NuVasive's system that we're here to about; is that fair?

18  A    Yes.

19  Q    And if I could show you what has previously been a

20  demonstrative.  I'm going to show it to you?

21       ATTORNEY FODEMAN:  If I may approach?  This is -- I

22  don't know if has a number before.  I'm going to mark it for

23  identification as PTX-3003.  If I may approach?

24       THE COURT:  Yes.

25

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   BY ATTORNEY FODEMAN:

2   Q   This picture I'm showing to you, are those generally tools

3   that are used in this system that we're talking about from

4   NuVasive?

5   A   They are among the tools.  That is not the complete set of

6   tools that are used in the XLIF procedure.

7   Q   I know you have talked a bunch about neuromonitoring.  And

8   the neuromonitoring computer system is not depicted on this?

9   A   It is not.

10  Q   These other parts, you recognize all of them including, for

11  example, the fourth blade, the retractor, the implants as part

12  of the NuVasive system?

13  A   As part of it, yes.

14         ATTORNEY FODEMAN:  Your Honor, I would offer PTX-3003

15  into evidence.

16         ATTORNEY WICKRAMASEKERA:  I think it's a

17  demonstrative, PDX.

18         THE COURT:  It's a demonstrative.  I'm not going to

19  admit it.

20         ATTORNEY FODEMAN:  Okay.

21  BY ATTORNEY FODEMAN:

22  Q   Do we have this on the screen?  It might be easier.

23      And just so the jury can see it, you're familiar with all

24  of these components as they're labeled; is that fair to say?

25  A   Yes.

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   Q    Okay.  Now with respect to the neuromonitoring machine that

2   you've talked about, the machine NeuroVision, as it has been

3   called, connects up to the dilators that are depicted here?

4   A    It can, yes.

5   Q    And it can hook up the retractor itself; is that correct?

6   A    It can stimulate the center blade, the posterior blade.

7   Q    And it sends electrodes -- it sends electricity to the

8   dilators down to the electrodes on those dilators; is that

9   correct?

10  A    It conducts electricity from the top to the bottom of that

11  dilator.

12  Q    Just so the jury is on the same page, that process is what

13  helps the surgeon identify, locate the nerves during the

14  procedure?  That process?

15  A    I think that's an oversimplification of how that works.

16  There's a lot of detail within the algorithms of that computer

17  system that make that happen.  It's not simply -- I can't plug

18  it into the wall and zap it and know where the nerves are.

19  There's an understanding of the feedback of that system and how

20  the algorithm interprets the location of those nerves as very

21  specific to the computer.

22  Q    I think maybe you misunderstood my question.  It's probably

23  not a good one.  Let me try it this way, the computer you're

24  talking about, NeuroVision, that can't find the nerves on its

25  own, right?  If we plug it in and put it in the corner of the

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1    OR?

2    A    It would need a tool to be in the wound.

3    Q    And the tool in this procedure is the retractor and the

4    dilators and the connection between all of that; is that fair?

5    A    In the XLIF system, it uses the dilators to transmit the

6    signal, but, again, requires an interpretation of the feedback

7    associated with that.  There are electrodes on the legs, and

8    when you stimulate the nerves, you need to be able to receive

9    an understanding of what's happening to identify where the

10   nerve is.

11   Q    Okay.  But you can't do it without the dilators, correct?

12   A    I would say you can't do it the way NuVasive does it, but

13   there are other systems that use other tools in that approach.

14   Q    Fair correction.  In NuVasive's system, you cannot find any

15   nerves unless you use the dilators?

16   A    No, not exactly either, because they have those other tools

17   as well.  They -- could use a ball tip probe.  They could

18   stimulate any metal device.  It's just a conductor of

19   electricity, so you can stimulate any metal device.

20   Q    And the dilators have directional arrows on them; is that

21   correct?

22   A    They are designed with an electrode on one side of the

23   dilator in order to conduct that electricity in one direction.

24   Q    And that was put on a particular side to help you do this

25   directionality; is that correct?

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1    A    That is one way that you learn that.  But, again, the

2    feedback from neuromonitoring system is interpret to

3    interpreting it.

4    Q    It's okay.  It was put on specific side of the dilator,

5    that electrode, so that we could get directionality, correct?

6    A    Through the neuromonitoring system, yes; that is correct.

7    Q    Now NuVasive launched its system, you told us, in 2003; is

8    that correct?

9    A    Yes.

10   Q    And over time, you told us that a number of other entrants

11   came into that space, into that market; is that correct?

12   A    Yes.

13   Q    Fair to say that this system we're looking at, I know,

14   together with the neuromonitoring became a huge commercial

15   success for NuVasive; is that fair?

16   A    I think that it helped NuVasive, for sure.  It had been its

17   flagship product for many years, but it's not used by all

18   surgeons.  So in terms of huge commercial success, I don't know

19   how you define that.

20   Q    Well, you went from 30 people to over a thousand people at

21   NuVasive in your time.  Probably more than that, right?

22   A    Yeah.

23   Q    And when it was 30 people, there were no products, correct?

24   A    Right.

25   Q    And then you launched XLIF in 2003 and experienced

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1    tremendous growth in the company in the coming years while that

2    project was the flagship product, correct?

3    A   Along with other products in the portfolio in T-LIF, PLIF,

4    ALIF, cervical.

5    Q   You're --

6    A   We had a lot of focus on lateral, but we had a full bag.

7    Q   Okay.  And you're not disputing that in fact that XLIF was

8    a -- was a driver of that commercial success?  You're disputing

9    that?

10   A   No, I am not disputing that.

11   Q   Okay.  Now one of the other options that we heard of, or

12   one of the other competitors was Medtronic DLIF system.  Are

13   you familiar with that one?

14   A   I am.

15   Q   And I think you heard Mr. McClintock say that came out in

16   2006 when he was leaving Medtronic?

17   A   I believe that to be true, yes.

18   Q   When DLIF came out, it did not have integrated

19   neuromonitoring; is that correct?

20   A   Not exactly.  They have a neuromonitoring system.  At the

21   time, they were the only other company that had a

22   neuromonitoring system.

23   Q   But it wasn't integrated like this one is, right?

24   A   I don't know what we mean by that.

25   Q   We've talked about how the neuromonitoring is integrated

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   into the retractor, correct?

2   A   It did not stimulate the retractor, if that's what you're

3   asking.

4   Q   It's integrated into these dilators, correct?

5   A   I believe that they did use dilators in that system as

6   well.

7   Q   They used dilators in 2006?

8   A   I believe so.

9   Q   Okay.  And the system that they came out with at Medtronic,

10  it was a two-bladed retractor?

11  A   Yes.

12  Q   We can agree it was different than the system we're looking

13  at here?

14  A   Than the system we're looking at here, yes.

15  Q   And they would say, Medtronic, well, it's another lateral

16  system, we know lateral works, ours works, correct?  That's

17  what Medtronic would go out and say?

18  A   Initially.  Until they could build up their own body of

19  evidence.

20  Q   Before they had a body of evidence, you would say prove it,

21  right?  We've explain -- is that correct?

22  A   That's correct.

23  Q   Those are words you would use, right?

24  A   Of course.

25  Q   So in other words, we've done the work at NuVasive to prove

1   our system works.  Yours is different.  You should prove yours

2   works first?

3   A   We did, yes.

4   Q   And this body of work that you had developed was a key

5   differentiator for NuVasive?  Your work, correct?

6   A   I'd like to think so.

7   Q   Your work proving that this system worked was a way to

8   differentiate it from what these other folks came out with

9   without that body of work, right?

10  A   Yeah.  We leaned on the fact that we had literature to

11  support our procedure where new entrants, we thought sort of

12  for the burden of proof as well in the same way that he had

13  surgeons initially interested in conducting that research

14  without the existing data, other companies did as well, and so

15  other surgeons were -- were willing to undertake that exercise

16  on behalf of Medtronic.

17  Q   Can we agree that the items -- the tools that are on this

18  photograph PDX -- I don't know what the number is, 3003 -- but

19  on this board, they were signed to work together; is that fair

20  to say?

21  A   They were designed to be used in the same procedure.

22  Q   They were designed to work together?

23  A   You are putting words in my mouth.  They were designed to

24  be used in the same procedure for different requirements of

25  that procedure.

1  Q   Is it fair to say that it is this collective system that is

2  another thing that differentiated NuVasive from the competition

3  that was out there in lateral; is that fair?

4  A   The way that we promoted the idea of proceduralization and

5  the idea we had been thoughtful of all of those different tools

6  that are necessary for the procedure including, again, that

7  specialized neuromonitoring platform because safety was of most

8  concern, some of the detail of how they -- there's no technical

9  connection of those things other than the idea that they are

10  being used in the same procedure.

11  Q   You have said, Ms. Howell, that the ability to measure the

12  advantage of the NuVasive system was in the assembly of all of

13  these products and how they worked together.  You have said

14  that, correct?  You have said it, or you have not said it?

15  A   I have said it.

16  Q   And you have said that it's not just the neuromonitoring

17  that leads to these good outcomes it's the whole system?

18  You've said that -- you haven't said it today, but in the past?

19  A   Yes.  In the context of the speed of the procedure, the

20  outcomes associated with the efficiency of doing the surgery in

21  a certain amount of time, but the actual measurable outcome of

22  the patient was really around are they having complications or

23  not.  So that was more focused on the neuromonitoring aspect of

24  it.

25  Q   I'm a little confused by your answer.  Did you say what has

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   led to the desired outcomes was the whole system?

2   A   I'm sorry?

3   Q   If we could -- you took a deposition in this case, a couple

4   of them; is that fair?

5   A   I don't know if it was a couple.

6   Q   You took a deposition think?

7   A   Sure.

8   Q   And you swore to tell the truth when you did it?

9   A   Of course.

10   Q   Just like you did this morning, right?

11   A   Um-hmm.

12   Q   You took it seriously?

13   A   Of course.

14   Q   Of course.  And you answered lawyers questions like you're

15   having to go through this morning, right?

16   A   Um-hmm.

17   Q   And you did the best you could, fair?

18   A   I'm trying to understand your question.

19   Q   Understood.

20        ATTORNEY FODEMAN:  If we could just play page 93, line

21   15 to page 94, line 4.

22        Do you need a copy?  93, line 15.

23        Judge, if you would like a copy of this as well.

24        THE COURT:  No, it's okay.  If you're going to play

25   something, I trust it's going to be appropriate and not

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1  somebody's paraphrasing.

2          ATTORNEY FODEMAN:  Are you ready?

3          ATTORNEY WICKRAMASEKERA:  Yeah.  So is this

4  impeachment?

5          ATTORNEY FODEMAN:  Yes.

6          ATTORNEY WICKRAMASEKERA:  Is this the question you

7  asked her at 15 through 17?  Maybe you can ask her that

8  question first.

9          ATTORNEY FODEMAN:  I think I've done that.

10          THE COURT:  Just play it.

11          ATTORNEY FODEMAN:  Thank you, Judge.

12     (Segment of Kelli Howell's deposition testimony presented

13  to the jury .)

14  BY ATTORNEY FODEMAN:

15  Q   And it's not just -- by the way, this goes without saying,

16  that was accurate?

17  A   And I think it is consistent with what I was saying about

18  the efficiency of the procedure and the surgeons' maybe

19  preference for familiarity is what I was saying in there, but

20  the seamlessness through which they do the procedure, but it is

21  a collection of all of those things that includes some

22  experience and familiarity as well as expectation of outcomes

23  associated with safety.

24  Q   And it is the collection of tools that we're talking about?

25  A   A broad collection of things, including things outside of

1  the tools is what I was describing in this testimony.

2  Q   Now just a little bit on neuromonitoring here.  I think you

3  told us this morning neuromonitoring existed prior to NuVasive,

4  right?

5  A   True.

6  Q   And in that video -- do you remember during my opening

7  statement there was a little animation blade about the XLIF

8  procedure; do you remember that?

9  A   I think so.

10 Q   And in the corner of the room, there was a computer system

11 depicted; do you remember that?  It's going back a week, I

12 know.  I just want to get at that's what you're talking about

13 when you say the neuromonitoring system or for lack of -- quick

14 phrase, the box?

15 A   The animation I'm thinking of was actually with the

16 NeuroVision not in the corner of the room but right in the

17 operative space that was driving understanding of the nerve,

18 and I think it showed nerve conduction and assessment with the

19 NeuroVision system, not a system in the corner of the room

20 which I would classify as more generic neuromonitoring.

21 Q   I don't know if anyone remembers.  We'll move on from that.

22 Is it fair to say that there a lot of different neuromonitoring

23 products on the market today; is that fair to say?

24 A   I don't know that there are a lot actually.  There are some

25 specially designed systems for neuromonitoring like the

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1  NeuroVision is for specific automation and feedback to the

2  surgeon, and there are more generic systems that really are,

3  again, this sort of idea of the technician of the corner with a

4  computer platform, and there maybe one or two main players in

5  that space in terms of algorithms for generic monitoring.

6  Q    Like Cadwell?

7  A    Cadwell is one.

8  Q    As an example?

9  A    Yes.

10 Q    Now you have said in describing neuromonitoring that it is

11 a background activity during the surgery; is that fair?  You

12 said that?

13 A    In this generic way, that is different from the way

14 NeuroVision created an interface that allows for the surgeon to

15 better understanding of what's happening during the surgery

16 rather than this background monitoring.  So the historical

17 element is this background monitoring which still happens

18 today, but what is unique about what we were developing at

19 NuVasive at the time was a way to have that more directly

20 interface with the surgeon about what exactly was happening

21 during surgery.

22 Q    And when Alphatec's system, the Battalion system came out,

23 you said you did not have a sort of proprietary neuromonitoring

24 system at the time?

25 A    Right.  In 2018, Alphatec did not.

1  Q   And the system, it was a trans-psoas procedure, correct?

2  A   Correct.

3  Q   And we have seen it here with a retractor going through

4  that muscle, correct?

5  A   Correct.

6  Q   And it had dilators with electrodes on the tip, correct?

7  A   Yes.  And those dilators were purchased from a third-party

8  company.

9  Q   And those dilators were hooked up to some neuromonitoring

10  equipment.  It just wasn't yours, right?

11  A   Right.  The third-party's company's sort of generic

12  neuromonitoring in the corner could also stimulate any

13  conductive material.

14  Q   And you're still selling this Battalion system today, so I

15  assume it was -- it was safe when you used it without your

16  proprietary system, correct?

17  A   Relative terms.  There was a preference for using

18  neuromonitoring.  I think Dr. Youssef explained that as well.

19  It's not -- it's not advisable to use it without, and we, from

20  prior experience, understand the value of that directed

21  neuromonitoring in the procedure, and so we struggled with

22  acceptance and appreciation of that procedure until we could

23  include a neuromonitoring platform.

24  Q   Battalion.  When you launched Battalion, you had a

25  neuromonitoring capability, correct?

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   A    Correct.  Well --

2   Q    You advised surgeons they should use neuromonitoring with

3   your system, correct?

4   A    Correct.

5   Q    And you were selling, I assume, what you believed to be a

6   safe procedure?  Are those three things correct?

7   A    Those things are correct in that the safety of that

8   procedure was predicated on a surgeon's ability to kind of

9   manage through the deficiencies of using this generic system.

10  And we saw that as a deficiency that we wanted to build our own

11  intraoperative monitoring platform that would be directed to

12  surgeons.

13  Q    The last area on the neuromonitoring.  We talked about

14  Dr. Pimenta a bunch in this trial, and you're aware that he

15  and -- he was performing a lateral surgery in Brazil when he

16  first met with Pat Miles, correct?

17  A    Correct.

18  Q    That procedures was called LETRA, and LETRA was a lateral

19  procedure that used endoscopes; is that fair to say?

20  A    Yes.  Tubes and endoscopes.

21  Q    Endoscopes means cameras, which we don't have here, right?

22  A    Correct.

23  Q    And Pat Miles had the idea with him to join neuromonitoring

24  with this lateral procedure, correct?

25  A    Yeah.  I would characterize it as the interest in

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   capitalizing on Luiz Pimenta's and other surgeons lateral

2   experience and combining that with the technology that we had

3   at the time which was, again, focused on neuromonitoring.  So

4   their interest in improving the safety profile of the

5   procedures they were already doing.

6   Q   Okay.  You didn't just take a neuromonitor and attach it to

7   LETRA, right?

8   A   No.

9   Q   You developed this set of tools to go hand in hand with

10  neuromonitoring?

11  A   Correct.

12  Q   And, in fact, we talked about this book that was written

13  which is now in evidence, 231 PTX?

14       THE CLERK:  No.

15  BY ATTORNEY FODEMAN:

16  Q   DTX-231.  You showed us chapter 9, but I would like to look

17  at the first part of the book.  Do you have it there, the

18  forward?  We see this as the foreword of the book, and it is a

19  letter from Dr. Pimenta.  You're familiar with that?

20  A   I am.

21  Q   I want to highlight the third paragraph right there.  These

22  are Dr. Pimenta's words at the beginning of this book, correct?

23  A   Yes.

24  Q   This book was supposed to be the authoritative guide on

25  this XLIF procedure; is that correct?

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   A    I don't know.  We had other materials as well

2   authoritative, but it was helpful.

3   Q    Okay.  And he says "I worked with Dr. Thomas Schaffa, my

4   longtime friend and colleague on perfecting a minimally

5   invasive technique for spine surgeries.  Our experiences

6   revealed that we could produce the safest most reproducible

7   results by using finger dissection to achieve retroperitoneal

8   access.  This insight along with my collaboration with NuVasive

9   (San Diego) to design the appropriate surgical techniques,

10  access instruments, and implants -- those three things, the

11  techniques, the access instruments, and the implants resulted

12  in the extreme lateral interbody fusion procedure as it is

13  defined today."  Is that correct?

14  A    That's correct.

15  Q    Remind us, this book came out in 2008, right?

16  A    Yes.  The first one.

17  Q    Now I just want to touch briefly on your decision to go to

18  Alphatec, which counsel asked you about.  When you were at

19  NuVasive in say 2016, you learned that Pat Miles had

20  resigned -- 2016 we're talking about -- had resigned and

21  announced he was going to Alphatec?

22  A    I did know that, yes.

23  Q    Pat Miles was a good friend of yours and a close colleague?

24  A    Correct.

25  Q    You worked with him for almost two decades, correct?

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1    A    Right.

2    Q    And had said and then at the end of the day, he decided to

3    stay; is that correct?

4    A    Yes.

5    Q    You said he was sidelined.  But that happened in 2016, you

6    said, correct?

7    A    Yes.

8    Q    All right.  And when you heard that Pat Miles, your friend,

9    your colleague was going to Alphatec, your reaction was

10   surprise, correct?

11   A    Correct.

12   Q    And part of that surprise derived from the fact that

13   Alphatec, for lack of a better word, was a company that was in

14   trouble; is that fair?

15   A    Yes.

16   Q    And in that time period, 2016, what you knew of Alphatec --

17   first of all, you didn't know that much about the company; is

18   that fair?

19   A    Yes.  Just a point of clarification.  So I didn't know that

20   Pat was going to Alphatec until 2017.  So when he was sidelined

21   in 2016, he ended up staying and working on the board.  But

22   you're right, I did not know a lot about Alphatec's products at

23   the time.

24   Q    But you did know they had a reputation -- a negative

25   reputation for business practices, correct?

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   A   I did.

2   Q   And you knew that they had financial troubles, correct?

3   A   Correct.

4   Q   You knew that they were on the verge of bankruptcy,

5   correct?

6   A   Correct.

7   Q   You knew that they had or were in the process of selling

8   their entire international business, correct?

9   A   I don't remember when I learned that, but ultimately, yes.

10   Q   You knew they were not a real competitor in the lateral

11   space, correct?

12   A   Correct.

13   Q   You weren't particularly familiar with their product line

14   because it really wasn't relevant to what you were doing,

15   right?

16   A   I wasn't paying attention to it.

17   Q   Because it was a nonissue essentially from your

18   perspective?

19   A   Correct.

20   Q   It was a company in hardship; is that right?

21   A   Yes.

22   Q   And did you know it was a public company and did you know

23   anything about its stock price being down to like pennies?  Did

24   you know that in 2016?

25   A   I don't think I was paying attention to that, no.

1  Q   But you were shocked that Pat Miles was even considering

2  going to such a company like that, right?

3  A   Shocked is strong, but I was surprised.

4  Q   And some point after that, you were at the -- actually we

5  can skip that.  Let's keep it moving.

6      When you arrived at Alphatec the following year, 2017, do I

7  have the date right?

8  A   When I arrived or he arrived?

9  Q   When you arrived at the beginning of 2018?

10 A   '18.

11 Q   So just to get the chronology right, he's says going to

12 Alphatec in 2016, but he doesn't?

13 A   Correct.

14 Q   Then he ultimately goes in October 2017?

15 A   To clarify, he says he's going to go," he's going to resign

16 from NuVasive in 2016.

17 Q   Right.  You didn't don't know that he was actually

18 considering going to Alphatec then?

19 A   Right.

20 Q   Then he actually does go to Alphatec in 2017, right?

21 A   Correct.

22 Q   Then you go to the Alphatec in the beginning of -- or the

23 end of the first quarter of 2018?  Do I have that chronology

24 correct?

25 A   Correct.

1  Q    Now when you got there, you, of course, saw their lateral
2  offering; is that fair?
3  A    Yes.  I actually had seen it from a distance presented at a
4  conference as well but didn't become familiar with it until
5  after working with Alphatec.
6  Q    Certainly once you got to Alphatec, you would have had an
7  opportunity to see the entire system, not something that you
8  saw from a distance at a booth; is that fair?
9  A    Yes.
10  Q    If you could bring up demonstrative PDX-- I'm not sure it
11  has a number.  It was going to be PTX-3004.  That's exactly it.
12  Thank you.
13       This is a demonstrative that's been used by the jury.  This
14  is Alphatec's lateral system; is that correct?
15  A    This is I think of your creation an assembly of instruments
16  that are used for lateral.
17  Q    Okay.  And did -- when you got there and you saw this, did
18  you say huh, this looks similar to what I've been working on
19  for the last 18 years at NuVasive?
20  A    Yeah.  I would characterize it as similar to not only
21  NuVasive's but what was happening in the space.  A lot of
22  companies had similar products.
23  Q    Well, similar is, to use a term that you said, "relative,"
24  right?  Did you notice it had integrated light cables?  Let's
25  start at the top.

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1    A    Sure.

2    Q    Did you notice it was a three-blade retractor?

3    A    Yes.

4    Q    There were two-blades, cranial and caudal, correct, on

5    either side and then a posterior blade.  Did you notice that

6    that was the general makeup of the three blades?

7    A    Yes.

8    Q    Did you notice it had detachable handles?

9    A    Yes.

10   Q    And did you notice that it had sequential dilators?

11   A    Yes.

12   Q    They had an electrode on their tip on a particular side?

13   A    Yes.

14   Q    Did you notice this system involved a K-wire to guide that

15   dilator down to the site?  Did you notice that?

16   A    That's -- yeah.

17   Q    Did you notice that there was an optional fourth blade?

18   A    Yep.

19   Q    That attached with a fourth-blade attachment, a crossbar,

20   across the front of the retractor; did you notice that?

21   A    Yes.

22   Q    Did you notice that there was this shim and a shim

23   inserter?  You noticed all that?

24   A    Yes.

25   Q    And you noticed the shim was designed to go down the

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1  posterior blade to lock this assembly in place?  Did you notice
2  that?
3  A    Yes.
4  Q    And did you notice that they -- Alphatec also had these
5  large implants that are depicted at the bottom of the page?
6  A    Yes.
7  Q    Now we can agree that all of those are components of
8  NuVasive's system, correct, the ones I've just listed?
9  A    Correct.
10  Q    Now part of your job was also to review and approve
11  surgical guides, correct?
12  A    Yes.
13  Q    And you, of course, have seen NuVasive's -- I'm sorry,
14  Alphatec's surgical guide, correct?
15  A    I have.
16  Q    When you looked at it the first time, I assume it wasn't
17  too long after you arrived, did you notice there were, in fact,
18  some similarities with NuVasive's?
19  A    Sure.  What it describes is the way to do lateral surgery,
20  so there will be similarities in how the surgery is described
21  from the surgical technique standpoint.
22  Q    Well, do you remember seeing the pictures depicted here on
23  PDX-144?
24  A    In some capacity.
25  Q    If could just give me a second.

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1    A    Oh, sorry.  Defense exhibit.

2    Q    Sorry about that.  Do you recognize these pictures as being

3    from the NuVasive and Alphatec surgical guides?

4    A    I'll take your word for it.

5    Q    Okay.  How about PDX-1.46, do you recognize these as coming

6    from the surgical guides.

7    A    Again, I'll take your word for it.

8              THE CLERK:  Counsel, hang on one second, please.

9              ATTORNEY FODEMAN:  I'm sorry.  Apologies.

10             THE CLERK:  The PDX-1 --

11             ATTORNEY FODEMAN:  These --

12             THE COURT:  These are all demonstratives, Lori.

13   They're not going into evidence.

14             THE CLERK:  I understand.  But can you slow down, so I

15   can at least document it.

16             ATTORNEY FODEMAN:  Of course.

17             THE CLERK:  Thank you.

18   BY ATTORNEY FODEMAN:

19   Q    I think we're up to PDX-1.48.  Is this from the surgical

20   guide.

21   A    It could be.

22   Q    How about PDX-1.52?

23   A    Again, it could be no dispute, but it might be.

24   Q    In fact, isn't it true that when you first saw the

25   Battalion lateral system -- lateral system being used in a lab

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   at Alphatec, the only difference you could distinguish from

2   your vantage point was the color?

3   A    Well, I didn't have a good vantage point, but yeah.

4   Q    You think you used a term called "familiarity."  Can we

5   agree that it would be easier to convert surgeons from one

6   system to another if they are familiar with that system?

7   A    I mean, I think it would be easy if they -- if there were

8   similarities, but it doesn't make it uneasy or difficult if

9   they aren't.

10  Q    In fact, you have said in the past that familiarity with a

11  system is a draw for surgeons, correct?

12  A    Meaning their experience with that particular system.

13  Q    You talked -- this is the last topic.  I just want to cover

14  it briefly.  You talk a lot about your reasoning for leaving

15  NuVasive after all those years, right?

16  A    Sure.

17  Q    You talked to us about your feelings, there was a lack of

18  innovation at the company, correct?

19  A    Yes.

20  Q    You didn't like the direction that management was taking

21  the company?  New management?

22  A    Yes.

23  Q    You didn't like that there was a sense that although of

24  lower morale at the company, at least among some employees; is

25  that correct?

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1    A    Correct.

2    Q    And you felt that you -- you just didn't have the same

3    feelings about this company that you had had for so long,

4    correct?

5    A    That's true.

6    Q    And you had discussions, I assume, with Pat Miles about the

7    idea of joining him at Alphatec before you did?

8    A    I had asked him questions about the vision for Alphatec.

9    Q    And in the course of those conversations, I assume the

10   nature of those conversations at some point turned to would

11   this be a good idea for me to join, what do you think, Pat?

12   A    I don't think it was expressed that way.  He was a friend

13   who went to another company and my askings were what the vision

14   of that company is, and I am still concerned about the

15   struggling business, that kind of thing.

16   Q    Well, is it fair to say that one of the things Pat Miles

17   told you before you left from NuVasive to Alphatec was that

18   there was an opportunity to make a lot of money on Alphatec

19   stock?

20   A    I don't know that we ever had a conversation about money.

21   Q    Did he ever tell you that Alphatec stock, this company that

22   was in dire financial straights, that its stock rice was very,

23   very low at the time?

24   A    No.  Again, we never had a conversation about money or

25   stock.

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1    Q    Did he ever tell you that if we can just get some surgeon

2    population to adopt some product, we can make revenues go up

3    proportionately significantly, a bump in revenue with just a

4    few million dollars and Wall Street would react?  Did he ever

5    tell you that?

6    A    No.  This was not a conversation that he and I had.

7    Q    As part of your compensation at Alphatec, is it fair to say

8    that you have reviewed stock and stock options?

9    A    Yes.

10   Q    And, in fact, the stock that you have -- you know all of

11   that is public, right?  It's on the SEC's website how much

12   executives get in stock, right?

13   A    Sure.

14   Q    And you have received in your time, over half million

15   shares of Alphatec since joining the company, restricted stock

16   units to be more precise.

17   A    A half million shares?

18   Q    Yes.

19   A    I don't know the number.

20   Q    Is that in the ballpark?

21   A    I don't know.

22   Q    If I could just have -- maybe this will refresh your

23   recollection as to how much stock you have?

24            ATTORNEY FODEMAN:  If I may approach, Judge?

25            THE COURT:  Yes.

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1          ATTORNEY FODEMAN:  PTX-3001.  If we can bring this --

2     actually it's not in evidence so I won't do that.

3          THE COURT:  You're refreshing.  Have her take a look

4     at it.

5          ATTORNEY FODEMAN:  If I may, Judge, point Ms. Howell

6     to a particular column here.

7     BY ATTORNEY FODEMAN:

8     Q   It's number 5.  If that refreshes your recollection that

9     you have 544 --

10         THE COURT:  Okay.  Counsel, let her --

11         ATTORNEY FODEMAN:  Oh, sorry.

12         THE COURT:  -- look at it.

13         ATTORNEY FODEMAN:  Thank you, Judge.

14         THE WITNESS:  That helps.  Thank you.

15         THE COURT:  So go back to your original question.

16    BY ATTORNEY FODEMAN:

17    Q   Okay.  So you don't dispute that number?

18    A   I don't dispute that those are the number of shares that

19    have been granted to me.  Not all of those have been vested.

20    Q   And if you stay at the company, then they're yours, right?

21    A   If -- yes, over that vesting schedule.

22    Q   And if someone buys the company, they're yours?

23    A   I actually don't know what the change in control measures

24    are.

25    Q   In the addition to these shares, you have the options to

1    purchase shares at a very low price, like two or three dollars,

2    right?

3    A    I have been offered options to purchase as well.

4    Q    Over a hundred thousand options, correct?

5    A    I don't know what the breakdown is within that.

6    Q    And it's fair to say that these shares are worth over

7    $6 million now, correct?

8    A    The shares are -- they don't all belong to me, again

9    because of the vesting schedule, so that is not a given for

10   sure, and some of that are shares that I have purchased on the

11   open market with my own money.

12   Q    And you would say that the stock has quadrupled since you

13   have been selling this Battalion system in 2017, right?  It's

14   over $11 a share now, right?

15   A    Yes.

16   Q    During the time period you have been selling this Battalion

17   system, your stocks have quadrupled?

18   A    They have.  We have a whole lot more to offer.

19   Q    And if the stock continues to rise, it will only go up from

20   here?

21   A    Hopefully.

22   Q    Hopefully.

23         ATTORNEY FODEMAN:  I have nothing further, Judge.

24   Thank you.

25         THE COURT:  Redirect?

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1              **REDIRECT EXAMINATION**

2    BY ATTORNEY WICKRAMASEKERA:

3    Q    Ms. Howell, related to the questions you were just asked by

4    counsel, how much of what counsel talked about, those shares --

5    how much of that is your own personal money that you put into

6    the company?

7    A    It's a significant amount.

8    Q    Why would you do that?

9    A    Because I believe in what we're doing.

10   Q    You recall being asked by counsel about the Alphatec

11   surgical technique?

12   A    Yes.

13   Q    Let's put up PTX-59.  It says the NuVasive surgical

14   technique.  Actually, Ms. Howell, you're familiar with both the

15   surgical techniques, the Alphatec and the Battalion?

16   A    Yes.

17   Q    Are they identical?

18   A    No.

19   Q    Let's turn to step 5 of the surgical technique.  And that

20   would be at page 18 and 19.  Actually it's 18, 19, 20, 21 and

21   22, is this in the Battalion surgical technique, step 5?

22   A    No, it is not.

23   Q    Okay.  Let's turn to step 6, which is the way the retractor

24   works.  And actually, let me ask you, Ms. Howell, you're

25   familiar with both retractors, the MaXcess and the Squadron?

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   A    Yes.

2   Q    Do they work the same way?

3   A    No, they don't.

4   Q    This is step 6.  Let's put a couple pages of that up.  Are

5   these steps in the Battalion technique?

6   A    Well, they'll differ because the retractors differ.

7   Q    Okay.  And then I think you can take that down.

8        And then you recall being asked about skepticism related to

9   XLIF at the beginning of your cross-examination?

10  A    Yes.

11  Q    What components of XLIF were surgeons skeptical of?

12  A    The safety and the procedure and the potential risk to the

13  nerves of the lumbar plexus.  And so their interest was to

14  better understand how NeuroVision might mitigate that.

15  Q    Let's turn to DTX-231 which is the XLIF text.  Let's look

16  at page 116, chapter 9.  What component of XLIF related to that

17  safety that the surgeons were skeptical of?

18  A    That would be the NeuroVision platform the neuromonitoring

19  system.

20            ATTORNEY WICKRAMASEKERA:  I have no further questions.

21            ATTORNEY FODEMAN:  No questions.

22            THE COURT:  Ms. Howell, you may step down.  I will see

23  the jury back in the box at approximately 10:50.

24       (Jury in morning recess at 10:22 a.m.)

25            THE COURT:  I have one more quick question before we

 1   all take a break.  On the proposed jury instructions with the

 2   person of ordinary skill in the art, you both provided a

 3   paragraph that is essentially similar.  NuVasive has added that

 4   the neurosurgeon or orthopedic surgeon should preferably have a

 5   fellowship in spine surgery.  That seems more than ordinary

 6   skill.

 7           ATTORNEY DEVINE:  Your Honor, we don't need that.

 8           THE COURT:  And also a graduate degree in mechanical

 9   or biomechanical engineering.  Again, this is a person of

10   ordinary skill.

11           ATTORNEY DEVINE:  Yeah, we can strike that.  We're not

12   challenging --

13           THE COURT:  I'd like to read just one of the

14   definitions, again, to simplify things.

15           ATTORNEY DEVINE:  Sure.  I think the parties have

16   agreed we're not to.  Your Honor, we have something to raise

17   about the next witness.  I'll yield to my colleague.

18           ATTORNEY TANNER:  Thank you, Your Honor.  This

19   pertains to Mr. Costabile and Mr. Robinson, likely first,

20   Mr. Costabile.  At the pretrial conference, Your Honor, counsel

21   for Alphatec indicated that it intended to introduce

22   Mr. Costabile to testify regarding his monitoring of XLIF

23   portfolio, specifically regarding Medtronic NuVasive.  Counsel

24   for Alphatec indicated that Mr. Costabile would likely take the

25   stand to testify that he was monitoring this litigation.  Upon

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   seeing that NuVasive was found to infringe the Medtronic

2   patent, Mr. Costabile went out and took a license to the '933

3   Branch patent.  Your Honor, we're concerned about this

4   testimony coming in for a couple reasons.

5           THE COURT:  First of all, is that coming in?  Before

6   he goes on and on?

7           ATTORNEY NISBET:  No, Your Honor.  That's not

8   precisely accurate how the testimony is going to come in.  He

9   will testify, if this is helpful, that will Alphatec went out

10  and obtained a license from Medtronic.  He became aware of that

11  after the fact.

12          THE COURT:  Is this not the license that was used for

13  the comparable license?

14          ATTORNEY NISBET:  It is, Your Honor.

15          ATTORNEY TANNER:  It is, Your Honor.

16          THE COURT:  It's already in evidence that they took

17  this license.  We don't need background about infringement

18  issues.  You took a license to this patent.

19          ATTORNEY NISBET:  This is the first I'm hearing of the

20  objection to this. I believe was covered at the pretrial

21  conference.  They put our knowledge of their patents at issue.

22  Our witnesses are entitled to rebut that by describing the way

23  in which they became aware of those patents.  So that's what

24  Mr. Costabile's testimony will be about.

25          ATTORNEY TANNER:  And, Your Honor, that's fine,

1    assuming of course that Mr. Costabile of his own volition was

2    monitoring this, but our concern is that both from

3    Mr. Costabile and Mr. Robinson, any of their knowledge that

4    they have that may be relevant to Alphatec's purported good

5    faith belief of non-infringement or invalidity is intricately

6    tied up with privileged information, and Alphatec has not

7    waived privilege over this information.  And all of these

8    depositions involving Mr. Costabile, as well as Mr. Robinson,

9    when we attempted to get information about what was the basis

10   for their belief that the NuVasive -- that they were not

11   infringing NuVasive patents, these patents were invalid.

12   Generally speaking counsel for Alphatec indicated that they can

13   testify about personal knowledge but did instruct them not to

14   share privileged information.  It's going to be very difficult,

15   if not impossible, to appropriately probe the basis for these

16   lay witnesses' knowledge about these other litigations and

17   validity issues that are so tied up with patent law, they're

18   not -- acknowledge they're not patent experts without them

19   invoking privilege and then we're going to butting up against

20   35 U.S C. section 298 which prohibits us from insinuating to

21   the jury that Alphatec may have obtained advice counsel but has

22   not shared that with us.

23          So I want to make sure we're getting guidance and that

24   we will be allowed to ask well Costabile and Mr. Robinson the

25   basis for their understanding that they were not infringing the

1    patents, their basis for the understanding that these patents

2    were invalid.  And, again, we suspect that we will ask them

3    how -- why did you think that was the case that we

4    instructed -- their knowledge almost certainly had to have come

5    from attorneys.  That's our concern, Your Honor.

6            ATTORNEY NISBET:  Mr. Tanner is incorrect, Your Honor.

7    It did not only come from attorneys.  And Mr. Costabile and Mr.

8    Robinson will be testifying about their personal experience

9    monitoring this litigation in the field and what understanding

10   they had from doing that.

11           There's a very easy way for them to avoid getting into

12   any privilege issues, and that would be don't tell me anything

13   you ever talked about with a lawyer, what did do you personally

14   in your own time as an engineer to monitor these facts.  I

15   don't think this will be an issue with the testimony that's

16   coming in.  Mr. Tanner is correct, they're not allowed to

17   insinuate to the jury that either seeking advice from counsel

18   or failing to seek advice from counsel is evidence of

19   willfulness.  They seem aware of these boundaries.  I don't see

20   this will be a problem.

21           ATTORNEY TANNER:  Again, Your Honor, I think my

22   concern is, I want to make sure we will be allowed when Mr.

23   Costabile and Mr. Robinson take the stand and say they were

24   monitoring the situation, they believe these patents are

25   invalid, they were seeing what was happening before the P-Tab

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1  that we can ask them, you're not a patent expert, you don't

2  know how to determine whether a patent is invalid, you don't

3  know the standards that apply in determining infringement

4  validity, et cetera.  I expect they wouldn't know that

5  personally, so, again, the concern is we're going to be butting

6  up against this.  We think the jury is going --

7          THE COURT:  The jury has very little frame of

8  reference for the things you think they're going to assume

9  about clients and privileges and all of that.  If he's going to

10  put people on the stand who are engineers who in the scope and

11  course of their work were looking at what was going on in the

12  marketplace as well as that involved looking at litigation and

13  what licenses and patents and things were being discussed, then

14  I assume they are going to ask those people what did you do,

15  what did you look at, how did you look at it, why did you look

16  at this.  They have not asserted that that information or

17  discussion came to them through counsel.  They're not going to

18  assert that now presumably, and so I don't -- you're sort of

19  guessing that the jury is going to assume a fact they would

20  have no frame of reference for unless it got raised on the

21  direct.

22          ATTORNEY TANNER:  Fair enough, Your Honor.  I just

23  want to confirm to make sure we are clear we will be allowed to

24  ask them what the basis for their knowledge is, probe them on

25  their ability to accurately assess the validity of patents, the

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   infringement of patents, et cetera.

2        THE COURT:  And if any of them say we can't discuss

3   that with you because it's privileged, we're going to have a

4   whole different conversation outside the presences of jury.

5   I'm assuming they're not going to do that.

6        ATTORNEY NISBET:  Yeah.  I don't know exactly what

7   questions they'll be answering.  That's not certainly not part

8   of the direct examination, so we -- those questions sound

9   generally fine except if they come up to section 298 that he

10  should have gone to see counsel.

11       ATTORNEY DEVINE:  Your Honor, just one point of

12  clarification, if I were to ask a witness well, you're not a

13  lawyer and you have no legal training and you did this

14  assessment on your own, that's insinuating --

15       THE COURT:  Don't ask them that.  You're asking them

16  in their context of being engineers, what did you look at, what

17  did you do.  If we get into well you're not a lawyer, you're

18  suggesting then to the jury that they should have consulted

19  with a lawyer.  Now we're getting into the gray area that I

20  think becomes inappropriate and it's not necessary.  If you

21  want to ask them what did they do, when did they do it, how

22  did, they do it, that's fine.  All the who, what, where, when

23  hows of it are fine, except did you consult with a lawyer.  You

24  can't go there, and insinuating that they should have or could

25  have, I think would be inappropriate under the circumstances.

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

 1              ATTORNEY DEVINE:  Thank you, Your Honor.

 2              THE COURT:  Break.  No.  I need a break.

 3         (Court in recess at 10:31 a.m.)

 4              THE COURT:  I'm sorry.  I needed to break when we

 5    broke.  Before we get the jury back in the box, is there

 6    anything or are we good?  Looks like a no.

 7              ATTORNEY DEVINE:  We have something to raise about

 8    Dr. Sachs, but he's two witnesses away.

 9              THE COURT:  Great.  Let's get going again.

10         (Pause in the proceedings)

11         (Jury entering at 10:51 a.m.)

12              THE COURT:  Is everybody settled?  Next witness.

13              ATTORNEY NISBET:  Your Honor, Alphatec calls Jon

14    Costabile.

15       Jon Costabile, called as a witness, testified as follows:

16         (Witness given an oath)

17              THE CLERK:  You would please state your name, spelling

18    your last name for the record?

19    A    Jonathan Thomas Costabile, C-O-S-T-A-B-I-L-E.

20              ATTORNEY NISBET:  May I approach, Your Honor?

21              THE COURT:  Yes.

22                        **DIRECT EXAMINATION**

23    BY ATTORNEY NISBET:

24    Q    Good morning, Jon.  You just did, but will you please state

25    your name for the jury?

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   A    Good morning.  I'm Jonathan Costabile.

2   Q    Where are you currently employed?

3   A    I am an employee of Alphatec spine.

4   Q    When did you begin working the Alphatec?

5   A    I began working at Alphatec in 2009.

6   Q    Have you worked there ever since 2009?

7   A    No.  I left in October of 2017.

8   Q    And have you returned to Alphatec?

9   A    Yes.  I returned to Alphatec in June of 2021.

10  Q    What were your job titles at Alphatec from 2009 to 2017?

11  A    When I first joined the company, I entered as a design

12  engineer in the R&D group, and then after a few years, I got

13  promoted to a senior design engineer.

14  Q    Jon, would you mind just moving the mic a little closer?

15  A    Can you hear me better?

16       THE COURT:  Yes.

17       THE WITNESS:  I'll start over. I entered the company

18  as a design energy in 2009 and then I received a promotion

19  after a period of time to senior design engineer.  I also then

20  went to project engineer, senior project engineer, and when I

21  left the company in 2017, I was a director in the R&D group.

22  BY ATTORNEY NISBET:

23  Q    A lot of engineering?

24  A    Quite a bit.

25  Q    What did you do during your time away from Alphatec from

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1    2017 to 2021?

2    A    I took a job with another medical device company in

3    San Diego.

4    Q    What was that name?

5    A    Dexcom.

6    Q    What does Dexcom do?

7    A    Dexcom makes glucose monitors for diabetics.

8    Q    And I think you may have mentioned this, but were you in an

9    engineering role at Dexcom?

10   A    Yes.  I was a staff engineer in the operations group

11   developing robotic automation equipment.

12   Q    What is your current title at Alphatec?

13   A    Staff engineer.

14   Q    How long have you been in that position?

15   A    Since June of 2021.

16   Q    What are your current responsibilities as a staff engineer?

17   A    I work on new and special projects within the R&D group.

18   Q    Do have you a college degree?

19   A    Yes, I do.

20   Q    Where did you get that from?

21   A    I got a bachelor's of science in mechanical engineering

22   from the University of California San Diego.

23   Q    What year did you graduate?

24   A    The summer of 2005.

25   Q    Why did you choose to study mechanical engineering?

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   A   Growing up, I was always inclined towards mechanical

2   objects.  I spent a lot of time working on skateboards, bikes

3   and then eventually in high school and college started working

4   on cars, and mechanical engineering was a field of study that

5   helped me get a deeper understanding.

6   Q   How long have you worked as a mechanical engineer?

7   A   My entire career since I a graduated in 2005.

8   Q   Seventeen years?

9   A   Coming up on 17.

10  Q   Out of those 17 years, how many years have you spent

11  designing medical devices?

12  A   I have spent my entire career working for medical device

13  companies.

14  Q   I would like to take a few minutes to talk about the

15  products at issue in this case.  Are you familiar with the

16  Alphatec products that are being accused of infringement here?

17  A   Yes, I am.

18  Q   Were you involved in the design and development of any of

19  those products?

20  A   Yes.  I was involved in the design of the Battalion system

21  and the Squadron retractor system.

22  Q   Were you involved in the design and development of the

23  shim?

24  A   Yes.

25  Q   Were you involved in the any design of the dilators?

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   A    No.

2   Q    Why not?

3   A    The dilators in the system were purchased from a

4   third-party company.

5   Q    What was the name of the company?

6   A    TeDan medical.

7   Q    I want to talk about you and your role in the design and

8   development of these products.  Can you describe for the jury

9   what you did?  What was your role in the development of

10  Alphatec's retractor?

11  A    I was at the time a project engineer.  My role and

12  responsibility was to lead the entire team of engineers in

13  developing that project.

14  Q    How many team members did you have working on Alphatec's

15  lateral system?

16  A    At the beginning of the project, it was myself and one

17  other engineer.  As the project progressed over a period of

18  time, we ultimately had five to six engineers on the team.

19  Q    Were there any former NuVasive employees on your

20  engineering team?

21  A    No.  None of the engineers on the team were from NuVasive.

22  Q    Did you work with any surgeons in designing Alphatec's

23  lateral retractor?

24  A    Yes, we did.

25  Q    Who?

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1    A   We had a panel of design surgeons that were dedicated to

2    the company, and then we also had friends of the company who

3    would come in, and we would talk to them as well.

4    Q   Do you recall some of the surgeons on your design team?

5    A   Yes.  There were five at the end of the project.  Dr. James

6    Billys, Dr. Payam Moazzaz, Dr. Mohammad Etminan, Dr. Kuwamura,

7    and Dr. Neville Alleyene.

8    Q   Why did you work with these surgeons in developing

9    Alphatec's retractor?

10   A   They were critical for providing their insights and what

11   they were seeing in surgery they were practicing on a daily

12   basis, and they also provided feedback on any of the new

13   designs that we would develop and come up.

14   Q   And is common for medical device companies to work with

15   surgeons?

16   A   Yes, it is.

17   Q   Why?

18   A   Ultimately the products that we design and develop can be

19   used for surgery.  It's important to have surgeons evaluate

20   them to see are they ready, do they mitigate risk, and how well

21   do they perform.

22   Q   What input did these surgeons provide to you in designing

23   Alphatec's retractor?

24   A   Two basic categories.  They provided us with a general

25   overview on their use and experience of products that they had

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1    available in the OR at the time.  So they kind of knew the

2    state of art for what they had available to them.  They also

3    would provide us with their ideas that they would see from

4    practicing, areas for opportunity, where things could improve,

5    be made better.

6    Q    Did you rely on these surgeons' feedback in designing

7    Alphatec's Squadron retractor?

8    A    Yes, we did.

9    Q    When did you start working on the development of Alphatec's

10   lateral system?

11   A    We started late 2012, early 2013.

12   Q    And what was Alphatec like as a company in late 2012, early

13   2013?

14   A    Late 2012 early 2013, Alphatec was still a good company to

15   work for.  We were taking on a lot of development -- yeah, we

16   were developing new products for the market and trying to grow

17   our presence.

18   Q    How many products were under development at that time?

19   A    About 20.

20   Q    Why did Alphatec decide to go into the lateral market?

21   A    By 2012, 2013, lateral surgery had become very popular.  It

22   was the fastest growing segment in all of spine for all of the

23   procedures that you could perform.  Alphatec doesn't have an

24   offering.  We had nothing.  So we saw that as a gap in the

25   portfolio.

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1    Q    At that time, were there many lateral competitors on the

2    market?

3    A    Yes, there were.

4    Q    Who were some of the major ones?

5    A    You had NuVasive, Medtronic, Globus, LDR, Lanx, K2M.

6    Q    And how did you plan to break into that very crowded

7    market?

8    A    We were planning to study the competition and then

9    address -- we knew that there were areas for opportunity to

10   develop new technology, to help -- to help further the spinal--

11   or the surgeons in their procedures that they were purchasing.

12   Q    Did you design and develop a product what would be

13   different from what was on the market?

14   A    Yes.  We felt that being a smaller company that we had to

15   have something that would differentiate us and attract the

16   surgeons to us.

17   Q    When did you finalize the Squadron on retractor's design?

18   A    The design was finalized in 2015.

19   Q    And as senior project leader thought the development

20   period, did you have all the resources you needed to design and

21   develop the Squadron retractor?

22   A    Yes.  We did have all of them during the development

23   period.

24   Q    And I believe you set out a development period of about two

25   years.  Was that common for projects at Alphatec at that time?

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1    A   At the time, no, it was not common.  At the time, most

2    projects were running around 12 months to 18 months and that

3    was considered to be a normal or fast project.  The Squadron,

4    the Battalion implant system and the Squadron retractor took

5    about two years and that took a while.

6    Q   Did you take any shortcuts --

7    A   No.

8    Q   -- when you developed the squadron retractor?

9    A   No, we did not.

10   Q   As you finalized the design the retractor in late 2015, can

11   you tell the jury what the state of company was at that time?

12   A   In 2015, the company started entering two areas of

13   hardship.  They were going through a management change at the

14   top end of the company, and then there also were some financial

15   difficulties that the company had.

16   Q   Did these financial difficulties impact the design of the

17   retractor at all?

18   A   No, not the design.  The design was done by then.

19   Q   How long did you work on the lateral project after you

20   finalized the design the Squadron retractor?

21   A   At the end of the 2015, I was offered a promotion to a

22   director role within the R&D group on a different area in the

23   group.  There was I think three or four different groups inside

24   the R&D group at the time, so I transitioned to a different

25   role.

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1  Q   Did you continue to be involved in Squadron retractor

2  project after that?

3  A   There was a period of transition of about two months where

4  I helped transferring knowledge that I had that wasn't

5  documented to the new team that was going to run the project,

6  and after that, the new team ran the project and I was focused

7  on the new task at hand.

8  Q   Were you involved in commercialization of the Squadron?

9  A   No.  The new team that took over handled that.

10  Q   Mr. Costabile, I want to spend a few minutes talking about

11  NuVasive's allegations that you copied the MaXcess retractor

12  and the NuVasive lateral system.  Mr. Costabile, did you copy

13  any competitor's products when you designed the Squadron

14  retractor?

15  A   No, we did not copy.

16  Q   Did you copy NuVasive's products when you designed the

17  Squadron retractor?

18  A   No, we did not copy NuVasive.

19  Q   Did you copy NuVasive's patents when you designed the

20  Squadron retractor?

21  A   No, we did not copy their patents.

22  Q   At that time at the beginning of your development, was

23  there a particular emphasis placed on not copying any

24  competitor's product in designing Alphatec's Squadron

25  retractor.

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1    A    Yes, there was.

2    Q    What was being emphasized?

3    A    The vice president of R&D at the time was pretty adamant

4    about don't copy any company's technology.

5    Q    Did you communicate this emphasis to your team?

6    A    Yes, I did.

7    Q    Who was the vice president that gave this instruction?

8    A    Jens Peter Timm, also known as JP Timm.

9    Q    Who was the JP Timm?

10   A    He was the vice president of R&D.

11   Q    What was your relationship like with JP Timm?

12   A    JP was the individual most responsible for hiring me when I

13   joined the company in 2009.  During the time we worked

14   together, he was also a mentor, became a friend after that.  He

15   taught me a lot about what it would take to develop medical

16   device products and how to run projects.

17   Q    And why was it particularly important at that time not to

18   copy any competitor's products?

19   A    Due to the popularity of lateral at the time, there was a

20   lot of technology out in the space and companies were starting

21   to sue each other over that.

22   Q    Were you aware of any litigations during that time period

23   between competitors in the lateral market?

24   A    Yes, I am.  Two to come to mind.

25   Q    Which ones?

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   A    The Medtronic NuVasive lawsuit and the NuVasive Globus
2   lawsuit.
3   Q    And how did you become aware of those litigations in your
4   role as an engineer?
5   A    They were -- in the industry, it was common knowledge.
6   People spoke about it, and then there was also some news that
7   was reported to the internet.
8   Q    I want to focus on the Medtronic NuVasive litigation for a
9   moment.  What is your general high level understanding of that
10  litigation?
11  A    Both companies were claiming that other company was
12  infringing on their intellectual property.
13  Q    Do you recall at a high level what patents were involved or
14  what type of technology was involved in that case?
15  A    Yes.  Medtronic was claiming that NuVasive was infringing
16  on their retractor technology, and NuVasive was claiming that
17  Medtronic was infringing on their neuromonitoring technology.
18  Q    Were you aware of other NuVasive patents not involved in
19  that litigation in your role as an engineer?
20  A    Yes.
21  Q    Do you know who won?
22          ATTORNEY DEVINE:  Objection, Your Honor.
23          THE COURT:  I'm going to ask you to rephrase.  Won is
24  a difficult term in litigation.
25          ATTORNEY NISBET:  Sure, sure. A relative term.  I get

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   it.

2   BY ATTORNEY NISBET:

3   Q   Do you recall the outcome of the Medtronic NuVasive

4   litigation?

5            ATTORNEY DEVINE:  Objection, Your Honor.  Relevance.

6            THE COURT:  If he knows.  He said he was monitoring it

7   on the internet.  And so no, go ahead.  You can answer that

8   question.

9            THE WITNESS:  Could you repeat the question?

10  BY ATTORNEY NISBET:

11  Q   Sure.  Do you recall the outcome of the Medtronic NuVasive

12  litigation?

13  A   Yes.  Medtronic was found to have I guess -- although I'm

14  trying to find another word besides won.  Medtronic's

15  intellectual property was found valid over NuVasive for the

16  retractor, and NuVasive was found valid over Medtronic for the

17  neuromonitoring.

18  Q   How did the understanding of the NuVasive Medtronic

19  litigation impact your development decisions of the Alphatec

20  lateral retractor?

21  A   It really reinforced the idea when we're developing new

22  technology we had to be careful, we had to be aware of what

23  else was out there in terms of technology that the other

24  companies were going to potentially sue over.

25  Q   What actions did Alphatec take after the dust settled in

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   the NuVasive Medtronic litigation?

2   A    Alphatec went and sought a licensing agreement with

3   Medtronic for retractor technology.

4   Q    Do you recall which patent that license is to?

5   A    Only by name.  It was the Branch patent.

6   Q    Were you involved in the negotiation or execution of that

7   license agreement?

8   A    No, I was not.

9   Q    How did you become aware of it?

10  A    I was informed after the fact.

11  Q    I'd like to discuss with you your approach to designing the

12  Squadron retractor.  What steps did you take in developing the

13  Squadron retractor?

14  A    Overall with the team, we had a four-step approach to

15  running a development project.  We had no in-house technology

16  that we were trying to leverage for this.  This was all brand

17  new development work.  We start out with step one, rigorously

18  studying the surgical procedure that the surgeons were using to

19  perform surgery.  We wanted to understand all of the little

20  steps we could, right?  This was down to everything that they

21  could do and every piece of knowledge that they had in their

22  heads.

23      Step two was to also study the current market offerings,

24  what was available to them, how did that fit into the surgical

25  technique or their practice that they were trying to do.

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1    That led us to step three which was comparing those two and
2  trying to identify gaps.  Were there new things that the
3  surgeons were trying to accomplish that perhaps other systems
4  hadn't been designed for and hence those were areas for new
5  technology to come in.
6    And then step four was we were then focused on directly
7  designing new features into the instruments to help the
8  surgeons as opposed to asking the surgeons to change their
9  techniques for other instruments that hadn't been designed for
10 that purpose.
11 Q   Let's talk about step one.  So what did you do to study the
12 surgical procedure?
13 A   The biggest thing was we spoke to as many surgeons as we
14 could.  Our design team was incredibly helpful on that front.
15 They taught us about the procedure.  We also read any
16 literature on the matter that was from clinical papers being
17 published to anything else on the internet.
18 Q   Why was it important to you as the engineer to study the
19 surgical procedure?
20 A   At end of the day -- again, all of these implants and
21 instruments are there to help the surgeon perform surgery.  If
22 you're not designing it with that in mind, I think it calls
23 into question how effective that instrument really is or that
24 implant really can be.
25 Q   Let's talk about step two, studying the competition.  What

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   did you do to study the competition?

2   A   We tried to -- we looked through open source material to

3   find out as much as we could to find out what was being offered

4   in the market in 2013 and 200- -- 2012 and 2013 time frame

5   where we started, there was quite a bit on the market right

6   now -- at that time for surgeons to use.  However, there were

7   still a lot of surgeons indicating that there were gaps for new

8   things to be developed.

9   Q   What competitor products did you research?

10  A   We started out by looking at the largest players in the

11  market and then went out from there.

12          THE COURT:  I'm sorry.  You used the expression "open

13  source material."  What does that mean.

14          THE WITNESS:  Anything we could find on the internet.

15  I'm sorry.  Could you hear me?

16          THE COURT:  I -- not really.  Go ahead.  Repeat the

17  answer.

18          THE WITNESS:  Anything we could find through open

19  channels like on the internet, non-private matters.

20          THE COURT:  Thank you.

21  BY ATTORNEY NISBET:

22  Q   So that would be news articles or documents, research

23  studies, things like that that were readily available to you

24  and anybody else, right?

25  A   Yeah.  Google Search was a powerful tool.

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   Q    If you could turn to your binder, Jon, to a document marked

2   PTX-344.

3   A    Okay.

4   Q    Do you recognize this document?

5   A    Yes, I do.

6   Q    What is this document?

7   A    This is an internal slide deck that I developed.

8   Q    Did you prepare this document?

9   A    Yes, I did.

10  Q    What was the purpose of this document?

11  A    This is a summary of competitors in the market.  It was

12  system concepts and key features that they had.

13          ATTORNEY NISBET:  Your Honor, I ask PTX-344 be

14  admitted into evidence.

15          ATTORNEY DEVINE:  No objection.

16          THE COURT:  It's admitted.  Go ahead.

17     (PTX-344 admitted)

18  BY ATTORNEY NISBET:

19  Q    To bring the jury up to speed, could you just walk them

20  through again what this document is?

21  A    Sure.  The title of is Lateral Retractor Systems Concepts

22  And Key features.  So this was a summary document of completive

23  systems and the features and functionality they had officered.

24  Q    What's the date of this document?

25  A    February 12, 2015.

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   Q   So this was very early on in your development phase,

2   correct?

3   A   Yes.

4   Q   Did you have any finalized designs or prototypes or

5   anything like that this time?

6   A   No.  We were very far away from that point.  At this point

7   in the development of the project, there was the core team that

8   was a couple people, and then we were still teaching a lot of

9   the other people inside the company what lateral surgery was.

10  Q   I'd like to direct your attention to page 3 of the

11  document.  PTX-344-003.

12  A   Okay.

13  Q   I'm sorry.  That's not the correct number.  Let me give you

14  a different page number Bates ending 4560 (as said) page 3 of

15  the document.  Are you there?  It should be on your screen?

16  A   4564?

17  Q   4564, yes.

18  A   Yes.

19  Q   It states "lateral retractor key features."  Do you see

20  that?

21  A   Yes.

22  Q   And the first bullet point is blade configuration.  Do you

23  see that?

24  A   Yes.

25  Q   And then it says XLIF standard three blade.  Do you see

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   that?

2   A   I do.

3   Q   Second bullet point, it says DLIF standard two-bade.  Do

4   you see that?

5   A   I do.

6   Q   The jury has heard a lot about XLIF at this point.  What is

7   DLIF?

8   A   DLIF is the branded overall procedure name for the

9   Medtronic system.

10  Q   Why were you looking at XLIF and DLIF at this time?

11  A   They were the number one and number two competitors in the

12  market.

13  Q   In these early days, did you consider both two and

14  three-bladed retractors for your design?

15  A   We were.  We were considering two, three, four, and even

16  five.

17  Q   Were these the only two competitors that you analyzed as

18  step two of your design process?

19  A   No.  There were others.  Again, these were the two largest

20  one in the market, so we were starting there.

21  Q   Let's move on to step three, identifying known gaps between

22  surgical technique and the competitive offerings on the market.

23  And let's bring up DTX-1061 which has already been admitted

24  into evidence.

25  A   Okay.

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1    Q    Do you recognize that document?

2    A    Yes, I do.

3    Q    What is this document?

4    A    It's another internal Alphatec slide deck.

5    Q    What type of document is it?

6    A    This one was a marketing presentation.  One of the

7    marketing members of the team put this together to help explain

8    again the internal company the greater scope of the project.

9    It wasn't just going to be an implant or an implant -- or

10   excuse me, implant or an instrument.  It was also going to have

11   other components that would affect the company as well.

12   Q    Are you familiar with the contents of this document?  And

13   it should be in your binder for you to look through.

14   A    Yes, I am.

15   Q    Let me turn to page DTX-1061-0002.  What were the two main

16   system goals for developing the Squadron retractor?

17   A    The two main goals, system goals were we were attempting to

18   reduce retraction time and then also another concept called

19   tissue creep.

20   Q    And what do you mean by "retraction time"?

21   A    So retraction time is a phrase used to describe the moment

22   from when you open the retractor open and start retracting or

23   spreading tissue apart.  Yeah.

24   Q    And did you design a retractor ultimately with features

25   that reduced the time the retractor was going to be spreading

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1  those muscle fibers apart?

2  A    Yes.   That was a big goal for us when we were designing it.

3  We were very conscious about the amount of time or other steps

4  in the procedure could affect retractor time and potentially

5  increase it.   Surgeons were very sensitive to this concept too

6  because they believed that after surgery when patients would

7  start recovering, they would have associated complications with

8  that.

9  Q    Let me turn to the next page, DTX-1061-0003.   Why was it

10  clinically important to reduce retraction time?

11  A    At the time, the literature and a lot of the surgeons

12  practicing were concerned with the amount of time that the

13  retractor was opened with would put extra pressure on the

14  nerves that were going through this tissue as well.   They

15  believed that that was associated with patients waking up

16  complaining with thigh pain or loss of feeling in their thigh

17  or even sometimes the inability to move the thigh or the leg.

18  Q    Let me go back to page 2 of the document, DTX-1061-0002,

19  and ask you the second main system goal.   What is meant by

20  tissue creep?

21  A    Tissue creep is a phrase used to describe when you go to

22  open the retractor if tissue slips back underneath the

23  retractor.   This was kind of one of the first major buckets,

24  right?   So as a surgeon would go to open the retractor, rarely

25  would it just open up and separate all of the tissue perfectly

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1    so you could start having direct access to the spine to start

2    doing spine surgery.  The tissue would find a different way to

3    slip in, and they would have to spend more time moving it out

4    of the way.  We felt we could develop features in that would

5    help them help prevent this.  This would help them do the spine

6    surgery quicker.

7    Q   Why was it clinically important to reduce tissue creep?

8    A   We believed this would be one of the technologies that

9    would be appealing for surgeons and differentiate us that would

10   help reduce their retraction time.

11   Q   It you ultimately design a retractor with features that

12   helped reduce tissue creep?

13   A   Yes, we did.  The majority of the features we put into the

14   retractor were centered around these two concepts.

15   Q   Let's talk about step four of your design process.  Once

16   you identified these gaps between the techniques and offerings

17   on the market, what types of retractors did you consider in the

18   early development to address these issues?

19   A   We started off looking at forceps based retractors as well

20   as open frame style retractors.

21   Q   Did you consider retractors with multiple blade

22   configurations?

23   A   Yes.  We were -- independent of the frame style, we were

24   also considering multiple different blade styles as well.

25   Q   You mentioned a few frame styles, and let me break them

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   down.  I think you said a forceps geometry style retractor.

2   What is that?

3   A   A forceps style retractor, to give you an analogy it is a

4   mechanism that resembled a pair of scissors.  So it has two

5   arms and then it has a pivot point on it.  So when you open it

6   up, the arms move very similar to a pair of scissors.

7   Q   And can you describe for the jury a retractor frame that is

8   based on an open frame design?

9   A   An open frame retractor is a different style of retractor

10  that focuses on using linear motion.  So the technical

11  component it uses is a gear rack, but what it does is it has --

12  these mechanisms provide motion that don't act like a scissor.

13  They just move linearly apart where they translate and slide in

14  a direct line.

15  Q   At that time in 2013, were there both forceps style

16  geometry retractors and open frame style retractors on the

17  market?

18  A   Yes, there were both.

19  Q   Did you end up using either of those designs in the

20  Squadron?

21  A   No.  We ended up developing something different.

22  Q   You said you considered multiple blade configurations.  Why

23  did you look at two-bladed, three-bladed, four-bladed,

24  five-bladed retractors as a possible design for Alphatec?

25  A   The number of blades, when we were first starting process,

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1  the design process, we were looking at those to see if there

2  was an effect on those how well they could affect or mitigate

3  tissue creep, and also when you do that initial opening of the

4  retractor, how well they could move as much tissue as possible

5  so you would have to do less work after you opened the

6  retractor.

7  Q   Why did you decide to use a three-bladed retractor as

8  opposed to a two-bladed retractor or a four-bladed retractor?

9  A   The majority of surgeons throughout their -- with their

10  feedback, they expressed they were the most comfortable with

11  using three-bladed retractors.

12  Q   And those were the surgeons that were on your design team?

13  A   Yes.

14  Q   I want to talk about the final design of the Alphatec

15  Squadron retractor.  Let me just ask you this first, do you

16  believe you designed this retractor to be different from the

17  competition and solve the problems that you had identified that

18  were issues with products already on the market?

19  A   Yes, I do.

20  Q   If you could turn to your binder at tab DTX-1059.  I

21  believe this has already been admitted into evidence.

22  A   Okay.

23  Q   What is this document?

24  A   This is a sales sheet for the Squadron retractor?

25  Q   And you're not a salesman, are you, Mr. Costabile?

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1    A    No, I'm not.  Far from it.

2    Q    You're familiar with this type of document, right?

3    A    Yes, I am.

4    Q    Are you familiar with the content of this document?

5    A    Yes, I am.

6    Q    And how is it that you're familiar with this type of

7    document?

8    A    Typically these style documents in Alphatec would be

9    generated by our marketing team members.  All of the content

10   that's in them regarding the implants and the instruments would

11   come from the engineering team.  So the more senior engineers

12   on the team would review these documents to make sure that the

13   depictions and the content described were accurate.

14   Q    And if we could put DTX-1059-002 and 003 side by side.

15   Thank you.

16        What is shown here?

17   A    This is an overview of all of the features that we

18   developed in the -- in the Squadron retractor that help address

19   the retraction time and tissue creep.

20        ATTORNEY NISBET:  I'd like to offer into evidence

21   Alphatec's retractor, 1074.  We have plaintiffs already in.  I

22   thought a second might be helpful in the jury room.

23        THE COURT:  Any objection?

24        ATTORNEY DEVINE:  No.

25

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1  BY ATTORNEY NISBET:

2  Q   I'm going to hand you this, Mr. Costabile.

3      (Courtroom deputy clarifying exhibit number)

4  BY ATTORNEY NISBET:

5  Q   I'm going to hand you this.  And, Jon, why don't you step

6  out of the jury box.  The jury has heard a lot of about the

7  Alphatec retractor, but they haven't seen it demonstrated in

8  the hands through an Alphatec engineer, so I hope you can walk

9  through some of the features.

10     At a high level, can you give the jury an overview of what

11 the Squadron retractor is all about?

12 A   We'll start with just the basic operation of it.  So first

13 off, you'll notice that the majority of the components are

14 either black or gold, right?  Black is to help are these

15 retractive light in the operating room.  Gold is to indicate a

16 surface that the surgeon would then try to interface with or

17 use as some type of functionality.  To open one of the arms

18 to -- one of these side arms, this lever down here, you have to

19 squeeze this lever to release it so the arm will move, and then

20 the arm can move.  And then once it's out and the lever has

21 been released, the arm will no longer move.  It is held in

22 place and it's locked in so that way it can't accidentally skip

23 or bump.

24     This other level that's right in front of it with another

25 arrow, if you push this forward, then the arm will actually

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   slide back in.  So that's the basic operation of it.  This

2   center arm has an ability to where you just rotate this guy

3   back and forth, and the arm will move.

4   Q   And, Mr. Wilson, if you could put back up DTX-1059-003.

5   Thank you.

6       I'm going to leave this document up to help guide our

7   discussion of the unique features of the Squadron retractor. in

8   the middle section, it states "cranial and caudal blades open

9   independently."  Do you see that?

10  A   Yes, I do.

11  Q   Okay.  Just can you explain what cranial and caudal blades

12  mean?

13  A   Sure.  So cranial and caudal are two phrases used to

14  distinguish orientation when you're in the body or near the

15  body.  So this retractor when a surgeon user goes to use it,

16  it's going to go in their side between the hip and rib.

17  Depending on which side the patient is on and which side the

18  surgeon decides to gain access to, these two-blades will flip

19  cranial refers to the blade closest to the side with the

20  patient's head, and caudal refers to the side of the retractor

21  that is closest to the patient's feet.

22  Q   What does it mean for these blades to open independently?

23  A   So opening independently, if you go back to our analogy for

24  scissors, when you go to open a pair of scissors or a

25  forceps-style retractor, both arms have to move relative to the

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1    other at the same time.  They can't move independently.  This

2    retractor when it moves, if you go to open up one, this one arm

3    will move while the other two stay in the same exact

4    configuration.

5    Q    Does the MaXcess retractor have blades that open up

6    independently?

7    A    No, they do not.

8    Q    I want to talk about the first bullet point highlighting

9    this feature which states "reduce unwanted psoas trauma by

10   customizable aperturae."  How does independently opening blade

11   arms do that?

12   A    So every patient's body is different.  The anatomy changes

13   quite a lot.  When this retractor is inserted, one thing that

14   can often happen is a piece of bone like the hip or rib, it may

15   be right up against the hip or the rib.  If you're trying to do

16   this with a forceps-style retractor where you try to open it up

17   and one of the blades gets hit, the whole thing shifts over to

18   one side.  With this retractor if you go ahead and place this

19   in and were to like start opening it up and you hit bone, you

20   can stop moving that one side, and then you can just readjust

21   the other side, basically making it like asymmetric one side to

22   accommodate for the access.

23   Q    Is that something you specifically designed in the Squadron

24   retractor?

25   A    Yes, it is something we were designing on purpose.

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   Q    The second bullet states "improve access over

2   circumferential expanding retractors."  Do you see that?

3   A    Yes, I do.

4   Q    What is a circumferential expanding retractor?

5   A    This is another way of describing our scissor or our

6   forceps-style mechanism.

7   Q    Is the Squadron retractor a circumferential expanding

8   retractor?

9   A    No, it is not.

10  Q    Is NuVasive's MaXcess retractor a circumferential expanding

11  retractor?

12  A    Yes, it is.

13  Q    Let me ask about two other features that are on the bottom

14  of page 2 and page 3, the DepthControl and then the no

15  instruments -- actually, Mr. Wilson, let me start with no

16  instruments required.

17       This says "no instruments required for blade attachment and

18  detachment."  Can you explain that to the jury?

19  A    Yes.  So a couple of the other goal features that we didn't

20  talk about thus for.  So the blade is the piece that is going

21  to actually extend into the patient's body and it's going to

22  retract the tissue.  To attach and release those blades, you

23  have to just simply press this gold lever on here and the blade

24  will simply slide out, no tool required.

25       The mechanism itself has a C shape on here to capture the

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1    blade.  The blade has a corresponding T shape that will slide

2    into that.  So this is the C shape on the retractor over here

3    and then this is the T shape on the blade if you look at it

4    from these two views.  I showed you how the blade was removed

5    but to just load the blade you start it into the top and then

6    it slides right down.  And that's it, when you hear that click,

7    it's now in and you can hear it rattle around a little bit.

8    It's loaded.

9    Q    Is this a feature reduces retraction type or tissue creep?

10   A    Yes, it was intended to.  So as a surgeon will try to

11   access the lower part of the lumbar spine and kind of start

12   working around the pelvis, the retractor might be at a slight

13   angle, so the blades might need to change length.  One of the

14   options that the surgeon had would be to swap out a blade where

15   you could just do this without having to take the retractor out

16   of the patient.

17   Q    Is this a patient out NuVasive MaXcess retractor?

18   A    No, it's not on the MaXcess retractor.

19   Q    Let me ask you about DepthControl.  It's on bottom of page

20   DTX-1059-0002.  Can you explain to the jury what DepthControl

21   is?

22   A    Yes.  In addition to swapping the blades, there's one other

23   step the surgeon can take before that.  These round gold screws

24   that are on the top of the retractor, if you take one of the

25   screwdrivers from the set, you can actually load that in and

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   actually drive the blade down or lift the blade up.  So what

2   this would allow the surgeon to do -- and you can see the

3   blades change length.  I haven't taken the blade out or swapped

4   it.  What that would allow the surgeon to do if there was a

5   little bony growth on the side of the spine or something else

6   in the way, the surgeon could pick the blade up.  Or if it was

7   at a little bit of an angle, you could raise one blade, drop

8   the other and that would potentially help with tissue creep.

9   It was another feature to help them make a very quick

10  adjustment to start setting up the exposure so they could start

11  doing the spine surgery.

12  Q   This is a feature that the surgeons viewed as beneficial,

13  right?

14  A   Yes.  They were very excited about those feature.

15  Q   It DepthControl a feature that reduces retraction time or

16  tissue creep?

17  A   Yes, that's why we designed it.  It was specifically

18  designed to help reduce the addition of retraction time.

19  Q   Does NuVasive's MaXcess retractor have a feature like

20  DepthControl?

21  A   No, it does not.

22  Q   I think you started to, can you explain to the jury the

23  special way in which the blades connect to the arms and to

24  allow for the quick connect and the DepthControl features?

25  A   Yes.  I can give a little more detail on that.  The

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1    retractor will be introduced into the patient's slide and be

2    slid in like this, so one of the important features of this

3    connection is when this blade is loaded, it's attached, but you

4    can easily release it and slide it out along that same access.

5    You can close the retractor a little bit to take some tension

6    off of it, but you can slide the blade in and out.  You don't

7    necessarily have to start over, right?  Which would be if this

8    blade was fixed, you would then have to collapse the retractor

9    potentially take it out of the patient, swap the blades out

10   still with some uncertainty and start over.

11   Q    So if the blades an immovably connected to the arms, would

12   the Squadron be able to achieve the DepthControl and quick

13   connect features?

14   A    No. what really allows this to happen is the shape that's

15   on the end of the retractor, that C shape and the T shape on

16   the two ends and how they allow the blades to slide in and out,

17   they allow them to slide fairly freely.  If you were to have

18   some other piece of tissue or something else get in the way,

19   they won't jam and you can still slide them out fairly freely.

20   Q    Let me take you to the back page DTX-1059-0003.  Let's talk

21   about LevelToe mechanics reduce soft tissue creep.  Do you see

22   that?

23   A    Yes, I do.

24   Q    First at a high level, what does it mean to toe the blades?

25   A    Toe is a term for a correction that a surgeon will do for a

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1  retractor to help create an exposure.  Ideally when you have a

2  retractor and you look down it, you have a straight corridor

3  like that that you're looking.  The missing component from what

4  we're seeing right now with this demonstration is that you're

5  going to have tissue squeezing in.  So when you go to open the

6  retractor, the blades and the arms can move in a little bit and

7  actually not provide a full exposure.  So toe is the name of

8  the adjustment that you use to help bring that blade back to

9  being parallel, so you have an exposure you can see directly

10  down.

11  Q    So what is LevelToe?

12  A    LevelToe is a feature we built into the main joint on the

13  arm to start putting in some toe as you open the retractor.

14  Almost all retractor -- the retractors for this size from what

15  we learned about when we studied everything, no one had a

16  retractor that was stiff enough to just open up without having

17  some type -- needing some type of toe correction.  So we

18  decided to build that feature into the main joint that opened

19  the arm.

20  Q    Can you show the jury how LevelToe works?

21  A    Sure.  Before I do that, I just want to adjust the blades

22  so they're even on the bottom.  There we go.  So LevelToe as

23  you go -- I'll come over here and repeat this.  As you --

24          THE COURT:  If any of the jurors need to stand to see

25  what he's doing, feel free to get up.

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1        THE WITNESS:  I'm using this bottom surface down here

2   as a reference.  It helps highlight the motion.  I'm going to

3   hold the retractor as steady as I can and then I'm going to

4   open with my right arm.  As you go to open, you'll notice

5   LevelToe keeps the bottom of that blade flush with that

6   surface.  It doesn't lift up.  We use the analogy like a

7   pendulum, a weight at the end rope that will swing back and

8   forth.  As the weight moves away from that centerline, it not

9   only moves out but picks up as well.  This doesn't.  This stays

10  flat along that surface as it moves.

11  BY ATTORNEY NISBET:

12  Q   And is this a feature that is designed to reduce tissue

13  creep?

14  A   Yes.  So as the surgeon starts opening that arm out and

15  moving that blade out, the blade doesn't pick up off the

16  surface of the spine all that tissue or nerves that sneak back

17  underneath.

18  Q   Does NuVasive's MaXcess have a feature like LevelToe?

19  A   No, it does not.

20  Q   How are you able to achieve that feature from an

21  engineering perspective?

22  A   That motion is built into the main joint on the arm.  So

23  the main joint on arm that controls on all the motion is right

24  here.  That's built into these features here.  If you hold the

25  retractor and look across this way, you can see some of the

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

 1   components inside that joint.

 2   Q    Why don't have you a seat and let's look at some of the

 3   engineering drawings associated with that joint.  If you could

 4   turn to DTX-369 in your binder?

 5   A    Okay.

 6   Q    What is this document?

 7   A    This is an engineering drawing of the Squadron -- yeah, of

 8   the Squadron retractor body.

 9   Q    Are you familiar with this document?

10   A    Yes, I am.

11          ATTORNEY NISBET:  I would like to offer into evidence

12   DTX-369.

13          ATTORNEY DEVINE:  No objection.

14          THE COURT:  It's admitted.

15      (DTX-369 admitted)

16   BY ATTORNEY NISBET:

17   Q    Jon, I would like to bring this up for the jury and walk

18   them through page by page.  What is shown page 1.

19   A    This is an image of the retractor body without the blades

20   on the ends or the extra handle component.

21   Q    Let me turn to page 2 and page 3.  Maybe we can put them up

22   side by side.  At a high level, what's shown here?

23   A    This is the overall -- this is showing all of the

24   components that are inside this device, and it's also showing

25   you how to assemble it with notes in the correct order so it

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1  will function.

2  Q   What are some of the parts and pieces shown on these pages?

3  A   These are all the components of the arms.  The -- on sheet

4  two, we're looking in the upper middle, we're looking at some

5  of the components that capture and hold the blade onto the arm

6  as we go down.

7          THE COURT:  You can actually touch and draw on the

8  screen if you want to highlight what you're talking about.

9          THE WITNESS:  Thank you.  On the lower part of the

10 sheet too here and here, we're looking at the components for

11 the toe mechanism.  And then on sheet 3, we have all the

12 components for the joints inside the arm.

13 BY ATTORNEY NISBET:

14 Q   And then on -- let's go to pages 4 and 5.  What is shown

15 here?

16 A   These are on page 4, these are the mechanisms that -- for

17 the arm actuators.  These are pieces, the levers, that you have

18 press to let the arm moved, and then they actually keep it

19 locked in position when it's not intended to move so it doesn't

20 skip or move unintentionally.

21 Q   Let's go to pages 6 and 7.  What is shown here?

22 A   Page 6 this is showing the assembly of the central arm that

23 moves in and out on this gold knob that I showed you.

24 Q   So this document reflects all of the engineering that you

25 and your team did in designing the Squadron retractor, right?

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1  A    Yes.

2  Q    Not all of it, but sort of a summation of it?

3  A    This a large portion of it and it is the starting point for

4  all the rest.

5  Q    So I want to focus on the joint you mentioned.

6       Mr. Wilson, if you could turn to DTX-369-0003.  Where on

7  this page is the engineering drawing tied to the joint that you

8  described?  If you can circle it?

9  A    That too.  All of those pictures there.  And these are

10 dedicated to the assembly of the mechanism.

11 Q    What are the individual component parts of that joint that

12 controls how the arms move?

13 A    That would be all of these components that are listed out

14 right here.

15 Q    About how many parts make up that joint?

16 A    Inside that joint, there's roughly -- there's eight there,

17 but also another three or four down below.

18 Q    Now this documents references and labels some of those

19 individuals components as pivots, as a main pivot, as a bottom

20 pivot; is that right?

21 A    Yes.

22 Q    And does the fact that the arms have components called

23 pivots mean that the arms operate in a pivoting motion?

24 A    No, it doesn't.

25 Q    Do the parts describe the way in which the Squadron arms

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1  move?

2  A    No, it doesn't.

3  Q    We're going to talk a little bit more about that movement.

4  I want to blow up and get an even better look at some of the

5  engineering behind that joint.  If you could turn in your

6  binder to DTX-389 and DTX-390?  Do you recognize those

7  documents?

8  A    Yes, I do.

9  Q    What are those documents?

10 A    These are screen shots from the -- of the CAD models of the

11 Squadron retractor.

12 Q    What is a CAD model?

13 A    A CAD model is three-dimensional computer file for these

14 parts.

15 Q    Are you familiar with the CAD model drawing associated with

16 the Squadron retractor?

17 A    Yes, I am.

18         ATTORNEY NISBET:  I would like to move DTX-389 and 390

19 into evidence.

20         ATTORNEY DEVINE:  No objection.

21         THE COURT:  They're admitted.

22     (DTX-389 through 390 admitted)

23 BY ATTORNEY NISBET:

24 Q    Describe what's shown in DTX-389 first?

25 A    That's the image on the left, correct?

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   Q   That's the image on the left, correct.

2   A   So the view that we're looking at here is from this -- is

3   from the side of the retractor.  This translucent kind of

4   see-through material that's on here, that is this outer arm

5   that's in solid black on the physical device.  That's been made

6   translucent so you can see inside of it.  What we see right

7   here are the two -- are all of the components of that joint

8   assembled, basically the output of that drawing we just looked

9   at.  When that drawing is completed, this is what this

10  represents.

11  Q   And what is shown in DTX-390 on the right?

12  A   This is a cross-section of that same view.  So with the CAD

13  software, we are able to actually just pretend we can make a

14  cut down this plane, and this is kind of showing you the

15  internal workings of those, what those parts look like from the

16  inside.

17  Q   I want to focus on DTX-389, the not cross-section.  Can you

18  explain to the jury what the green and gold components are on

19  the screen shot?

20  A   Yes.  So the green and gold components are hemispherical

21  counterparts for a hemispherical joint.  So the green component

22  is essentially a cup and the yellow or gold component is a

23  ball.  If you want an analogy for these, you can think of your

24  hip joint.

25  Q   How do the two hemispherical joints move?

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   A   So the green and the gold components slide over the

2   surfaces of each other to allow for the motion.

3   Q   And what type of arm movement do these two hemispherical

4   joints produce?

5   A   So the arm movement that's allowed from these two joints is

6   the result of both joints moving simultaneously.  So one of

7   these joints doesn't move on its own.  They both have to move

8   at the same time to allow the arm to move.  And that's what

9   gives the arm its motion.

10  Q   And how would you describe the motion of the Squadron

11  retractor arm?

12  A   So when you look at the retractor when you go to open the

13  arm up, the first thing the arm does is move forward up down

14  and out in roughly a straight line.

15  Q   Does the arm of the Squadron retractor rotate when it

16  opens?

17  A   No, it does not rotate.

18  Q   Does the arm of the Squadron retractor turn away when it

19  opens?

20  A   No, it doesn't.

21  Q   How much time and effort did it take for you and your

22  colleagues to develop this joint that results in the unique arm

23  motion retractor?

24  A   It took a good amount of time to develop this concept and

25  to design this joint, and then it took even longer amount of

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   time to fine tune and adjust it so it provided the motion that

2   we were looking for the arm.

3   Q   And why did you design the retractor with this type of arm

4   movement as opposed to one that has a central pivot point like

5   the NuVasive MaXcess retractor?

6   A   This mechanism was pivotal -- sorry.  This was important --

7   this mechanism was important to creating the type of motion

8   that the surgeons wanted clinically.

9   Q   I would like to go back to DTX-1061, a document we looked

10   at earlier in your examination, and I'd like to go to page

11   DTX-1061-0007.  This is -- this slide is entitled "Cranial

12   Caudal Blades Open Independently."  Do you see that?

13   A   Yes, I do.

14   Q   What is shown in the two images on the slide?

15   A   The image on the left is an X-ray taken from a cadaver lab

16   showing the retractor being used in a cadaveric specimen, and

17   the image on the right is a CAD rendering of the retractor

18   showing one of the arms in an open position.

19   Q   What does the blue arrow in this figure represent?

20   A   It's indicating the direction of motion for the arm.

21   Q   And if you can come back out, Mr. Wilson.

22      Do you see that the text, the red text under the heading

23   "demonstrate."  Do you see that, Jon?

24   A   Yes, I do.

25   Q   What does it mean when it says explain how most handheld

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   retractors open radially?

2   A    This is a reference going back to our forceps-style

3   retractor or pair of scissors.  As those arms open up like with

4   a pair of scissors, they not only open up and move away from

5   each other, but they also create that distance and move

6   backwards, effectively closing the exposure for the retractor

7   that it creates.

8   Q    Is that how the Alphatec Squadron opens?

9   A    No, it is not.

10  Q    Just one last question, Mr. Costabile, in light of all of

11  the differences that we've discussed today, what would you say

12  to someone who just picks up the Squadron retractor and picks

13  up the MaXcess retractor and says it's a copy?

14  A    It's not a copy.  A lot of time and effort into making this

15  fundamentally different than what already existed at the time.

16          ATTORNEY NISBET:  No further questions.

17          ATTORNEY FODEMAN:  May we approach briefly before we

18  start cross with a short issue?

19     (Sidebar held outside the presence of the jury, reported as

20  follows):

21          THE COURT:  Yes.  You can speak. fairly loudly.

22          ATTORNEY FODEMAN:  Thank you.

23          THE COURT:  Not as loud as you normally speak.

24          ATTORNEY FODEMAN:  Understood.  Candidly I'm at loss

25  about the testimony that was elicited about what the result of

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   the Medtronic NuVasive litigation.  I went back to the

2   transcript of our motions in limine about this.  This was

3   exactly what I was concerned about, that they would elicit

4   information about the results of some unrelated trial about

5   some unrelated patents to suggest that NuVasive was doing the

6   exact same thing.

7          Now to make matters even worse, rather than call us

8   infringers, he couldn't remember the word infringe after

9   counsel used the word infringe and said they were found to be

10  valid, which makes even more confusing.  Candidly, this is

11  literally verbatim.  It could have been handled so much better:

12  Following that litigation, based on that litigation come out

13  and got a license.  That's what I thought was going to happen

14  after Your Honor told them that couldn't happen.  And now I

15  don't know what to do. I certainly don't want to ask for a

16  mistrial.

17         THE COURT:  I'm not going to grant a mistrial because

18  I think this is not going to be a big impact to the jury.

19  There was litigation.  He was following it, the litigation

20  resolved, and they decided to take a license to the retractor

21  that Medtronic sells.

22         ATTORNEY FODEMAN:  That would have been great.  I

23  would have loved that.

24         THE COURT:  That's the only thing they got out of it.

25  You're getting into stuff that that's going to go way over

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   their heads.

2        ATTORNEY FODEMAN:  Here's what I would ask Your Honor

3   to consider, and I don't know if I want to draw even more

4   attention to it, but I will give it some thought over the

5   evening, if there was some kind instruction that doesn't make

6   this worse about you have heard about litigation and that is

7   not what's before you, and the outcome of that is irrelevant to

8   this, something along those lines, and I would work on the

9   language.

10        ATTORNEY NISBET:  For what it's worth, I don't think I

11   said anything about infringement.

12        ATTORNEY FODEMAN:  Who won.

13        THE COURT:  I dealt with won because won is a relevant

14   term in litigation.  All right.

15        Do your cross whoever is doing it, and then if for

16   some reason, you think they need further instruction as to

17   limiting the use of any prior litigation with regard to the

18   issues in this case that are not who did what to whom elsewhere

19   but the relevance to him.  And I think the relevance to the

20   entire line of questioning was this is a crowded market with a

21   lot of people in it who are litigious, so they did some

22   homework.  You disagree, but that's what his testimony was.  We

23   looked at what was going on and took a license where we thought

24   we needed one.

25        ATTORNEY FODEMAN:  Then we should certainly be able to

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   test how good was that homework.  If you're saying I asked in

2   good faith, I just can --

3        THE COURT:  You want to open the door, but then the

4   problem is if he relied on it, he didn't say relied on counsel.

5   He said I looked at what was going on and I understood the

6   company took a license.

7        ATTORNEY FODEMAN:  I am not going to say you didn't --

8   you didn't look at this patent and that patent and that patent.

9   That seems obviously responsive.

10       ATTORNEY NISBET:  The statute is clear you can't come

11   anywhere near suggesting that failure to seek advice of

12   counsel.

13       THE COURT:  That's not what he's asking.  He looked at

14   the patents that are involved here, because that's really all I

15   care about.  I don't want to go through a laundry list.

16       ATTORNEY FODEMAN:  I don't want to do that either and

17   all the patents that Medtronic and Globus has, but rather you

18   can certainly can ask him, did you look at the patents in this

19   case?

20       ATTORNEY DEVINE:  Can I just to make sure I'm on solid

21   footing.  So one of the patents at issue in the Globus issue

22   that the witness testified that he was following was the '801

23   patent.  It was put through reexam by Globus and survived.  I

24   should be able to ask him you weren't following that, you

25   didn't see that, did you; you didn't look at the claims of that

1    patent, did you didn't require a fancy ball joint or fancy --

2    on the retractor.  Is that crossing the line?

3                ATTORNEY NISBET:  I didn't mean to interrupt.  He said

4    he did not recall what patents were at issue in the Globus

5    litigation, so I'm not sure what.

6                ATTORNEY DEVINE:  I mean the --

7                THE COURT:  The problem I'm having with all of this is

8    there's lots of parts to these things, none of the things they

9    have to look at it.  If you want to ask him if he's familiar

10   with the patents in this case, if he read them.  And if the

11   answer is no, move on.  Don't go through a litany of other

12   things.  I mean, he -- you have accused them of copying the

13   device, your device that's been a theme throughout here.  He

14   just went through an explanation as the designer what steps he

15   took not to copy a device.  You can challenge him with regard

16   to the patents.  You can ask him, in looking at the -- you said

17   you were looking at what was out there, what was publicly

18   available when litigation was going on, did you read any of the

19   patents in this case.  If he doesn't remember, he doesn't

20   remember.  If he didn't, he didn't.  That's it.  Let's leave it

21   at that.

22       (Open court, jury present.)

23                THE COURT:  All right.  Back for cross.

24                            **CROSS-EXAMINATION**

25

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   BY ATTORNEY DEVINE:

2   Q    Good afternoon, Mr. Costabile.

3   A    Good afternoon.

4   Q    My name is Wendy Devine.  You may remember we met at a

5   deposition a couple years ago?

6   A    I do.

7   Q    Great to see you again.

8   A    Nice to see you.

9   Q    Monitoring some litigation in the industry.

10  A    Yes.

11  Q    Are you familiar with the three patents that are at issue

12  in this case?

13  A    Not specifically.

14  Q    Have you ever read them?

15  A    No.

16  Q    I believe you told the jury that you were at Alphatec from

17  April of 2009 to October of 2017; is that right?

18  A    Yes, that's correct.

19  Q    And you said that when you set out to work on the Battalion

20  system that Alphatec had nothing?  I think that's the word you

21  used, right?

22  A    Yes, that's correct.

23  Q    But Alphatec did have a lateral system before Battalion,

24  right?

25  A    I'm not sure what you're referring to.

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   Q    Are you familiar with GLIF?

2   A    Yes.

3   Q    What's that a lateral system?

4   A    I guess you could consider it one.  It wasn't being

5   promoted.

6   Q    Okay.  But it was for lateral surgery or it wasn't?

7   A    It was for a different form of lateral surgery.  It wasn't

8   for a traditional lateral surgery like we've been speaking

9   about.

10  Q    GLIF was for lateral spine surgery, right?

11  A    Yes, I agree request that.

12  Q    Okay.  And, in fact, you worked on GLIF before you worked

13  on Battalion, right?

14  A    I did not work on GLIF.  That was the commercial product.

15  I was part of the team vetting some idea that was going to be

16  called GLIF 2.

17  Q    Alphatec wanted to make a new version of GLIF after GLIF

18  failed, right?

19  A    GLIF 2 was a series of technology who the surgeon who owned

20  the intellectual property was interested in offering us as a

21  company.

22  Q    Okay.  GLIF 1 failed, right?

23  A    What do you mean by "failed"?

24  Q    It's not around anymore, is it?

25  A    No.  It's not commercially available.

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1    Q    And it wasn't commercially successful for Alphatec?

2    A    No, it wasn't.

3    Q    And generally, surgeons did not adopt it and start using

4    it, right?

5    A    No.  There was a slow adoption curve.

6    Q    And so you vetted GLIF 2 version 2 of Alphatec's venture

7    into the lateral spinal fusion market, right?

8    A    Yes.  I was one of the members of the team that did that.

9    Q    And the concept for GLIF 2 was a prone patient, which is a

10   patient facing down, right?

11   A    Yes, that's correct.

12   Q    Okay.  And it was a curved access to the spine, right?

13   A    GLIF 2 wasn't going to go along so much of a curve.  It was

14   going to be more of a handheld retractor to gain access.

15   Q    I believe you were saying earlier that was very different

16   than the technology we've been talking about today, right?

17   A    Yes, it is.

18   Q    Ultimately you made the decision that Alphatec should

19   abandon GLIF 2, right?

20   A    No.  It wasn't ultimately me.  It was the VP of R&D, JP

21   Timm who made the final call.  I was working on the project

22   under his direction.

23   Q    Okay.  But Alphatec abandoned GLIF?

24   A    I know Alphatec didn't pursue GLIF after a period of time.

25   Q    So is it fair to say it was abandoned?

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   A    I mean, it was de-commercialized.  It was on the market and

2   then they took it off, so.

3   Q    Is there a difference between that and abandoning it?

4   A    I guess not.

5   Q    Okay.  And it is your personal belief that GLIF 2 was

6   abandoned because it required too much training for surgeons to

7   adopt it, right?

8   A    Yes.

9   Q    So GLIF failed, tried GLIF 2, was going to require too much

10  training for surgeons to adopt it, abandoned it, then you moved

11  to Battalion, right?

12  A    Yeah.  Overall, I agree with that, yes.

13  Q    That was in 2013?

14  A    2012, more than early parts of '13.

15  Q    Okay.  So your first three years at the company, you spent

16  on GLIF?

17  A    No.  I was not part of the team that commercialized GLIF.

18  Q    But you evaluated GLIF, I think we've established, right?

19  A    GLIF 2.  There were two separate projects in there.

20  Q    So you got Battalion in 2013.  You were the design leader

21  for Battalion, right?

22  A    Yes.

23  Q    Okay.  And you made the design decisions for Battalion,

24  right?

25  A    Yes.  I was overseeing the design team.

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1    Q   Let's talk a little bit about what resources you had

2    available when you were designing Battalion, okay?  There's

3    been some talk about this XLIF book that's all about NuVasive's

4    the history and its novel lateral procedure.  You had this

5    book, right?

6    A   Yes, we did.

7    Q   In fact, we met at your deposition, right?  And that

8    deposition took place while you were not employed at Alphatec,

9    right?

10   A   Yes, that's correct.

11   Q   You produced documents out of your personal files, right?

12   A   Yes.

13   Q   And one of documents was this book.  So it was personally

14   your book, right?

15   A   No.  The documents that I produced were a PDF that I had

16   from the company.

17   Q   So you had a PDF copy of this book?

18   A   Yes.

19   Q   And you had that personal PDF copy of NuVasive's book

20   detailing its novel lateral procedure while you were developing

21   Battalion, right?

22   A   Yes.

23   Q   Let's talk about what else you had.  You and your design

24   team also had a NuVasive lateral implant when you were

25   developing Battalion, right?

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1    A    Yes, we did.

2    Q    You had that at your office facility while you were

3    developing your products, right?

4    A    Yes, we did.

5    Q    And you and your development team also had NuVasive's light

6    cables that go with NuVasive's MaXcess retractor while you were

7    developing Battalion, right?

8    A    Yes, we did.

9    Q    You had physical versions of them, right?

10   A    Yes.

11   Q    You took pictures of them and put them in presentations

12   about your development, right?

13   A    Yes.

14   Q    And you and your design team also, in fact, had a MaXcess I

15   retractor.  Remind ourselves about it.  You and your design

16   team had a MaXcess I retractor at your facility at Alphatec

17   while you were developing Battalion, right?

18   A    It wasn't the full retractor shown there.

19   Q    Okay.  But you had a MaXcess I retractor?

20   A    There was a MaXcess I retractor body in the building, yes.

21   Q    You didn't have blades on it, but you had everything else?

22   A    We didn't have the blades, we didn't have the handles, we

23   didn't have any of accompanying instruments that went with it.

24   Q    You had the arms that rotate out?

25   A    Those are attached to the body.

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   Q    Yeah.  And you have this arm that translates, right?

2   A    Yes.  That was a part of the mechanism.

3   Q    You had all three arms of the MaXcess I at Alphatec while

4   you were developing Battalion, right?

5   A    Yes.

6   Q    Going back to the light cables, you ended up designing

7   Battalion to have light cables that slide down the blades just

8   like NuVasive's, right?

9   A    Our light cables didn't go down the blades, yes.  But just

10  like NuVasive's?  I don't think that's fair.

11  Q    NuVasive's slide down the blades of the MaXcess, right?

12  A    Yes.  At a high level, they do.

13  Q    And so do your Battalion ones?

14  A    Ours slide down the blades, yes.

15  Q    And at some point during the development, you decided an

16  alternative way of lighting up the space, right?

17  A    I don't remember what you're speaking about.  Could you --

18  Q    Do you remember saying that you considered lighting up the

19  disc space by lighting up the blades themselves?

20  A    Yes.

21  Q    But you didn't do that, right?

22  A    No.

23  Q    Instead you developed a system that has light cables that

24  slide down the retractor blades, right?

25  A    Yes.

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1    Q    And that's what NuVasive has?

2    A    NuVasive has light cables that go down the blades, yes.

3    Q    At some point during the development, you wanted to use

4    dilators with electrodes on the tip, right?

5    A    We were developing dilators for the system, yes.

6    Q    I'm asking you personally, you wanted to have dilators with

7    electrodes on the tip while you were developing Battalion,

8    right?

9    A    Early on in development, we considered it and then we

10   didn't pursue developing on our own.

11   Q    That's not what I'm asking, sir.  I'll use the Mo rule.

12   I'll try two more times.

13         During the development of the Battalion, you personally

14   wanted to use electrodes with dilators on the tip in your

15   system, right?

16             THE COURT:  I think you mean dilators with electrodes

17   on the tip.  Why don't you go for four.

18   BY ATTORNEY DEVINE:

19   Q    I'll make it the Wendy rule.  You personally while you were

20   developing Battalion wanted to use dilators in your system that

21   had electrodes on the tip, right?

22   A    Yes.

23   Q    Okay.  But you were told you couldn't do that, right?

24   A    I'm not sure by what you mean I was told I couldn't do

25   that.

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   Q   Do you remember telling me at your deposition that you were

2   told you were not able to put electrodes on dilators?

3   A   Depending on how those electrodes were used, that comes

4   very close so some of the NuVasive technology.

5   Q   So you were told you couldn't use them?

6   A   I don't remember who said not to use them.

7   Q   I'm asking, you were told you couldn't use them.

8   A   I'm trying to think back who would have told me I can't use

9   them.

10  Q   I'm not asking who, sir.  You were told you couldn't use

11  them, right?

12  A   Yeah.  But that implies someone told me.  I didn't tell

13  myself that.

14  Q   But that's the message you received?

15  A   I don't remember that message coming.

16  Q   You don't remember that?  Okay.  At your deposition, you

17  were under oath, right?

18  A   Yes.

19  Q   And you did your best to tell the truth?

20  A   Yes.

21  Q   There was no reason you could not tell the truth?

22  A   Yes.

23  Q   I'll give you a binder.

24          ATTORNEY DEVINE:  Your Honor, may I approach?

25          THE COURT:  Yes.  Do you want to give him a chance to

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1    look at the appropriate deposition testimony because "I don't

2    remember" isn't "no."

3             ATTORNEY DEVINE:  Sure.  All right.  Let me make sure

4    I can find it.  I believe we're at page 86, Mr. Smith.  Is that

5    right on this one, 86?  I'm not asking to put it up.

6             THE COURT:  Do you have the page and line for the

7    reference?

8             ATTORNEY DEVINE:  Unfortunately my hole went through

9    the numbers.

10            Mr. Smith, can you just tell me the page and line?  I

11   punched a hole.

12            THE COURT:  He just needs the page and line to read

13   the testimony to himself.

14      (Pause in the proceedings)

15            ATTORNEY DEVINE:  I apologize.  I'm having a technical

16   difficulty.  I'll come back to it.  I should learn not to hole

17   punch my pages through my printout.

18   BY ATTORNEY DEVINE:

19   Q   So coming back to the retractor.  You testified on direct

20   that you considered two-bladed, four-bladed, many-bladed

21   designs for your retractor, right?

22   A   Yes.  We considered many different blade configurations.

23   Q   Ultimately you went with a three blade?

24   A   Yes, we did.

25   Q   And the MaXcess that you had in your lab while you were

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   designing had a three-bade configuration, right?

2   A   Yes, it did.

3   Q   And you mentioned on direct that you found a lot of

4   information about the industry on the internet, right?

5   A   Yes, we did.

6   Q   You didn't find the MaXcess I retractor on the internet,

7   did you?

8   A   No, we didn't.

9   Q   And you didn't find the NuVasive implants on the internet,

10  did you?

11  A   No, we did not.

12  Q   Okay.  Now in designing your retractor, you needed to

13  devise a way to anchor the retractor to the spine, correct?

14  A   Yes, we did.

15  Q   And eventually you came up with an intra-discal shim,

16  right?

17  A   Yes, we did.

18  Q   That's a shim that locks into the posterior blade, goes on

19  into the disc of the spine of the patient, right.

20  A   Generally speaking, yes.

21  Q   But that's not the only thing you tried in your two years

22  of development, right?

23  A   No.  There were others.

24  Q   For example, you tried screws, right?

25  A   Yes, we did.

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   Q    Sorry?

2   A    They were not well accepted.

3   Q    And they weren't well accepted because doctors didn't like

4   the idea of screwing something in the vertebra, right?

5   A    Particularly they were concerned with the bone bleeding

6   afterwards.

7   Q    And the intra-discal shim doesn't go into the vertebra, so

8   there's no bone bleed, correct?

9   A    Generally speaking, it doesn't, but there's oftentimes it

10  does.

11  Q    But doctors preferred the option to go into the shim

12  instead of screwing something into the bone, right?

13  A    Generally speaking, yes.

14  Q    You also tied to anchor the retractor by sliding a K-wire

15  down the blade down the vertebra, right?

16  A    Yes, we did.

17  Q    And you abandoned that too, right?

18  A    Yes, we did.

19  Q    And you abandoned that because doctors, again, would not

20  accept an anchoring system that had to go into the vertebra,

21  right?

22  A    This one, they were more open to the idea, but they were

23  concerned with other risks besides the one we just spoke about

24  with the bleeding.

25  Q    What were those other risks?

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   A   Mainly if the K-wire would continue to migrate forward and

2   puncture other vessels.

3   Q   Over the course of your two-year development, you tried to

4   develop a retractor that didn't have an intra-discal shim, but

5   eventually, you just went with the intra-discal shim, right?

6   A   We were equally exploring all three to try to figure out

7   what would be most effective and what surgeons would prefer.

8   Q   And you commercialized is intra-discal shim, right?

9   A   Yes.

10  Q   And you're aware that NuVasive uses an intra-discal shim to

11  anchor its retractor to the spine too, right?

12  A   Yes.

13  Q   Let's go to PTX-501, which is in your binder.  And I just

14  want to show it to the witness for now.

15      Mr. Costabile, do you recognize this document?

16  A   Yes, I do.

17  Q   Is it a document created -- well, that's your name on the

18  front, right?

19  A   That's my name on it.

20  Q   That's an Alphatec document?

21  A   Yes.  It is an internal Alphatec slide deck.

22          ATTORNEY DEVINE:  We'd like to move PTX-501 into

23  evidence, please.

24          THE COURT:  Any objection?

25          ATTORNEY NISBET:  No objection.

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1           THE COURT:  It's admitted.

2       (PTX-501 admitted)

3           ATTORNEY DEVINE:  Thank you.

4   BY ATTORNEY DEVINE:

5   Q    PTX-501.  The purpose of this document was to pitch

6   management for approval to move forward with your Battalion

7   project, right?

8   A    Yes, generally speaking.

9   Q    Okay.  And if we go to page three of the document.  This

10  slide is entitled "What Is Lateral Lumbar Interbody Fusion,"

11  and there's some pictures on here right?

12  A    Yes, I see those.

13  Q    Do you know where those pictures come from?

14  A    Generally, yes.

15  Q    Where?

16  A    I forget what piece, but some piece of literature.

17  Q    The NuVasive Surgical Guide?

18  A    Could be.

19  Q    It even has figure 1, figure 2 markings; do you see that?

20  A    I do.

21  Q    And those are references in the NuVasive surgical guide,

22  right?

23  A    I don't remember that, but I wouldn't be surprised if that

24  was true.

25  Q    Let's go to page four.  This slide is entitled "What Does

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   The LLIF Surgical Pathway Look Like," right?

2   A    Yes.

3   Q    There's a couple more pictures on here?

4   A    Yes.

5   Q    Do you know where they came from?

6   A    Again, generally another form of NuVasive literature.  I

7   don't remember exactly which one.

8   Q    Could it be the NuVasive Surgical Guide?

9   A    It could be.

10   Q    And let's go to page nine.  And here we have competitive

11   landscape.  Do you see that?

12   A    Yes.

13   Q    And you contributed to this slide deck, right?  You were on

14   the team for this slide deck?

15   A    Yes, I was.

16   Q    And you evaluated here three different companies in the

17   table on the competitive landscape, right?

18   A    Yes.  These were the three biggest competitors in the

19   market at the time.

20   Q    So you have NuVasive Medtronic and Globus, right?

21   A    Yes.

22   Q    And NuVasive is 53 percent?

23   A    Yes.  That's what it says.

24   Q    So many heads above the other two, right?

25   A    Generally speaking, yes.

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1    Q   Let's go to page 10 of this document.  The title of this

2    one is "What Is The Project Scope."  That's your Battalion

3    project, right?

4    A   Yes.

5    Q   So you're pitching to management, you want to do this

6    Battalion project.  You're telling management what is the

7    project scope, and then you say retractor system, right?

8    A   Yes.

9    Q   And you state "access system specifically designed to

10   create a safe reproducible surgical pathway," right?

11   A   Yes, that's what it says.

12   Q   And then you show a picture of the retractor, right?

13   A   Yes, that's what's shown.

14   Q   What retractor is that.

15   A   That is the MaXcess III.

16   Q   That's a NuVasive retractor?

17   A   Yes.

18   Q   Okay.  Let's go to page 11, please.  This is another one

19   with "what is the project scope."  Do you see that?

20   A   Yes, I see that.

21   Q   Again, we're referring to the project scope of your

22   Battalion development project, right?

23   A   Yes, we are.

24   Q   And you reference an implant system, right?

25   A   Yes.

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1    Q    And you state implants specifically designed for lateral

2    placement that's what these implants are supposed to be, right?

3    A    Yes, that's what it says.

4    Q    Then you have some pictures?

5    A    Yes.

6    Q    Whose implants are those?

7    A    NuVasive's.

8    Q    Let's go to page 13.  Okay.  Again, what is the project

9    scope?  That's your Battalion project, right?

10   A    Yes.

11   Q    Okay.  And you have training programs?

12   A    Yes.  That's what it says.

13   Q    And there's a picture of surgeons in training there, right?

14   A    Yes.

15   Q    Whose training facility is that picture of?

16   A    That is NuVasive's.

17   Q    And you mentioned earlier that GLIF 2 was abandoned because

18   there was too much training time, right?

19   A    Generally speaking, yes.

20   Q    I believe there was some discussion on your direct

21   testimony about DLIF; do you recall that?

22   A    Yes.

23   Q    That's Medtronic's lateral system, right?

24   A    Yes, it is.

25   Q    Medtronic has a retractor that's two-bladed, right?

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1    A    Yes.

2    Q    And during your design of the Battalion system, you

3    received feedback that the Medtronic system leads to disruption

4    of neural structures and related pain post-surgery, right?

5    A    I don't specifically recall, but generally speaking, yes.

6    Q    And ultimately, Alphatec did not go with the two-bladed

7    retractor like Medtronic?  They went with the three-bladed

8    retractor?

9    A    Can you repeat that?

10   Q    Sure.  When you finished your design of Battalion, it

11   wasn't a two-bladed retractor, right?

12   A    No, it was not.

13   Q    It was a three-bladed retractor, right?

14   A    Yes, it was.

15        ATTORNEY DEVINE:  No further questions.  Thank you.

16        THE COURT:  Thank you.

17        Any redirect for this witness.

18        ATTORNEY NISBET:  Yes, Your Honor.  A few questions.

19                         REDIRECT EXAMINATION

20   BY ATTORNEY NISBET:

21   Q    Mr. Costabile, you were asked on cross about dilators; do

22   you remember that?

23   A    Yes.

24   Q    And at some point, you were looking to develop dilators,

25   right?

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1    A    Yes, we were.

2    Q    Did you ultimately develop dilators that are used in the

3    Battalion lateral system?

4    A    No, we did not.

5    Q    Where did the dilators that are currently used in the

6    system come from?

7    A    A third party we purchased them from.

8    Q    You were asked questions about various components of

9    competitor products.  You testified earlier you studied

10   competitor products?

11   A    Yes.

12   Q    The MaXcess retractor was publicly available and sold,

13   right?

14   A    Yes, it was.

15   Q    And counsel asked you about having a MaXcess retractor in

16   your lab.  Do you remember that?

17   A    Yes.

18   Q    Where was the retractor that was in the Alphatec building?

19   A    It was in another former employee's office.  He was former

20   NuVasive employee who left in -- before I joined the company.

21   Before 2009.  And he had it sitting on his desk ever since I

22   knew him when I joined the company.

23   Q    It served more as a paperweight than anything else,

24   correct?

25   A    It was sentimental to him.

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   Q   And you were asked about -- a few questions about the

2   surgical guide, right?

3   A   Yes.

4   Q   That wasn't confidential, was it, the surgical guide at

5   that time?

6   A   No.  You could find that on the internet.

7   Q   Let me ask you about PTX-501.  Bring that up.  So what was

8   the purpose of document?

9   A   This was a marketing document created for our development

10  process which we had a formal one in the company for, and this

11  was part of a rather large presentation to upper management on

12  what the project would be.  So this document was probably one

13  of the -- it was one of the first ones that we put together

14  that was comprehensive to show a lot of the management in the

15  company when we talk about what lateral surgery is, what are

16  all of the components of it to give them pictures and

17  descriptions behind what we're going to try to start

18  developing.  This is what that was for.  This is to show what

19  was out there.

20  Q   I notice the date of document, June 16, 2014.  Do you see

21  that?

22  A   Yes.

23  Q   That was well into your development of the Squadron

24  retractor, right?

25  A   Yeah.  We had just started beginning and we had some very

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1    crude, very simple designs.  Nothing that had -- yeah.  Those

2    were very simple in nature and very incomplete, and we were

3    working on very specific focused tasks at the time.  We did not

4    have a lot of work done on the broader scope of the project.

5    Q   And why were you showing executives information about

6    various competitors in the market?

7    A   This is to show them what was out there and to give them an

8    idea about what it was going to take to actually -- when we

9    produced something what it was going to be competing against.

10   So consistent with this, right?  I mean, as that slide showed,

11   NuVasive was the market leader.  So we were using them as the

12   main point of reference if you're going to enter.  And they

13   also had the largest number of offerings out there.

14   Q   Let me draw your attention to page 11 of the document Bates

15   ending 702 -- sorry.  Slide 9.  Slide 9.

16   A   Yes, I see it.

17   Q   And so what are you showing management here?

18   A   This is a high-level summary of the three top competitors

19   in the market, just a general picture of what their retractor

20   is to give them all an idea, and then a general picture of

21   their implant with a slight description down below it of all of

22   the different sizes.  One of the things is there's one image

23   for those implants, but there could be hundreds or thousands of

24   different versions of all those implants that go behind it.

25   And those numbers kind of represent how much -- how many

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   implants you actually have to design to make.

2   Q   And so you were showing management various retractors

3   around the market, right?

4   A   Yes.

5   Q   Various different competitors, right?

6   A   Yes.

7   Q   And you were showing implants that were on the market,

8   right?

9   A   Yes.

10  Q   Including an implant for Medtronic, right?

11  A   Yes.

12  Q   And from Globus; is that right?

13  A   Yes.

14  Q   Counsel asked you whether you had NuVasive implants in the

15  building as you were designing the Battalion lateral system.

16  Do you remember that?

17  A   Yes.

18  Q   Are the Alphatec implants identical to the NuVasive

19  implants?

20  A   No.

21  Q   Is that the same for the Squadron retractor?  Is the

22  Squadron retractor identical to the MaXcess implants -- sorry

23  the MaXcess retractor?

24  A   No.

25  Q   Do other competitors use implants and retractors like the

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   ones we've talked about today?

2   A   Yes.

3   Q   Do other competitors use shims in their lateral systems?

4   A   I believe so, yes.

5   Q   Do other competitors use light cables in their lateral

6   systems?

7   A   Yes.

8   Q   Those aren't things that are unique to NuVasive, are they?

9   A   I don't believe so.

10          ATTORNEY NISBET:  No further questions.

11          ATTORNEY DEVINE:  Very briefly, Your Honor?

12          THE COURT:  Yes.

13                    **RECROSS-EXAMINATION**

14   BY ATTORNEY DEVINE:

15   Q   Mr. Costabile, you have emphasized a number of times that

16   the dilators that Alphatec provides with its lateral system are

17   from a third-party company, right?

18   A   Yes.

19   Q   But you chose those dilators to provide with your system,

20   right?

21   A   Yes.

22   Q   And you specifically chose dilators that have an electrode

23   on the tip, right?

24   A   Yes.  We wanted dilators that would be compatible with our

25   neuromonitoring.

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   Q    And PTX-501, page 9.  Let's pull that up real quick.  I

2   believe you told us when you showed this presentation to,

3   Alphatec management you were trying to show them what was out

4   there; is that right?

5   A    Yes.

6   Q    But when you defined the project scope for the retractor,

7   you only showed NuVasive, right?

8   A    We needed a picture, and that was the best picture we had

9   to show.

10  Q    For the implant, you showed NuVasive?

11  A    Yes.  Same answer.

12  Q    And for the training lab, you showed NuVasive?

13  A    Yes.

14  Q    And there are many other competitors out there, I believe

15  you testified, right?

16  A    Yes.

17  Q    But you didn't reference them, right?

18  A    No.

19          THE COURT:  Anything else?

20          ATTORNEY NISBET:  No, Your Honor.

21          THE COURT:  Sir, thank you very much.  You can step

22  down and if you can take at a retractor and put it on the table

23  with rest of them, I think that would be helpful.  Do you want

24  to take your afternoon break now go a little longer.

25          ATTORNEY NISBET:  The next witness Scott Robinson

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   Probably 45 minutes.

2          THE COURT:  That's a long time.  Why don't we break.

3   it's 12:25.  We will break until 1:00.  See you then.  Don't

4   talk about the case.

5       (Jury in afternoon recess)

6          THE COURT:  Okay.  The jury is on their break.  And I

7   cut somebody off last time with an issue.  So why don't we

8   address that now before we all break.

9          ATTORNEY DEVINE:  Sure.  The next witness after

10  Mr. Robinson is Dr. Sachs.  So there's two concerns.  The first

11  is on slide -- I can't read the green -- 8 and I think this is

12  just something I want to flag.  Something flagged in my brain

13  during Ms. Howell's testimony.  It appears that Alphatec is

14  attempting to supplement their obviousness case with additional

15  claims of some sort of prior use or prior commercial

16  availability.

17         And we spoke with Alphatec about this slide.  They

18  were going to bring these actual physical retractors in, but I

19  understand they have decided not to do that so I just want to

20  flag that, you know, we do have some concern that they be kept

21  to the obvious combinations that they have elected for this

22  case.  Obviously my concern is that Dr. Sachs is going to take

23  the stand and say that he somehow personally engaged in some

24  invalidating prior use.

25         THE COURT:  I don't know.

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1      ATTORNEY KANG:  Dr. Sach's has testimony where, you

2  know, in his expert report from the beginning of the case he

3  disclosed his opinions that he had performed lateral

4  trans-psoas procedures.  It's not par of our invalidity

5  combination.  It's just state of the art in his background

6  surgical procedures.  I'm not sure if they have question with

7  the pictures of the retractors or just his opinions.  His

8  opinions are disclosed and the pictures are purely

9  demonstrative.  We're not sending them back to the jury at all.

10      ATTORNEY DEVINE:  My concern is only to the extent

11  they're trying to supplement invalidity.  Dr. Sachs did tell me

12  at his deposition that he's not offering invalidity opinions,

13  so as long as it doesn't go in that direction.

14      THE COURT:  I think they just said it's not.

15  Certainly your doctor offered a lot of background about his

16  knowledge as a surgeon in the field and their doctor can

17  similarly talk about his experience.

18      ATTORNEY DEVINE:  Understood.  Thank you, Your Honor.

19  My next concern is slide 18.  This will is my second to last

20  concern.  There are a number of slides like slide 18 throughout

21  Dr. Sach's demonstratives.  And it appears to me -- obviously I

22  don't know what he's going to say, but it appears to me that

23  the implication is that the claims are somehow limited to this

24  figure in the specification.

25      And if Your Honor recalls when we were debating the

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

 1   construction of pivot, Alphatec advocated for a construction

 2   that required a single pivot point, and that was not adopted

 3   and it seems that's what's at least being implied here.

 4        ATTORNEY KANG:  We didn't advocate for a single pivot

 5   point.  And there's a series of slides here where Dr. Sachs

 6   talks about what does the patent tell you about dilators or

 7   retractors and opening, and he's pointing to the embodiment in

 8   the spec.  I don't know what kind of trial he's going to have

 9   where he can't talk about what the patent says.  We're not

10   going to say the claim requires this.  We're going to couch is

11   in the context of the specification.

12        THE COURT:  I am assuming that he applied the Court's

13   claim constructions when it comes to looking at the claim and

14   applying it to the accused device, so I'm not anticipating

15   there's going to be an issue here.

16        ATTORNEY DEVINE:  Okay.  The last issue that I just

17   want to flag is they disclosed a document for Dr. Sachs that

18   relates to the 2016 meeting between Alphatec and NuVasive,

19   Project Titan.  This is DTX-968.  It is not in his reports, and

20   I cannot imagine as an expert witness how he could speak to

21   that.

22        ATTORNEY KANG:  That must have been a typo.

23        THE COURT:  Make sure work that out.

24        ATTORNEY DEVINE:  That was easy.

25        THE COURT:  That was easy.  I'll see you all at 1:00.

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   With regard to jury instructions having gone through, there

2   were disputes.  I think they were style points more than legal

3   points, for the most part.  So I will probably be getting you a

4   hard copy, email you both copies at the end of the day today

5   sometime between 3:00 and 5:00.

6        There are a couple slides that I have to wait for

7   instructions on the evidence all come canning in, basically to

8   do with damages and the concept of why we may or may not be

9   introducing convoyed sales here.  The testimony from Mr. Blake

10  Inglish was that it's not really a convoyed sales issue.  It is

11  the pricing structure that is done for these systems.  It

12  wasn't as if there were oh, there's gauze and Band-Aids, which

13  would be kind of a convoyed sales sort of issue here as opposed

14  to implants and the other disposables are the way the system is

15  priced for use.  If that's going to be the same, and they

16  discuss Ms. Howell's testimony in that regard.  I haven't heard

17  from your expert yet so if there is an a la cart pricing

18  structure that we have to talk about, we need to revuist those

19  slides, but I've kind of left those with your competing and

20  highlighted that we can talk about tomorrow.  But maybe you

21  guys can look at those damages slide and see if there's some

22  common ground there based on testimony that's come in so far.

23       ATTORNEY DEVINE:  Understood.

24       ATTORNEY MORGAN:  He did say both things.  He did say

25  these components operate as a functional unit, and in addition,

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

 1  there's the fact here of the pricing structure.  He did say

 2  both.

 3          THE COURT:  There's so many terms of art in patent

 4  cases.

 5          ATTORNEY MORGAN:  Yes.

 6          THE COURT:  And to the extent that we have agreement

 7  for the way things should be analyzed here, if we can carve out

 8  stuff that introduces a concept that they don't really have to

 9  grapple with or there isn't really evidence about.  Like

10  there's a reference to anticipation.  I don't think there's any

11  anticipation defense here.  So I've just struck that paragraph

12  because they don't need to deal with that.

13          But, again, I'm just -- you know it's a lot of

14  instructions, and I would like to keep them focused on the

15  things they've heard evidence about.  So that's sort a general

16  comment.  Otherwise, I think the jury instructions are pretty

17  much in order and there was not a lot of dispute.

18          You are looking like you have something you want to

19  say.  You're hovering.  You're making me nervous.  All right I.

20  Need to go look at my email.  See you all at 1:00.

21      (Court in afternoon recess)

22          THE COURT:  Okay.  Are we ready?  Sorry to keep you

23  all waiting.

24      (Jury entering at 1:10 p.m.)

25          THE COURT:  Everybody is back.  Thank you.  Next

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1  witness for Alphatec, please.

2        ATTORNEY NISBET:  Yes, Your Honor.  Alphatec calls

3  Mr. Scott Robinson.

4     Scott Robinson called as a witness, testified as follows:

5     (Witness given an oath)

6        THE CLERK:  For the record, state your name spelling

7  your last name.

8        THE WITNESS:  Scott Robinson, R-O-B-I-N-S-O-N.

9        ATTORNEY NISBET:  May I approach, Your Honor?

10        THE COURT:  Yes, you may.

11                    **DIRECT EXAMINATION**

12  Q   Good morning -- oh, Good afternoon.  Can you please

13  introduce yourself to the jury?

14  A   Yes.  Scott Robinson.

15  Q   Who are you employed by, Mr. Robinson?

16  A   I'm employed by Alphatec Spine.

17  Q   What is your current title?

18  A   I'm a manager in Research & Development.

19  Q   How long have you been with Alphatec?

20  A   Eleven years now.

21  Q   Where did you grow up?

22  A   I grew up in Cincinnati, Ohio.

23  Q   Did you go to college?

24  A   I went to the college at the University of Cincinnati.

25  Q   When did you graduate college?

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   A   I graduated March of 2011.

2   Q   What did you study in college?

3   A   I studied biomedical engineering.

4   Q   Did you always plan on studying biomedical engineering?

5   A   No.  Growing up, I always wanted to be a pilot, and then

6   right before I graduated ed high school, 2005, I was in an ATV

7   accident leaving me paralyzed from the chest down, and that

8   experience kind of took me into the world of like ortho device,

9   and I had a lot of questions about the surgery, and my surgeon

10  took a lot of time with me to kind of explain what happened,

11  showed me a lot of the tools, and that kind of changed my

12  career path.  I wanted to design, you know, better tools, and

13  that's what took me to the University of Cincinnati and

14  biomedical engineer.

15  Q   How did you connect with Alphatec?

16  A   Actually our college program had an internship program and

17  my internship, I did with Alphatec.

18  Q   What it you do after graduating college?

19  A   Threw all my worldly possessions in the back of my car and

20  drove to California.

21  Q   How many possessions was that?

22  A   Not much.

23  Q   Do you currently live in San Diego?

24  A   I do.  I live in Encinitas.

25  Q   Are you married?

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   A    Married, yes.

2   Q    Have you been employed by Alphatec since starting there

3   full-time after college?

4   A    Yes, continuously.

5   Q    Your current title, you said was manager of research and

6   development, right.

7   A    Manager R&D.

8   Q    How long having you been manager of research and

9   development at Alphatec?

10  A    About four years now.

11  Q    What other titles have you had at Alphatec.  If you can

12  start from when you started to today?

13  A    Yep.  Started as intern.  They hired me on full-time after

14  the internship as a design engineer and then eventually senior

15  design engineer.  After that project engineer.  And then, about

16  four years ago, promoted to manager.

17  Q    What are your current job responsibilities as manager of

18  R&D?

19  A    It varies.  I have a small team, and so I work with them to

20  make sure that they are executing on the day-to-day

21  deliverables.  You know, try to help with concept development

22  design, help guide theme through design control process,

23  et cetera.  In addition to that, look for opportunities within

24  the market, look for ways to you, know, better support the guys

25  on my team.  You know, help them be better at their jobs.

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1  Q   And as a manager the R&D, do you work on products for

2  different approaches to the spine?

3  A   We do.  We would work on basically every -- every approach

4  that we offer.

5  Q   Can you describe those to the jury?

6  A   Sure.  There would be -- so starting with cervical, any of

7  your like anterior posterior cervical work, which is like the

8  neck.  Any approaches to the thoracic spine, which is general

9  trauma.  Trauma, tumor.  And then any approaches to the lumbar

10  spine which would be like you PLIF and T-LIF which are the

11  approaches where you come in kind of from the back posteriorly.

12  Lateral where you come in from the side.  And then OLIF, ALIF,

13  where you're coming in more from the front or anterior lumbar

14  surgery.

15  Q   Does each approach you mentioned have its own set of

16  equipment and tools?

17  A   Each approach definitely has its own unique challenges.  A

18  lot of the devices are very similar, kind of a generic nature

19  to them.  We often try to specialize them for unique approaches

20  to try to make that procedure more efficient.

21  Q   You have worked on projects for each approach, right?

22  A   I've worked on projects for each approach.

23  Q   Right.  I'd like to talk about your background and history

24  with the design and development of the Squadron retractor a

25  little bit.  You understand NuVasive is alleging infringement

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   of various components of Alphatec's lateral system, right?

2   A   I do, yes.

3   Q   In addition to Mr. Costabile, were you also involved

4   designed in the development of the Squadron retractor?

5   A   I was part of the team that developed our lateral system,

6   yes.

7   Q   How were you involved?

8   A   There was a team.  There were several of us, and it is --

9   it is concept development.  It is design.  It's, you know,

10  creating the 3-D models, creating the 2-D drawings navigating

11  the various regulatory requirements, working on test protocols,

12  test reports.  You know, writing all the validations for like

13  both user validations and FDA submissions, and things like

14  that.

15  Q   In addition to and you Mr. Costabile, who were some of the

16  other engineers that were involved?

17  A   Yun Chang, Nate Thwa was involved, Frank Chang was involved

18  Bill Ryan was involved, myself, Jon.  So it was a big team.

19  Q   When diagonal Alphatec start development of the Squadron

20  retractor?

21  A   I believe development started early to mid-2013.

22  Q   And Mr. Costabile talked about this a little bit, but did

23  you work with surgeons during the development of the retractor?

24  A   Yes.  Continuously.  Our design process involves gaining

25  the clinical experience up front, so we tried to engage the

1    surgeons, you know, cadaver labs, however we can to try to kind

2    of establish the initial requirements for the system, and then

3    over, you know, a series of months or years, we develop

4    prototypes based off their requirements.  They come in, they

5    usually just break them, usually it's a simulated surgery

6    setting in a cadaver lab, and then we take their feedback, we

7    iterate on that design, and eventually bring them back in

8    reevaluate, and that's just the iterative process that leads us

9    to our final design for surgery.

10   Q    Which surgeons did you work with?

11   A    For the lateral system specifically, Dr. James Billys,

12   Frank Kuwamura, Mohammad Etminan, a local doctor, Payam

13   Moazzaz, a little later, Neville Alleyne.

14   Q    What is the purpose of the surgeon design team?

15   A    They help us establish what we refer to as user needs, what

16   does the surgeon need this device to do for surgery.  From

17   there, we establish our kind of design inputs and try to start

18   building a system around these requirements.  Then throughout

19   the project, the surgeons will get on conference calls, like

20   they'll review material, they will bounce ideas off of them,

21   and then after every several months, they come back to our

22   headquarters, they go through all of the devices that we've

23   been able to prototype in that timeframe, and they tell us what

24   they like, what they don't like.  And over time, we combine

25   features, we create instruments, the system looks more and more

1   like a real product, and then they eventually give us kind of

2   the thumbs up for us to move forward with the production for

3   surgery.

4   Q   I think you mentioned it, do you as an engineer work with

5   the surgeons to develop and test prototypes?

6   A   Yes.  We work directly.

7   Q   Did any one surgeon on the design team stick out to you in

8   particular?

9   A   From that team, Dr. Billys.

10  Q   How so?

11  A   He was always -- he seemed very mechanically minded.  He

12  had a lot of experience with lateral.  He had a lot of, you

13  know, kind of creative ideas just how to streamline the

14  procedure, how to identify very clearly the things that slowed

15  him down or made his procedure less efficient.  He was able to

16  elloquate (as said) and gave us a lot of good feedback as we

17  went through the project.

18  Q   Which lateral systems did Alphatec surgeon design team

19  previously use?

20  A   They would have used a variety.  You know, Medtronic,

21  NuVasive, you know Lanx, which was popular at the time, Spinal

22  Elements, potentially C Spine, Globus.  There were a variety of

23  systems on the.  Market I'm not sure who used which, but I know

24  they tried out a lot of different systems.

25  Q   What challenges did the surgeon design team identify for

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   you which helped drive the development of the Squadron

2   retractor?

3   A   It kind of ties back to there was literature published at

4   the period of time linked to a very common nerve injury to the

5   amount of time the retractor was open and reducing that

6   retraction time was one of our primary focuses, and the

7   challenges of navigating more abnormal anatomy like where you

8   have what they would call osteophytes or bone growths on kind

9   of the lateral aspect of the spine or potentially like nerves

10  where you didn't want them.  You know, tissue creep or tissue

11  would kind of come like in under the retractor blades.  These

12  were kind of identified as opportunities for us to try to

13  create a better procedure.

14  Q   Did you try to address those in designing Squadron

15  retractor?

16  A   We did, yes.

17  Q   So Alphatec started to design the Squadron retractor in

18  late 2012, early 2013.  When did the design finalize?

19  A   By late 2015.  There were very few changes to the retractor

20  after 2015.

21  Q   After the finalized what else did you need to do before you

22  could do a first surgery using the lateral system?

23  A   So once we had the design finalized, we had to go through

24  all of our testing of the retractor itself, and then we still

25  had to do a lot the development of the other instruments that

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1  support the system.  These systems have a lot of instruments in

2  them and so you have the instruments you need for disc removal,

3  you know, other elements of the procedure.  We have to do all

4  the FDA testing, testing the implant, making sure the implant

5  is safe.  You know, we had to -- there were several elements of

6  the system that we weren't developing internally that we were

7  just kind of purchasing from external suppliers, so like our

8  annulotomy knife was one which was just a disposable we just

9  bought.  Our fixation arm.  Our dilators.  A lot of these we

10  just purchased from companies that were kind of an OEM

11  manufacturer.

12  Q    Who did you purchase the dilators from?

13  A    The dilators, I think was a company called TeDan.

14  Q    And were those TeDan dilators made to Alphatec's

15  specifications or just an off-the-shelf component?

16  A    They were an off-the-shelf dilator.

17  Q    When did Alphatec do its first lateral surgery on a live

18  person using the Squadron retractor?

19  A    The first surgery was -- I want to say February 2017.

20  Q    Was this the first commercial use of the Squadron

21  retractor?

22  A    It would have been the first time it was used in live

23  surgery, yes.

24  Q    Was this used in February 2017 part of a full commercial

25  launch?

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   A    No.  We would have -- when we go to the market with a new

2   system, we usually go into what we call like an Alpha or kind

3   of limited market release where, you know, we just want to be

4   absolutely sure that everything is going to function and

5   perform exactly the way we want it.  And so we would go to what

6   we would call an Alpha limited market release whether either a

7   member of the engineering team or marketing team is likely on

8   site just to make surgeon has a good experience.  And once we

9   have a lot of those cases under our belt and confidence the

10  system is going to perform, we open it up for broader

11  commercialization.

12  Q    When did you do that?

13  A    Six weeks or so after those -- that first case.

14  Q    April 27?

15  A    Yeah, late March, early April.

16  Q    I would like to -- actually take a look in your binder

17  Mr. Robinson.  There's DTX labeled 410.  Take a look at that

18  and turn to DTX-410-002.

19  A    Um-hmm.

20  Q    What is this document?

21  A    It looks like a copy of a press release for the launch of

22  our lateral system.

23  Q    And are you familiar with this document?

24  A    I would have -- I would have read this when -- when this

25  came out, yes.

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1        ATTORNEY NISBET:  I offer DTX-410 into evidence.

2        ATTORNEY DEVINE:  No objection.

3        THE COURT:  It's admitted.

4     (Defense Exhibit DTX-410 admitted)

5  BY ATTORNEY NISBET:

6  Q   To bring the jury up to speed, can you just read the title

7  of the press release?

8  A   Yeah.  "Alphatec Spine Launches Battalion Lateral System

9  Squadron Retractor To Support Minimally Invasive Lateral Access

10 Procedures."

11 Q   What's the date on it?

12 A   April 7, 2017.

13 Q   Does this coincide with the full commercial launch of your

14 lateral system?

15 A   That would have been the time, yes.

16 Q   What features did you believe were unique to the Squadron

17 retractor?

18 A   The ability for us to independently open blades would allow

19 us to better guide the surgical corridor based off of what we

20 would learn from like of the location of the nerves.  The

21 ability to independently like raise and lower blades would

22 allow us to, you know, move past somewhat challenging anatomy

23 without shifting the entire retractor, and then the ability of

24 our blades to open in a level plane would help maintain their

25 distance from the lateral aspect of the vertebra, therefore,

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1  reducing tissue creep.  You're reducing the likelihood that a

2  surgeon would need to go down with request a secondary tool to

3  push tissue down under the blades.

4  Q   You believe that these features were solving problems with

5  then existing offering from competitors?

6  A   We did, absolutely.

7  Q   Let me draw your attention to the second paragraph.  Under

8  Battalion Lateral System Overview.  It quotes Dr. Kuwamura

9  saying "the ability to independently raise and lower blades to

10 accommodate the anatomy really separates the retractor from

11 other retractors available on the market."  Do you see that?

12 A   I do, yes.

13 Q   After that launch -- after the launch in April 2017, did

14 you learn of any other surgeons who liked the Squadron

15 retractor because of the various features you just identified?

16 A   Yes.  I mean, like our design team liked like it, like

17 Dr. Billys liked everything about the retractor, Dr. Moazzaz

18 liked everything about the retractor.  Later on, you know, Dr.

19 Russell I think is listed in that press release.  Dr. Gunny

20 Deol, Chris Brown, Tyler Smith.  You know, a lot of -- we had a

21 lot of like early adopters that liked the system.

22 Q   You mentioned Dr. Billys.  Does he use the lateral system

23 today?

24 A   Unfortunately, no, he does not.

25 Q   Why not?

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   A   In between the time when we kind of finalized design, which

2   was 2015, and when we finally went into the market, he had

3   switched hospitals.  He had moved from I think, you know, East

4   Coast to West Coast of the Florida and moved into a hospital

5   system with a very small vendor list where Alphatec products

6   never got approved so he was never able to start using the

7   system.

8   Q   In conjunction with the launch, did Alphatec prepare any

9   marketing materials to promote the unique features you've

10  identified?

11  A   Yes.  There would have been a sales sheet kind of

12  highlighting the various components of the retractor, you know

13  a surgical technique guides, and, you know, various system

14  overviews.  You know, like video, you know, animations of the

15  system anything that would support the sales force in the

16  conversations that they were going to have with their surgeons.

17  Q   I'm going to play on your screen a portion of a video file,

18  PTX-0933.

19          THE COURT:  Hold on.

20          ATTORNEY NISBET:  I want to show the video to the

21  jury, Your Honor.  I just want to get the video in evidence

22  before to see if I can lay the foundation.

23          THE COURT:  Yes.  Is there an objection to the video?

24          ATTORNEY FODEMAN:  No, Judge.

25          THE CLERK:  What is it, PTX?

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1          ATTORNEY NISBET:  Yes.  I'd like to offer PTX-933 into

2    evidence.

3          ATTORNEY FODEMAN:  I have no objection with or without

4    the music.

5      (PTX-933 presented to jury)

6    BY ATTORNEY NISBET:

7    Q    Have you seen that video before?

8    A    Yes.

9    Q    Many times I'm sure?

10   A    Yes.

11   Q    I notice in that video there's no -- no neuromonitor system

12   associated with the Alphatec lateral system; is that right?

13   A    That's correct.

14   Q    When you launched the product in April 2017, you didn't

15   have a proprietary neuromonitor; is that right?

16   A    We did not, no.

17   Q    I'd like to talk to you a little bit about the financial

18   health of Alphatec during the development period.  Do you have

19   an understanding of the financial health of Alphatec during

20   this development period from 2012 to 2017?

21   A    Yeah.  I had a fairly good understand.

22   Q    What was financial's health like when it first started

23   developing its lateral system?

24   A    Like 2013 time frame, I would say it was probably fairly

25   good.  We had been -- you know we were generating between 180

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   and 200 million in revenue.  You know, we had been growing.  We

2   had 40-plus engineers in R&D.  Everything was going fairly

3   well, I would say.

4   Q   Were there any changes in Alphatec's financial health over

5   the course of the development of its lateral system?

6   A   Yeah.  Between 2013 and 2014 and really accelerating into

7   2015, the financial health deteriorated quite a bit.

8   Q   What caused the deterioration of the financial health?

9   A   There were a number of things.  We were manufacturing a lot

10  of our own implants, and so we had an internal manufacturing

11  group that was just not keeping up with times.  It was a very

12  inefficient operation, so we lost a lot of money through

13  manufacturing.  We'd had an acquisition that had some

14  challenges and acquiring and integrating that company's

15  products had proven difficult, and really just some of the

16  leadership team wasn't necessarily taking the company in a

17  direction that everyone believed in.

18  Q   I'm going to pause there and return to the video really

19  quickly.  I have a few questions about it, then we'll come

20  back.  Can you describe for me how those -- the animations of

21  the retractor arms were developed and prepared for that video?

22  A   Yeah.  For the animation, we would -- like our marketing

23  communications group would come to like the engineering team

24  and we would provide them the models.  Like they didn't have

25  access to our CAD database.  We would provide them the models

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   and kind of explain to them how the different articulation

2   points around the retractor would work to control the

3   functionality of the retractor.

4   Q   And so the video is an accurate representation of how the

5   retractor works according to the engineering models, correct?

6   A   The video is just an animation of the way the different

7   components in the retractor moved together.

8   Q   I want to return to the financial decline of 2015 through

9   2017.  Can you describe, again, for the jury why that occurred?

10  A   Yeah.  I mean, three main ones, you know, a manufacturing

11  group that really just wasn't with the times, a pretty costly

12  attempt to integrate a French company called Scient'x and just

13  the leadership wasn't -- wasn't taking us in the right

14  direction to be a healthy company, like a lot of additional

15  bureaucracy was created.  You know they really gave control

16  over the company to people who didn't want to development

17  product, so.

18  Q   Why was the integration of Scient'x costly?

19  A   I mean, there were a lot of little reasons.  Just the

20  integration of various products with different, like all

21  European registrations, et cetera.  It was all just very time

22  consuming.  The one big one is Scient'x had been in a lawsuit

23  themselves with another company dating, you know, a few years

24  prior to the acquisition that when we acquired Scient'x we

25  acquired the liability for that lawsuit, and we ended up

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   losing, and I think it was a $49 million settlement.

2   Q    Alphatec had nothing to do with Scient'x's litigation?

3   A    No.  We ended up owning it, but they had been sued prior --

4   prior to our involvement with the company.

5   Q    It was a $49 million liability that Alphatec had to absorb?

6   A    That we ended up having to absorb, yep.

7   Q    What was moral like?

8   A    It was bad.  We had to lay off close to half the company.

9   We closed our manufacturing group.  A lot of my friends were

10  either fired or left.  You know, the people that were there,

11  you know, we were doing everything we could to kind of keep the

12  company going.  You know, we had to, like I said, close our

13  whole manufacturing building.  As we were getting out of that

14  lease, the engineers were over there patching holes in walls

15  because we didn't want to pay a contractor.  Bonuses hadn't

16  been paid in three or four years.  Yeah, it was tough.

17  Q    What did you personally do to try to help keep the company

18  afloat?

19  A    Everything I could.  You know, I showed up every day for my

20  team, and I still, you know, got to work with my friends, and I

21  still believed in the work that we were doing, and I believed

22  that a small group of people with, you know, the right attitude

23  could turn the place around.  I believed in the quality of the

24  products we were developing and I believed that eventually that

25  those would find their way to the marketplace and we would find

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   success.

2   Q    Did Alphatec take any actions to address the financial

3   issues you mentioned?

4   A    Yeah.  I mean, there were the layoffs, like I mentioned and

5   they contracted the company as much as possible try to save

6   money, but then eventually, sometime mid-to-late 2016, we sold

7   a lot of -- sold all of our international business to another

8   competitor, Globus.

9   Q    Was that Globus transaction publicly announced?

10  A    It was, yes.

11  Q    Turn in your binder to DTX-648.  What is this document; do

12  you remember?

13  A    It's an 8-K SEC filing document schedule.

14  Q    Is this a document that you're familiar with?

15  A    Somewhat.  I mean, yeah.  It's a document that a public

16  company has to file with the SEC when something big changes

17  about the company.

18  Q    And was it your regular course of practice to review

19  Alphatec's SEC filings?

20  A    I would always read them.  They would post on message

21  boards, Yahoo finance or whatever.  And so we would follow the

22  industry pretty closely.  So when something like this gets

23  posted, you get a little alert, and absolutely, we'd read it,

24  so.

25           ATTORNEY NISBET:  I'd like to offer DTX-648 into

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1    evidence, Your Honor.

2              THE COURT:  Admitted.

3         (Defense Exhibit DTX-648 admitted)

4    BY ATTORNEY NISBET:

5    Q    How much did Alphatec sell it is international business for

6    to Globus?

7    A    I think at the end of the day, $80 million.

8    Q    Did this Globus sale impact Alphatec's lateral project?

9    A    It did, yes.

10   Q    How so?

11   A    Up until the sale of our international business to Globus,

12   we were having trouble just paying our vendors.  So a lot of

13   vendors had either stopped working with us entirely or had us

14   on kind of a payment plans, and even with payment plans, we

15   weren't often meeting.  You know, the cash infusion from the

16   sale of our business finally allowed us to start catching up

17   with payments lot of our vendors and allowed us to move forward

18   with the launch of this system.

19   Q    There is a contention in this case the launch of the

20   Alphatec's lateral system saved the company.  Did the launch of

21   the lateral platform save the company?

22   A    Not from a financial perspective, no.  I mean --

23   Q    How successful was it in the first few months after launch?

24   A    I think in the first six months, we only did 180 to 200 in

25   revenue.

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   Q    How was Alphatec able to turn it around?

2   A    Well, like I said, there was a small group of people that

3   believed in what the company was doing, and eventually like

4   over time, the leadership began to change.  The new leadership

5   that came in saw the opportunity to, you know, maybe shift some

6   positions around.  And so fortunately, some people who were

7   cancerous to the company were let go.  And late 2017, Pat Miles

8   specifically showed up, and that really breathed a lot of life

9   back into the company.  You know, his passion for the work that

10  we were doing, his vision kind of gave the company somebody

11  they could rally around.  And it's been a pretty good ride

12  since then.

13  Q    Does that leadership include Ms. Howell?

14  A    Yes.  Not long after Pat, a bunch of people he worked with

15  in a prior life all started coming up to Alphatec, Kelli among

16  them.  Their sophisticated approach to the development process

17  was pretty incredible for me to see and learn from.

18  Q    How did that change in leadership impact in your view and

19  experience why surgeons chose Alphatec products?

20  A    Surgeons trust Pat.  They trust his vision and they trust

21  that he, you know, cares for the quality of the product.

22  That's delivered to them the same way that they care about it

23  for their patients right there in OR.  They like knowing that

24  they have a partner who has the same, you know, passion for the

25  work that they have dedicated their lives to.

1    Q    What would you say is the primary focus of Alphatec today?

2    A    We -- I mean, we want to develop the best procedures and

3    achieve the best patient outcomes.  That's our number one goal.

4    Q    Overall, with all its ups and downs, how has your

5    experience been working with Alphatec?

6    A    A lot of ups and downs, but incredibly rewarding.  I get to

7    be challenged pretty much every day.  I've grown a lot, learned

8    a lot, and we're able to -- you know, I'm able to live out the

9    dream, so.

10    Q    I have two final topics to cover with you, Mr. Robinson.

11    The first, the jury has heard a lot about GLIF.  Are you

12    familiar with technology at Alphatec called GLIF?

13    A    Yes.

14    Q    What is GLIF?

15    A    GLIF was our first attempt at -- like Alphatec's first

16    attempt at a lateral system where the patient was positioned

17    prone.  You know, we had several surgeons we were working with

18    at that time that believed that keeping a patient in a position

19    that was more familiar to surgeons, was more advantageous.  And

20    so a patient -- like surgeons are trained with patients

21    generally laying flat on the table, flat on their stomach.  So

22    keeping a patient in that position creates more working space

23    for the surgeons so we believed doing lateral in the prone

24    position was a better way to go.

25    Q    Did GLIF cause -- or the inability to commercialize GLIF,

1   did that cause Alphatec to enter the dire financial straights

2   we discussed earlier?

3   A   I wouldn't say so.  I mean, there was a development effort

4   bind GLIF.  We weren't able to participate in the lateral space

5   when GLIF ultimately, you know, wasn't very successful, but we

6   learned a lot from GLIF.  I mean we only had like three or four

7   sets.  Like we never made that many sets for GLIF, and so we

8   didn't -- there wasn't a whole lot invested in it at the time.

9   Q   In your eyes, was GLIF a failure?

10  A   I think GLIF was ahead of its time.  I think we learned a

11  lot from GLIF, but it was not a commercial success.

12  Q   What were some of the reasons why Alphatec had difficulty

13  commercializing GLIF?

14  A   The portal itself -- the design the portal was -- did not

15  give the surgeons the flexibility that I think that they

16  needed.  There wasn't an integrated neuromonitoring system like

17  the retractor would break.  You know, prone positioning was

18  challenging for this type of procedure.  You know, it just

19  didn't prove to be a clinical success.

20  Q   Did GLIF have anything to do with the decision to pursue

21  lateral?

22  A   We wanted to have a product offering in the lateral space

23  but I wouldn't say like GLIF specifically drove that.

24  Q   And when did Alphatec stop offering GLIF?

25  A   2011 or so I think.

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   Q    So that's about six years before it launched its lateral

2   system?

3   A    Yes.

4   Q    One last topic to cover, Mr. Robinson.  I want to talk with

5   you about some of the Alphatec's design decisions during the

6   development process.  We've heard that Squadron retractor has

7   three blades.  From your perspective being involved, what is

8   the purpose -- what purpose did retractor blades serve?

9   A    The blades themselves are the part of the retractor

10  assembly that are actually holding tissues out of the way.

11  They're the components that go into the side of patient and

12  create that surgical corridor.

13  Q    Could Alphatec at the time, in 2017 even, made a retractor

14  with a different number blades?

15  A    We could have, yes.

16  Q    And what were your options?

17  A    I mean, common on the market were, you know, two-blade

18  retractors.  There had been a lot of two-blade retractors used

19  in posterior surgery.  Medtronic was using one -- were using a

20  two-blade retractor for lateral surgery.  There were three-bade

21  retractors on the market, and even four blades.  Four blades

22  had been commonly used I think for lateral and some posterior

23  approaches up until that point, so like any of those would have

24  been options for us to pursue.

25  Q    Why did Alphatec go with a three-bladed retractor instead

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1  of a two or four-bladed?

2  A   It was the design a lot of the surgeons on our design team

3  were familiar with and gave us the most specific feedback on.

4  In the early development of the project, you know, they just

5  centered around a three-blade design and were able to identify

6  the issues with three-blade retractors that existed in the

7  market at that time up until that point more clearly and gave

8  us better requirements for finding a way to improve upon those

9  designs.

10 Q   Were there others on the market at that time?

11 A   There were, yes.

12 Q   Which ones; do you remember?

13 A   I think NuVasive was three blade, Lanx was three-blade.  I

14 think Spinal Elements was three blade.  I think K2M might have

15 been.  I think C Spine had a retractor that was a three blade.

16 There were a lot on the market.

17 Q   Were there a lot of two-bladed retractors on the market?

18 A   DLIF from Medtronic, I know for sure.  There might have

19 been more.  I forget if LBR was three blade or not or K2M.

20 There were multiple two-blade on the market as well.

21 Q   Medtronic at the time was a significant competitor in the

22 lateral space?

23 A   They were the second largest competitor next to NuVasive.

24 Q   Could Alphatec have developed a two-bladed retractor in

25 February 2017?

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1    A    We could have, yes.

2    Q    Did you have the personnel to do it?

3    A    Yes.

4    Q    Would you have been personally involved in the development

5    of the two-bladed retractor?

6    A    I would have likely been personally involved in the

7    development of a two-bladed retractor.

8    Q    Did you have the manufacturing capabilities to do it?

9    A    Yes.

10   Q    Did you have the expertise to do it?

11   A    I would say yes.

12   Q    Did Alphatec have the knowhow to create a two-bladed

13   retractor?

14   A    I believe so, yes.

15   Q    What would have been involved in the development of the

16   two-bladed retractor?

17   A    It would have been very similar to the development of our

18   three-bladed retractor where we would have brought in a surgeon

19   team, we would have tried to establish like the early

20   requirements for the things most important, you know to them

21   for the procedure.  We would have designed, you know, our first

22   prototype, brought them back in, tested it in the lab, see what

23   they like, what they didn't like.  You know, design iterations

24   lead to new prototypes.  New prototypes lead to new feedback.

25   Eventually we get to a product that we could commercialize.

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1    Q    What would have been the cost associated with that

2    development effort?

3    A    You know, with one engineer -- one engineer salaried

4    focusing on it and, you know, multiple, you know, prototypes, I

5    would say between, you know, a high hundred-thousand dollar

6    range to maybe 200,000, 220,000, in that ballpark, so.

7    Q    How long would it have taken Alphatec to develop the

8    two-bladed retractor if it had chosen to do so instead of the

9    three-bladed retractor?

10   A    The development cycle now that we're able to execute is

11   between -- around 12 months for what would be a class 1 device

12   to get it to market.

13   Q    That's less that time than it took you to develop the

14   Squadron retractor.  Why would that have been different?

15   A    Squadron was incredibly complex.  It had more than 50

16   components in that assemble.  They required very high precision

17   manufacturing.  The high precision brings lead time.  And so

18   getting those prototypes of the Squadron retractor just took a

19   lot longer because of that complexity.  So the two-blade would

20   be much simpler and could be prototyped in a much more

21   efficient way.

22   Q    Does Alphatec now have a two-bladed retractor on the market

23   today?

24   A    Yes.

25   Q    And what kind of approaches is it used in?

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   A    It's primarily -- well, we have a couple.  We have some for

2   posterior approaches and some for like lateral or what we call

3   our PTP procedure.

4   Q    The jury heard a little about that.  What is that?

5   A    PTP, prone trans-psoas procedure where the patient is

6   laying flat on their stomach, which is kind of that ideal

7   position for, you know, the surgeons are used to where we

8   approach laterally the patient in prone it gives the surgeon to

9   work both what we would refer to as the anterior column or

10  interbody space while they can also work posteriorly placing

11  screws and helping correct various pathologies from the back.

12  So.

13  Q    Why did you develop this two-bladed retractor?

14  A    It was, you know, based on the feedback of the design team

15  behind it.  They liked the idea of -- like with a two-blade

16  retractor, you can get better stiffness out of the blades.

17  They like the idea of -- you know, like stiffer blade

18  construct.  They like the idea of the two-blade retractor has a

19  lot less going on around the blades and so you get a much

20  better kind of fluoroscopic image.  So during surgery taking

21  X-rays to find their location within the anatomy.  That X-ray

22  during the procedure isn't blocked by the metal of a bulky

23  retractor.  Our two-blade retractor helps remove that mass from

24  that shock and helps the surgeon identify where they are.

25  Q    How long did it take Alphatec to develop this two-bladed

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1  this retractor?

2  A   I think it was less than a year between napkin sketch to

3  commercial product.

4  Q   Was the design process for the two-bladed retractor similar

5  to the design process for the Squadron retractor?

6  A   Similar, yes same iterative process to get to our final

7  design.

8  Q   Has this two-bladed retractor been used in live surgeries?

9  A   Yes.  Probably close to 3,000 by now.

10 Q   And it has been used in live surgeries involving the direct

11 lateral approach that we've been talking about here?

12 A   We've -- yes, we have surgeons that use it both in kind of

13 like the prone trans-psoas approach and with a patient

14 positioned in the more traditional lateral decubitus where the

15 patient is on their side and the two-bladed retractor comes in

16 vertically with the patient on its side.

17 Q   When did Alphatec's two-bladed retractor launch?

18 A   Middle of 2020, so.

19 Q   In your experience, how has the feedback been from surgeons

20 on this two-bladed retractor?

21 A   As far as I know, very well received.  PTP is, you know,

22 one of the fastest growing products in our company right now.

23 Q   I have one final question for you, Mr. Robinson.  What do

24 you say to the contention that you and your team copied

25 NuVasive's lateral system in designing the Squadron retractor?

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1  A   We did not copy?

2           ATTORNEY NISBET:  No further questions.

3           THE COURT:  Cross.

4           ATTORNEY FODEMAN:  Thank you, Judge.  May I inquire,

5  Your Honor?

6           THE COURT:  Yes, go ahead.

7                        **CROSS-EXAMINATION**

8  BY ATTORNEY FODEMAN:

9  Q   Good afternoon, Mr. Robinson.

10  A   Hello.

11  Q   How are you?

12  A   Doing well.  How are you?

13  Q   Good.  Just until we met in the hallway just before court

14  today, you and I have never met before, correct?

15  A   Just outside the men's room.

16  Q   Okay.  So I want to -- I want to start in an area that

17  counsel touched on and that was the condition of Alphatec, your

18  company in the 2014-15 time period, okay?

19  A   Okay.

20  Q   I think you told us the company came to a 1:00point where

21  it was struggling; is that correct?

22  A   It did, yes.

23  Q   And it wasn't, growing certainly?

24  A   In the '14-15 time frame, no.

25  Q   At some point, you told us that there was a need to start

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1  making -- or taking action to lay off folks, right?

2  A   Yes.

3  Q   And then you told us at some point things got so bad in

4  2016, you should to -- I shouldn't say "you."  Your company had

5  to sell off its overseas business, correct?

6  A   We did, yes.

7  Q   If we can bring up that SEC document that you looked at.

8  That 8-K which I think was 648.  And turn to page two of it at

9  the top.  Yes.  Great.

10      And there you can see that section of that SEC document

11  publicly filed talks about you selling off your businesses

12  overseas, correct?

13  A   Yes.

14  Q   And it lists a bunch of companies -- a bunch of countries,

15  I should say, Japan, Brazil, Australia, Singapore, the United

16  Kingdom, Italy.  Is it fair to say you had operations in all of

17  those countries that you had to sell off, correct?

18  A   I believe so, yes.

19  Q   Okay.  And there's been some talk by counsel that this was

20  a startup, if you will?

21  A   Um-hmm.

22  Q   But we can agree that this startup had operations on

23  multiple continents, correct, in multiple countries?

24  A   We did, yes.

25  Q   In fact, the startup had assets just overseas it was able

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1  to sell for I think you said $80 million; is that correct?

2  A   Yes.

3  Q   You also mentioned a lawsuit that you had to settle; is

4  that correct?

5  A   Yes.

6  Q   I'm saying "you."  I mean Alphatec.  Obviously it wasn't

7  you personally, correct?  And I think you told us that that

8  cost the company close to $50 million; is that right?

9           ATTORNEY NISBET:  Objection, Your Honor.

10  BY ATTORNEY FODEMAN:

11  Q   $49 million?

12  A   Yes.

13  Q   What's a million dollars amongst friends.  Okay.  If we

14  could look up DTX-648.  Did you put this in?  Same document,

15  I'm sorry.  The same document we were looking at.  I just

16  wanted to go to the back of the document.  Counsel didn't show

17  you this part.  But do you see in -- on page 14 of the

18  document.

19      And if you can blow up, Mr. Smith, the bottom section

20  there, Alphatec there.

21      Great.  And you can see that is a consolidated statement of

22  operations?  It's sort of like your finances being filed with

23  the SEC; is that right?

24  A   I believe so, yes.

25  Q   You see over there that you had on page 14 revenue at the

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1    startup of how much?  138,000.  That's not the 138,000.  That's

2    138 million, right?

3    A    Yes.

4    Q    It says at the top there in thousands?

5    A    Um-hmm.

6    Q    Right.  So the startup had 138 million in revenue?

7            ATTORNEY FODEMAN:  I'm sorry, Judge.  I thought the

8    jury had it.  Does the jury not have it?

9            THE CLERK:  I'm sorry.

10   BY ATTORNEY FODEMAN:

11   Q    Let's rewind the tape just a bit.  This is a financial

12   statement of Alphatec, correct?

13   A    It is, yes.

14   Q    It's for the year ending 2015, right?

15   A    That's under that is yearend, yes.

16   Q    I directed you to the top line that talks about revenues?

17   A    Um-hmm.

18   Q    We saw there was revenues of $138 million, correct?

19   A    I believe that's correct, yes.

20   Q    And if we turn the page to -- to page 15, the next page, at

21   the top it continues on, and the problem that we have -- that

22   we see here is down at the bottom where it says net loss, do

23   you see that where it says $191 million?  Do you see that?

24   Those parenthesis mean a loss, like a negative, correct?

25   A    Um-hmm, yes.

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1    Q    So this is sort of the problem that you were talking about.

2    Yes, you had a lot of, revenue 138 million, but you lost

3    191 million, right, in 2015?

4    A    On the statement, that is correct.  But I would also like

5    to point out the 165 in goodwill and intangible assets

6    impairment where I believe that was more of like an overall

7    like accounting shift.  I've never been exactly sure what

8    writing off of goodwill and intangible assets meant, but I

9    remember at the time, it wasn't like hard cash being lost.  It

10   was an accounting decision the company made.

11   Q    It's not a good thing that you have a $191 million loss on

12   your balance sheet, right?

13   A    It's not a good thing, but would have been advantageous for

14   tax purposes if that closing of all of our -- like French

15   acquisition, closing our internal manufacturing building.  A

16   lot of that goodwill wasn't -- it wasn't like a cash loss that

17   year.

18   Q    You're not suggesting, I don't think you are, that there's

19   anything improper being shown?

20   A    I don't think there's anything improper.  I think it's

21   within our ability to do that, but that was a one-time

22   breakdown of a lot of asserts.

23   Q    I think you said in 2014 things were, I think, to use your

24   words, pretty good, right?

25   A    From my perspective, the company still had what I thought

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   was clear direction.

2   Q   And from a final standpoint, I think you said things

3   weren't bad?  All these troubles started later, you explained

4   to us.

5   A   2014 going into '15, I would say that things had

6   definitely --peaked in that phase of the company.

7   Q   Let's turn to page 15 of the same document, if we could.

8   If you see over there on the bottom of 15 where -- now we see

9   we're talking about year ending 2014; do you see that, sir?

10  A   Yes.

11  Q   And if we just go down to net loss, we still see a negative

12  $18 million, right?

13  A   Correct.

14  Q   Can we agree, Mr. Robinson, that things have gone from bad

15  to worse '14 to '15; is that fair?

16  A   '14 to '15, things were deteriorating, yes.

17  Q   And you, know you mentioned before that Alphatec was a

18  public -- this startup was a public company, and that was true

19  in 2014 and 2015, correct?

20  A   Yes.

21  Q   And, therefore, its stock was traded on the open market and

22  you could see the price of the stock on a given day, correct?

23  A   Correct.

24  Q   During this time period we're talking about, Alphatec stock

25  was quite low, correct?

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   A   Don't remind me of the pain, but yes.

2   Q   Yes.  Very, very low, like pennies?

3   A   I don't know if it was pennies.

4   Q   Certainly not where it was today?

5   A   It was $2 range.

6   Q   You told us about the need for layoffs.  In fact, there was

7   a real concern at times that there would be not enough money to

8   actually make payroll, right?

9   A   That may have been the case.

10  Q   There was talk of bankruptcy, correct?

11  A   I wasn't involved in any of those conversations, but I know

12  the financial health of the company was not good.

13  Q   And during this time period, 2014 and '15, can we agree

14  that you had no viable lateral offering in the marketplace in

15  2014 or '15, correct?

16  A   We did not, no.

17  Q   And we have seen slides and heard testimony about what a

18  big market this lateral market had become by this time.  You

19  would agree with that, correct?

20  A   I believe lateral was about 15 percent.

21  Q   We've sewn a slide earlier today I think it was actually an

22  announcement that you were entering a market that was a

23  $500 million a year market?

24  A   Agreed, yes.

25  Q   And you, meaning Alphatec, had no offering in any of that

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   in 2014 or '15, right?

2   A   Correct.

3   Q   And we talked a little bit about GLIF.  I hate to belabor

4   the GLIF because the jury has heard so much about it.

5       But if we could put up PTX-77, Mr. Smith, this is in

6   evidence so the jury can see it.  Does the jury have it?  There

7   we go.

8       You talked about this on direct examination with counsel,

9   correct?

10   A   I did, yes.

11   Q   And I think you told us that this effort to launch GLIF and

12   commercialize it was abandoned in approximately 2011; am I

13   right about that?

14   A   Yes.

15   Q   Now you had told us that this was a lateral offering or an

16   attempt at a lateral offering, correct?

17   A   Correct.

18   Q   Okay.  And I think in the context of talking about this,

19   you said that one of the things that you learned was

20   familiarity was important to surgeons?  In other words, they

21   were drawn to projects they were familiar with?

22   A   I believe I was referring to the positioning of the

23   patient.

24   Q   Exactly.  Thank you.  So what was familiar to surgeons

25   potentially was the idea that they would be on their stomach,

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   and surgeons would be familiar with that positions because they

2   did T-LIF and PLIF that way, correct?

3   A   Yes.

4   Q   One thing this system did not have was a three-bladed

5   retractor?

6   A   The GLIF did not.

7   Q   And just to be clear, by now NuVasive had been on the

8   market for seven or eight years or so, seven or eight years

9   with their three-bladed retractor?

10  A   I believe so.

11  Q   This had no shim, correct?

12  A   There was technically kind of a posterior shim.

13  Q   Not the kind of shim that we've been looking, right?

14  Sliding down blades and locking into...

15  A   It would have been similar where it would have followed out

16  of the anterior posterior aspect of the retractor.

17  Q   And there are no light cables on this, correct?

18  A   I don't know if there was an integrated light cable.

19  Q   Certainly, no sequential dilators, correct?

20  A   I believe there was technically a sequential dilation

21  system for this.

22  Q   Attached to neuromonitoring?

23  A   I think there were some integrated challenges for

24  neuromonitoring, but the neuromonitoring system wasn't a

25  consideration for this.

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1  Q    I think you agree, this was not commercially successful; is

2  that correct?

3  A    Yeah.  GLIF was not a commercial success.

4  Q    If I could show the jury PTX-499, page 1.  This is an

5  Alphatec Spine Market Need Request.  Do you see that, sir?

6  A    I do, yes.

7  Q    And the date on this just to orient us is 2013; is that

8  correct?

9  A    Correct.

10  Q    Okay.  And if we could just go down to the first page of

11  that document.  If I could just grab it here, my copy.  If we

12  could go into the market needs section of that document on the

13  first page.  And do you see where it says "direct lateral is

14  one of the fastest growing segments in spine."  Do you see

15  that, sir?

16  A    I do, yes, sir.

17  Q    So when you were telling us about the direct lateral market

18  only being 15 percent, we can agree by at least 2013, Alphatec

19  recognized it was one of the fastest growing segments in spine;

20  is that correct?

21  A    I would believe at the time it was growing quickly, yes.

22  Q    If we drop down to the next section, it says "GLIF was not

23  commercially successful.  This was supposed to be our entry

24  into the lateral market, but it has never come to fruition;" is

25  that correct?

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   A    That is what is says here on the document.

2   Q    And you don't disagree with any of that, right?

3   A    GLIF was not commercially successful, but we learned a lot

4   from GLIF.

5   Q    What to include and what not to include?

6   A    We learned there were better ways to do lateral than it was

7   currently being done.

8   Q    Do you see the next sentence says we do not have a custom

9   direct -- or "we do have custom direct lateral sets being

10  developed for a short term, but without a retractor option,

11  growth in the market will be extremely limited."  Do you see

12  that?

13  A    I see that, yes.

14  Q    Do you agree in 2013, Alphatec's view was unless we have a

15  direct lateral system, a viable one, we are going to have very

16  limited growth in this market, correct?

17  A    Without a direct lateral system, we weren't going to grow

18  in the direct lateral market.

19  Q    And this is a needs assessment?  This is what does the

20  company needs; is that fair?

21  A    This would have been a document that was part of our design

22  process where to get kind of approval, we would go to -- we

23  would kind of put a business case together to say where we saw

24  opportunity in the market.

25  Q    And it also recognized that this was a highly profitable

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   high growth market, correct?

2   A   I believe that it was -- I don't know much about the

3   profitability, but I know that it was a fast growing segment of

4   the market.

5   Q   If you look just below there?

6   A   Okay.

7   Q   Any reason to disagree with that?

8   A   I don't, no.

9   Q   Can we agree that in 2013, Alphatec was aware of NuVasive's

10  patents that -- the '801 patent and the '832 patent?  Are we

11  aware of that?  Are you aware of that?

12          ATTORNEY NISBET:  Objection.

13          THE WITNESS:  I was not aware, no.

14  BY ATTORNEY FODEMAN:

15  Q   Do you recall testifying at your deposition about that

16  fact?

17  A   I mean, I knew there were patents in the market.

18          ATTORNEY NISBET:  Objection, Your Honor.

19          THE WITNESS:  I don't know which specifically.

20          THE COURT:  Hold on.

21          ATTORNEY NISBET:  He testified as a corporate witness,

22  Your Honor, not as a personal witness.

23          ATTORNEY FODEMAN:  Maybe I can clean it up, Judge.

24  Let meet give it a shot.

25          THE COURT:  Okay.

1   BY ATTORNEY FODEMAN:

2   Q   You don't dispute, do you, sir, that in 2013, Alphatec the

3   company was aware of NuVasive's patents on its lateral system?

4   A   I don't think we would have been looking for them yet

5   because of how early it would have been in our development

6   process.

7   Q   All right.  We can come back to this.  I don't want to hold

8   us up.

9       You certainly were aware that NuVasive has a lateral system

10  in 2013; is that correct?

11  A   We were aware.

12  Q   And you were aware that NuVasive was the first to come to

13  market and the market leader in this area?

14  A   NuVasive was a strong player in the lateral market.

15  Q   If you turn to the next page of the document we're looking

16  at, it says that on number one, correct -- let's just show it

17  to you.  Any reason to dispute what's shown on page 2 of the

18  market need assessment?

19  A   No reason to disagree.

20  Q   And you knew that in 2013?  You personally knew that,

21  right?

22  A   I would have known that, yes.

23  Q   And you would have familiarized yourself in this leading

24  lateral system as you set out to design one for your own

25  company, correct?

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   A   We look at a lot of competitors when we were developing a

2   new product.

3   Q   And you would have seen --

4           ATTORNEY FODEMAN:   Judge, we have shown this a lot.   I

5   don't think it has had a number, but I will call it PDX-18.

6   BY ATTORNEY FODEMAN:

7   Q   That's components from the NuVasive lateral system,

8   correct?   You recognize that, right?

9   A   I recognize most of it.

10  Q   Do you recognize the three-bladed retractor?

11  A   I do, yes.

12  Q   The shim and shim inserter?

13  A   I've actually never seen the shim inserter, but I recognize

14  the shim.

15  Q   The fourth blade and fourth blade clip?

16  A   I have not seen the fourth blade clip before, but fourth

17  blade, yes.

18  Q   And the dilators over there, you see those on the right?

19  A   I do, yes.

20  Q   And by the way, with respect to the dilators, I think you

21  said that although -- well, let's go back to that.   We'll come

22  back to that.

23      With respect to the retractor, I think this is a

24  three-bladed retractor, no doubt about that, right?

25  A   It's a three-bladed retractor, yes.

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   Q    Now there was some testimony just a moment ago that asked

2   you whether or not Alphatec could have designed a two-bladed

3   retractor in 2017 when it launched its system, correct?

4   A    Yes.

5   Q    And I think you told us that that effort would only have

6   cost $100,000 or 200,000, right?

7   A    For a retractor, yes.

8   Q    Can we agree that that was not done in 2014, '15, '16, or

9   '17, correct?

10  A    That's correct.

11  Q    Okay.  So you could have done it, but you didn't do it,

12  right?

13  A    We did not.

14  Q    Okay.  For only $100- or 200,000 it could have been done.

15  And you say you now have a two-bladed retractor.  That wasn't

16  released until 2019, correct?

17  A    20 -- I forget the date.  I think it was 2019 or mid-2020.

18  Q    2020.  And that's the PTP system we've talked about,

19  correct?

20  A    Correct.

21  Q    Now in the course of your work in designing this system,

22  did you -- you looked at other competitors out there and what

23  they were offering; is that correct?

24  A    We did, yes.

25  Q    Okay.  And I think you talked about Medtronic in

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1  particular, correct?

2  A    Yes.

3  Q    And looked at the DLIF system?

4  A    We would have, yes.

5  Q    And if we could look at page 2 of the document we were just

6  looking at -- I'm sorry PTX-499 is that the document we were

7  looking at earlier?

8  A    Yes, it was.

9  Q    Page 2, number 3.  Do you see that?  "Medtronic DLIF

10 retractor generally not perceived as being very good due to its

11 two-bladed design."  Do you see that?

12 A    I do see that, yes.

13 Q    And that was saying we shouldn't go with the two-blade

14 because surgeons don't like it, right?

15 A    There were -- I mean, it was not a -- as significant a

16 market player.  I would say there were fewer surgeons that

17 preferred it.

18 Q    If I could show you PTX-423 which I do not believe is

19 evidence.  No, it's not.  Just the witness.  This is an

20 Alphatec early design concept from 2014; is that correct?

21 A    This is the first slide of a presentation?

22 Q    That's right.

23 A    It says "retractor early design concepts"?

24 Q    That's right.  And you see Mr. Reimel's name on there.

25 He's one of the folks who works with you; is that correct?

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   A   He is, yes.

2           ATTORNEY FODEMAN:  Your Honor, I offer PTX-423 in

3   evidence.

4           ATTORNEY NISBET:  No objection, Your Honor.

5           THE COURT:  It's admitted.

6       (Plaintiff Exhibit PTX-423 admitted)

7   BY ATTORNEY FODEMAN:

8   Q   If we can turn quickly to page 4831.  This was one the

9   early design concepts you considered for the retractor for

10  Alphatec, correct?

11  A   I believe so.

12  Q   This is a ring concept, correct, a swing arm concept,

13  correct?

14  A   Correct.

15  Q   This doesn't have any handles, right?

16  A   Nope.

17  Q   And doesn't work by squeezing handles and having two-blades

18  move and having a third one move separately, right?

19  A   This would work differently, yes.

20  Q   This was something that was considered but reejected as

21  well, correct?

22  A   I believe so, yes.

23  Q   Okay.  Now if I could show you what I will say is PDX-19.

24  This is what you did go with.  And this can be shown to the

25  jury.  It's been shown before.  Right.  The three-bladed

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1  retractor, correct?

2  A   Yep.

3  Q   Light cables integrated into two of those blades, right?

4  A   That one I believe is introduced to all three blades, but

5  yes.

6  Q   And a shim and shim inserter, right?

7  A   Yes.

8  Q   Like NuVasive?

9  A   Yes.

10  Q   Fourth blade optional, like NuVasive, right?

11  A   Among other components of the system, yes.

12  Q   Fourth blade crossbar.  You saw that, right?  That's

13  attached to the fourth blade, right?

14  A   Yes.

15  Q   Implants like those shown at the bottom, right?

16  A   Implants are -- yes.

17  Q   And sequential dilators, meaning one over the other,

18  correct?

19  A   Correct.

20  Q   Now dilators that were equipped what an electrode, correct?

21  A   They had like a little conductive patch so you could run a

22  neuromonitoring through them, yes.

23  Q   Like NuVasive's had electrodes on the distal tip of the

24  dilators, correct?

25  A   I believe so, yes.

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1  Q   You mentioned you bought these off the shelf from TeDan; do

2  you recall that?

3  A   I do, yes.

4  Q   Now do you have any reason to believe TeDan is selling

5  sequential dilators as part of a lateral system like this, or

6  did they just sell you the dilators?

7  A   I know TeDan is a -- predominantly a retractor system

8  company, so I think they were -- I think they were making their

9  own retractors and their own dilators.

10 Q   Okay.  And when you went to them to get dilators, this is

11 what you asked for, correct?  You said were just off the shelf

12 and they had electrodes on the tip?

13 A   Um-hmm.

14 Q   That's what you wanted, correct?

15 A   Yes.  But -- yes.

16 Q   They didn't decide that, Alphatec decided that, correct?

17 A   Well, they would have had decided to manufacture them and

18 have them in use and available, so we just bought them.

19 Q   Now you've walked us through some ways in which -- some

20 improvements that you made or some enhancements that you

21 thought made NuVasive's -- I'm sorry Alphatec's offering

22 different than NuVasive's; do you recall that?

23 A   Yes.

24 Q   And one of things that I think you mentioned or perhaps it

25 was Mr. Costabile was that it was painted a special color to

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1  avoid glare.  Did you say that?

2  A   I don't believe I did, no.

3  Q   But that' the case with the Alphatec?

4  A   We tried to coat it in areas that are likely to get high

5  intensity light with non-reflective surfaces.

6  Q   I should have asked you this before, did you ever read the

7  patents that are at issue in this case?

8  A   I've been able to skim some of them, but I don't know if

9  it's all of them.

10  Q   In skimming those patents when you were doing your work,

11  you were not reading the patents when you were developing the

12  retractor?

13  A   I'm not an expert in patents itself.

14  Q   Are you aware whether there's anything in those patents

15  about the paint or the color in NuVasive's patented system?  Is

16  there anything in there about that?

17  A   I'm not sure if there is or not, no.

18  Q   And there's also -- we've talked about independent

19  inspected moving arms.  And the Alphatec system has independent

20  moving arms, right?

21  A   Yes.

22  Q   Meaning you use the right one independent of the left one,

23  right?

24  A   Yes.

25  Q   As you sit here today, do you know if the NuVasive patents

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1  have taught anything about that feature?

2  A   I don't believe so, no.

3  Q   Now it's your view, am I correct, that this -- you're aware

4  that the patents at issue -- the patents at issue be in this

5  case reference a term called "pivot" or "pivoting," correct?

6  A   I've heard this, yes.

7  Q   And it's your belief that the retractor you developed

8  doesn't pivot as it's used in that patent, correct?

9  A   I don't believe that our retractor pivots, no.

10  Q   And that's because I think -- well, if I understood your

11  testimony, that's because your retractor has that special joint

12  that we have seen this morning, correct?

13  A   There are multiple, but yes.

14  Q   Hemispherical joints, right?

15  A   Yes.

16  Q   And I think you showed this picture, or Mr. Costabile

17  showed, DTX-389 in evidence.  That's sort a cutaway of what's

18  going on in the joints of the arms of your retractor, correct?

19  A   That is correct, yes.

20  Q   That's what controls the movement of the arms, correct?

21  A   Yes.

22  Q   If we can see what's inside of those green sort of discs,

23  there's a number different parts; is that right?

24  A   There would be a couple components in there, yes.

25  Q   Let me pull up 423 again, if I could, and go to page --

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1  this is a document we just looked at -- 4827.  Now just if we

2  go down to the bottom, that is sort of a cutaway of what we

3  were just looking at, correct?

4  A   I believe so, yes.

5  Q   If we can make that a little bigger, Mr. Smith.

6      I'm interested in that D and P on the right.  What does

7  that say "dual offset pivots," correct?

8  A   I think that is the -- that's what it says, yes.

9  Q   And if we could just look at another document PTX-29, and

10 this is not in evidence.

11     This an Alphatec Spine submission to the Food and Drug

12 Administration; is that what that appears to?

13 A   That's what it appears to be, yes.

14 Q   And it looks like something called a 510k application

15 related to the Alphatec Battalion Universal Spacer System.

16 This is a submission to the FDA about the Battalion system,

17 correct?

18 A   That is, yes.

19 Q   And it's dated 2016 now, so we're just before the launch,

20 correct?

21 A   About a year?

22 Q   Within a year.  Fair enough?  Good.

23         ATTORNEY FODEMAN:  Your Honor, I would offer PTX-29 in

24 evidence.

25         ATTORNEY NISBET:  No objection, Your Honor.

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1          THE COURT:  It's admitted.

2      (Plaintiff Exhibit PTX-29 admitted)

3   BY ATTORNEY FODEMAN:

4   Q   Okay.  If we could go -- is there any reason to think that

5   some information that Alphatec submitted to the FDA about a

6   year before launch is somehow incorrect, inaccurate?

7   A   Unlikely.

8   Q   You would to be accurate with them.  This has to do with

9   the approval process?

10  A   We want to be accurate with the FDA.

11  Q   Go to page ending 929.  It that's the body of your

12  retractor, correct?

13  A   That's correct, yes.

14  Q   And if we go to the -- it's like an engineering drawing,

15  correct?

16  A   Engineering assembly drawing.

17  Q   If we go to 931, two pages later, at the top section there.

18  Exactly.  You read my mind, Mr. Smith.

19      That's sort of an exploded view of what's going on in

20  those -- in those -- in that green box, if you will, correct?

21  Those are those components that make up that joint; is that

22  right?

23  A   Yes, that's correct.

24  Q   The ball that we saw before is number 25, and -- I'm

25  calling it a ball.  That half of hemisphere; is it is that more

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   appropriate?

2   A    Yep.

3   Q    The other one is number 26; am I right about that?

4   A    Yes.

5   Q    And both of them fit into number 12, correct?

6   A    Yes.

7   Q    Now if we go back to page 929, two pages earlier, there's a

8   key for what all those numbers mean, correct?

9   A    Correct.

10  Q    Let's take a look at what those things are called 25, 26,

11  and those -- those components the joint we are talking about,

12  those are main, pivot, bushing, threaded, correct?

13  A    That's the description for them, yes.

14  Q    And number 12 is the pivot -- main pivot socket, correct?

15  A    That's correct.

16  Q    We're talking about these are talking about components that

17  make up this joint that controls the arms in your retractor,

18  correct?

19  A    That's correct, yes.

20  Q    Was there a particular time in this chronology when you

21  stopped referring to the joint as having components that pivot?

22  A    I don't think we ever changed the descriptions of any of

23  the components that make up that joint, no.

24  Q    Did you stop when you got sued for patent infringement in

25  2018 calling it pivoting?

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1        ATTORNEY NISBET:  Objection, Your Honor.

2        THE COURT:  Overruled.

3        If you know.

4        THE WITNESS:  I don't think we changed the drawing for

5   a new description.

6   BY ATTORNEY FODEMAN:

7   Q   I mean more the terminology.  We didn't hear you using that

8   term to describe the joints in court today.  I'm wondering what

9   happened between the time this was submitted to the FDA before

10  launch and now we don't hear much about pivoting?

11  A   I would say in the movement of the arm overall is a more

12  complex movement than I believe the pivot describes, and it's a

13  component movement where you have arms that move both out and

14  down and kind of tilt away all simultaneously, which is a

15  little bit more complex and kind of a sum of components.

16  Q   So this description of these components of the joint isn't

17  a fair characterization of the way the arms move; is that what

18  you're saying?

19  A   Yes.

20  Q   Could we turn to PTX-342 just for the witness.  One more of

21  your design documents here.  This is a design review for this

22  particular product.  And we see down the bottom of the first

23  page the signature of Scott Robinson.  Is that you?

24  A   That is me, yes.

25  Q   And the date when you reviewed -- did this design review

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   the Battalion system was August 21st, 2017.  So now we're after

2   launch before lawsuit; is that fair?

3   A    That's fair, yes.

4           ATTORNEY FODEMAN:  I would offer this design review

5   PTX-342 into evidence.

6           ATTORNEY NISBET:  No objection.

7      (Plaintiff Exhibit PTX-342 admitted)

8   BY ATTORNEY FODEMAN:

9   Q    If we could show that to jury.

10      And turn to page 2 of this document.

11          THE COURT:  I'm sorry.  Hold on.  Counsel, did you say

12  this was dated after the lawsuit was filed?

13          ATTORNEY FODEMAN:  No.  Before the lawsuit after the

14  launch.

15  BY ATTORNEY FODEMAN:

16  Q    Before the lawsuit; we agree on that, Mr. Robinson, right?

17  A    We do, yes.

18  Q    And if you see on page 2, it says "product requirements."

19  Do you see that there?  Yeah.  Yeah.  Let me jump to 4 to make

20  this quicker.  If you need to go back, let me know.  We don't

21  want to lose you.  We see a section in there about retractor

22  assembly; do you see that?

23  A    Yes.

24  Q    We read the first bullet point.  Take a moment to look at

25  it.  It says "inputs for general geometry number of" what?

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1    A    Number of pivoting arms.

2    Q    So in this 2017 document after launch, we're describing

3    your system as having arms that pivot; is that correct?

4    A    Um --

5    Q    Is that correct that that's what we're doing here?

6    A    That leaves outlet some context of this document.

7    Q    Well, maybe three lines lower will help with the context

8    where it says "independent opening of pivoting arms"?

9    A    I believe the purpose of this document still lacks a little

10   context.

11   Q    You are describing the retractor we've all been talking

12   about for a week and a day, correct?

13   A    The retractor is the subject of this document, yes.

14   Q    And the retractor to be used in the Battalion system,

15   correct?

16   A    Correct.

17   Q    Okay.  Now one thing that we've heard from counsel during

18   this case and we have heard it this morning from Mr. Costabile

19   is that these arms move in a line.  They move linearly, these

20   arms.  And we have seen a document, I think it's DTX-1059 a

21   bunch of times.  And in particular, page 2 is a -- is a

22   photograph or a diagram we've seen a number of times.  Do you

23   see that green arrow on this?

24   A    I do, yes.

25   Q    And counsel has pointed to that to suggest that the arm

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   moves in a linear fashion, correct?  I mean do you understand

2   that's been said here?  You weren't here, so maybe that's not a

3   fair question.

4   A   I guess I would like to know the context that that was

5   said.

6   Q   Let me ask it this way, do you agree that the arm moves

7   linearly, in a line?

8   A   I mean, I would have to say that it's -- the arm moves

9   maybe not quite linearly.  It moves in multiple planes, not

10  entirely linear, but mostly in one direction.

11  Q   There's rotation, correct?

12  A   It isn't really rotation.

13  Q   It is curving; is that correct?

14  A   It's more of like a kind of a squiggle as it kind of drops

15  away from its origin.

16  Q   It's a squiggle?

17  A   It goes back to the way those two hemispheres move around

18  each other.  The movement being mostly out and away in a mostly

19  nearly linear direction away from the origin.

20  Q   I want to make sure we have this right.  It does not move

21  linearly.  It does not move in a line.  It does not move like

22  this arrow.  It may squiggle.  So far so good?

23  A   Yeah, so far.

24  Q   It doesn't curve and it doesn't rotate.  Have I described

25  your testimony accurately?

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   A   Yes.

2   Q   Now you gave a deposition in this case, correct?

3   A   I did, yes.

4   Q   And you swore to tell the truth just like you did today,

5   correct?

6   A   Yes.

7   Q   Ms. Devine asked you a series of questions, you gave a

8   series of answers, correct?

9   A   I believe so, yes.

10  Q   If we could play a clip from you 2019 deposition, page 153,

11  line 16 to page 154, line 13.  That was page 153, lines 16 onto

12  the next page of 154, line 13.

13      Do you see that, sir?

14  A   I do.

15  Q   Is that accurately transcribed?

16  A   I believe it is accurately transcribed.

17          ATTORNEY FODEMAN:  If we could play that clip please,

18  Mr. Smith.

19      (Segment of Scott Robinson's deposition testimony presented

20  to the jury)

21  BY ATTORNEY FODEMAN:

22  Q   Sir, the arms of your retractor when you squeeze these

23  handles, these arms --

24  A   Um-hmm.

25  Q   -- they rotate away from a central axis of insertion?  They

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   turn away from a central axis of insertion, don't they?

2   A   I believe they would move away from a central axis of the

3   surgical corridor.

4   Q   And they don't just move in any old way, they turn away,

5   correct?

6   A   Again, I would say they move away from the origin in a way

7   that I don't think can be described as a turn or rotation.

8   Q   Maybe this will help.  If I could show you a demonstrative,

9   PDX-17.  Maybe this will help.  That's your retractor, right?

10  A   I believe so, yes.

11  Q   If we can just stop there.  I don't know if I can draw on

12  it.  Yeah, I can.  That's looking down the blades, correct?

13  A   That's a funny angle to look at it, but generally.

14  Q   Okay.  And these blades are inserted into the patient,

15  correct?

16  A   That's correct, yes.

17  Q   We can agree that is the axis of insertion, down the middle

18  of those blades, correct?

19  A   If you were to able to look down the middle of those

20  blades, that would be the axis, yes.

21  Q   You can play it.  Let me stop you there.  See that dotted

22  line that we just drew.  Would you agree that is roughly on top

23  of the retractor arm?

24  A   Yes.

25  Q   Play it, Mr. Smith.  Have we accurately shown the way in

1  which that retractor arm moves from -- looking down on it, that

2  the angle grows larger; is that fair?

3  A   If you were to look down on the retractor, I mean, clearly,

4  that's -- you've shown this view from the top of the retractor,

5  but the arm movement is more complex.  You know, it moves in a

6  composite fashion that, like I believe is the clinically

7  differentiating movement that combines multiple directions of

8  movement.

9  Q   It may very well do that.  I don't think there's any

10  dispute here about that.  The question though is, in doing

11  that, does it also turn away from that X?

12  A   I do not believe it turns away from the X, no.

13  Q   Now just one last area before I sit down -- oh, there's one

14  more thing.  If we could keep it going.  Well, does that --

15  what I just drew there, does that fairly reflect the movement

16  of that arm?

17  A   I don't believe so, no.

18  Q   Now the other -- one of the other areas that you talked

19  about was the fact that these blades can move up and down,

20  correct?

21  A   Correct.

22  Q   And that was a feature that Alphatec developed because

23  surgeons thought it would be useful, correct?

24  A   Correct, yes.

25  Q   So you incorporated that into the Battalion -- the

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   Battalion retractor, correct?

2   A    We did, yes.

3   Q    So they move, right?  The blades move?

4   A    Yes.

5   Q    Now we can agree, can we not, that they are attached in the

6   OR these blades, correct?  They don't come attached to

7   permanently to the retractor, right?

8   A    The blades are assembled in the OR.

9   Q    And that's how it is with the NuVasive retractor too.  They

10  are put on the retractor?

11  A    Ours are different in a couple pretty key ways.

12  Q    I appreciate we're going to go there, but we can all agree

13  that the retractor arms have to be put onto the retractor in

14  both systems some way or another, right?

15  A    Correct, yes.

16  Q    After the surgery, they are removed from the retractor,

17  correct?

18  A    Generally, yes.

19  Q    Now before you insert this device into the patient, the

20  arms are attached, correct?

21  A    Arms -- the --

22  Q    The blades.  I'm sorry.

23  A    The blades will be attached into the arms.

24  Q    Before we insert it into the patient.  And when they are

25  attached to the arms, these blades, before entering the

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1    patient, they are on their firmly, correct?

2    A    Some people might debate that.

3    Q    They are on there?

4    A    They're attached.

5    Q    They're attached.  They are not moving, right, when they're

6    attached if they're attached properly?

7    A    They -- they shake a little bit.

8    Q    They shake a little bit.

9    A    A little toggle.

10   Q    But you would agree that they are locked into place; is

11   that right?

12   A    I mean, they're attached in a way that they won't fall off,

13   but they are -- we do have -- they have the ability to move.

14   Q    Are they locked in place before they are entered into the

15   body?

16   A    Again, they're attached to the arm, but that attachment

17   allows movement.

18   Q    And if we can just bring up PDX-162.  So wait a minute.  I

19   want to make sure I understand that.  They are not locked into

20   place?

21   A    Again, they're attached to the arms, but that attachment

22   allows -- allows movement of the blades.

23   Q    But you don't want to give me that they're attached,

24   they're locked down?  You don't want to say that?

25   A    Locked is probably a little -- a little firm.

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   Q   Have you ever seen this claim language that we're all here

2   to talk about for two weeks?

3   A   I believe so, yes.

4   Q   Okay.  And you see the line where it says "prior to

5   introduction."  Do you see that line, pivotal arm member is

6   rigidly coupled to said second pivotal arm member -- I'm in the

7   middle -- prior to the introduction to the targeted spinal

8   site.  You understand that means before you put it in the

9   patient right?

10          ATTORNEY NISBET:  Objection, Your Honor.  Is he

11   soliciting expert testimony here?

12          THE COURT:  I'm going to allow this.  Go ahead.

13   BY ATTORNEY FODEMAN:

14   Q   I just want to understand if you understand that language?

15   A   I would believe that prior to introduction means prior to

16   introduction to the surgical site.

17   Q   All right.  Now I just want to show you PTX-2388 not in

18   evidence.  This is another Alphatec book or document it appears

19   related to your lateral lumbar interbody fusion system.  Do you

20   see that, sir?

21   A   Yes.

22   Q   It's about this Battalion system; is that correct?

23   A   Without knowing the rest of the presentation, I believe so,

24   yes.

25   Q   Fair enough.  We'll give you a copy.

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1            ATTORNEY FODEMAN:  I'm going to offer this, Judge.  I

2   don't know if there's an objection.  We just gave a copy to

3   counsel.

4            ATTORNEY CARLSON:  May I approach, Your Honor?

5            THE COURT:  Yes, go ahead.

6            ATTORNEY FODEMAN:  Thank you, Judge.

7            Any objection?

8            ATTORNEY NISBET:  Can you lay foundation.

9   BY ATTORNEY FODEMAN:

10  Q   Is this an Alphatec Spine document?

11           THE COURT:  Hold on.  Let him take a look at it to see

12  if he's seen it before.

13           THE WITNESS:  (Witness reviewing document.)

14           THE COURT:  Are you familiar with that document?

15           THE WITNESS:  I am.

16           THE COURT:  Is there any objection?

17           ATTORNEY NISBET:  No.

18           THE COURT:  It's admitted.

19      (Plaintiff Exhibit PTX-2388 admitted)

20  BY ATTORNEY FODEMAN:

21  Q   If you could turn to page 250, Mr. Smith.

22  A   Mr. Smith?

23  Q   That's Mr. Smith.  That's confusing.  Mr. Smith is the guy

24  putting up the pictures.  Sorry, Mr. Robinson.  If I could just

25  see under the first section there it says "quick connect levers

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1    lock blades in place."  Do you see that?

2    A   I do, yes.

3    Q   If we look over there, that's accurate, correct?  This is

4    the system that you designed, right?

5    A   This is the system we designed, yes.

6    Q   This document, if you know, is before the lawsuit?

7    A   I'm not a hundred percent sure of the date of this, but

8    from the looks of it, this was prior to launch.

9    Q   Okay.  Let's just go back to another document, PTX-29.

10   This is a document that is before the lawsuit.  This is from

11   2016.  And if we can go to page 8930 this is the Food and Drug

12   document submission.  Do you see that number 8 there at the

13   top?

14   A   Yes.

15   Q   Yeah, right there.  That's that gold member here that I'm

16   pointing to correct?

17   A   I believe so, yes.

18   Q   This morning you weren't here, but at about 11:55,

19   Mr. Costabile described that item as a lever, right?  I'm going

20   to represent to you that's what he said at 11:55 today.

21       Can we go look at what that number is in the key?  If you

22   could read that line for us, sir?

23   A   Battalion LLIF retractor body, blades lock.

24   Q   These blades are locked in place before they go into the

25   patient, correct?

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1  A   They say locked, but in the embodiment of the retractor,

2  movement is still allowed.

3         ATTORNEY FODEMAN:  Judge, I think I'm done.  If I

4  could just have a moment.

5      (Plaintiff attorney discussion off the record)

6         ATTORNEY FODEMAN:  I don't want to run afoul of

7  anything here.  Let me try it, and if people have a problem, we

8  can take it up after, all right?

9  BY ATTORNEY FODEMAN:

10 Q   I asked you about Alphatec's knowledge of the patent, all

11 right?

12     All right.  Well, I'm going to try it.

13     About when you learned -- when you, Alphatec, learned of

14 NuVasive's patents.  Remember, I asked you about that?

15 A   Yes.

16 Q   And there was discussion amongst the lawyers of whose

17 knowledge that was; do you remember that?

18 A   Yes.

19 Q   Do you remember during your deposition you were shown a

20 court document?

21        ATTORNEY NISBET:  Your Honor --

22        THE COURT:  You know what, Counsel?  We did not

23 resolve the issue with the interrogatory, and I would like to

24 address that as the knowledge of the company rather than trying

25 to force this out of this witness, so why don't we leave that

1   for after the jury is excused.

2          ATTORNEY FODEMAN:  I think that's a great idea and

3   much quicker.  I have nothing further.

4          THE COURT:  Redirect for this witness.

5                    **REDIRECT EXAMINATION**

6   BY ATTORNEY NISBET:

7   Q   Good afternoon, Scott.  Just a few questions.  I wanted to

8   ask you about the engineering drawings DTX-389, I believe.

9   Pull that up on the screen, the last document that Mr. Fodeman

10  was asking about.  The next page.  Go down to where the

11  engineering drawings were depicted.  You can go to page Bates

12  ending 8931.  Fourth page in I believe.  Thank you.

13       This was a document I reviewed with Mr. Costabile, and I

14  had asked him this question about this document mentioning that

15  certain component parts of the joint were called pivots, main

16  pivot, bottom pivot.  Does the fact that the individual

17  component parts of the joint are described as pivots.  Does

18  that describe the way in which the arm moves?

19  A   No.  I mean, the components within the joints themselves --

20  I mean, we need to give them names, and the combination of

21  these joints working together is what results in the movement

22  of the arm.

23  Q   If I could please pull up PTX-342.  And counsel has

24  highlighted page four of the document.  It's the Bates ending

25  4203.  And he asked you some questions about the reference to

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1    pivoting arms in this document, and you said there was a little

2    bit more context to it?

3    A    Yeah.

4    Q    What is that context?

5    A    I think back on page two, this document is just a review of

6    existing documentation.  In that kind of second box, the third

7    box down where it says "previous outstanding action items,"

8    this was an internal document open, and where it says -- the

9    last sentence is "this is a just a review of previously

10   documented design inputs," and so this document was merely a

11   transcription of inputs that already existed in our product

12   requirements specification.

13   Q    And what is the context or how -- what does pivoting arms

14   mean in the context of this document?

15   A    Here again, it was a -- it was a way for us to kind of

16   label and differentiate arms in our product requirement

17   specification from the, you know, early 2015 time frame on.

18   Q    What were you differentiating with respect to the arms?

19   A    Basically the arm that moved versus the central arm versus

20   the arm that wasn't moving.

21   Q    The cranial caudal arms versus the --

22   A    Yeah.  Cranial caudal, right and left versus center.  It's

23   just the way that they were described.

24   Q    And does pivoting arms here describe the way in which the

25   arms move from the central axis of insertion?

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   A    No.  When we have design control documentation, we're

2   required by FDA to establish user needs and design inputs up

3   front and then those inputs drive outputs, and the outputs are

4   the actual like embodiments of those initial concepts.  So when

5   we define an input, you know, it even says on -- you know,

6   PRS10025, that document where it lists inputs it's, you know,

7   what that a device could potentially be.  The way that we're

8   able to combine, you know, multiple design inputs or multiple

9   user needs into a single feature is something we don't know

10  until later in the project.

11          ATTORNEY NISBET:  May I approach, Your Honor?

12          THE COURT:  Yes.

13  BY ATTORNEY NISBET:

14  Q    I'm going to hand you -- counsel was asking you a few

15  questions about whether or not the blades were locked in

16  connection with the arm; do you remember that?

17  A    I do, yes.

18  Q    And locked does not mean they're fixed and immovably

19  connected, right.

20  A    That's correct.

21  Q    And Mr. Costabile reviewed several of the design features

22  associated with the connection between the arms and the blades.

23  Can you just remind the jury what DepthControl looks like and

24  the quick connect blades?

25  A    Yeah.  So the one of the problems with the existing

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1    retractors is that you need an additional tool to tighten and
2    remove the blades.  And so once the blade is in place, you
3    couldn't move it at all.  With ours, it's just, you know, like
4    a quick connect where they kind of drop in with no additional
5    tools.  It makes it much faster to swap blades.  Blade depth is
6    important.  And so when a surgeon inserts this into a
7    punishment for the first time if they have the wrong length
8    blades, it's very time consuming to undo each individual set
9    screw and then replace all the blades.  It was seen as an
10   opportunity for us.  And if you need just a little bit of extra
11   depth on one blade or another, or you need it to be a little
12   bit shorter, you can very quickly and without detaching it from
13   the retractor move that blade up and down allowing you to
14   navigate either some -- navigate an osteophyte, or when you're
15   tilting the retractor slightly one way or the other, you can
16   create a better aperture by lowering one blade or another.
17   Q   And it's the special way in which the blades are connected
18   to the arms that allows that movement?
19   A   Yes.
20   Q   If the blades were fixed and immovably connected to the
21   arms, you wouldn't be able to do DepthControl or have quick
22   connect blades, correct?
23   A   Correct.
24   Q   And that connection is the same before you insert it into
25   the patient and after you insert it into the patient, right?

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1   A    It is, yes.

2   Q    The blades are always moveable, correct?

3   A    The blades are always moveable.

4            ATTORNEY NISBET:  No further questions.

5            THE COURT:  Anything else, Counsel?

6            ATTORNEY FODEMAN:  Nothing further.

7            THE COURT:  You are excused, sir, but why don't you

8   wait there we will excuse the jury for the day.

9            Thank you fur your time again today.  We will see you

10  in the morning.  Again, please, don't discuss the case and

11  don't do any research.  We're getting there.  See you all

12  tomorrow ready to go at 8:30.  Thank you.

13      (Jury in evening recess.)

14           THE COURT:  The jury has recessed if you want to do

15  what you need to do to get out of the box.  All right.

16           ATTORNEY FODEMAN:  Just two issues from for me, Judge.

17  We can either address them now or --

18           THE COURT:  Wait just a second because of the noise.

19  With regard to the interrogatory that was used earlier, it's a

20  long interrogatory.  The question is long.  To have context for

21  the answer, I think the jury needs the portion of the question

22  that just indicates at what date did the company first become

23  aware of these two patents, and they don't need the whole chart

24  and all the other stuff.  So my suggestion would be just to a

25  stipulation based on that interrogatory response that simply

247 of 254

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1    says that Alphatec as a company became aware of these two

2    patents on these dates.

3         ATTORNEY FODEMAN:  Yeah, we'll work it out.

4         THE COURT:  And then we don't have to worry about

5    redacting the interrogatory and have a lot of blank spaces that

6    make juries go what's going on there.

7         Okay.  I will be emailing you a set of the proposed

8    instructions in the next hour or so.  I just want to go through

9    where I am on my draft, and then we can discuss the ones that

10   you can lodge objections to and the ones that are kind of open

11   still for negotiation.  Anything else to prep for tomorrow that

12   we should discuss now, so we're not in the morning.

13        ATTORNEY FODEMAN:  No, Judge.  The only thing is that

14   at the sidebar we had discussed or I had proposed potentially

15   contemplating a limiting instruction with respect to this other

16   litigation that came up during the day today.  If it's all

17   right with the Court, I would like to reflect on that issue of

18   whether we should have it at all and draw more attention to it,

19   to be quite candid, or whether if we have it, what the wording

20   should be.  If it's okay with the Court, I would like the night

21   to think about it.

22        THE COURT:  I know you have all lived and breathed

23   this case for three, four years, and your sensitivity that

24   might suggest stuff is probably far more heightened than for

25   the jury and drawing a line under it, might make it worse

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1    rather than better.

2         ATTORNEY FODEMAN:  Yes.  I guess maybe even I'll talk

3    to opposing counsel and see if we're going back near that

4    anymore, and if we're not, it may become less of an issue.

5         ATTORNEY NISBET:  We have one housekeeping issue, Your

6    Honor, concerning time allotted to deposition designations.

7         THE COURT:  Yes.

8         ATTORNEY NISBET:  So we -- almost all the witnesses

9    that NuVasive identified in discovery and who have been deposed

10   in this case are no longer at NuVasive and are no longer

11   available so we have a number of deposition designations to

12   play.  Paragraph 41 of the pretrial order allots time according

13   to who is affirmatively designating and who is affirmatively

14   counter-designating.  Last week NuVasive played about 28

15   minutes of their designation, we had six minutes of counters.

16   You charged all that time to them.  Across the five or six

17   witnesses we've got, we have maybe an hour or so of affirmative

18   designations.  The issue is with respect to their counters.

19   They have an hour and twenty minutes worth the counters, and we

20   don't think that should be attributed to us.

21        THE COURT:  They were very short last week and it

22   wasn't really helpful for me to try dissect who was doing that.

23   At my count right now you have five hours and 48 minutes left,

24   which includes your closing, and I expect you're going to need

25   at least an hour, given that you did an opening that was longer

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

 1  than an hour.

 2       You have ten hours and 40 minutes.  So if you want to

 3  negotiate an accounting for the depositions that balances out

 4  what you're playing and how much time should go, you can let me

 5  know and I'll use those numbers.

 6       ATTORNEY NISBET:  Our plan would be to do it according

 7  to the pretrial order which says we get our affirmatives.

 8       THE COURT:  I know, but I can't tell, so.

 9       ATTORNEY NISBET:  We'll --

10       THE COURT:  So you need to figure it out between you.

11  And if you want to cut some of the stuff you were offering,

12  then obviously you need to let them know so they can adjust

13  what they're going to play.  If you're going to be offering

14  stuff from the depositions, that would be the equivalent of a

15  cross or inverse direct, it should count against you.  The

16  other ones I thought were significantly short enough that I

17  wasn't worried about it.

18       ATTORNEY FODEMAN:  Just so I understand the order, so

19  that is inclusive no matter what we play.  I don't know whether

20  this makes a difference.  I haven't looked at it.  But whether

21  it's merely just trying to have completeness is one thing we're

22  doing that because they're playing something.  Affirmative

23  seems different.

24       THE COURT:  No.  If they're asking the questions and

25  you added stuff and they're doing the questioning, then that's

1  them.

2     ATTORNEY FODEMAN:  Okay.

3     THE COURT:  If you're asking the questions in the

4  deposition, then that's you.

5     ATTORNEY FODEMAN:  Oh, well, I don't think -- I'll

6  have to take a look at it, but that is a difference that

7  matters, I think.

8     ATTORNEY WICKRAMASEKERA:  Your Honor, I think we

9  resolved this already in the pretrial order.  Typically we

10  designate questions and answers, they designate counters, but

11  they're from us taking the deposition.  So we typically count

12  that so that the other side gets their counters and we get our

13  affirmative designations.  We already negotiated this in the

14  pretrial order.

15     THE COURT:  I do remember there being a lot of

16  discussion about that.  Try to work it out.

17     ATTORNEY FODEMAN:  Okay.

18     THE COURT:  Essentially if they were calling the

19  person, they would not be asking the questions that you

20  designated.  You would be doing it when you got up to then do

21  some sort of direct or redirect with this person.

22     ATTORNEY WICKRAMASEKERA:  And the issue -- the issue,

23  Your Honor, is primarily that most of the NuVasive witnesses

24  that we deposed in this case are gone from NuVasive, so we have

25  to present this testimony by deposition designations.  We

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1    brought our people here, they did not, and so we have to

2    designate the testimony.

3            THE COURT:  I don't think there's any issue here that

4    you're using depositions, but there should be some balance to

5    this, so I would hope that you can do the right thing and work

6    that out.  If there's a real dispute and it comes down -- I

7    mean, what I'm worried about is that I want you to get your

8    full amount of time, and we have had delay in the morning and

9    afternoon, and so, you know, the amount of time I've got left

10   with this jury, and Friday -- I have a full criminal calendar

11   Friday morning, so we have to be done on Thursday, at least

12   with them to go out to deliberate, which means we might have to

13   consider Thursday doing a different schedule, not doing -- you

14   know, not telling them it's going to be 8:30 to 3:00 but rather

15   a full day, you know, 8:30 but they are going to be here

16   probably to 4:30 just getting instructions and starting

17   deliberation because it's a long jury instruction session to

18   read.  Right now the timing should work for you to get your

19   full 20 hours in, but I still need time to read the

20   instructions to them before you do your closing so that's just

21   kind of be built in.  But we'll make it work.

22           ATTORNEY FODEMAN:  Thank you, Your Honor.

23           ATTORNEY CARLSON:  Your Honor, one very quick

24   housekeeping issue.  On Friday, there was a document DTX-1089

25   that used with Mr. Inglish both on cross and redirect and we

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1    would ask that it be moved into evidence.

2         THE CLERK:  It was identified, but it was never

3    received.  They never moved for the Court to receive it.

4         THE COURT:  Do you all know what document?

5         ATTORNEY LOMBARDI:  I had the odd request to admit the

6    document during the cross and so I wasn't able to show it to

7    the jury.  Then they came back on redirect and asked that the

8    document be introduced into evidence.  And I guess my position

9    would be since I was barred from using it with the witness and

10   introducing it there, that that's the way it should stay

11   probably.

12        THE COURT:  Was it shown to the jury?

13        ATTORNEY CARLSON:  Yes, it was.

14        THE COURT:  It's admitted.

15     (Plaintiff Exhibit DTX-1089 admitted)

16     (Court in recess at 2:58 p.m.)

17      CERTIFICATE OF OFFICIAL STENOGRAPHIC COURT REPORTER

18   I, Mauralee Ramirez, federal official stenographic court
     reporter, in and for the United States District Court for the
19   Southern District of California, do hereby certify that
     pursuant to Section 753, Title 28, United States Code that to
20   the best of my ability, the foregoing is a true and correct
     transcript of the stenographically reported proceedings held in
21   the above-entitled matter and that the transcript page format
     is in conformance with the regulations of the Judicial
22   Conference of the United States.

23        Dated this 9th day of March 2022

24        S/ Mauralee Ramirez_____
          Mauralee Ramirez, CSR No. 11674, RPR
25        Federal Official Stenographic Court Reporter

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1

2                                    INDEX

3                            INDEX TO WITNESSES

4  DEFENDANTS                 DIRECT    CROSS    REDIRECT    RECROSS

5  Kelli Howell

6   Attorney Wickramasekera   15                  --

7   Attorney Fodeman                    52                    --

8  Jon Costabile

9   Attorney Nesbit           102                 165

10  Attorney Devine                    147                    170

11 Scott Robinson

12  Attorney Nesbit           177                 242

13  Attorney Fodeman                   205

14

15                                   EXHIBITS

16 PLAINTIFFS                                            ADMITTED

17 PTX-29                                                 227

18 PTX-423                                                221

19 PTX-432                                                230

20 PTX-501                                                161

21 PTX-1089                                               252

22 PTX-2388                                               239

23

24

25

18CV0347-CAB, MARCH 7, 2022, JURY TRIAL VOLUME 5

1                          INDEX (continued)

2                    INDEX TO EXHIBITS (continued)

3    DEFENDANTS                                        ADMITTED

4    DTX-231                                              44

5    DTX-344                                             118

6    DTX-369                                             136

7    DTX-398-390                                         139

8    DTX-410                                             187

9    DTX-454, Pages 1, 7, 14, 15, 21                      21

10   DTX-589                                              39

11   DTX-648                                             195

12

13

14

15

16

17

18

19

20

21

22

23

24

25