18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1                    UNITED STATES DISTRICT COURT

2                   SOUTHERN DISTRICT OF CALIFORNIA

3        BEFORE HONORABLE CATHY ANN BENCIVENGO, JUDGE PRESIDING

4

5   NUVASIVE, INC., a Delaware        )
    Corporation,                      )
6                                     )
                         Plaintiff,   )   CASE NO. 18CV0347-CAB-MDD
7                                     )
            vs.                       )   SAN DIEGO, CALIFORNIA
8                                     )
    ALPHATEC HOLDINGS, INC., a        )   TUESDAY, MARCH 8, 2022
9   Delaware Corporation, and         )
    ALPHATEC SPINE, INC., a           )
10  California corporation,           )
                                      )
11                       Defendants.  )

12

13

14

15

16      STENOGRAPHIC COURT REPORTER'S TRANSCRIPT OF PROCEEDINGS
                   JURY TRIAL DAY 6, VOLUME 6
17                       PAGES 1-180

18

19

20

21

22  Proceedings reported by stenography, transcript produced by CAT
    software
23  _____

24             Mauralee Ramirez, RPR, CSR No. 11674
            Federal Official Stenographic Court Reporter
25                 ordertranscript@gmail.com

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1    APPEARANCES:

2    For the Plaintiff:

3        Wilson Sonsini Goodrich and Rosati
         Wendy Lynn Devine
4        Natalie Jordana Morgan
         12235 El Camino Real, Suite 200
5        San Diego, CA 29130

6        Wilson Sonsini Goodrich and Rosati
         Morris Fodeman
7        1301 Avenue of the Americas, 40th Floor
         New York, NY 10019.
8
         Wilson Sonsini Goodrich and Rosati
9        Erik J. Carlson
         633 West Fifth Street, Suite 1550
10       Los Angeles, CA 90071

11   For The Defendants:

12       Winston & Strawn LLP
         Nimalka M. Wickramasekera
13       333 South Grand Avenue
         Los Angeles, California 90071
14
         Winston & Strawn LLP
15       George C. Lombardi
         Brian J. Nisbet
16       35 West Wacker Drive
         Chicago, IL 60601
17
         Winston & Strawn LLP
18       Robert Kang
         101 California Street
19       San Francisco, CA 94111

20

21

22

23

24

25

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1      San Diego, California, Tuesday; March 8, 2022; 8:15 a.m.

2      (Case 18CV0347-CAB called)

3      (Appearances stated)

4           THE COURT:  Good morning.  What are today's issues?

5           ATTORNEY FODEMAN:  Good morning, Judge.  These should

6    be brief.  The first two relate to deposition clips.  First, I

7    understand that at some point today, there will be -- the

8    defense intends to play a video of Dr. Moazzaz.  And you may

9    recall late last week, this issue came up with the defense

10   serving a subpoena on Dr. Moazzaz and another individual.  I

11   assume I know Dr. Moazzaz is not going to respond to the

12   subpoena.  He's not going to be here.  I just want to renew or

13   motion.

14          THE COURT:  He was subpoenaed.  He didn't move

15   officially to quash.  He just wrote a letter saying basically

16   I'm not coming, so they can use his deposition.

17          ATTORNEY FODEMAN:  Understood.  And I'm not actually

18   positive where we fell on this, but there is a deposition clip

19   from a Mr. Lucier, the former CEO and chairman of NuVasive,

20   that the defense intends to show.  We've worked it out with the

21   exception of three short portions that relate to questioning

22   about crushing Alphatec.  You may remember in the opening

23   statement, regarding the opening slides, Your Honor had asked

24   the defense not to highlight that portion of a particular

25   email.  That particular email is one of the exhibits -- is the

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1  exhibit that Mr. Lucier is being questioned about, in

2  particular, that particular phrase.  We would ask that the

3  sections that have been identified on pages 263 and 264, 265,

4  and 266 be excised from what's shown to the jury.  I don't

5  think that issue is relevant.  It goes only to our state of

6  mind, as we have discussed a number times.

7          The other issue is unrelated to the evidence.

8          ATTORNEY NISBET:  Your Honor.

9          THE COURT:  Yes, go ahead.

10          ATTORNEY NISBET:  Yes, Your Honor.  So we have

11  designated the testimony in order to get in the document which

12  you've already agreed could be shown to the jury, which we did

13  in opening.  I'm not a hundred percent clear what their

14  objection is.  I think it's a prejudice objection.  But the

15  document and his testimony pertain to his language regarding

16  the retention of surgeons.

17          I'll provide you a clip.  I wasn't expecting this this

18  morning.  If you look at his testimony, Your Honor, and if

19  that's truthful testimony, he says very clearly:

20          "We're not out here trying to crush Alphatec.  We're

21  just out here doing our best excellence.  We're just there to

22  -- to do what we can professionally to compete in the normal

23  and appropriate way."

24          And so that testimony in and of itself is not

25  prejudicial, if it's true.  So I'm not sure what the issue is.

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1    He was asked about it, he explained the context of the

2    document.  The document is in the context of retaining surgeons

3    and surgeon relationships, and his testimony is, we don't mean

4    anything bad by it.  We're out here doing our best excellence.

5                ATTORNEY FODEMAN:  Judge, I think we can maybe short

6    circuit this.  If all they want to do is offer the document, we

7    would stipulate to its admissibility.  The questioning is not

8    about retention of surgeons.  The questioning is about this

9    notion that we are going after Alphatec, looking to crush them,

10   setting up a war room.  That's our first reaction to Pat Miles

11   leaving.  That's all about the very thing Your Honor has said

12   is not relevant in this case.  So if it's all about getting

13   document in, no problem.  I assume they won't focus like they

14   said they wouldn't in the opening and they agreed and did not

15   focus on in the opening.

16               THE COURT:  Could you stop talking for just a second--

17               ATTORNEY FODEMAN:  I've heard that before, Judge.

18               THE COURT:  -- so I can try to read this.

19               ATTORNEY FODEMAN:  Sorry, Judge.

20          (Pause in the proceedings)

21               THE COURT:  Is the yellow part here offered as well?

22               ATTORNEY NISBET:  Yes.  The yellow part is NuVasive's

23   counter-designations.  The blue represents testimony that will

24   be affirmatively designated.

25               THE COURT:  I'm going to allow this.  I am going to

1   allow you to play the whole thing.  I think there's enough.

2   I'm going to allow it in part because of testimony that was

3   given by Dr. Youssef when in response to the financial

4   interests here, he said in front of the jury, all us sitting

5   here for two weeks, that this case doesn't matter, and I think

6   they're allowed to explore why it matters and the terms it

7   mattered in, and I think the explanation is sufficient, that

8   it's not unduly prejudicial.  They wrote in a document we're

9   going to crush Alphatec, and if that was the purpose, not that

10  it financially mattered to them because the amount of money at

11  risk here was inconsequential to a company of this size, but

12  rather that they just wanted it startup to disappear.  I think

13  that that's fine, and the jury should hear that.

14          ATTORNEY FODEMAN:  Well, Judge, with all due --

15          THE COURT:  No.  That's my order.  I'm not going to

16  hear any further argument.

17          ATTORNEY FODEMAN:  Thank you, Judge.  The other issue

18  is unrelated.  After thinking about it last night, I do believe

19  that a limiting instruction related to this unrelated

20  litigation that counsel questioned the witness about Medtronic

21  having one is in order.  I've prepared the proposal.  I can let

22  defense counsel take a look at it.

23          THE COURT:  Go ahead, give it them.  We'll do it on

24  the first break.  Is there anything Alphatec wanted to address?

25          ATTORNEY WICKRAMASEKERA:  No, Your Honor.

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1          THE COURT:  Let's get the jury in and get going.

2          ATTORNEY CARLSON:  Your Honor, can I have one minute

3    for a quick housekeeping issue?  So for plaintiffs' cross of

4    Scott Robinson, we see 1:50 on 2:45 in the timing and that math

5    there says 65 minutes.

6          THE COURT:  And it should be 55, yes.

7          ATTORNEY CARLSON:  Thank you, Your Honor.

8      (Pause in the proceedings)

9          THE COURT:  Good morning, everybody.  We are ready to

10   go this morning.  Counsel, would defendants call your witness,

11   please.

12         ATTORNEY KANG:  Good morning.  Alphatec calls

13   Dr. Payam Moazzaz by video designation.

14     (Segment of Payam Moazzaz deposition testimony presented to

15   the jury.)

16         ATTORNEY KANG:  Your Honor, we'd like to move into the

17   evidence the documents that were referenced in Dr. Moazzaz's

18   testimony.  Those would be PTX-644 and 650.  Any objection?

19         ATTORNEY DEVINE:  No objection.

20         THE COURT:  They're in evidence.  Thank you, 644 and

21   650.

22     (Plaintiff Exhibit PTX-644 and PTX-650 admitted)

23         ATTORNEY KANG:  Your Honor.  Alphatec calls as its

24   next witness, Dr. Barton L. Sachs.

25     Barton L. Sachs, called as a witness, testified as follows:

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1        (Witness given an oath)

2            ATTORNEY WICKRAMASEKERA:  Your Honor, may I approach

3    to hand you the binders?

4            THE COURT:  Yes.  And I suspect he's going to need

5    lapel mic.

6            THE CLERK:  Would you state your name, spelling your

7    last name for the record.

8            THE WITNESS:  Yes.  Barton, B-A-R-T-O-N, middle

9    initial L., Sachs, S-A-C-H-S.

10                        **DIRECT EXAMINATION**

11   BY ATTORNEY KANG:

12   Q    Good morning, Dr. Sachs.

13   A    Good morning.

14   Q    Could you please introduce yourself to the jury?

15   A    Yes.  My name is Barton Lewis Sachs.  I'm an orthopedic

16   spine surgeon.  I live in Charleston, South Carolina.

17   Q    And, Dr. Sachs, you were retained by Alphatec as an expert

18   witness, correct?

19   A    Yes, I was.

20   Q    Are you affiliated with Alphatec in any way outside of this

21   litigation?

22   A    No, sir, I am not.

23   Q    And do you receive any compensation from Alphatec other

24   than for your work related to this litigation?

25   A    No, I do not.

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1  Q   And, Dr. Sachs, you will testifying today about several

2  topics; is that right?

3  A   Yes, sir.

4  Q   And have you prepared demonstratives to help the jury

5  understand your testimony today?

6  A   Yes, I have.

7  Q   Mr. Wilson, if you can you show DDX2-1 to the witness only.

8      Shown on the screen here is a presentation, DDX2.  Do you

9  recognize it, Dr. Sachs?

10 A   Yes, I do.  This is the presentation that I put together

11 the slide presentation to prepare for the jury.

12         ATTORNEY KANG:  Your Honor, permission to publish to

13 the jury DDX2-1 through DDX2-52.

14         ATTORNEY DEVINE:  No objection.

15         THE COURT:  All right.  That is admitted for

16 demonstrative purposes.

17 BY ATTORNEY KANG:

18 Q   Let's turn two slides ahead.  Starting with your education.

19 Could you please walk us through your educational background

20 starting with undergraduate degree?

21 A   Yes.  I attended Harvard University where I obtained my

22 Bachelor of Arts Cum Laude and honors in biology.  I then

23 matriculated to the State University of New York at the Upstate

24 Medical University Campus in Syracuse where I obtained my

25 Doctor of Medicine.  Following that, I spent six years in

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1    Cleveland, Ohio at the Case Western Reserve University Hospital

2    program training in an approved residency program.  And then

3    later on in my career, I also obtained a degree, Masters of

4    Business Administration when I was working at the Albany

5    Medical Center.

6    Q   Why did you decide you wanted to pursue a career in

7    medicine?

8    A   There's a French term called raison d'etra.  What it means

9    is reason for being.  And when I was younger and growing up,

10   somewhere probably in junior high or high school, I read

11   something and started to think in that way, and I wanted to

12   learn about myself and have a meaning and give back to society

13   and really help others arrive at a better state of wellness.

14   And as I learned more about my own capabilities and what I

15   could do, I felt the calling of going into medicine would best

16   allow me to reach my goals that I was looking for.

17   Q   If we could go to the next slide.  What do we see here on

18   DDX2-4?

19   A   A number of fellowships I have been fortunate to have.

20   Q   Are any of these fellowships particularly relevant to the

21   area of medicine and technology we'll be discussing in this

22   case?

23   A   Yes.  The third section down, I served as the John Moe

24   fellow at the Twin Cities Spine Center University of Minnesota.

25   At that time for that year, I worked with -- and there were

1  very few spine fellowships at the time.  Spine was a growing

2  field.  I worked with four world-renowned spine surgeons really

3  as an apprentice learning the techniques and learning how to

4  perform over 500 spinal surgeries in that year.

5  Q   If we turn to the next slide, DDX2-5.  Dr. Sachs, do you

6  have and board certifications?

7  A   Yes, I do.

8  Q   And on the next slide, Dr. Sachs, are you currently

9  licensed to practice?

10  A   Yes, I am.  I'm licensed in several states in the United

11  States, and I have been for over 40 years at this point.

12  Q   And how long have you been practicing?

13  A   I've been practicing, as I said, for -- for 40 years.

14  Q   And can you give us an overview of the types of procedures

15  you have performed as a surgeon?

16  A   Yes.  I performed all manner and sorts of surgeries when it

17  comes to the spine.  Those have included decompression

18  procedures, which really means removing parts of the spine,

19  either bone or soft tissue, to take pressure off of the nerves

20  which are listed up in here.  It might be from tumors or

21  trauma.

22      And I've also performed many reconstructive spine

23  operations which is literally taking pieces of the spine apart,

24  moving them around, realigning them, and then fixing them

25  together with implants, with metal, and performing spinal

 1   fusions.

 2       And what I've tried to do throughout my career is focus on

 3   how I can do these surgeries in the most minimal fashion of

 4   entering the body and perform the least damage to the patient

 5   and allow that patient the easiest recovery.

 6   Q   Is that what you refer to as minimally invasive surgeries

 7   on this slide?

 8   A   Yes, sir, that is.

 9   Q   Dr. Sachs, what is your current role?

10   A   Currently, I work as a medical officer at the United States

11   Food and Drug Administration.

12   Q   How long have you been in that role?

13   A   I was continuing to practice my clinical practice until the

14   summer, July of 2020 really in sort of the middle or early part

15   of the pandemic.  Then I started the month after that in

16   August 2020 at the FDA.

17   Q   Are you required to be licensed in order to be a medical

18   officer for the FDA?

19   A   Yes.  The FDA requires medical officers to be licensed and

20   be board certified.

21   Q   Turn to the next slide.  Dr. Sachs, have you done any

22   research and development over the course of your career?

23   A   Yes, I have.  I have been involved in a lot of changing

24   techniques, developing and mastering new techniques which is

25   where I got into the minimally invasive surgery, how can we do

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1   it.  And I give the analogy minimally invasive surgery is like

2   building a model ship inside a bottle with at small neck.  In

3   thinking about how to get in the bottle, use the right tools

4   and put it together.  I've researched in that.  I have also

5   been involved with developing new products and new technology

6   that is associated with doing all of those types of procedures.

7   Q   And, Dr. Sachs, you have listed a bullet point here about

8   teaching medicine.  Could you please tell the jury about your

9   experience with teaching?

10  A   I've had teaching appointments as a professor of

11  orthopedics, professor of surgery, professor of engineering

12  throughout my career at various academic university centers

13  where I have taught various levels of individuals from students

14  and continue to teach throughout my career for my peers, where

15  I would be invited or actually put together courses where we

16  would talk about and I would present my research and teach new

17  techniques as well as standard techniques for developing

18  people.

19  Q   If we can turn to the next slide, DDX2-8.  Dr. Sachs, how

20  many spine surgeries have you performed over the course of your

21  entire career?

22  A   I've performed over 10,000 spine surgeries in my career.

23  Q   And of those, how many were lateral trans-psoas surgeries?

24  A   I've been involved and performed between 3- and 400 lateral

25  percutaneous minimally invasive trans-psoas spinal fusion

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1    surgeries.

2    Q    And when was the first time you performed minimally

3    invasive trans-psoas spine surgery?

4    A    The first time I performed that is in the latter 1990s when

5    I was at the Albany Medical Center.

6    Q    And what kinds of instruments were you using for these

7    procedures in the late 1990s?

8    A    The instruments that I was using, as a said, I was helping

9    to develop the technique to perform these, and I adapted

10   instruments that were being used for spine surgery or for other

11   surgery from other places.  So we're seeing on the screen here

12   a two-bladed retractor which opens on a hinge, and I adapted

13   that from doing posterior surgery and first started using that

14   from the side to the spine laterally to place that.  And then I

15   adapted another instrument here which is a general surgical

16   retractor, soft tissue retractor to be able to put it into the

17   wound and protect the great vessels and the bowel and open up

18   the space of the psoas muscle.

19   Q    Dr. Sachs, you said these were general retractors.  Were

20   any of these specifically designed for spine surgery?

21   A    The Caspar retractor that we're seeing in a closed position

22   on the left and in the middle, open position was designed for

23   spine surgery.  It wasn't designed for lateral.  It was

24   designed for posterior spine surgery.

25   Q    To your knowledge, were there other surgeons doing similar

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1   minimally invasive techniques in the 1990s?

2   A   Yes, absolutely there were.  As a matter of fact, I have

3   close associates, friends, and colleagues from around the

4   country where this was also going on and being developed in

5   Dallas, Texas; Madison, Wisconsin; Johns Hopkins in Baltimore

6   and Virginia, and we used to get together at national meetings

7   the North American Spine Society, the American Academy of

8   Orthopedic Surgeons, and we would have side meetings in hotel

9   rooms or side groups, and we would discuss what each of us was

10  doing, how we were performing the surgery, how we were

11  developing it, what type of tools we were doing.  So we were

12  all aware of what each other was up to.

13  Q   Did you consider lateral trans-psoas surgeries to be

14  dangerous in the late 1990s when you performing them?

15  A   No.  None of us considered it to be dangerous, or we

16  wouldn't be doing it on patients.  We didn't think about doing

17  the surgery one night and walk into the operating room and do

18  it the next day.  It was a developmental process.  For me

19  particularly, it was working in an anatomy lab, developing the

20  technique and figuring out what tools and how to get in, then

21  working in an animal lab and making sure it was safe so that by

22  the time we got permission from the hospital to perform this,

23  it was safe, it was effective, and we felt it would allow us to

24  move forward and help that patient.

25  Q   Now, Dr. Sachs, were you here for opening statements in

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1   this case?

2   A   Yes, I was, sir.

3   Q   Do you recall seeing information about lateral trans-psoas

4   surgeries being performed for the first time in the 1980s?

5   A   Yes, I did.

6   Q   And do you recall what work was played in opening statement

7   relating to that?

8   A   In the 1980s, there were some articles published by a

9   Dr. Friedman who described how he performed lateral trans-psoas

10  surgery for the spine.

11  Q   And when did you become aware of Dr. Friedman's

12  publications in the 1980s?

13  A   I became aware of Dr. Friedman's publications when I was

14  preparing for actually this matter that we have been talking

15  about, which actually goes back to 2018 when we first -- when I

16  first became involved.

17  Q   If we could go the next slide.  Dr. Sachs, I'm sure you

18  received many awards and recognitions over the course of your

19  career.  Can you please share with the jury one you're

20  particularly proud of?

21  A   Yes.  Aside from some of the citations and best papers or

22  awards that I've won for research, this is one I'm particularly

23  proud of where I received -- what you're seeing is a letter and

24  a plaque from the United States House of Representatives --

25  Congress where my name was read and I was -- received this

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1   citations for work that I had done putting together a

2   healthcare team to take care of a woman who was brought in from

3   outside the country.  We were able to help her arrive and

4   recover, and she returned to Moldova and is now working as a

5   social worker.  And this was a unique presentation that I

6   received.

7           ATTORNEY KANG:  Thank you, Dr. Sachs.

8           Your Honor, at this time, the defendant offers Dr.

9   Sachs as an expert in the surgical arts related to the human

10  spine.

11          ATTORNEY DEVINE:  No objection.

12          THE COURT:  He is received as an expert in that field.

13  BY ATTORNEY KANG:

14  Q   Let's turn to your opinions.  What materials did you

15  consider in forming your opinions in this litigation?

16  A   I considered many different materials, a myriad.  I have

17  tried to list them for the jury just to follow here.  They

18  included the asserted patents and the file histories.  They

19  also included the Court's claim construction, which I applied.

20  NuVasive's MaXcess system.  I looked at the physical devices

21  the technical documents and the marketing materials as well as

22  Alphatec's Squadron retractor.  Again, the devices, the

23  documents, and the marketing materials.

24      And in Alphatec's case, I had the opportunity of

25  interacting, visiting Alphatec and speaking with the developers

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1    and the engineers to learn more about the product to see how it

2    was put together.  I've studied Dr. Youssef's expert report,

3    his declarations, and his testimony, other witness testimony,

4    as, well as competitor documents and devices.

5    Q    Thank you.  If we go to the next slide.  As a result of

6    reviewing these materials, what opinions did you reach in this

7    case?

8    A    My opinions, number 1, are that the Alphatec Squadron

9    retractor does not infringe on the asserted claims of '801 and

10   '531, that there is no functional unit between the access tools

11   that are presented, the implants that are placed in

12   neuromonitoring, that Alphatec's retractor is not a copy of the

13   NuVasive claimed device from the patents, and that there are

14   many acceptable non-infringing alternatives that result in

15   safe, effective, and clinically successful outcomes surgery for

16   patients.

17   Q    If we go to the next slide.  Let's turn to the patents

18   you'll be addressing today as part of your non-infringement

19   analysis, Dr. Sachs, what documents are we looking at on this

20   slide?

21   A    We're looking at the cover pages of the two patents we've

22   been discussing '801 on the left and '531 on the right I

23   photographed them and put them on a slide.

24   Q    And the next slide.  At a high level, what do these two

25   patents relate to?

1    A    These two patents describe and relate to a minimally

2    invasive lateral trans-psoas approach to the spine to perform

3    spinal intra-discal fusion surgeries.

4    Q    And what does the specification describe in terms of the

5    distraction of tissue?

6    A    The first part of the patents talk about the technique of

7    distracting the tissue and creating a distraction corridor with

8    dilators, a series of dilators.  And I've shown that on the

9    picture here.  This figure comes -- and it's labeled there.  It

10   comes from the each of the patents, and it shows the successive

11   dilators labeled with the numbers 54, 52, 44.

12   Q    Turn to the next slide.  Let's talk about retraction.  How

13   do the patent specification describe tissue retraction?

14   A    Well, after the distraction corridor is created, the

15   patents talk about a retractor that is placed over the

16   dilators.  And this is, again, a figure that comes from each of

17   the patents and it shows how the retractor is fashioned, that

18   it has two arms, it has two blades.  I have put the blades in

19   green, the arms in yellow.  And the arms are connected in the

20   middle by a hinged coupler which is labeled 30 in this.

21   Q    And if we could go to slide 18.  Dr. Sachs, do you have

22   images of the retractor or demonstrative images of the

23   retractor in the closed position versus in the open position?

24   A    Yes.  That is what we're showing here.  I prepared the

25   demonstrative on the left and actually an image that appears as

1   a figure on the right side.  It shows that the arms are in

2   closed position together on the left, and they pivot to open.

3   On the right side, we can see them separated.  The arms are

4   separated.  And that's what it would look like by squeezing the

5   handles, down below.  And we can see this is a very simple

6   action of movement, simply pivoting from the couple which is

7   labeled in red, the hinged couple in the middle.

8   Q   Let's turn to your non-infringement analysis on the next

9   slide.  Dr. Sachs, can you start by summarizing your opinions

10  on why Alphatec's Squadron retractor does not infringe the

11  asserted claims of the '801 and '531 patents?

12  A   Yes.  The Alphatec Squadron retractor, first of all, does

13  not pivot to open.  And the Alphatec Squadron retractor has

14  blades that are rigidly coupled to the arms.  That is seen in

15  the '801 patent.  Not pivoting to open is seen in '801 and the

16  '531 patent.

17  Q   Let's talk about your opinion relating to the pivot

18  requirement.  Where in the claim language does the -- the claim

19  language of the '801 patent does the pivot requirement appear?

20  A   Yes.  My methodology to try to display this for the jury is

21  I have shown the text on this slide on the left side.  I then

22  highlighted the areas of the text and I've blown that up and

23  moved that into the right side to make it easier for us to

24  read.  And I've put two sections of the claim 1 from '801, 1B

25  that I've labeled and 1E, and I've bold typed and underlined

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1  the word where we see pivot.

2      So it shows in 1B a first pivotable arm and a second

3  pivotal arm that pivots.  And then we can see in 1E, it talks

4  about the arms which are stated to be in a closed position and

5  then they pivot to open and move into the open position where

6  I've put down open by pivoting and pivotable.

7  Q   And, Dr. Sachs, you have highlighted some text in green on

8  claim limitation 1B.  Can you explain what that relates to?

9  A   Yes.  The green text, I tried to differentiate the fact

10 that there's a third arm also in the claims -- in this claim 1.

11 And that third arm is described as a translating member that

12 moves in a longitudinal direction or more linearly.  It moves

13 straight.  One arm that moves straight which is different from

14 the two other arms that pivot to open.

15 Q   If we can turn to the next slide.  Can you explain to the

16 jury where the pivot limitation appears in the '531 patent?

17 A   Yes.  In this patent, again, I've used the same

18 methodology, showing you the text, blowing up the text on the

19 right side so we can read it easier.  And if we look in the

20 element required at 1E, we see that the word "pivot" is used

21 again, and it's very similar to the last patent that we were

22 looking at.  It talks about a first arm that pivots.  It talks

23 about a second arm that pivots.  And I've also given you green

24 text to show that there's a third arm which this patent is also

25 talking about the third arm translates and moves linearly.

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1   Q   I'd like to go back to DD2-16.  Now you -- we were talking

2   about the patent specification discussing the retractor.  Did

3   you -- does the patent specification -- we'll get to this

4   later, but just to clarify, does the patent specification state

5   that the arms are rigidly coupled to the blades?

6   A   It states that the blades are rigidly coupled to the arms.

7   Q   Let's go back to DDX2-21 -- sorry.  23.  And going back to

8   the claim language in green, what do you have highlighted in

9   green on this slide?

10  A   I was, again, trying to point out it's very similar to the

11  claim 16 the '801 patent where the third arm -- the patent

12  describes, the element shows a third arm which moves linearly

13  and translates.  And it says -- that's exactly what it says.

14  So it's a different type of movement from the first arm and the

15  second arm.

16  Q   And if we turn to the next slide, DDX2-24.  Did you apply

17  the Court's construction in analyzing the claims we just looked

18  at?

19  A   Yes, I did.

20  Q   What is the Court's construction here on DDX2-24?

21  A   The Court's claim construction that we were instructed to

22  use is that pivoting should be interpreted as to rotate outward

23  or turn away from a central axis of insertion.  And what I've

24  done in this slide on the patents at '801, every time that

25  pivot showed up, I replaced it with the Court's claim

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1    construction.  This is how it would read with the red

2    replacing.

3    Q   Dr. Sachs, when did the Court define pivot in these patents

4    to have the meaning we see on the screen?

5    A   The Court defined that in April 2020, I believe.

6    Q   Were you here for the testimony of Mr. Scott Robinson

7    yesterday?

8    A   Yes, I was.

9    Q   Yesterday during his testimony, NuVasive examined

10   Mr. Robinson on Alphatec documents using the word "pivot."  Do

11   you recall this?

12   A   Yes, I do.

13   Q   Were those documents created before this litigation?

14           ATTORNEY DEVINE:  Objection.  Foundation.

15           THE COURT:  If he knows.  He was here.

16           THE WITNESS:  Yes.  The documents were created before

17   the Court's claim construction was provided.

18   BY ATTORNEY KANG:

19   Q   Was there any indication that Alphatec was in 2017 using

20   the term "pivot" to mean rotate outward or turn away from a

21   central axis of insertion?

22   A   No.  It would have been highly unlikely that that would

23   have occurred because we didn't have the Court's claim

24   construction, and those documents were being used to develop

25   the product.

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1  Q    Now, Dr. Sachs, how do you perform your infringement

2  analysis?

3  A    I performed my infringement analysis by -- starting by

4  looking at the accused product, which is what we start with,

5  which was the Alphatec Squadron retractor, trying to look at

6  how that retractor works, how it moves, and check on that.  I

7  then looked at the engineering diagrams that were created, and

8  I spoke to the engineer again because I'm not a mechanical

9  engineer but to understand the components and how it's written.

10 I then had the opportunity of looking at the CAD diagrams and

11 the video CAD where it was created from the CAD so it mimicked

12 the motion of the arms.  And what I did at that point was

13 compare that to the claims of the patent.  So I compared

14 Squadron retractor with all of those components to the claims.

15 Q    Dr. Sachs, in your expert opinion, is it a proper

16 infringement analysis to compare the words of the Court's 2020

17 claim construction to the words of Alphatec documents from

18 2017?

19         ATTORNEY DEVINE:  Objection.  Foundation.

20         THE COURT:  Overruled.

21         THE WITNESS:  No, I don't think it would have been

22 appropriate because when those documents were created, the

23 Court's claim construction wasn't available.  I had it

24 available to me as I was proceeding with this matter.

25

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1  BY ATTORNEY KANG:

2  Q   And, Dr. Sachs, what evidence did Dr. Youssef rely on to

3  conclude that the Alphatec arms move in the manner required by

4  the Court's construction?

5  A   My understanding is he looked at the Alphatec Squadron

6  retractor, tried to see in his naked eye how it moved and then

7  stated that he felt that he understood how it was working.

8  Q   Dr. Sachs, you've reviewed Dr. Youssef testimony in this

9  case?

10  A   Yes, I did.

11  Q   And did Dr. Youssef rely on the documents NuVasive's

12  counsel questioned Mr. Robinson on?

13  A   I'm not aware that he did at that point.

14  Q   Let's go to the next slide, DDX2-25.  Dr. Sachs, how do the

15  '801 and '531 patents show or describe the pivoting movement of

16  the arms?

17  A   Those two patents, I tried to show with a diagram on the

18  left side.  Again this is a figure from the patents, a section

19  of the figure that shows that the arms of the Squadron -- I'm

20  sorry.  Arms of the claimed device from the patent are shown

21  open, and it talks about the pivoting to open.  And if we use

22  the Court's claim construction, that's to say that the arms

23  rotate outward, turn away from a central axis, which means that

24  it's a simple type of hinged motion opening up.  And we can see

25  it opens at the coupler and it moves more at an arc, as we can

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

 1  see I put this red dotted arrow here which is the arc I believe

 2  it's moving in as the arms pivot.

 3  Q   And the Court's construction includes the term "central

 4  axis of insertion."  Can you explain to the jury what the

 5  central axis of insertion is?

 6  A   May I write on --

 7           THE COURT:  Yes, go ahead.

 8           THE WITNESS:  If we're looking at this where I put

 9  that red dot there, that would be the central axis of insertion

10  because it states that the claimed device, the retractor would

11  slide over the cannulas that would have been placed there to

12  provide the distraction corridor, so they would rotate outward

13  from that point and that because that point is an axis, that

14  axis is also parallel to the axis of the coupler down here.  So

15  that's the rotation point that they rotate outward.

16  BY ATTORNEY KANG:

17  Q   And, Dr. Sachs, could you indicate on the right side where

18  the central axis of insertion is in the Alphatec image?

19  A   The central axis of insertion would be right hare on the

20  right side.  Is what you're asking me?

21  Q   Yes.

22  A   On the right side, we're looking at will Alphatec Squadron

23  retractor which does not pivot to open.

24  Q   How is the motion described in the patent different from

25  the arms of the Alphatec Squadron retractor?

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1  A   The Alphatec Squadron does not pivot to open.  It moves in

2  a more linear motion.  I have drawn these blue lines over here

3  to show how the retractor arms are moving.  And what happens is

4  because of the complex motion, the arms actually move forward

5  outward and down, as I think everybody has heard before.  But

6  that's the opening motion, so it is not a pivoting motion.

7  Q   Over the course of this trial, we have seen several

8  demonstratives by NuVasive's attorneys to show still images of

9  the Alphatec retractor in the closed position and then a still

10 image in the open position.  My question is, do you think this

11 is a proper way to characterize the motion of the retractor

12 arms of the Squadron retractor?

13 A   No, I do not believe that that's the best way to

14 characterize it.  Because if we look at two points in time

15 basically and then we're asked to draw a conclusion and we're

16 asked to make an assumption to support the conclusion of how

17 the arms got from one position to another.  It doesn't take

18 into account the actual movement that takes place in the arms.

19 What I've tried to is show what the movement actually looks

20 like on this slide, that it moves forward, outward, and down.

21 And this is showing movement as it occurs not one point

22 compared to another point.  And then in our mind, we have to

23 figure out and design how we think it got there.

24 Q   Thank you, Dr. Sachs.  If we can turn to the next slide.

25 We heard a bit about this before, but how does the Squadron

1  retractor achieve this motion that we saw in the previous

2  animation?

3  A   Again, we've seen this before, and it's a system that was a

4  complex joint system which are two hemispherical joints.  This

5  is what the illustration of the mechanism looks like if we look

6  at the upper right of the screen.  The two red boxes, I have

7  tried to blow up.  The internal area of those boxes, what the

8  mechanism looks like on the right side.  On the left side, it's

9  showing the hemispherical joints.  If we cut through that,

10  we're looking at the right side where we see that there are

11  really two types of circles rotating against one another and

12  moving -- they both are moving at the same time, and they offer

13  this complex motion, which allows the retractor arms to move as

14  we've heard before which is more of a linear fashion, keeping

15  the arms out at a distance.

16  Q   And, for the record, you have put DTX-389 and 390 on this

17  slide; is that correct?

18  A   Yes, sir.  Those are what we're looking at.

19  Q   Dr. Sachs, why did Alphatec design such a complex joint

20  instead of a simple pivot?

21  A   We heard there was a reason for designing this complex

22  joint.  And the complex joint was to prevent soft tissue creep.

23  And to prevent the soft tissue creep, the goal was to keep the

24  arms at a distance further out to maintain the arms so that the

25  blades would be against the part of the spine, the bony part or

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1   disc part to prevent that tissue coming under the blades and

2   obscuring my view as a surgeon, looking down the pipe where

3   something would be blocking my view.

4       Also by keeping the arms out in that position, it protects

5   the soft tissue.  It keeps the bowel away, it keeps the great

6   vessels away, it protects the nerves, and it keeps the psoas

7   muscle from coming in and blocking my view where I would

8   constantly have to work to keep it -- move it back.

9   Q    And, Dr. Sachs, are you aware of any retractors in the

10  market that have a similar feature as this LevelToe feature?

11  A    No.  I have used many other retractors, and I don't know of

12  another retractor that offers these unique features.

13  Q    Dr. Sachs, if we turn to the next slide, 27, what was

14  Dr. Youssef's testimony regarding how the Alphatec Squadron

15  retractor meets the pivot requirement in the '801 and '531

16  claims?

17  A    Dr. Youssef stated that his view the Alphatec retractor

18  that -- he stated that the blades pivot, as he put it here, and

19  I've highlighted in yellow, they pivot or rotate outward.  And

20  I can read the rest of it:  Or they turn away from a central

21  axis of insertion.  But, again, he was referring to the blade

22  motion and the arms of the retractor as pivoting.

23  Q    Now, Dr. Sachs, did Dr. Youssef rely on any other

24  information or evidence than his naked eye for reaching his

25  opinion that the arms rotate outward or turn away?

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1   A   Not that he has told us or stated, not that I found.

2   Q   And during Mr. Robinson's presentation yesterday, there was

3   a video played; do you remember that?

4   A   Yes, sir.

5   Q   Is that video -- for the jury, what's the best evidence

6   they have back in the jury room to look if at for

7   characterizing the motion of the retractor arms and the

8   Squadron trajectory?

9   A   I believe that the video is the best way of understanding

10  the true motion that is occurring, because the video is based

11  on the cam, and the cam is based on the mechanism put inside

12  this complex joint -- I'm sorry, not cam.  CAD.  The CAD

13  design.  The CAD was based on the mechanism and then the CAD

14  was turned into a video so frame by frame we can see how the

15  motion of the arms actually move, and we can see that that is a

16  complex motion and not just a simple pivot motion as defined by

17  the Court.

18  Q   If we can turn to the next slide, I would like to talk

19  about your opinions on the blades, the rigidly coupled

20  limitation.  Can you explain this opinion to the jury?

21  A   Yes.  The Alphatec blades of Squadron retractor are not

22  rigidly coupled to the arms of the Squadron retractor.  And the

23  rigidly coupled term is found in the '801 patent.

24  Q   If we turn to the next slide, I think you have highlighted

25  some language in the '801 patent.  Could you please explain

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1  that to the jury?

2  A   Yes.  I've used the same methodology that I've described to

3  each of you before.  The text on the left, I've highlighted in

4  the right.  And in the element, the requirement which I labeled

5  1C, we see rigidly coupled and I've bold typed and I've

6  underlined in three different places.  What it's referring to

7  is that the first pivotal arm is rigidly coupled -- the blade

8  is rigidly coupled to the first pivotable arm, that the blade

9  is rigidly coupled to the second pivotable arm, and the blade

10  is rigidly coupled to the translating third arm.

11  Q   Now if we turn to the next slide, DDX2-30, did you apply

12  the Court's constructions in analyzing the claimant we just

13  looked at?

14  A   Yes, I did.

15  Q   On slide 31, what does the patent -- or how did the '801

16  patent illustrate the blades that are rigidly coupled to the

17  arms?

18  A   In the '801, I've demonstrated two figures that are in the

19  specifications, shown figure 10 and fig 11, from patent '801.

20  So they're right in the patent and it shows -- I've colorized

21  the blades in green and the three arms in yellow.  Again, two

22  pivotable arms 28 and 26 and, the translating arm which is

23  labeled 17, and the blades 16, 1, and 12.  And it shows the

24  green blades rigidly coupled to the yellow arms.

25  Q   Is there any description or illustration in the

1  specification of the patents where the blades are detached or

2  detachable from the arms?

3  A    No, there is no description in claim 1 of the '801 patent.

4  Q    And does the patent have any illustrations of the retractor

5  where the blades are moveable or adjustable with respect to the

6  arms after they're connected?

7  A    No, there's no illustration or picture that shows that.

8  Q    Now did Dr. Youssef provide an opinion about an exemplary

9  device that has rigidly coupled blades?

10 A    Yes, he did.

11 Q    What is that device?

12 A    That would be the MaXcess retractor which was the

13 commercial embodiment of the claimed device.

14 Q    Now if you could turn on your boom mic and step down?

15 Could you show --

16        THE COURT:  Actually, I'm sorry to interrupt, but we

17 have a request for a bio break.  So as you're getting to step

18 down and mic'd up, we're going to take a few minutes.

19    (Pause in the proceedings)

20 BY ATTORNEY KANG:

21 Q   Can you please demonstrate for the jury how the blades are

22 connected to the arms in the MaXcess retractor?

23 A    Sure.  I get to work on this side of the table.  So this is

24 the MaXcess retractor that we were just discussing.  And there

25 are three blades.  The way that they go in is from the front,

1  and then it requires a screwdriver to produce that rigid

2  coupling.  And I have to screw each one down so it's in

3  position.  And this is the -- as we can see, the fully

4  assembled retractor.  And if we close it up, we can see -- I'm

5  sorry.  So this is the fully closed position that we would

6  start out, the retractor with the blades rigidly coupled, and

7  then I think you've seen that it opens, the handles and pivots

8  to open around this coupling point right here the -- when we

9  put the dilators in, the dilators would here so it would slide

10  over the dilators.

11  Q   Dr. Sachs, could you demonstrate with the Alphatec

12  retractor how to attach and detach the blades?

13  A   Yes.  Thank you.  This is the Alphatec Squadron retractor.

14  The main mechanism.  These are the three blades.  And to

15  assemble this rather than putting it in, we pop it in from the

16  top, first blade.  This is the longitudinal blade, and this is

17  the left blade, and it's assembled that way.  And then to close

18  up and get it ready to put in, that's the system put together,

19  ready to be placed in the patient over like that.  Let me -- do

20  you want me to continue?

21  Q   No.  I think you can return to take your place.

22      Now, Dr. Sachs, do you agree with Dr. Youssef that the

23  blades of the MaXcess retractor are rigidly coupled to the

24  arms?

25  A   I believe the arms of the MaXcess retractor are rigidly

1  coupled to the arms, yes.  In the MaXcess retractor.

2  Q    Why is that?

3  A    Once the blades are coupled to the arms, the arms move, but

4  the blades are -- the blades go with the arms and they don't

5  have any other action other than where the arms are going.

6  Q    And now we took a look at the Alphatec retractor.  In your

7  opinion, does the Alphatec Squadron retractor have blades

8  rigidly coupled to the arms?

9  A    No, the Alphatec retractor does not have blades rigidly

10  coupled to the arms.

11  Q    I want to talk a little bit about DepthControl.  I believe

12  that you have prepared some demonstratives to help the jury see

13  this functionality more clearly.  If we could go to DDX2-32.

14  Dr. Sachs, before we play this video, what is being shown in

15  this video?

16  A    Again, if what I'm trying to show in the video is that the

17  arms in the Squadron retractor, the Alphatec retractor move,

18  but the blades are not rigidly coupled.  The blades are able to

19  be raised and lowered 5 millimeters in each direction, so a

20  total of 10 millimeters up and down which is called

21  DepthControl that they've designed into the blades.

22       The other aspect about the blades is after they're

23  connected to the arms, they can be removed very easily with a

24  quick release, popping a blade out if needed and putting a

25  different length blade in.  It wasn't talked about how that

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1    works, and -- anyway, that's DepthControl and that's what we

2    will see on this video.  We can see that the blades go in very

3    easily.  They snap in, and then we can see how they can be

4    lowered 5 millimeters, and the blades can be -- arms can be

5    closed, arms come back together.

6    Q    Now what clinical advantages does the ability to change

7    blades in C2 and DepthControl provide a surgeon?

8    A    In situ the use of the blades being able to come up or down

9    is something you just heard an associate surgeon talk about

10   that.  The goal of doing and performing the surgery as much as

11   we can, we want to keep blades against the spine.  The spine is

12   not a smooth surface, not even like that model over there.

13   There are bumps, especially we don't operate not normal spines,

14   so there are usually big spurs, sometimes the disc space

15   collapsed.  We want to maintain the blades from the arms

16   against the spine, and the DepthControl allows us to do that

17   and prevent soft tissue creep.

18   Q    What does Dr. Youssef say will happen if you replace the

19   blade in C2?

20   A    Dr. Youssef actually made a statement the other day that I

21   heard that one wouldn't want to take a blade off in situ

22   because that would mean we would have collapse of the soft

23   tissue and just fill the space.  I think that that's not really

24   presenting to you how it would work, because the ease of doing

25   that would mean we would just take the third dilator, put it

1   back in position to keep the tissue from retracting, take the

2   blade off, very easily snap it out and then put a new length

3   blade in, either shorter or longer as was desired, and we could

4   spread and then keep the blade against the spine.  So it's an

5   easy quick thing without having to unhook the retractor and

6   take it out of the body.

7       The alternate other retractors in order to change a blade

8   height or distance, we actually have to take the whole

9   retractor out and repeat the retraction part of the procedure,

10  even if we left the dilator in place.  And the retractors are

11  connected to the table so there's a -- it takes -- one system

12  takes about 15 to 20 seconds and the other system to replace it

13  would take about 5 to 8 minutes.

14  Q   If we can turn to the next slide, that brings us to the end

15  of your opinions on non-infringement.  Could you please

16  summarize your opinions for the jury?

17  A   Yes.  It's my opinion that the Alphatec Squadron retractor

18  does not pivot to open as we see in two claims '801 and '531

19  and that the blades of the Squadron retractor, the Alphatec

20  retractor aren't rigidly coupled to the arms as I have shown

21  you in claim 1 of '801.

22  Q   Now let's turn to slide 35 for your second set of opinions

23  in this case regarding damages.  Could you explain your

24  opinions to the jury, please?

25  A   Yes.  At the beginning of my presentation to you, I gave

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1  three other opinions that will go through here.  The first one

2  being that there is no functional unit between the tools, the

3  retractor and the access system and the implants and

4  neuromonitoring that's been discussed.

5      The second point is that -- excuse me.  The second point is

6  that the Alphatec's Squadron retractor did not copy MaXcess

7  retractor or XLIF.

8      And also, the third is that there are many acceptable

9  non-fringing alternatives that offer safe, reproducible, and

10 clinically successful outcomes for surgeons to complete this

11 surgery.

12 Q   If you turn to the next slide, DDX2-36.  Doctor Sachs, what

13 are we rooking at here in the slide?

14 A   We're looking at several components that have sort have

15 been presented a functional unit that everything works

16 together, and we're looking at the access tools which include

17 the retractor, the shim, and the dilators on the left.  We're

18 looking at the fusion implant device in the center called

19 CoRoent, and we're looking at a neuromonitoring system down at

20 the right.

21 Q   And do each of these three groups of products have

22 different purposes?

23 A   Yes.  All of these products have different functions, and

24 the functions aren't tied together.  The dilators and the

25 retractor serve to create an opening and create an area for an

1   operative space and an operative corridor that didn't exist

2   before.  So it's trying to create that corridor.  The implant

3   is a fusion device to hold the space afterward.

4   Q   And could you use the access tools like a retractor without

5   the implant?

6   A   Yes, certainly one could.

7   Q   Could you use the access tools such as the MaXcess

8   retractor with an implant from a different company?

9   A   Yes.

10   Q   And could you use access tools such as a retractor without

11   neuromonitoring?

12   A   Yes.  And I think you have heard and I would agree I've

13   done that in many different cases.  Others have done that.

14   Q   We just heard the testimony of Dr. Moazzaz.  How does his

15   testimony comport with your opinions here?

16   A   Dr. Moazzaz independently and we have met each other and

17   we've never discussed anything, but it happens to be almost

18   exactly the same.  He happened to tell you that he was

19   really -- he was comfortable using the Biomet Zimmer retractor

20   system and then he put a K2 implant.  Two different companies

21   that he mixed and matched.  And he did that in, what did he

22   say, I think about a hundred procedures.

23   Q   If we can turn to the next slide, DDX2-37.  Were here for

24   the testimony of Mr. Paul McClintock?

25   A   Yes, I was here.

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1  Q   How does his testimony comport with your opinion on this

2  issue?

3  A   Again, he would agree and -- I would agree basically with

4  his testimony that it's showing that Mr. McClintock stated that

5  the retractor has a different function from the implant.  And

6  we're looking at that he's again referring to the MaXcess

7  retractor, but he was saying that creates an operative corridor

8  and then that the implant has a different function for fusion.

9  Q   If we could turn to DDX2-38.  This is a document that's

10 already in evidence DTX-657.  Have you reviewed any NuVasive

11 documents that support your opinion on functional unit?

12 A   Yes, I have.  I've reviewed the document we're looking at

13 here which was created and dated ed in 2006.  And it's a

14 marketing document that was created by NuVasive in this case.

15 And what the company is trying to promote and show is the

16 MaXcess retractor can be used in other situations such as

17 posterior spine surgery where no implant is put in at all.

18 It's just a discectomy, which is the center picture.  And the

19 picture on the right, it can be used posteriorly again, a

20 little bit off-center where the disc is removed and a different

21 type of implant, a T-LIF implant can be put in, again, using

22 the same retractor.

23 Q   If we can turn to the next slide.  Dr. Sachs, what factor

24 impact a surgeon's choice of equipment for spine surgery?

25 A   I would give you three categories that I as a surgeon and

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1   other surgeons use when we're deciding on what equipment we're

2   using.  The first one is that -- it's a clinical reason.  There

3   are technical reasons.  And there are non-clinical,

4   non-technical reasons.

5       The clinical reasons, if we're using equipment, we want to

6   know that the equipment is safe and it's effective and it

7   offers successful outcomes.  If it's not safe and effective,

8   they don't even in get in game.  It's not available.  So we use

9   certain equipment that's safe.

10      Technical reasons, we look at how the equipment works, how

11  it twists, how it turns, every surgeon has a little bit

12  different skill set.  We turn our hands differently.  Some

13  people are left handed, right handed.  We might have greater

14  strength or size in or grip.  That's the technical reasons, the

15  functionality.

16      And the third is non-clinical, non-technical.  And you

17  heard that in the video just a bit earlier today that hospitals

18  now are contracting with corporate vendors and they only allow

19  certain companies to sell their products, so some of the

20  products are not available to us.

21      Another consideration that was also presented here and I

22  totally agree with and had it through my career is that

23  surgeons like to work with service providers.  There's a

24  technical provider or an individual sales rep who can provide

25  value added service to help us.  So that's another

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1    consideration.

2    Q    Thank you, Dr. Sachs.  What companies have safe product

3    offerings for spinal surgery?

4    A    Many companies -- really, as I said, companies have to be--

5    offer safe products, and that would be other products if we're

6    talking about lateral spinal trans-psoas surgery, it would be

7    the Medtronic company, the Globus company, Synthes, which has

8    now merged with DePuy, Stryker company, Biomet, you've heard.

9    Zimmer; many other companies that offer safe and effective

10   products.

11   Q    Which of these company systems have you used to perform

12   spine surgeries?

13   A    To perform spine surgeries, I have used well, probably

14   between 20 and 30 different companies, and the ones that I've

15   enjoyed the most success with and used most recently would be

16   Globus, Synthes, DePuy.  I've used Medtronic.  I have used

17   NuVasive in the past for some procedures, and other ones that

18   you probably haven't heard of we don't need to discuss.

19   Q    Thank you, Dr. Sachs.  Now do surgeons pick a spinal

20   equipment at a platform level or at an individual component

21   level?

22   A    Surgeons choose at an individual component level.  We

23   choose, and I think you heard that in the presentation just

24   before me, that I would choose a spinal implant that I feel is

25   the right size and offers me the right product and has the best

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1   what's called modulus elasticity.  It matches the bone around

2   it.  And I like the equipment and then I choose a retractor

3   that allows me to see and work the best.  So I do it at a

4   component level.

5   Q   And is that a common practice in the industry?

6   A   Yes.

7   Q   But some surgeons do choose to -- one company's entire

8   product offering, right?

9   A   Yes.  Some surgeons do choose the entire product offering.

10  Q   In your experience, what is the main reason behind the

11  decision to use one company's entire offering?

12  A   Usually the decision is a sales and marketing decision or a

13  relationship decision where the surgeon might have a

14  relationship with the company to use all of that equipment

15  over, the sales rep was trying to sell it, and the sales rep

16  says, Well, gee, I can bring it all in and that way you don't

17  have to call anybody else in the operating room or have it sent

18  in.  I'll provide it all.  And then, of course, the sales rep

19  gets greater reimbursement for using all the products.

20  Q   If we can turn to the next slide.  Can you please summarize

21  your opinions for damages for the jury?

22  A   It's my opinion that the Alphatec system did not copy the

23  NuVasive claimed device from the patents, which was the MaXcess

24  retractor which is the commercial offering product.

25  Q   And if we can turn to the next slide, slide 41.  Dr. Sachs,

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1    at a very high level, can you please tell us what you're

2    showing on this slide?  And we'll walk through the individual

3    bullets separately.

4    A   On the left side, we're showing the NuVasive MaXcess

5    retractor which is, again, a commercial embodiment of the

6    claimed device.  On the right side, we're showing the Alphatec

7    Squadron retractor.

8    Q   And taking -- so there are differences between these two

9    retractors; is that fair?

10   A   Yes, there is.  I was trying to point --

11   Q   How do these --

12   A   I'm sorry?

13   Q   How do these differences relate to your opinions on

14   copying?

15   A   Well, the differences we can go through, and displayed here

16   that the Alphatec retractor did not copy the MaXcess retractor,

17   as we see on the left.

18   Q   If we can take the first two bullets in order, what claim

19   limitations do these differences relate to?

20   A   The first two sections talk about the blades relative to

21   the arms, and it shows on the left, front-loading blades which

22   can't be taken off in situ, and there's no depth control.  On

23   the right, we see there's top-loading blades on the Squadron

24   retractor which also allows for DepthControl.  So it's

25   referencing the claim that we talked about is rigidly coupled.

1    There is rigid coupling on the left.  There is no rigid

2    coupling on the right.

3    Q    The next four differences on the NuVasive side and the two

4    differences on the Alphatec side, what claim limitations do

5    those relate to?

6    A    That -- what we're talking about is the concept of

7    pivoting, that there's just a simple motion of pivoting to open

8    on the left side of the arms from that central pivot point by

9    squeezing the handles, and on the right side, that there is a

10   complex mechanism motion that we've already talked about for

11   the movement of opening the blades and opening the arms.  The

12   arms do not pivot to open, and it's the LevelToe that is

13   trademarked there.

14   Q    Are there clinical benefits to the way the Squadron

15   retractor opens with the LevelToe feature?

16   A    Yes.  The Squadron retractor, as we said, has the benefit

17   of allowing us the ability to keep the blades against the spine

18   both as it opens and moves forward, outward, and downward, the

19   arms movement.  And then we have DepthControl with the blades

20   to maintain and prevent soft tissue creep.  As I said, the goal

21   there is to perform the surgery as easy as possible for the

22   surgeons so we don't have to struggle to keep pushing the soft

23   tissue away as it comes under the blades.

24   Q    Dr. Sachs, the last difference.  Can explain those two

25   differences to the jury?

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1    A    At the bottom, the MaXcess retractor opens by squeezing the

2    two handles together, so both arms are activated at the same

3    time; whereas, on the Alphatec retractor, the arms open

4    independently.  One arm can be opened and then other arm can be

5    opened.  And what that allows is, you've heard, you have heard

6    a couple times actually in the last days people talk about how

7    the retractor can be slid at L5-S1.

8         Different people have different anatomy, and some people

9    have this crest on the side of their body which is higher than

10   others.  And if it's a high-riding crest, that L4-5 disc sits

11   under the crest, we have to get around it.  So that's one

12   point, we don't open the bottom blade very much and we can open

13   the top blade, it doesn't push the retractor out of the way.

14        The other situation that no one has talked about is that we

15   don't always just do one disc that we're fusing.  If we're

16   doing more than one disc, if the blades open simultaneously, we

17   end up placing one incision for one disc and then repeating it

18   at another disc.  If we have independent arm motion which we

19   can adjust and independent blade height, we can place one

20   incision between two discs and tile the retractor to perform

21   one discectomy and procedure, and then we've completed that,

22   basically tilt it in the other direction.  And because of this

23   independent arm motion and the independent blade usage, we can

24   actually use one incision and complete it much easier and in

25   much less time.

1   Q    Turning to your next slide DDX2-24.  This is displaying

2   DTX-0722 which I believe is already in evidence.  Have you

3   reviewed any documents that support your opinion of no copying?

4   A    Yes.  This is a NuVasive internal document that I'm showing

5   here, and I've highlighted the section that talks -- where

6   NuVasive was comparing the two devices that we just looked at

7   on the last screen, blade actuation and blade splay.  And

8   NuVasive talks about the independent opening of the

9   cephalad-caudad blade for Alphatec which they don't offer, and

10   they also reference LevelToe technology, again, which they

11   don't offer.

12   Q    If we can go to the next slide and turn to your third

13   opinion regarding non-infringing alternatives.  Can you please

14   remind the jury of that opinion?

15   A    Yes.  That opinion, I -- it's my strong opinion there are

16   many acceptable non-infringing alternatives that can be used by

17   surgeons to perform safe, effective surgery which offers very

18   successful and good outcomes for patients which always our main

19   goal.

20   Q    If we can turn to the next slide.  What are you showing

21   here on this DDX2-44?

22   A    Yes.  What I'm showing on this is really a crosscut

23   section.  And I think that we saw this last week at one point.

24   If we could sort of -- again, this is an illustration, so

25   there's no blood here, cut the body in half.  I think somebody

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1    used term of being a magician and cutting the body in half.

2    Looking at the level of L4-5, the top of the body is -- the

3    front of the body is at the top of the screen, the back of the

4    body is at the back of the screen, and we can see where the

5    spine sits.

6        What I'm trying to display to the jury here is there are

7    many different surgical approaches to get into this.  You have

8    heard different people talk about ALIFs, you've heard people

9    talk about OLIFs, or T-LIFs, or PLIFs.  And I've tried to show

10   this is an operative corridor and an angle.  It's not just one

11   line that has to be approached, but surgeons can place their --

12   in a minimally invasive surgery, they can place a one-inch

13   incision anywhere in those corridors and then reach the spine.

14       And it's much like thinking about a compass, the way we

15   name a compass and if we're talking about north and south and

16   east and west.  If we're talking about anterior, basically it's

17   toward the front.  If you hear posterior, it's toward the back.

18   If you hear lateral, it's somewhere where you see the Ls in

19   there, OLIF, ALIF, and T-LIF.

20   Q   And, in fact, is the majority of fusion surgery from some

21   of these other approaches rather than lateral that we have been

22   talking about over the course of this case?

23   A   Yes.  There are many more cases that are performed in each

24   of the other corridors rather than just the trans-psoas lateral

25   approach.

1  Q   What's your opinion regarding safety of these other

2  approaches?

3  A   The other approaches are very safe.  Surgeons need to learn

4  techniques, and we all master techniques, and we master

5  principles, and we apply those when we do the surgery in other

6  areas.

7  Q   Just to be clear for the record, can these other nonlateral

8  approaches be used to perform minimally invasive surgeries?

9  A   Yes.  All of these approaches offer minimally invasive

10 surgery, which means really a type of a one-inch incision.

11 Q   And can they all be used to perform lumbar fusion

12 procedures?

13 A   Yes.  In that minimally invasive surgery, it does involve

14 placing something into the spine to perform fusion.

15 Q   And were all these approaches known and available in 2017.

16 A   Yes, they have been.

17 Q   Have you personally used approaches other than lateral to

18 perform interbody fusion?

19 A   Many, many times, as I was saying before.  And there are

20 some situations, for instance, L5-S1, the only way to get to

21 L4-S1 is from the front or from the back.  We can't go from the

22 side because that is where our pelvis is.  Any spine surgeon

23 who has to operate on 5-1 has to know how to get there.

24 Q   And you kind of touched on this in your last answer, but

25 what factors determine which approach you choose between these

1   approaches on DDX2-44?

2   A   Yes.  The factors include the size of the patient, the

3   anatomy we're operating on, and the problem we're trying to

4   treat for that patient.  We always analyze each patient and

5   their problem, and we should offer them the best approach that

6   we as a surgeon feel comfortable with that we take care of

7   their individual problem.

8   Q   Just for example, why would you choose a lateral approach

9   over a nonlateral approach?

10  A   I'm very comfortable with any of these other approaches.

11  And, actually many times, my preferred approach is an anterior

12  approach.  My anterior surgery if I do it at L5-S1, L4-5, 3-4,

13  I work with another surgeon and I can compete that in less than

14  45 minutes, and the patients would be out of the hospital

15  either that evening or go home the next morning with minimal

16  blood loss and very little downtime.  And I can perform it

17  better, in many, many cases, than some of the others.  But

18  that's my personal technique.  Other people like posterior

19  surgery the best.

20  Q   And you were here for Dr. Moazzaz's testimony this morning,

21  right?

22  A   Yes.

23  Q   Do you recall his preferred approach?

24  A   I believe he said his preferred approach was a lateral

25  approach, that he was talking about, didn't he?

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1    Q    I think we'll check the record.

2    A    Maybe I missed that.  I'm sorry.  That was the first time I

3    heard that.

4    Q    Have we heard any testimony from NuVasive witnesses that

5    confirms your opinion?  If we can turn to the next slide.

6    A    Yes.  We heard from Mr. McClintock who gave a presentation

7    on the first or second day, and I put that up here, that he

8    referenced the ALIF, the T-LIF, and the PLIF, which is why I

9    put that other slide up so that everyone can get an idea of

10   what they're talking about.  And he said most of the market is

11   not for lateral spine surgery, XLIF.  And he answered that

12   correct.

13   Q    If we can turn to the next slide, DDX2-46.  Besides the

14   alternate approaches we just discussed, do you have any

15   opinions on non-infringing alternatives?

16   A    Yes.  That are there many companies that offer technology

17   which is a non-infringing alternative, and I have put just five

18   of those companies up here.  You have heard about some of them

19   through this trial.  Medtronic, Globus, DePuy and Synthes which

20   are two companies that merged, and then Stryker, and Zimmer.

21   Q    And do you recall the claim components on which Dr. Youssef

22   focused on to evaluate whether these competitive systems or

23   competitor systems were suitable alternatives?

24   A    I'm sorry?  The question is, do I recall Dr. Youssef?

25   Q    Right.  You've listed three categories of components on

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1    this chart.  Are those the components that Dr. Youssef focused

2    on analyzing to determine whether a competitor system is a

3    suitable alternative?

4    A    Yes.  It's my understanding that he presented the fact that

5    the systems have sequential dilators and electrodes, that

6    there's a retractor as part of the system, and there's an

7    intra-discal shim, and those are the components that were

8    referenced.

9    Q    Now we've heard a lot sequential dilators with electrodes,

10   or as NuVasive calls it, neuromonitoring enabled dilators.  Let

11   me ask you a few questions about that.  Can you perform

12   neuromonitoring with just a dilator with an electrode?

13   A    No, I can't.  The dilator is really -- as it says, it's a

14   dilator.  It's just a tool.  And basically it acts as a

15   conductor of electricity but it doesn't generate the

16   electricity, and unless a stimulation is put into it, nothing

17   happens.

18   Q    Would you mind stepping down again to explain to the jury

19   how a neuromonitor works?

20           THE WITNESS:  Your Honor, may I?

21           THE COURT:  Yes, that's fine.

22           THE WITNESS:  What I wanted to do for all of you is

23   that we've heard a lot of about neuromonitoring, we've talked

24   about neuromonitoring, and it's referenced, but no one has

25   really gone through it.  I wanted to share with you the concept

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

 1    that -- and, again, pardon the way that I draw this, but if we

 2    have a patient -- this is dry too.  Do you have a better one?

 3          THE CLERK:  It's been a couple of years since we've

 4    had a trial.

 5          THE WITNESS:  Okay.  If we imagine we have a patient

 6    and, again, I'm just going to use a stick figure here like this

 7    lying sideways on the table.  And this is the head and these

 8    are the feet, obviously, down here.  This is the body.  So this

 9    is the section, the lumbar spine that we're working with.

10          And when we do surgery -- and we've talked about these

11    dilators, we have talked electrical stimulation -- that's the

12    dilator coming in here.  So we have a dilator here, and we

13    might have nerves that are coming out the spine here.  So if we

14    just put the dilator in if they hit the nerves and these nerves

15    travel down into the leg and they make the muscles of our leg

16    work, they also give us the sensation, the feeling in the leg.

17    So if this, whatever we're doing here, hits these muscles --

18    hits these nerves which are in the psoas muscle, they innervate

19    the muscles down here.

20          What neuromonitoring does is we have a box here that

21    provides a stim, and this then is connected to that so we can

22    send a signal down here.  As I said, this is a conductor.  As

23    it conducts the stimulation from the top to the bottom, it

24    detects a nerve, and it might stimulate that nerve, what then

25    causes a twitch.  Then we put either pads or pins or something

1    in the leg.  The patient is asleep, so they don't feel these

2    things being stuck in them.  The monitoring screen here, and

3    there are leaves that come up here like this.

4            So we send the stimulation from the box, it gets

5    conducted through whatever this factor is, and then if it

6    twitches a nerve here, it's -- the signal is picked up here and

7    then transmitted where it can be interpreted over here.  So

8    this is the whole system.  It's a looped system like this.  And

9    if there's no stimulation, there's nothing that goes through

10   the conductor here.  If that makes sense to everybody.  It's

11   sort of like the idea of throwing a pebble in a pool when you

12   see the ripples that come off.  And that's what we're

13   interpreting here.  Does that make acceptance to everybody?

14   BY ATTORNEY KANG:

15   Q    Thank you, Doctor.

16           THE WITNESS:  Thank you, Your Honor.

17   BY ATTORNEY KANG:

18   Q    Now, Dr. Sachs, does a dilator with a simulation electrode

19   perform any detection of nerves?

20   A    The dilator without a stimulator is not going to detect a

21   nerve on its own.

22   Q    Even with without a stimulator, does it detect any nerves?

23   A    No, it does not.  It has to be the closed system, the full

24   system the detector with the algorithm that picks it up from

25   the leg, and we have to have the stimulation that hooks onto

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1    conductor or the dilator or the probe.

2    Q    Right.  There's a lot more to the system than just a

3    dilator with a conductor, fair?

4    A    Yes, sir.

5    Q    You were here for Dr. Youssef's testimony, right?

6    A    Yes, I was.

7    Q    And I want to be precise because I don't want to

8    mischaracterize his testimony.  But he said, The dilator sends

9    impulse down, and the impulse gives me a map.  Do you remember

10   that?

11   A    I remember something like that, yes.

12   Q    And he was leaving out a couple of steps on your drawing

13   there, right?

14   A    Yes.  That this is the complete system and that does leave

15   out the steps.

16   Q    And he was leaving out a lot of components on your drawing

17   there, right?

18   A    Yes, sir.

19   Q    And he also said, It gives me a map in my mind where the

20   nerves are.  Do you agree with that statement?

21   A    No.  There's no real map that is created in the mind.  It

22   basically provides -- it picks up a signal and sends it to a

23   box that we can then read and interpret that some nerve got hit

24   somewhere.  It doesn't tell us where the nerves are, the map of

25   the nerves.

1   Q   And do any of the claims in any of the asserted patents

2   here require neuromonitoring?

3   A   No, they do not.  Not in claims that we've looked at.

4   Q   Thank you.  Now turning back to DDX2-46.  In your opinion,

5   do competitor systems have to have identical components in

6   order to be a suitable alternative to the claimed system?

7   A   No, I do not believe competitor systems have to have

8   identical features.

9   Q   Is it your opinion that all these systems you have listed

10  on DDX2-46 have sequential dilators with electrodes and an

11  intra-discal shim?

12  A   All of these systems do have these aspects that I've listed

13  up here, yes.

14  Q   And have these systems been available since 2017?

15  A   Yes, they have been.

16  Q   Mr. Wilson, if we could please put up, just for Dr. Sachs,

17  DTX-914 on his screen.

18      And, Dr. Sachs, what is this document?

19  A   This is a Medtronic technique manual that's published by

20  Medtronic which is the surgical technique for DLIF.

21  Q   You're familiar with this document?

22  A   Yes, I am.

23  Q   Did you rely on this document in forming your opinions in

24  this case?

25  A   Yes, I did, as one of the pieces of information I looked

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1   at.

2          ATTORNEY KANG:  I offer into evidence DTX-914.

3          ATTORNEY DEVINE:  No objection.

4          THE COURT:  It's admitted.

5      (Defense Exhibit DTX-914 admitted)

6   BY ATTORNEY KANG:

7   Q   So let's look at some of these systems more closely.

8   Starting with the Medtronic DLIF system, does Medtronic offer

9   an acceptable non-infringing alternative?

10  A   Yes, they do.

11  Q   And what is the name of that system?

12  A   That system is called DLIF system which they labeled as

13  direct lateral -- direct lateral technique.  They coined that

14  term as we can see on the left-hand side of their cover page.

15  Q   What are some of the different components of the Medtronic

16  DLIF system?

17  A   The components are -- as we talked about, they have

18  sequential dilators.  They do offer a neuromonitoring

19  stimulation probe, and they have a retractor and they have

20  stability pins rather than a shim.

21  Q   And let's take those one at a time.  Is it your opinion

22  that Medtronic's neuromonitoring probe is a suitable

23  alternative to NuVasive's dilators equipped with electrodes?

24  A   Yes, that's my opinion.  Because the probe acts as a

25  conductor when stimulation is placed, the same way it is showed

1    over here for conductor of dilators.

2    Q    What does Dr. Youssef say about neuromonitoring probes?

3    A    Actually he felt that the neuromonitor probe by itself was

4    not good enough.  He did reference the fact that after he does

5    all of his preparation and he opens up and he uses the dilators

6    and then he opens up the retractor, he said he puts a probe in

7    and he passes it around.  So in this case, we're using a little

8    bit different kind of probe, but it's working very well.

9    Q    Turning to the retractor.  Is it your opinion that

10   Medtronic's two-bladed DLIF retractor is a suitable alternative

11   to NuVasive's retractor?

12   A    Yes, it is my opinion it is a suitable alternative.

13   Q    And the two-bladed retractor such as the Medtronic DLIF

14   retractor would not infringe the asserted claim, correct?

15   A    Correct, it would not infringe.

16   Q    What's Dr. Youssef's opinion on two-bladed retractors?

17   A    He believes that the two-balded retractor is inferior and

18   doesn't work as well and is not a suitable alternative.

19   Q    Do you agree?

20   A    No, I do not.

21   Q    And is it your opinion that Medtronic's stability pin is a

22   suitable alternative to NuVasive's shim?

23   A    Yes, that's my opinion.  The stability pin, in many cases

24   the surgeons who use this like the stability pin even better

25   than a shim because it holds the blades in place against the

1   bone so while one of us is a surgeon is working, the blades

2   don't slide around and move so it prevents that creep.  And we

3   know that almost 20 to 25 percent of the market of people that

4   do lateral surgery are using this system and are very happy

5   with it.

6   Q   And let's turn to the next, slide DDX2-48.  And we're

7   looking at DTX-915.  Does DePuy offer an acceptable

8   non-infringing alternative to the patents?

9   A   Yes, the DePuy Synthes is a very acceptable alternative.

10  Q   What are some of the different components of the Insight

11  system?

12  A   The Insight system also has sequential dilators.  It has a

13  neuromonitoring stimulation probe, as we just talked about a

14  probe.  It's a three-bladed retractor, and it also has disc

15  anchors, and we can see the anchor in the lower right corner

16  there and the three-bladed retractor sort of just above that.

17  The difference in their dilators is the entrance hole for the

18  stimulation probe is a little offset from the dilators.

19  Q   We'll talk about a dilators in a minute.  Let me ask you

20  about the retractor first.  Is it your opinion that the Insight

21  three-bladed retractor is a suitable alternative to NuVasive's

22  retractor?

23  A   Yes, sir.

24  Q   Is it your opinion -- well, are the disc anchor blades in

25  the Insight system suitable alternatives to NuVasive's shim?

1  A   Yes, sir, they are.

2  Q   Let's turn to the next slide to discuss the dilators.  What

3  are you showing on this slide, DDX2-49?

4  A   What I've tried to do is blow up these pictures from the

5  DePuy Surgical Technique Guide.  We can see the cover on the

6  left.  And it's showing the stimulation probe which is seen on

7  each of these pictures.  That's the shiny metal piece that's

8  going through the insulated dilators.  So there are three size

9  dilators.  As we look on the left, we see holes where the

10  stimulation probe would go, and at each dilator, it's offset to

11  the side.  So what is allows is the surgeon puts the probe

12  in -- puts the stimulation probe into the insulated dilator and

13  then can spin it around so it can get different places.  And

14  then we take the stimulator off and the probe off.  We put the

15  second dilator in, put the probe in, spin it around.  So it

16  accomplishes the same effect we've talked about before.

17  Q   And how does that process you just described, using the

18  stimulation probes set into the eccentric dilators in the DePuy

19  system compare to the use of the stimulated dilators in

20  NuVasive's XLIF system?

21  A   It accomplishes the same events.  The probe in and of

22  itself is just a conductor.  Every time we use the probe in a

23  dilator, we have to put the stimulation component on top, spin

24  it around, check it, and then take it off, and then put the

25  next dilator in.  If we use dilators themselves without a

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

 1  probe, we would put the stimulation on top for the first

 2  dilator, spin it around to check different sections, take the

 3  stimulation off, put the second dilator in, put the stimulator

 4  on, and, again, repeat it for the third dilator.  So it's the

 5  same process.  So we've learned it in one and we just apply it

 6  to a different system.

 7  Q    Now, Dr. Sachs, you're talking about this operation in both

 8  talking about the stimulated dilators in NuVasive's system and

 9  the DePuy Insight where you're talking about spinning it

10  around.  Do any of the claims require directional electrodes on

11  the dilators?

12  A    No, there's no claim that requires that.

13  Q    Thank you.  Now, Mr. Wilson, if we could just put up only

14  for Dr. Sachs DTX-698.

15       Do you recognize the document that's put in front of you,

16  DTX-698?

17  A    Yes, I do.

18  Q    What is this document?

19  A    This is an email, an internal email that was from NuVasive

20  that different people were involved, and a discussion back and

21  forth in this email.

22  Q    Did you rely on this document in forming your opinions in

23  this case?

24  A    Yes, I was able to see this document and reference it.

25            ATTORNEY KANG:  I offer DTX-698 into evidence.

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1              ATTORNEY DEVINE:  No objection.

2              THE COURT:  It's admitted.

3          (Defense Exhibit DTX-698 admitted)

4    BY ATTORNEY KANG:

5    Q   Let's turn to your slide DDX2-50 which shows this document.

6    What is your opinion relating to the suitability of alternate

7    procedures and systems?

8    A   My opinion is that there are many different acceptable

9    non-infringing alternatives that can be used by surgeons.

10   Q   Are there any significant barriers to switching platforms

11   or approaches for surgeons?

12   A   No, there are no significant barriers in my opinion.  We as

13   surgeons throughout our career we learn principles of surgery,

14   and those principles are applied every time we do a case in

15   whatever type of surgery we do.  We learn steps of particular

16   surgeries and we repeat those steps over and over again.  So if

17   we maintain the principles and the steps, we can switch from

18   one product in one system to another product in another system

19   and actually apply those principles and steps, and it works

20   very well.

21   Q   And does this NuVasive document DTX-698 support your

22   opinion?

23   A   Yes, it does.

24   Q   And can you explain some of the things -- how it supports

25   your opinion to the jury?

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1   A    Yes.  I have talked about different non-infringing systems

2   and alternatives.  And if we look at the first, this was from

3   June 2017 as we see an email, and I have blown up the sections.

4   The first highlighted area refers to a doctor who switched from

5   his volume of doing XLIFs to anterior lumbar surgeries.  He

6   preferred to do the surgery from the front, as I was talking

7   about before.

8       The second highlighted area talks about a doctor who

9   shifted most of his practice to T-LIFs, so he went from the

10  side to the back of the patient.  He preferred that.

11      The next section talks about a doctor who left NuVasive for

12  another company.  He went to Medtronic because he preferred the

13  products that Medtronic was offering.

14      And the last highlighted area talks about a surgeon who was

15  doing cases with Biomet and titanium options, so he was looking

16  at different types of implants that he could put in.  He wanted

17  to switch from one company to another because he preferred the

18  implants.

19      And the switching back and forth like this as I was

20  answering the question for Mr. Kang, is much like you learn the

21  principles of how to drive a car.  And we all know how to drive

22  a gas combustion car.  Most of us have learned on that.  As

23  electric cars come in, we haven't forgotten the principles and

24  how we drive the car, but the mechanism of what's going on in

25  the car and how it runs is different.  But we switch from one

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1   to another, and it's fairly easy.

2   Q    If we turn to DDX2-52, Mr. Wilson.

3        Can you just summarize your opinions from your testimony

4   today for the jury?

5   A    Yes.  As I've stated, in summary, the Alphatec Squadron

6   retractor does not infringe on the asserted claims of '801 and

7   '531 patents; that there's no functional unit between the

8   access tools, implants, and neuromonitoring; and that

9   Alphatec's retractor is not a copy of the NuVasive claimed

10  patent device; and that are there many acceptable

11  non-infringing alternatives that result -- that a surgeon can

12  use for safe, effective, and clinically effective outcomes for

13  there patients.

14            ATTORNEY KANG:  Thank you, Dr. Sachs.

15            Pass the witness.

16            ATTORNEY DEVINE:  Your Honor, would you like me to

17  begin?

18            THE COURT:  Do you want to break now?  We'll take the

19  morning recess.  20 minutes.  I'll see you all back here at

20  10:40 a.m.

21       (Jury in morning recess at 10:16 a.m.)

22            THE COURT:  See you all in 20.

23       (Court in recess at 10:16 a.m.)

24       (Court in session at 10:38 a.m.)

25            THE COURT:  All right.  Sir, you're still under oath.

1      Counsel, you may proceed.

2      ATTORNEY DEVINE:  Thank you, Your Honor.

3                   **CROSS-EXAMINATION**

4  BY ATTORNEY DEVINE:

5  Q   Good morning, Dr. Sachs.

6  A   Good morning.

7  Q   Nice to see you again.

8  A   Good to see you.

9  Q   We have met a few times --

10 A   Yes, we have.

11 Q   -- your depositions in this case?

12 A   Yes, ma'am.

13 Q   Nice to see you.

14 A   Thank you.

15 Q   I believe you stated -- well, let's start here.  You

16 started your work in this case in 2018; is that right?

17 A   Yes, I believe that was when I started.

18 Q   And I believe you stated that you became aware in 2018

19 through your work on this case that there were lateral

20 trans-psoas procedures that were performed in the 1980s; is

21 that what you said?

22 A   Yes, ma'am.

23 Q   And you were not aware prior to that that were there

24 lateral trans-psoas procedures performed in the 1980s?

25 A   As I said, the articles that were published by Dr. Friedman

1   which were disclosed by NuVasive after I was involved in a

2   different matter in a different case about a decade about ago.

3   And I had an interpretation of a patent.  There were articles

4   that were disclosed by NuVasive after I was really -- had

5   submitted my declarations and testimony.  So no, I didn't know

6   about that matter until after I got involved in this case.

7   Q    So we can level-set and the jury knows what we're talking

8   about, we're talking about a matter involving the Medtronic

9   patent, right?

10  A    Yes, ma'am.

11  Q    You were a paid expert for Medtronic in that case?

12  A    Yes, ma'am.

13  Q    You gave opinions that the Medtronic patent was valid,

14  right?

15  A    Yes.  We were talking about -- it was a different matter

16  and there were several patents, and I was a proponent.  It was

17  my opinion that patents that Medtronic had were valid, yes.

18  Q    And some of the issues in that involved a 1980s procedure

19  invented by a Dr. Jacobson, correct?

20  A    Yes, ma'am.

21  Q    You gave opinions about Dr. Jacobson's procedure during --

22  you gave opinions during that proceeding about Medtronic's

23  patent regarding to Dr. Jacobson's procedure; is that right?

24  A    Yes, ma'am.

25  Q    And do you recall there was a declaration in that procedure

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1   from Dr. Jacobson himself?

2   A   I do recall that.  I don't remember what exactly his

3   declaration was.  I remember really reviewing his patent and

4   what his patent was, what his patent stated in my

5   interpretation of the patent.

6   Q   Do you recall reviewing his declaration in that proceeding

7   about what his patent was?

8   A   I know I reviewed it.  If you're asking about me about it

9   today, no, I haven't re-reviewed it, and I am at a loss to

10  answer questions about it now.

11  Q   Sure.  But back then, you reviewed it as part of your work

12  for Medtronic?

13  A   Yes, ma'am.

14  Q   In opening -- I believe Alphatec's counsel asked you if you

15  saw references to this procedure in the opening slides; is that

16  right?

17  A   That's correct.  I believe it was referenced by somebody on

18  the first day of the openings.

19  Q   Sure.  Can we pull up that slide, please.  This is DDX-126.

20  Is this the slide you were referencing, Dr. Sachs?

21  A   I don't recall if this was the exact slide I was

22  referencing that day.  I do remember, I believe that the

23  Jacobson name might have also been said.

24  Q   And this is the Jacobson procedure on the right-hand side,

25  right?

1   A    This is the Friedman procedure on the right-hand side,

2   okay.  Dr. Friedman published five articles, three that I would

3   reference from 1983, 1985, and 1988, and in each of his

4   articles, he was talking about a procedure and he was

5   referencing the fact that he had learned the procedure and

6   spoken to Dr. Jacobson.  This, I don't believe is the slide

7   from Dr. Jacobson's work.  This is from Dr. Friedman's article

8   in 1988.  There's a difference between the two.  If you would

9   like me explain, I would be glad to talk about the difference.

10  Q    Not yet.  We might get there.  So you mentioned a Friedman

11  '83, '85, and '88 article, right?

12  A    Yes, ma'am.

13  Q    And all of those talk about Friedman's interpretation of

14  Dr. Jacobson's technique; would you say that's fair?

15  A    I would say that's fair.  He was referencing what -- his

16  discussions with Dr. Jacobson of what Dr. Jacobson had -- was

17  performing.

18  Q    You did not become aware of any of those three articles

19  until 2013 in your work in this case, right?

20  A    Yes, ma'am.

21  Q    Okay.  And do you understand this procedure originated by

22  Dr. Jacobson described by Dr. Friedman to be trans-psoas?

23  A    You just asked me a compound question.  The way that I

24  would answer that is Dr. Jacobson in his article talked about a

25  lateral spinal procedure.  He used the "lateral" word, and he

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1   didn't use the word "psoas." He didn't say he was going

2   through the psoas. He also referenced the fact that he

3   recommended using a spinal needle as a guide. And he actually

4   said use the spinal needle first as a go, no-go. And if you

5   hit a nerve, then know it's a no-go. So those were some of the

6   differences. He said "lateral." He didn't say "psoas." He

7   said he used the spinal needle. That was the reference to

8   Jacobson and that was the interpretation that I had knowing the

9   procedures at the time and what was state of the art.

10   Dr. Friedman came along in 1983 and then started to clarify

11   that where he -- none of his articles talk about using a

12   needle. This article in 1988 that you're referencing, Friedman

13   said specifically that it was a lateral trans-psoas surgery.

14   So he actually referenced the term "psoas," that it was going

15   through the psoas muscle.

16   And he also in this article stated that neuromonitoring

17   would be beneficial and helpful, and he said that over 300

18   cases had been done in this article of 1988 where he referenced

19   that Jacobson told him he had done 200 cases, a Dr. Vogel had

20   done 100 cases after Vogel learned the technique after speaking

21   to Jacobson, and that Friedman himself had done 14 cases. So

22   that's the situation. So it's a different discussion, and

23   we're talking about a different interpretation of what Jacobson

24   showed in a patent and what Friedman talked about in his

25   articles.

1    And the big concern that they had is where you draw this

2  red circle here, if we look at -- may I?  Will it show up to

3  the jury?  This point here is the bowel, okay?  And that area

4  of the bowel, Jacobson -- I'm sorry, Friedman's article of 1985

5  was an anatomic dissection and view of cadavers where he found

6  that one-third of all patients, in his review, had bowel in the

7  way of that approach.

8    So he said you have to take a CAT scan beforehand, and if

9  the bowel is there, you can't do this procedure in one third of

10  the patients.  So his explanation was much more thorough where

11  we described the operation and the technique as opposed to what

12  Jacobson what's disclosing in his patent.

13  Q   Just to level set, Doctor, in the Medtronic case, it was

14  2014, right?

15  A   I don't believe I was involved -- I don't remember 2014 for

16  me, for my involvement.

17  Q   I'll have my colleague hand you a binder.  This may refresh

18  your memory, Doctor.  PTX-300 in here should be your

19  declaration from that case.

20  A   Yes, ma'am.

21  Q   Is that your declaration from that case?

22  A   I'm looking at the cover page, and it appears to be my

23  declaration, and it's dated August 28, 2012.

24  Q   If you turn to the last page, there's your signature,

25  correct?

1   A    Yes, ma'am.

2   Q    And in 2013?

3   A    It's dated December 2013.

4   Q    So does that set where you were at?  What time it was?

5   A    Yeah.  It doesn't say 2014.  I don't see that in here.

6   Q    It says December 20, 2013, right?

7   A    Yes, ma'am.

8   Q    So almost 1014.  Will you give me that?

9   A    I'll give you whatever you want here.

10  Q    Okay.  Great.  Oh, I like that.  So in this declaration,

11  you said that the Jacobson technique was not direct lateral,

12  correct?

13  A    Yes, ma'am.  That is what I said.

14  Q    And in the present case, you have said that the Jacobson

15  technique is direct lateral, correct?

16  A    I did not change mind and I have not changed my opinion.  I

17  said that the Jacobson technique -- I based on what he

18  described in his patent and the use of the needle I said it was

19  not direct lateral.

20       And, again, the term here and in that case, we were talking

21  about a direct lateral.  The key word is "direct." direct meant

22  one line.  It was a different topic.  There were different

23  issues.  And they were talking about issues of putting in an

24  implant and how the implant would go in.  And they were talking

25  about a direct lateral procedure and defining the term

1  "direct."  And my interpretation of direct by Jacobson was he

2  wasn't talking about direct for the reasons I just gave the

3  jury because of that needle.  You stick a needle in, and

4  one-third of the patients are going to have bowel as the needle

5  goes down blindly.

6  Q   Understood.  Maybe I can shortcut this.  Also in your --

7  you told me you did review Dr. Jacobson's declaration as part

8  of that proceeding?

9  A   I said I believe I did.  I don't remember, and I also said

10  if you ask me about it, I don't remember anything from his

11  declaration now a decade ago.

12  Q   Sure.  If you turn to DTX-115 in your binder, that should

13  be Dr. Jacobson's declaration?

14  A   Yes, ma'am, I'm there.

15  Q   If you turn to page 7?

16  A   Yes.

17  Q   There's a paragraph on this page, and I believe

18  Dr. Jacobson references Dr. Friedman's publications about his

19  procedure, correct?

20  A   Yes, I see that.

21  Q   So you were aware of those publications back in 2013 when

22  you worked on the case for Medtronic, right?

23  A   I believe I must have been aware of it if I read this at

24  that time.  At least I would have -- I should have seen this.

25  Q   Okay.  So it's not true you that became aware of Friedman's

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1   publications in 2019 as part of your work in this case?

2   A   I didn't review Friedman's articles in 2000 -- at this

3   point.

4   Q   If we can go to one of your demonstratives just very

5   quickly, DDX2-8, please.  Here you have the dates 1994 to 2000

6   when you were talking about surgeries when you were performing

7   trans-psoases, right?

8   A   No.

9   Q   The dates on this slide are 1994 to 2000, right?

10  A   Those are the dates of the period I was at Albany Medical

11  Center?

12  Q   Okay.  But you're not --

13  A   That's my time at Albany Med.  I specifically said that I

14  performed lateral minimally invasive trans-psoas surgeries in

15  the late 1990s.

16  Q   Not 1994 to 2000?

17  A   I didn't say it was '94 to 2000.  I was at Albany Med from

18  '94 to 2000, historically, and I said that I performed these

19  type of surgeries that we're talking about in the late 1990s,

20  around 1997, somewhere in there.  So it was after 1995.

21  Q   Okay.  Let's talk about your infringement opinions.  We can

22  take this down.  You spent a lot of time talking with counsel

23  about a hinged coupler.  Do you remember that?

24  A   Yes, I did.

25  Q   And you're familiar with all versions of the MaXcess

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

 1   retractor, NuVasive's retractor, right?

 2   A   I have seen -- I've seen -- I haven't seen all of the

 3   versions of the MaXcess retractor.  I've seen some of the

 4   versions in preparation for this.

 5   Q   Okay.  And you are aware of how MaXcess I works, right?

 6   A   Yes.

 7   Q   And you're aware of how MaXcess II works, right?

 8   A   Yes.

 9   Q   And MaXcess III, you're aware of how that works?

10   A   Yes.

11   Q   And MaXcess IV, you're aware how that works, right?

12   A   Yes.

13   Q   And MaXcess I has a hinged coupling, right?

14   A   Again, when I talk about a hinged coupling, I'm referring

15   to claims of the patent and the figures in '801 and '531.  The

16   figures demonstrate a hinged coupling and show that.  That's

17   what I'm referencing.

18   Q   Okay.

19   A   My infringement analysis was referencing the patents and

20   the claims.

21   Q   Sure.  You offered an opinion in your report that MaXcess I

22   does not meet the pivot limitation of the claims, right?

23   A   Could you show me that opinion?

24   Q   Sure.

25   A   Where it comes from?  And if I could place it in a

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1  reference, please, for what we're talking about?

2  Q   Sure.  I'll refer you, Dr. Sachs, to page 27 -- or

3  paragraph 27?

4  A   In what -- what?  What section here?

5  Q   Your expert report that you signed on November 22nd, 2019.

6  It's page 27.  There's a paragraph at the top, and that's the

7  paragraph I'm referring to.  You can start at line 6.

8          THE COURT:  Sir, I'm going to ask you to be careful

9  with the microphone.  Thank you.  It's disruptive for the court

10 reporter when you're scratching, and you're bending it a lot.

11         THE WITNESS:  I'm sorry.

12         THE COURT:  That's okay.

13         THE WITNESS:  Okay.

14 BY ATTORNEY DEVINE:

15 Q   Will you agree with me, sir, now that you've refreshed your

16 memory, that in your report you offered the opinion that

17 MaXcess I does not meet the pivot limitation of the '801 or;

18 531 patents?

19 A   The MaXcess I retractor and what I was referencing in this

20 paragraph talks about rotating blades that pivot.  Rotating

21 blades that pivot.  I didn't say -- and MaXcess I doesn't have

22 rotating blades that pivot.

23 Q   Um-hmm.  You agree with me -- well, let me ask you this,

24 you agree with me you say here, you talk about MaXcess I and

25 other version of MaXcess, and you say, "Therefore, none of

1  these products can embody the claims of the '801 or '531

2  patent," right?

3  A   Again --

4  Q   That's what you say in your report, sir?

5  A   That's what the report says, yes.

6  Q   That's what you said in our report?  And you wrote your

7  report and you signed it, right?

8  A   Yes, ma'am.

9  Q   And you did your best to be accurate, right?

10  A   The use of the word pivot was different then, and that's

11  difference.  So according to pivoting from the claimed

12  construction that we've been given, it doesn't match up.

13  Q   So you're telling me you did not apply the Court's

14  construction when you formed the opinions in your report.

15  A   I have since then, yes, but I didn't have the Court's claim

16  construction when I formed this report.

17  Q   So you had some other opinion based on some other

18  interpretation in your report?

19  A   I had my interpretation of how the function of the

20  retractor worked at that time.  And, again, I didn't have the

21  Court's claim construction, so I'm not sure how I could have

22  applied the Court's claim construction at that time in 2019.

23  Q   But you'll agree with me, sir, that MaXcess I has blades

24  that pivot in the scope of the '801 and '531 patents?

25  A   May I see the MaXcess I retractor?

1   Q    You don't know if they do or not?

2   A    I would have to refresh myself.  I've looked at the MaXcess

3   I retractors.  I've never had a complete set that you have.  It

4   wasn't provided by NuVasive to me.

5   Q    Sure.  But you offer opinions in this case partially on

6   your familiarity with NuVasive's devices, right?

7   A    Yes, ma'am.

8   Q    And you offer opinions on whether certain other devices are

9   acceptable to surgeons who want to use NuVasive's devices,

10  right?

11  A    Yes, I did.

12  Q    So you do have a working familiarity with NuVasive's

13  devices; is that right?

14  A    Yes, I did.

15  Q    And you did offer in your opinions -- in your report and

16  opinion that MaXcess I does not pivot as required by the '801

17  and '531 claims, right?

18  A    Again, I'll go back.  The words say "rotating blades" and

19  "pivot," and I said -- to read my report, it says "do not have

20  rotating blades that pivot."

21  Q    And you said that the MaXcess I does not meet the

22  requirements of the '801 and '531 claims, right?  That's what

23  you said in your report?

24  A    Well, again, I'm a little bit confused because this it

25  talking about pivoting with a different definition than we've

 1  discussed here.  We're talking about three different patents or

 2  four different patents involved in this.

 3  Q   We can move on, sir.  It's fine.

 4      Can we pull up -- well, let me ask you this, you did a lot

 5  of talk about hinged coupling.  Do the claims of the '801

 6  patent require a hinged ed coupling?

 7  A   The claims of the '801 patent talk about pivoting to open

 8  and they show numerous figures where there's a couple.  I'm not

 9  sure if they use the word "hinge."  That's a word that I used,

10  but there is a couple.

11  Q   Let's do it this way --

12  A   And it's not the blades.  It's the arms.  I'm not sure if

13  you said blades or arms.

14  Q   I didn't say either, sir.

15      Can we pull up Dr. Sachs demonstrative DDX2-24?

16      Dr. Sachs, you recited some language from the '801 patent

17  about the pivotable arm members in this demonstrative, right?

18  A   Yes, ma'am.

19  Q   And it doesn't say anything -- it doesn't say hinged

20  coupling, right?  I don't see the words "hinged coupling."  Do

21  you see them?

22  A   Hinged coupling is not there, you're correct.

23  Q   And it doesn't say via a coupling mechanism, does it?

24  A   No, it doesn't.

25  Q   And it doesn't say simple action of movement, does it?

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1    A    No, it doesn't.

2    Q    And it doesn't say something that you cannot trust your

3    naked eye to proceed, does it?

4    A    I'm not sure what you're getting at there.

5    Q    Does it say --

6    A    If you're asking about my infringement analysis, my

7    infringement analysis was based on comparing an accused product

8    from the Squadron Alphatec retractor to these claims.  If

9    you're asking to me to opine on the MaXcess retractor, I

10   believe that the other people in this court have stated that

11   MaXcess is a commercial product that represents the claimed

12   device.

13   Q    Sir, we've moved on from the MaXcess retractor, and I have

14   limited time so if we could focus on the question I'm asking,

15   that would be super helpful.

16        So does it say anything in the claim language that this

17   pivotable arm member cannot be perceived and understood with

18   the naked eye?

19   A    No, it does not say that in the claim language.

20   Q    Does it say in the claim language that it has to be a

21   simple hinged motion?  Does it say that?

22   A    No, it doesn't say that.

23   Q    Does it say in the claim language that the arm cannot move

24   forward or down when it pivots?

25   A    No, it doesn't say that.

1  Q    Mr. Smith, could we pull up PDX-17 which is the

2  demonstrative that was used yesterday.

3      Dr. Sachs, were you in the courtroom when this

4  demonstrative was used yesterday?

5  A    Yes, I was.

6  Q    Okay.  And do you recognize that to be the Alphatec

7  retractor in this demonstrative?

8  A    It appears to be representative of the Alphatec retractor,

9  a little bit turned obliquely.  I noticed that when it was

10 first presented.  I'll take your word for it if you're trying

11 to represent it as an Alphatec retractor.

12 Q    You have no reason to believe that's not the Alphatec

13 retractor?

14 A    No, I have no reason to believe that.

15 Q    I believe you testified on direct that best evidence of

16 pivoting is the video, right?

17 A    I'm talking about the CAD video, not this video, the CAD

18 video representation of what the engineers created, the

19 engineering device.  The CAD was created and turned into a

20 step-by-step video of what was happening with the device.

21 Q    Okay.

22 A    I'm not talking about a twisted image like this.  And I'll

23 let you go on.

24 Q    Sure.  Thank you, sir.

25      Mr. Smith, could we just run through the video so we can

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1    all see what it shows there?  So there we have it closed, open,

2    and the arm has moved, correct?

3    A    The arm has moved.  And, again --

4    Q    That's my only question.

5    A    -- exactly what I said before.

6            THE COURT:  Sir --

7            THE WITNESS:  -- you're drawing a conclusion.

8            THE COURT:  She just asked you a simple question.  If

9    your counsel wants to have you expand on it later, they can do

10   that.

11           THE WITNESS:  Yes, ma'am.

12   BY ATTORNEY DEVINE:

13   Q    You would agree with me, sir, that the axis on the left,

14   the yellow dotted line on the left represents when it was

15   closed, right?

16   A    Yes, ma'am.

17   Q    And you would agree with me that the axis on the right, the

18   yellow dotted line, represents when it was open, right.

19   A    Yes, ma'am.

20   Q    And you would agree with me the axis on the right is

21   outward vis-a-vis the axis of insertion versus the axis on

22   left, right?  It's further away, right?

23   A    It's further away, yes.

24   Q    And you would agree with me that that line versus the other

25   line has rotated?  That's a rotational movement, right?

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1    A    I don't know how it got there, so I wouldn't agree with you

2    because --

3    Q    You don't think that's a -- it's a simple "yes" or "no."

4    You don't think that's a rotational movement on that

5    demonstrative?

6    A    I don't agree with you.

7    Q    Is it a rotational movement, "yes" or "no"?

8    A    No, I don't agree with you.  You can't draw that

9    interpretation from what you've represented here.  I don't

10   agree with you.

11   Q    Let's talk about rigidly coupled.  You had a lot of

12   discussion with Alphatec's counsel about whether or not blades

13   are detachable, and I believe you said that the MaXcess blades

14   are detachable, right?

15   A    I said the MaXcess blades are rigidly coupled once they're

16   screwed together.

17   Q    The MaXcess blades can come off?

18   A    They can come off, yes.

19   Q    And they're rigidly coupled, right?

20   A    And they're rigidly coupled.

21   Q    Can we pull up Dr. Sachs' demonstrative DDX2-30, please.

22   Dr. Sachs, you presented the claim language from the '801

23   patent here, correct?

24   A    Yes, ma'am.

25   Q    And do you see that it says that the blade has to be fixed

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1 and immovably connected to the arm prior to introduction

2 towards the targeted spinal site.  Do you see that?

3 A Yes.

4 Q So that's before you're putting it in the patient, right?

5 A Yes.

6 Q And there are some retractors, would you agree, such as

7 anterior retractors where you open the patient, you put some

8 sort of retractor holder over the patient and then you place

9 the blades one by one inside, right?

10 A Yes, there are.

11 Q You're familiar with those, right?

12 A Yes, I'm familiar with those.

13 Q This is describing something distinct from that in that all

14 your blades are on the retractor prior to putting it in the

15 patient, right?

16 A Yes, ma'am.

17 Q And that's what's required by the claim, right?

18 A Yes, ma'am.

19 Q And I believe you demonstrated for the jury that you can

20 move the blades up and down on the Alphatec arms if you use a

21 screwdriver, right?

22 A There's a driver there, yes, ma'am.

23 Q I know they have a fancy name for it, but.

24 A Hex head, yes.

25 Q A Hex head screwdriver, sound good?

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1   A   I'll give that to you.

2   Q   Great.  So if you don't use the screwdriver, it doesn't

3   move up and down, right?

4   A   That's correct.

5   Q   Okay.  And then I believe you also explained to the jury

6   that if you depress a trigger lock, if you push a button, the

7   blade will pop off, right?

8   A   If you press the button, we can take the blade off from the

9   top is what I said.  It doesn't "pop off."

10  Q   I apologize for my inaccuracy.

11  A   Okay.  Well, I don't want to make it sound like it pops out

12  into nowhere.

13  Q   That might be dangerous?

14  A   It's still there and we have control over it.

15  Q   Yeah.  So if we move the trigger lock, then the blade is

16  going to come off, right?

17  A   It's capable of releasing the blade and taking it off, yes,

18  ma'am.

19  Q   If we don't touch the trigger lock, the blade isn't going

20  anywhere, right?

21  A   If we don't touch that, it doesn't slide off, yes.

22  Q   So you would agree with me that if you manipulate the

23  connection between the blade or the arm with either a

24  screwdriver or by pushing a lock, it's going to move, right?

25  A   I'm -- I'm not sure what you mean by "move."  Can you

1   define by "move" for me please, which is what you're getting at

2   here?

3   Q   Let's start with one at a time.  You would agree with me if

4   you manipulate the connection between the blade and the arm of

5   the screwdriver, that connection is going to move and change,

6   right?

7   A   The position of the blade relative to the arm is now

8   altered, yes.  It can go up or down five millimeters in each

9   direction.

10  Q   Okay.  And you would agree with me if they move what they

11  call a trigger lock device, then the connection between the

12  blade and the arm is going to change, right?

13  A   Yes.  And the blade can be removed.

14  Q   And you would agree with me that if you don't do either of

15  those two things, the connection between the blade and the arm

16  is not going to change, right?

17  A   The blade is going to remain -- yes.

18  Q   Okay, sir.  I believe you mentioned that you have

19  experience using NuVasive's tools for lateral lumbar interbody

20  fusion surgery; is that right?

21  A   Yes.  About 15 years ago, I used it.

22  Q   About six times, right?

23  A   Yes, ma'am.

24  Q   And would you agree with me when it comes to lateral

25  surgeries, you have done more open surgeries than minimally

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1   invasive ones?

2   A   Well, the difference is I've done more open than I have

3   lateral surgeries, but my open surgeries from the front are

4   minimally invasive.  I still make a one to one and a half inch

5   incision from the front of the body, which is minimally

6   invasive, and if the patient is off the table in 45 minutes, I

7   have accomplished what I've needed to in a minimally invasive

8   approach.

9   Q   Understood, sir.  I'm talking about your lateral surgeries.

10  You have done more open than minimally invasive, right?

11  A   I'm sorry.  More open compared to what?

12  Q   Lateral.

13  A   Minimally invasive lateral?

14  Q   Yes.

15  A   To open lateral?

16  Q   Yes.

17  A   No.  I've done more open lateral surgeries than I have

18  minimally invasive surgeries in a lateral approach.

19  Q   That's exactly my question.  Thank you, sir.

20  A   Okay.

21  Q   Okay.  Dr. Sachs, in those half a dozen times you have used

22  NuVasive's tools to perform a lateral lumbar interbody fusion,

23  you used all NuVasive access equipment and all NuVasive

24  implants, right?

25  A   Yes, ma'am.

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1    Q    In fact, in your experience, surgeons generally receive a

2    spinal implant and access equipment in a system, right?

3    A    If that's what they desire and they work it out ahead of

4    time, they might work it without with a rep.  In this case, I

5    was trying to use different parts.

6    Q    In your opinion, it's very rare for them to be provided

7    separately, right?

8    A    I would say that the equipment -- the sales representatives

9    want to supply everything they can because it's a sales and a

10   marketing position.

11   Q    Okay.  But it's rare to supply them separately, to pick and

12   choose, right?

13   A    I would say that it's more rare, but people who have it in

14   their hospital can pick and choose.

15   Q    Not my question.

16   A    You've heard it from another surgeon and I said it myself.

17   Q    I apologize.  I'm on a clock, so.  Do you recall the first

18   time we met for a deposition in June of 2018?

19   A    Yes, I do.

20   Q    And do you recall that you had already given opinions in

21   this case?

22   A    Was that -- are you referencing a declaration?

23   Q    You had given a declaration, right?

24   A    Yes, ma'am.

25   Q    And that declaration pertained to Alphatec's devices and

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1  NuVasive's patents, right?

2  A   Yes, ma'am.

3  Q   And recall you told me in forming the opinions in that

4  declaration, you had actually inspected and manipulated

5  Alphatec's devices?  Do you recall that?

6  A   Yes, ma'am.

7  Q   Do you recall you told me a shim does not lock into the

8  Alphatec blade?  Do you recall that?

9  A   Yes, I did say that.

10  Q   Okay.  The shim locks into the blade, right?

11  A   If we want to go that direction.

12  Q   Sir, it's a yes-or-no question.

13  A   The shim does not lock into the blade.

14  Q   Okay.  Alphatec's shim?

15  A   I'm sorry, I can't see it.

16        ATTORNEY DEVINE:  Could I approach, Your Honor?

17        THE COURT:  Yes, you may.

18  BY ATTORNEY DEVINE:

19  Q   Alphatec's shim?  Can you just see it?

20  A   I believe it looks -- it says Alphatec, yes, ma'am.

21  Q   Alphatec's blade?  It says Alphatec on it?

22  A   Yes, ma'am.

23  Q   Okay.  If I put this into the blade, it's going to stay

24  put, right?  You can hold up -- oop.

25  A   Guess not.

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1   Q   Guess not.  I guess I don't know how to use it.  I'm not a

2   surgeon, right?  If I push this down into the blade, it's going

3   to say there, right?  If I hold it up, it's going to stay

4   there?  It's not going to pop out?

5   A   Can I --

6   Q   Do you know if it's going to pop out?

7   A   I don't believe it locks in.

8   Q   You don't think it locks?

9   A   It doesn't have the same locking mechanism that you're

10  referencing, no.

11  Q   So you think this is just going to pop off, right?  I can't

12  hold it like that.  It doesn't lock in?

13  A   It has a different fixation system.  It doesn't lock.

14  Q   Is this stuck to the blade?

15  A   It's stuck to the blade, yes.

16  Q   And you told me at deposition in 2018 that doesn't happen,

17  right?

18  A   I believe I said it doesn't lock to the blade.  If you want

19  to go to the testimony or my declaration.

20  Q   Because you don't think that's a lock?

21  A   Let's read my testimony.

22  Q   My question right here and now, you're saying that's not

23  locked into the blade?

24  A   I don't believe it fits the definition of lock is what I

25  said.  And we have to go, again, and look at our discussion at

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1   that point which was four years ago.

2   Q   Do you recall at that same deposition I asked you what the

3   purpose of the grooves in the blade are?  Can I use the Elmo

4   really fast?

5   A   I really don't have a good memory of all the details.

6           ATTORNEY KANG:  I'm going to object on relevance.

7   These aren't related to any asserted claims.

8           ATTORNEY DEVINE:  It has to do with Dr. Sachs' ability

9   to know how to use the devices.

10          ATTORNEY KANG:  These were claims that were previously

11  asserted but NuVasive dropped.

12          THE COURT:  What was the question again, because --

13          ATTORNEY DEVINE:  I'm asking him if he knew when he

14  first inspected these devices what the grooves are on the

15  blade.

16          THE COURT:  I'll allo that.

17          ATTORNEY KANG:  This relates to the locking of the

18  shim not at issue in any of these claims.

19          THE COURT:  You know, it's her time.  If she wants to

20  use it, there's no language in the claim that uses the word

21  "lock."  So if you want to dispute what lock means, you can

22  have at it.

23          Go ahead.

24  BY ATTORNEY DEVINE:

25  Q   When we met in 2018, did you know what those grooves in the

1  blade were for?

2  A   Yes, I learned what those grooves in the blade were for.

3  Q   When we met in 2018 after you had offered opinions in this

4  case, did you know what they were for?

5  A   Yes, I knew what the grooves were for.

6  Q   Do you recall telling me at deposition that they might be

7  for aeration?

8  A   I don't recall what our discussion was in 2018.  I've said

9  that.

10 Q   You understand that surgeons who use NuVasive's tools are

11 trained in how to use them, right?

12 A   Yes, ma'am.

13 Q   And they know how to use them?

14 A   Well, it depends on how they're trained.  I would hope that

15 they know how to use them.  Yes, I would agree with you.

16 Q   And you have offered an opinion in this case that GLIF

17 failed because Alphatec did not have the resources to train the

18 surgeons?

19 A   Are we going back to further testimony?  I don't remember

20 that testimony.  I don't recall.

21 Q   I can refer you to your report at paragraph 541.

22 A   Would you, please?  541 in which report?

23 Q   Same report we were looking at.

24 A   2019, November?

25 Q   Um-hmm.  Sorry.  I meant 540.

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1          THE COURT:  I'm sorry, Counsel, what paragraph?  It's
2  okay.  You can just wait.
3          ATTORNEY DEVINE:  Yes, 540.  I apologize.  May I read
4  it, Your Honor?
5          THE COURT:  Well, he's looking at the paragraph.  You
6  asked him a question --
7          ATTORNEY DEVINE:  Sure.
8          THE COURT:  -- so he can see if that refreshes his
9  recollection as to his prior testimony and you can restate the
10 question now.
11         ATTORNEY DEVINE:  Sure.
12         THE WITNESS:  Yes, ma'am.
13 BY ATTORNEY DEVINE:
14 Q   Okay.  So you stated in your report, right -- you offered
15 the opinion that GLIF did not succeed once launched because the
16 technology required people to be taught how to use technique,
17 right?
18 A   How to use the novel technique.  And the reference to
19 that--
20 Q   I'm not asking for the reference.  That is what you said in
21 your report, right?
22 A   That is what I said in the report.
23 Q   So GLIF failed because it required training, but Battalion
24 didn't fail, right?
25 A   Battalion has been a success, to my knowledge.

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1  Q   Can we go to Dr. Sachs' demonstrative very briefly, and

2  let's talk about your non-infringing alternatives.  DDX2-46,

3  please.

4      Do you recall, Doctor, your testimony about non-infringing

5  alternatives this morning?

6  A   Yes, I do remember.

7  Q   And you drew a picture of neuromonitoring over there,

8  right?

9  A   Yes.

10 Q   And you called it a loop, I think?

11 A   A feedback loop, yes.

12 Q   That feedback loop wouldn't work unless you had something

13 to conduct in the wound, right?

14 A   I did state that something has to be a conductor of the

15 stimulus.

16 Q   So if you had a dilator that couldn't conduct, it wouldn't

17 work, right?

18 A   That's correct.

19 Q   You took issue with Dr. Youssef using the phrase "a map in

20 my head;" do you recall that?

21 A   I recall that questioning.

22 Q   You talked about the patches on the patient's leg, right?

23 A   Patches or needles in the leg to pick up the signal, yes,

24 ma'am.

25 Q   Right.  And those are correlated with specific nerves,

1  right?

2  A   They're actually put into muscles and the nerves innervate

3  those muscles.

4  Q   Right.  But they're specifically placed to detect specific

5  nerves, right?

6  A   Yes, ma'am.

7  Q   Kind of like a map, right?

8  A   Yes.

9  Q   Let's talk about these all in total in the interest of

10  time.  You said that Medtronic did things differently than

11  NuVasive, right?

12  A   I'm not sure what -- where you come with that statement.

13  You would have to refresh me, please.

14  Q   Is Medtronic's system the same as NuVasive's?

15  A   Medtronic's system is not the same as NuVasive's overall,

16  but offers the same advantages.

17  Q   That's not my question, sir.

18  A   Okay.

19  Q   Medtronic has a two-bladed retractor, right?

20  A   Yes, ma'am.

21  Q   Okay.  And that's entirely acceptable?

22  A   Yes, ma'am.

23  Q   And a surgeon who wants to do a lateral trans-psoas surgery

24  to do a fusion thinks that's just fine, right?  Two-bladed

25  retractor, yes or no?

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1  A   Are we just talking about the retractor alone?  The answer
2  is no.
3  Q   My question is about the retractor, sir.
4  A   Just the two-bladed retractor, is that an acceptable
5  alternative over the three-blade --
6  Q   Is Medtronic's system with a two-bladed retractor entirely
7  acceptable to a surgeon?
8  A   It's acceptable to a certain group of surgeons, yes.
9  Q   Thank you.
10  A   As an alternative with the three blade.
11  Q   Thank you.  Alphatec didn't go with the two-bladed
12  retractor?
13  A   We heard they didn't yesterday.
14  Q   Even though it's acceptable to surgeons, right?  They
15  didn't do it?
16  A   Again, the end result was that they made this three-bladed
17  retractor.
18  Q   Right.
19  A   I don't know the internal workings of how the decision took
20  place.
21  Q   I didn't ask you, okay?  So you talked about dilators and
22  other ways to do neuromonitoring, right?
23  A   Yes, ma'am.
24  Q   Okay.  And there's other ways to do it, right?
25  A   Yes.

1   Q    Other than electrodes on a dilator, right?

2   A    You mean other than stimulating the dilator?

3   Q    Other than putting an electrode on the distal tip of a

4   dilator, there are other ways to integrate the ability to

5   conduct neuromonitoring during a lateral trans-psoas interbody

6   fusion, right?

7   A    Yes, ma'am.

8   Q    And other companies have done it other ways, right?

9   A    Yes.

10  Q    You gave us a couple of examples, right?

11  A    Yes, ma'am.

12  Q    But Alphatec chose to put an electrode on a distal tip of a

13  dilator for its system, right?

14  A    I can't tell you that.

15  Q    That's what's on their system, right, sir?

16  A    I'm not sure what system you're talking about.

17  Q    You don't know what Alphatec system we're talking about?

18  A    No.  I don't know how you're using term "system."  Is the

19  system the retractor system that is alleged in the patents?  Is

20  the system a combination of dilators with --

21  Q    I understand you, sir.  In the interest of time, how about

22  I rephrase my question?

23  A    Please.

24  Q    Okay.  The system that we are talking about for these two

25  weeks of trial, Alphatec's system includes dilators, correct?

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1   A    That's how you've referenced it and presented it.

2   Q    They're dilators, right?  They are dilators and that have

3   an electrode on the distal tip, right?

4   A    They have the ability --

5   Q    They have --

6   A    -- to conduct electricity.  And I've said that.

7   Q    Okay.  So you --

8   A    I'm not going to say that they --

9           THE COURT:  Sir, sir.  First of all, you're talking

10  over each other which drives my court reporter crazy.  You need

11  to just slow down, listen to her question, and just answer her

12  question.

13  BY ATTORNEY DEVINE:

14  Q    Alphatec did not choose to use one of the alternatives that

15  you talked about that other competitors in the markets have

16  used, right?

17  A    Which alternatives are we talking about now?

18  Q    You don't know what alternatives you talked about?

19  A    You just were just talking about dilators.  Are we still

20  talks about dilators?

21  Q    I'm talking about neuromonitoring as you discussed it in

22  your direct testimony and you discussed alternatives in the

23  market that you said are entirely acceptable as alternatives to

24  NuVasive's system, and you talked about things that people have

25  done that are not dilators with electrodes on the distal tip.

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1   You did, correct?

2   A   I did say that, yes.

3   Q   Okay.  And Alphatec didn't do any of those alternative

4   things, correct?

5   A   That's not part of what's presented.

6   Q   That's not my question.  I'll move on.  You also talked

7   about intra-discal shim, right?

8   A   We have the intra-discal shim.

9   Q   You talked about that, right?

10  A   Yes, ma'am.

11  Q   Okay.  And you talked about an alternative that is a pin

12  driven into a bone, right?

13  A   Yes, ma'am.

14  Q   And you said that that's entirely acceptable, right?

15  A   Yes, I did say that.

16  Q   Okay.  And Alphatec did not use a pin driven into a bone,

17  they used intra-discal shim, right?

18  A   Yes.

19  Q   And you were you here for the testimony of Mr. Costabile

20  yesterday?

21  A   Yes, I was.

22  Q   And did you hear him testify that they did not use

23  mechanisms that go into the bone because doctors do not want to

24  cause bleeding and hematomas in the psoas?

25  A   I heard him say that.

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1    Q    Great.  Thank you.  No further questions.

2              THE COURT:  All right.  Redirect?

3                   **REDIRECT EXAMINATION**

4    BY ATTORNEY KANG:

5    Q    Dr. Sachs, Good afternoon.  Do you recall NuVasive's

6    counsel asking you if you had seen Dr. Jacobson's declaration

7    before you wrote your declaration in the IPR against Warsaw?

8    A    Yes.  She asked me about Jacobson, yes.

9    Q    And you said you couldn't remember the date; am I correct?

10   A    Yes, that's true.

11   Q    And we saw that you signed your declaration in December of

12   2013.  Let's take a look at the date of Dr. Jacobson

13   declaration.  That should be in front of you in DTX-115.  It's

14   on the screen.  DTX-115 is the Jacobson declaration, right?

15   A    Yes, sir.

16   Q    If you look at the last page, what is the date of this

17   declaration?

18   A    The date of his declaration is March 10th, 2014.

19   Q    Was it possible you could have seen Dr. Jacobson's

20   declaration before you signed yours in December of 2013?

21   A    No, it wouldn't be possible because it wasn't available to

22   me.

23   Q    Now there was once a contention by Dr. Youssef in this case

24   that to splay the blades meets the term "pivot," right?

25   A    Yes, there was a contention of that.

1   Q   And he didn't present that opinion to the jury in this

2   case, right?

3   A   No, he did not.

4   Q   Let's turn to page 27 of your expert report that counsel

5   for NuVasive directed you to, the 11 -- the first infringement

6   report?

7   A   November 22nd, 2019?

8   Q   That's page 27.

9   A   Yes, sir.

10  Q   And this is a paragraph that counsel directed you to,

11  correct, at the top?

12  A   The top paragraph, yes.

13  Q   If you flip back, did she show you the beginning of this

14  paragraph?

15  A   No.

16  Q   And were you responding to Dr. Youssef in this paragraph

17  70?

18  A   Yes, I was.

19  Q   And does the MaXcess I splay?

20  A   The MaXcess I does not splay.

21          ATTORNEY KANG:  No further questions.

22          ATTORNEY DEVINE:  Nothing, Your Honor.

23          THE COURT:  Thank you.

24          Sir, you may step down.

25          Next witness.

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1        ATTORNEY NISBET:  Thank you, Your Honor.  Alphatec

2   calls John English by deposition video.  Mr. English is a

3   former vice president global professional affairs and

4   distributor engagement.  There will be no exhibits entered with

5   his deposition.

6        THE COURT:  All right.  Thank you.

7     (Segment of John English's deposition testimony presented

8   to the jury.)

9        ATTORNEY NISBET:  Alphatec next calls Matthew Link.

10  This is conducted by deposition over the course of, I believe,

11  three depositions.  He had several titles in each one, but his

12  last was the president of NuVasive.  So he's the former

13  president of NuVasive, and throughout these depositions, the

14  following exhibits will be admitted into evidence, DTX-698,

15  DTX-736, and DTX-741.

16       THE COURT:  Any objections?

17       ATTORNEY DEVINE:  No objection.

18       THE COURT:  Those are all admitted.  Thank you.

19    (Defense Exhibit DTX-736, and DTX-741 admitted)

20    (Defense Exhibit DTX-698 previously admitted in Volume 6,

21  page 61, line 3.)

22    (Segments of Matt Link's deposition testimony presented to

23  the jury.)

24       ATTORNEY NISBET:  Your Honor, we have one more

25  witness.  Mr. McClintock.  The jury has already heard from him.

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

 1   Just a short clip from his deposition.

 2         THE COURT:  Okay.

 3      (Segment of Paul McClintock's deposition testimony

 4   presented to the jury.)

 5         THE COURT:  That's it?  Where are we going?

 6         ATTORNEY NISBET:  Alphatec's next witness will be

 7   Dr. Keith Ugone.

 8         ATTORNEY CARLSON:  We have an objection to one of the

 9   demonstratives that hasn't been resolved yet.

10         THE COURT:  Why don't we take a two-minute,

11   three-minute I'll do this with them, and then we'll get this

12   witness in before we do our fuller afternoon break.

13         ATTORNEY CARLSON:  Thank you, Your Honor.

14      (Jury in recess at 12:15 p.m.)

15         ATTORNEY TANNER:  Your Honor, very briefly as well

16   regarding the exhibits that were just admitted using Mr. Link's

17   depositions, those DTX-736 and 741.  I made the mistake

18   preemptively of giving my team the thumbs up and realizing

19   those of declarations of Mr. Link in support of NuVasive's

20   preliminary injunction motion and his reply.  One of those is a

21   300-page declaration with a bunch of attachments on it.  The

22   other is about 70 pages with attachments.  I know those have

23   been admitted, but NuVasive would like to see if we could just

24   get the portions, maybe the cover page of the declaration,

25   portions actually cited and discussed in the depositions

 1   admitted as evidence as opposed to the entire thing.  I don't

 2   know what Alphatec's position would be on that.  Again, I

 3   apologize for not seeing that earlier.

 4          THE COURT:  That's okay.

 5          ATTORNEY NISBET:  Yes, Your Honor, we would like full

 6   declarations admitted.  The volume is due to some of the

 7   attachments thereto.  We're happy to pull out what's not

 8   necessary from that.  I just haven't had an opportunity to

 9   assess that yet.  But in terms of the full declaration where he

10   is actually giving testimony, we would like that admitted.  I

11   think that's agreeable.

12          THE COURT:  I think they're asking just the stuff that

13   was actually presented to jury, those portions of the

14   declarations should be moved into evidence as opposed to I

15   don't know what breadth they cover in those declarations.

16          ATTORNEY NISBET:  We can work that.

17          THE COURT:  It is admitted but with the caveat that it

18   may be limited to pages that you guys can agree to, and then

19   the whole thing won't go into the jury room.  They could decide

20   they want to sit down and read documents that nobody talked

21   about, but it's unlikely.  But if there's something in there

22   that could be problematic, it shouldn't go in if it wasn't

23   discussed.

24          ATTORNEY CARLSON:  All right, Your Honor.  We worked

25   to reduce the objections as much as possible.  There's just one

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1    remaining objection.

2         Mr. Smith, if you could pull DDX-434, one of

3    Dr. Ugone's demonstratives.

4         And NuVasive objects to this demonstrative as

5    misleading.  It starts with the title which says Mr. Inglish's

6    damages calculations include products not accused.

7         THE COURT:  Wait a second.  All right.  Go ahead.

8         ATTORNEY CARLSON:  Our objection starts with the title

9    here that says Mr. Inglish's damage calculation includes

10   products not accused.  And from the slide, it's clear that the

11   point to be made is that implants are not accused.  And this is

12   inconsistent the Court's pretrial order.  If you go to

13   paragraph 6, it lists a number of implants that are accused of

14   infringement of the '531 patent which has a dependent claim,

15   claim 39, that accuses the implants of infringement -- or sorry

16   that is directed to an implant.

17        And then, the first bullet point here is also

18   incorrect in the characterization of Blake Inglish's analysis.

19   If you look at his November 20, 2020 report, for example, he

20   lists all the dependent claims.  That's at page 13 to 14 for

21   the '801 patent.  At page 57, he identifies the accused

22   products, including the implants, and at pages 146 to 148, he's

23   relying on Dr. Youssef's opinions regarding components that are

24   only in the dependent claims.  So we object to this as

25   inconsistent with the pretrial order and also misleading.

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1          ATTORNEY NISBET:  Yes, Your Honor.  So to address

2     their objection, this not inconsistent with either the pretrial

3     order or Mr. Inglish's damages analysis.  Mr. Inglish, who

4     actually testified here, was very clear that his damages

5     analysis is tied to the independent claim 1 only of all of the

6     asserted claims.

7          In independent claim 1, of all of the asserted claims,

8     there is no implant.  The implant is not amongst the accused

9     products in any of those independent claims.  It is not

10    considered in any of the infringing combinations on which he

11    relied to calculate -- to identify infringing sales.  His

12    damages calculations through a series of convoyed sales, which

13    we will address at JMOL as soon as they close their case, and

14    something we raised on motion in limine his damages

15    calculations all generally seek that $10 million comes from

16    sales of implants, which again are not accused in claim 1.  So

17    this is 100 percent accurate.  Those do not cover the implants.

18    He has no disclosed opinion on any of the dependent claims in

19    his expert report, but his calculations include sales of

20    products which are not accused.

21         ATTORNEY CARLSON:  Your Honor, I believe Mr. Inglish

22    testified he was asked to assume, as all damages experts do,

23    that the patents were valid and infringed.

24         THE COURT:  He did testify though that he only looked

25    at the independent claims.

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1           ATTORNEY CARLSON:  Right.  Assuming that all the

2    claims were valid and infringed.

3           THE COURT:  I know.  But he did testify he only looked

4    at independent claims in each of the patents, and I noted that

5    because independent claim 1, particularly -- well, in all of

6    the patents does not include a bunch of the stuff that we've

7    spent the last four days talking about, including the implants.

8    I'm not quite sure what the argument is in terms of -- I mean

9    his testimony wasn't that the implants were covered by the

10   claim.  It was rather that the structure for how these things

11   are compensated is that the systems are provided.  The aspects

12   of the covered claims, the tools that are covered by the claims

13   are not sold individually.  They're not a saleable unit.  They

14   are provided with the purchase of the implant and/or the other

15   disposables.  So that was his testimony.  That's what came in.

16   That is the basis of their damages analysis.  So I guess I'm

17   not understanding what the problem is.

18          ATTORNEY NISBET:  Sure.  So the issue, Your Honor, is

19   that he can only do that -- he can only get damages tied to

20   things that are not accused if they can prove convoyed sales.

21   To prove convoyed sales, they have to demonstrate a functional

22   relationship, that these products are sold in a functional

23   unit, as a single unit to achieve a single outcome, right?  He

24   hasn't done that, right?

25              So our testimony here and our rebuttal to this is his

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1  calculation includes things that are not accused.  He only gets

2  those things if he is able to demonstrate a functional

3  relationship.  He can't do that because every witness in this

4  case has testified that the retractor and implants serve

5  different functional purposes.

6        So that's our criticism of his calculation and

7  something we're going to raise at JMOL because there's no

8  evidence to support a functional unit.  But that's where we're

9  going with this.

10        We need to explain to the jury how he got to

11  $10 million.  He gets to $10 million by including things that

12  are not covered by the claims tied to his damages analysis.

13  There's no evidence to support a connection between those two

14  things.  In fact, there is only affirmative evidence from every

15  NuVasive witness that there is no functional relationship

16  between these two things.

17        And so if you eliminate the products that are not

18  accused and focus only on those that could be found to infringe

19  under his damages analysis, the damages calculation drops

20  considerably.  This is a $9 million issue, Your Honor.  They

21  didn't fully explain that on direct of Mr. Inglish, but that's

22  the criticism we have with Mr. Inglish's analysis.

23        ATTORNEY CARLSON:  Your Honor, very briefly.  This is

24  a legal attack, and that's the problem with this slide.  We're

25  debating what functional unit is and how it applies.  It's

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1    improper for an expert to be the mouthpiece for explaining what

2    the law is or how the law should apply.

3              ATTORNEY NISBET:  Except, Your Honor, if you could go

4    to the next slide.  I don't know who's controlling.

5              ATTORNEY CARLSON:  Mr. Smith.

6              ATTORNEY NISBET:  Mr. Smith, the next slide.  The

7    mouthpiece for this opinion is their expert, Dr. Youssef, who

8    testified that the retractor and the implants don't have a

9    functional relationship.  If you go to the next slide.

10             THE COURT:  Okay.  But go back to the slide that they

11   talked about because what I'm gathering from this is your

12   problem is that it says that -- well, it says the independent

13   claims don't cover the implants.  They don't.  So what's wrong

14   with that?  I mean, that's true.

15             ATTORNEY CARLSON:  Right, Your Honor.  It's the title

16   Mr. Inglish's damages calculations include products not

17   accused.

18             ATTORNEY NISBET:  Also true.

19             ATTORNEY CARLSON:  And the first bullet point, his

20   analysis was not limited only to the independent claims.  Those

21   are the main misleading aspects of this slide.

22             ATTORNEY NISBET:  That's entirely true and correct.

23   His damages calculations are not tied to anything but the

24   implants.

25             THE COURT:  I don't know what he had in his report,

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1   but his testimony from the stand was I looked at the three

2   independent claims and that was the basis of his analysis.  He

3   did not include the fact that there was the dependent claim 39

4   only on the one patent that brings the implants in.  His

5   testimony all came in how he did his pricing structure, and

6   that's all fine.  I'm going to leave this.  This a slide.  It's

7   a demonstrative.  There's going to be all kinds testimony, and

8   you can point that out.  But it is not incorrect to say that he

9   based his analysis on the independent claims that don't cover

10  the implants because he did, at least that's what he told the

11  jury.

12       ATTORNEY MORGAN:  Your Honor, the implants are accused

13  of infringement in claim 39.  It's misleading to tell the jury

14  that they're not.

15       THE COURT:  His analysis -- his testimony was his

16  analysis was based on independent claims that don't cover the

17  implants.  That is true.  There is nothing misleading about

18  that in corresponding to his testimony.  That said, he

19  explained how the system in his opinion and from his

20  assumptions that were given to him is a functional unit and

21  that by buying the parts or tools or using the tools that are

22  covered, the pricing is based on the implants.  I'm not going

23  to do undo this.  All right.  You can do it.  Just -- it's

24  fine.

25       ATTORNEY CARLSON:  Understood, Your Honor.

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1      (Pause in the proceedings)

2           ATTORNEY FOEDEMAN:  Just to keep it on your radar,

3  counsel and I have been discussing the proposed limiting

4  instruction.  I'm not -- I don't want to speak for opposing

5  counsel.  I'm not optimistic we're going to find common ground.

6  I don't think it needs to necessarily be resolved right now,

7  but I didn't want you to think it had fallen off the radar.

8      (Jury entering at 12:30 p.m.)

9           ATTORNEY NISBET:  Alphatec calls Dr. Keith Ugone.

10     Keith Ugone, called as a witness, testified as follows:

11     (Witness given an oath)

12          THE CLERK:  Sir, would you please state your name,

13  spelling your last name for the record.

14          THE WITNESS:  Sure.  My name is Keith Raymond Ugone,

15  U-G-O-N-E.

16  BY ATTORNEY NISBET:

17  Q   Good afternoon, Dr. Ugone.  Can you please introduce

18  yourself to the jury?

19  A   Yes.  As you just heard, my Keith Raymond Ugone.  Last name

20  is spelled U-G-O-N-E.

21  Q   Before we talk about your qualifications and the work you

22  did on this case, why are you here testifying today?

23  A   I'm actually here for two reason.  One, I'm here to

24  evaluate the work of Mr. Inglish who is NuVasive's damages

25  expert, as you're aware.  He testified last week.  But I'm here

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1    to evaluate the lost profits claim and number he put forth to

2    the jury, and I'm also here to evaluate what's called

3    reasonable royalty damages in the alternative.

4    Q   Have you reached any conclusions about those two topics?

5    A   Yes, I have.

6    Q   What are your conclusions?

7    A   I've reached conclusions based on work that I've done and

8    I'll show the jury that lost profits would not be from an

9    economic perspective an appropriate remedy in this case given

10   the facts and circumstances.

11       My second opinion is the amount of damages that would

12   adequately compensate NuVasive if the patents-in-suit are found

13   to be valid, enforceable, and infringed would be a reasonable

14   royalty compensation at $918,414.

15   Q   Let's go back and find out a little bit about you.  Where

16   do you live, sir?

17   A   I live in a little town in East Texas, 75 miles east of

18   Dallas.  It's called Grand Saline, and it's called that because

19   we have a huge Morton Salt mine there.

20   Q   It's a very salty town it sounds like?

21   A   We provide like 80 percent of the table salt in the United

22   States from my hometown of 3,000 people.

23   Q   Do you have any children?

24   A   I do.  Son number 1, Kyle is a lieutenant colonel in the

25   United States Marine Corps and just got transferred from

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1   Germany to San Diego, so he's living right around here now.

2   And son number two, Casey is a software programmer.

3   Q    Are you married?

4   A    I am.  I'm coming up on my four-month wedding anniversary.

5   I just got married four months ago, so that was a change in my

6   life.

7   Q    What do you do for a living?

8   A    I'm an economist.  Usually in more formal settings, there's

9   a more formal name but I'm an economist, but what I actually

10  describe what I do is I'm a forensic economist and a damage

11  quantifier.

12  Q    What does that mean?

13  A    Well, what it means is that it's not uncommon for companies

14  like NuVasive and Alphatec to get into commercial disputes and

15  end up in a courtroom like this, and someone has to figure out

16  what was going on kind of financially and economically during

17  an alleged period of wrongful conduct.  That's kind of the

18  forensic economics part, and the damage quantification part

19  that's kind of coming up with the numbers, like what is the

20  dollar amount of harm if wrongful conduct has been found.

21  Q    In your damages analysis -- sorry.  Is that what you did

22  here?

23  A    That's what I did here, yes.

24  Q    In your damages analysis in this case, what assumptions did

25  you have to make?

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1   A   Well, an assumption any damage quantifier has to make, and

2   sometimes this gets a little confusing, but I have to assume in

3   this case, it's a patent infringement case, that the patents

4   are valid, enforceable, and infringed.  In other words, you

5   never get to the damages question unless liability is found.

6   So that's an assumption I have to make and, frankly, any person

7   testifying to damages has to make that assumption.

8   Q   And what if the jury decides that the asserted patent

9   claims are not valid or not infringed?

10  A   Well, I always hate to say this, but if they're not valid

11  or they're not infringed, then you don't listen to anything I

12  have to say because it wouldn't be relevant.  You only listen

13  to what I have to say if you find that the patents are valid or

14  infringed.

15  Q   And because you're here discussing damages, does that mean

16  that you think or that the jury should think that the

17  patents-in-suit are valid and infringed?

18  A   No.  That's on the technical side.  I'm talking about

19  economics and damages.  That determination as to whether

20  they're valid and infringed.  I don't want to misspeak about

21  the law, but I guess that's up to the jury to decide based on

22  what you hear from the technical experts.

23  Q   In preparing for your testimony today, did you prepare some

24  demonstratives to help aid the jury in understanding what it is

25  you're talking about?

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1  A   I did, yes.

2        ATTORNEY NISBET:  I'd like permission, Your Honor, to

3  put before jury what will be DDX-42 through 41.

4        THE COURT:  Objection?

5        ATTORNEY MORGAN:  No objection, Your Honor.

6        THE COURT:  These are all admitted for demonstrative

7  purposes.

8  BY ATTORNEY NISBET:

9  Q   The demonstrative is labeled DDX4-2 for the record.

10     Before we get into the specific work you did in this case,

11 would you tell us about your education and work experience?

12 A   Sure.  On the left-hand side of this slide is my education.

13 I received a bachelor's degree in economics from the University

14 of Notre Dame in 1977.  Here comes a major contradiction, then

15 I got my master's degree in economics from the University of

16 Southern California.  If you're a college football fan.  And

17 then I got my Ph.D in economics from Arizona State University

18 in 1983.  So somehow back then, I went to college for ten

19 straight years to get my degrees.

20 Q   What did you do after you got your Ph.D?

21 A   Well, and while I was getting my Ph.D, I was teaching at

22 Arizona State University, and so that's what I wanted do when I

23 got my Ph.D, so I actually got hired at California State

24 University Northridge, that's just north of Los Angeles, San

25 Fernando Valley, and I worked there full time for two years,

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

 1   1983 to 1985.  And then I left to go to Price Waterhouse

 2   Coopers, but I enjoyed teaching so I continued to teach part

 3   time for another seven years.  So I actually taught at Cal

 4   State Northridge for quite a while.  But in 1985, I joined,

 5   it's now Price Waterhouse Coopers, but joined the legacy firms

 6   of that merger, and I was there for 18 years from 1985 to 2003.

 7   Q   What type of work did you do at Price Waterhouse Coopers?

 8   A   Actually the same kind of work I'm doing now, economics and

 9   damages quantification, so it's economic analysis in a dispute

10   setting is how you might describe it.

11   Q   And what did you do afternoon you left Price Waterhouse

12   Coopers?

13   A   I left Price Waterhouse Coopers, actually this is very

14   accurate, on December 31st, 2003 and started at Analysis Group

15   on January 1st, 2004, but I switched firms to an economic firm

16   called Analysis Group, and I've been with them for about 18

17   years, since 2004.

18   Q   What is Analysis Group?

19   A   Analysis Group does economic, financial strategy type

20   consulting work with companies, with law firm clients, with

21   government agencies.  So we basically do economic financial and

22   strategy consulting.

23   Q   What is your role at Analysis Group?

24   A   For many of these years, I was called a managing principle,

25   which is basically a partner level position.  About two years

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1   ago -- I'm getting old and gray -- I decided, you know, it's

2   time to retire, so I retired from my managing principle

3   position and became what's called a senior adviser.  So I'm now

4   a senior adviser to the firm.  What that really means is I

5   don't have to do administrative work anymore.  I just work on

6   client things doing analysis.  I also invented a new term.

7   It's called failed retirement.  So I'm in my failed retirement

8   mode.

9   Q   And you specialize in economics and damages related work?

10  A   Yes, that's correct.

11  Q   Have you received any awards for your work?

12  A   Yeah.  Actually since, I don't know, every year since 2014,

13  I have been named one the leading practitioners in the patent

14  and infringement damage quantification area experts.

15  Q   Does Analysis Group set the billing rate that is charged

16  for the time you spend working on economics and damages related

17  work?

18  A   Yes, that's set by Analysis Group.

19  Q   And is Analysis Group's compensation dependent upon the

20  opinions you give or the outcome of this matter?

21  A   No, it's not dependent on any opinions or any outcome of

22  the case.  I just do my work, present my results, and then we

23  get -- it doesn't matter what happens in terms of the

24  compensation the firm gets.

25          ATTORNEY NISBET:  Your Honor, I would like to tender

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1   Dr. Ugone as an expert in the valuation and calculation of lost

2   profits and reasonable royalty patented damages and to give

3   opinions in this case to assist the jury.

4           ATTORNEY MORGAN:  No objection, Your Honor.

5           THE COURT:  He's received as an expert in that area.

6   Thank you.

7   BY ATTORNEY NISBET:

8   Q   Let me go to DDX4-3.  I want to turn back to the work

9   you've done in this case.  Can you please remind the jury what

10  your assignment was?

11  A   Yes.  I really did do things.  As you can see in the slide

12  I'll point out whenever you read the slides, it's always good

13  to read the title and then you'll know the context.  But I was

14  asked to evaluate NuVasive's claimed lost profits damages as

15  presented by Mr. Inglish and evaluate NuVasive's reasonable

16  royalty damages.

17  Q   And are you prepared today to discuss and explain your

18  opinions to the jury?

19  A   Yes.

20  Q   Go to the next slide, DDX4-4.  What did you do to prepare

21  for your testimony that you'll be giving here today?

22  A   There's a lot that I did to prepare, both to issue my

23  report and for my testimony today.  But the easiest way to

24  think about it is that there was a lot of NuVasive information

25  and documentation that was produced, including, you know,

1   financial data and sales data, and there was also Alphatec

2   information produced, including the same type of information,

3   so I reviewed those.  And then there was just other information

4   which would include some of the things you have been seeing

5   here at trial like declarations or depositions, some of the

6   video depositions you have been seeing, and some of the expert

7   reports that have been produced in this case.

8   Q   Go to DDX4-5.  What are your ultimate opinions in this

9   case?

10  A   So I sort of had two tasks but they come down to three

11  opinions.  So the first task, as I mentioned, was to evaluate

12  the lost profit claim put forth by Mr. Inglish.  And I have two

13  opinions under that.  One is that Mr. Inglish did not establish

14  or prove lost profits.  So a lost profits remedy from an

15  economic perspective would not be reliable and would not be

16  warranted because it hasn't been proved, and I'll explain why.

17      But also, even if you accept his framework and then adjust

18  for some of the let's call them less supported assumptions he

19  makes, that number would go down substantially from the

20  10.5 million number he provided to the jury.  So those both

21  fall under my evaluation of NuVasive's claimed lost profits as

22  presented by Mr. Inglish.

23      The second task was to evaluate NuVasive's reasonable

24  royalty.  My opinion there if all three patents are found valid

25  and infringed by Alphatec, then royalty damages are no more

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1   than $918,414.

2   Q   I want to move on to your evaluation of NuVasive's claimed

3   lost profits damages in the work performed by Mr. Inglish.  Let

4   me go to DDX4-6.  Can you remind the jury why you believe lost

5   profits are inappropriate in this case?

6   A   I think the easiest way to say it, and I'll have some

7   slides on this too, is that you have to have a nexus or

8   economic nexus or causal link between the alleged wrongful

9   conduct and some economic impact on -- in this case, on

10  NuVasive.  So an easy way to think about it is okay, we have

11  this allegation of infringement, and the question is in the

12  absence of the infringement, what would have happened?  Would

13  Alphatec sales have been less?  So that's an important

14  question, or would they have maintained those sales?

15      The second question is would some of those sales have gone

16  to NuVasive?  And if you can answer yes to both of those

17  questions, then you can continue down the lost profit path and

18  do that evaluation.  But I felt he hadn't established those

19  linkages that you need to come up with a reliable lost profits

20  figure.

21  Q   Go to DDX4-7.  What are the reasons why NuVasive is not

22  entitled to lost profits in your opinion?

23  A   Yeah.  So in my opinion, like I said from an economic

24  perspective, I've given three reasons, but these all go back to

25  the overview framework that I talked about would Alphatec's

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1    sales have been less, would NuVasive sales have been higher so

2    that's a way to think about it and keep it straight.

3        But the three reasons why is that, first, NuVasive as we

4    have seen in the evidence here lost customers unrelated to the

5    alleged infringement.  That starts to break that causal link,

6    that nexus to the infringement and claim for damages.

7        The second thing, and we'll get into the detail on this,

8    and we've heard a lot of testimony on this I'm just bringing it

9    all together in the damages framework is that there's

10   acceptable non-infringing alternatives available both to

11   Alphatec and in the marketplace.  We'll go into some detail on

12   that.  Plus Mr. Inglish through himself and Dr. Youssef

13   introduced this concept of functional units, but it turns out

14   there's a contradiction or inconstancy, I should say, between

15   what Mr. Inglish did when he was implementing functional units

16   versus what Dr. Youssef -- what his opinion was.  So those are

17   the reasons why I'm saying conceptually there shouldn't be a

18   claim for lost profits here.  That's not the proper remedy.

19   Q   Let's go to DDX4-8 and we'll go through these three points.

20    The first is NuVasive lost customers for reasons unrelated to

21   Alphatec's alleged infringement.  Why is that important?

22   A   Well, again, it's establishing a nexus.  In other words,

23   why were they leaving?  Were they leaving because they knew

24   Alphatec had this product that basically was allegedly

25   infringing on the NuVasive patents, and was that reason, or

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1  were there other reasons that motivated the customers to leave

2  that is entirely independent of that.  So that's really what

3  we're talking about in point number 1.

4  Q   Does a finding of infringement mean that lost sales and

5  lost profits are an appropriate monetary remedy?

6  A   Well, again, I always have to be careful.  So I'm giving an

7  economic perspective.  I'm not giving a legal guidance on this.

8  But my understanding is there has to be compensation adequate

9  to compensate for the infringement if infringement is found and

10 the patents are valid, but that doesn't mean it's lost profits.

11 It can be reasonable royalty.  And there's nothing wrong with

12 that if it's appropriate.

13 Q   NuVasive's experts Mr. Inglish and Dr. Youssef testified

14 that drove Alphatec's alleged infringement drove Alphatec's

15 sales, correct?

16 A   I'm sorry.  Say that again.

17 Q   Sure.  NuVasive's experts have testified that it was

18 Alphatec's alleged infringement that drove Alphatec's sales?

19 A   Yes, I believe that's their position.

20 Q   What else have you seen from NuVasive that contradicts

21 Mr. Inglish and Dr. Youssef's testimony?

22 A   I felt that Dr. Youssef and Mr. Inglish's reasoning was

23 incomplete because there's evidence that, you know, it wasn't

24 Alphatec's technology that was driving these customers to

25 AlphaTel -- Alphatec from NuVasive.  So we saw some deposition

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1    video and I've got a declaration of Mr. Link who was former

2    president of NuVasive that was basically saying look, you know,

3    NuVasive didn't consider that Alphatec was really going to be a

4    competitive threat because they didn't have surgeon

5    relationships and they lacked experienced personnel.  So you

6    can see that in the yellow highlighting towards the top of

7    paragraph 40, and they also didn't have the neuromonitoring

8    platform, so they really didn't consider Alphatec to be a

9    competitive threat.

10   Q    In this declaration submitted by Mr. Link, that's signed

11   under the penalty of perjury, right, which is shown at the

12   bottom of the slide?

13   A    Yes, I think that says March 30, 2018.

14   Q    Let me go to DDX4-10.  Does Alphatec's sales data confirm

15   Mr. Link's statement that the accused products alone were not

16   likely to compete with NuVasive?

17   A    Yes.  If you look at the data, this is from the date of the

18   first alleged infringement February 2017 through October of

19   2017, you can see that the sales that are at a very low level

20   and you can either say they're flat or even going down a little

21   bit depending how you want to look at it.  But the point is

22   they're at a very low level during those first, you know, six

23   or eight months.

24   Q    In his declaration, what factors did Mr. Link identify as

25   the primary reasons NuVasive might potentially lose sales to

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1    Alphatec?

2    A   Well, I think NuVasive became concerned when -- and would

3    be concerned if AlphaTel was able to get --

4    Q   Alphatec.

5    A   I'm sorry.  I keep saying AlphaTel.  Alphatec was able to

6    get a more seasoned management team a, more experienced

7    management team and a good sales force.

8    Q   Let's go to DDX4-11.  Who did Mr. Link identify as being

9    the key senior leader that NuVasive had lost?

10   A   I think the jury has heard this name of Patrick Miles.  He

11   was very well respected in the spinal surgery community, and he

12   had a maintained a substantial portion of XLIF surgeon

13   relationships, and so that was of concern to NuVasive that

14   Mr. Miles went over to Alphatec.

15   Q   Let me go to DDX4-12.  What did Mr. Link say about whether

16   Alphatec sales were tied to the deep personnel relationships of

17   Pat Miles?

18   A   It's kind of interesting in this declaration, they didn't

19   name surgeon names, but they gave them letters like surgeon J,

20   and then below that there's a surgeon O.  This is right out of

21   Mr. Link's declaration.  Surgeon J stated he was trying out

22   Alphatec's offerings as a favor to Mr. Miles or Pat Miles's and

23   at Mr. Miles' request.  And then it goes on there to say, to

24   talk about direct personal relationships and here in this case,

25   in this paragraph with surgeon zero or surgeon O.

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1  Q   Were there other individuals who joined Alphatec at around

2  the same time who also had deep personal relationships with

3  surgeons?

4  A   Yes.  That's what the beginning part of that second

5  paragraph shows, the panel there, and he mentions they all had

6  deep personal relationships with this particular surgeon.  And

7  there's other surgeons as well in the declaration.

8  Q   Let me go to DDX4-13.  How did the arrival of Mr. Miles and

9  others impact Alphatec's sales?

10  A   So we can see it in the chart here.  Alphatec grew after it

11  hired experienced personnel and innovated.  So it's almost like

12  a before and after analysis.  Before they got the good

13  salespeople, sales were very low and were flat.  There's a

14  period of time where they hired experienced personnel between

15  October 2017 and March 2018, and then you can see what's

16  happened to sales after that.

17  Q   Have you seen any evidence in this trial from any NuVasive

18  witness that testified that any former NuVasive surgeon who

19  switched or started using Alphatec products did so because of

20  Alphatec's retractor?

21  A   Yeah.  I haven't heard that they've done -- I haven't heard

22  any evidence.  I haven't heard that NuVasive has put forth any

23  evidence of that.

24  Q   Has there been in anyone else in this trial that NuVasive

25  employees ever talked to these surgeons to try to win back

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1  their business?

2  A   I think on some of the -- you know some of the

3  documentation, I think they had talked a little bit, but it

4  wasn't like they had done a full force to try to get these

5  surgeons back.

6  Q   Let me go to DDX4-14.  In addition to losing relationships

7  due to Mr. Miles and other departures, have you seen any other

8  evidence in this trial indicating that surgeons left NuVasive

9  due to reasons that had nothing to do with Alphatec's alleged

10 infringement?

11 A   So this is from the trial testimony of Mr. McClintock, and

12 he relayed some of the issues that NuVasive was having with

13 some of the surgeons.  And I'll just go down the list NuVasive

14 was making promises they couldn't keep.  They weren't -- they

15 were missing out on the newest trends, their portfolio products

16 wasn't complete, and there were, I guess I would call it trays

17 of tools that were in disarray or disfunctional, and all of

18 those were concerning to surgeons and help understand reasons

19 other than the alleged infringement why surgeons were leaving

20 NuVasive.

21 Q   And if the jury believes that NuVasive surgeons left for

22 reasons unrelated to Alphatec's infringement and would not have

23 otherwise returned, how does that impact of lost profits

24 analysis?

25 A   Well, that breaks the linkage between the cause of damages

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1   and economic harm and the alleged infringement.

2   Q   Let me go to DDX4-15.  The second reason you identified for

3   how Mr. Inglish failed to prove economic causation is the

4   availability of acceptable non-infringing alternatives in the

5   marketplace and to Alphatec.  What to you mean by acceptable

6   non-infringing alternatives?

7   A   The way to think about it is there's the patented

8   invention, and so the question is, is there a way to do a

9   redesign or a different design or another alternative in the

10  marketplace that can be used in place of whatever the patented

11  design is, and here we're talking about the NuVasive retractor.

12  And those existed.  That's the point.

13  Q   Why are non-infringing alternatives relevant to the lost

14  profits analysis?

15  A   Here's -- I'm going to circle back to what I said at the

16  beginning, that we're really asking the question in the absence

17  of the infringement, would Alphatec's sales have been less and

18  would NuVasive's sales have been greater to get the lost

19  profits.  That's really what we're asking.  If you now kind of

20  inject into the analysis the fact that there's acceptable

21  non-infringing alternatives, if you take away the alleged

22  infringing product from Alphatec, but they could substitute in

23  an acceptable non-infringing alternative, then Alphatec sales

24  would not have been down, or alternatively, even if they didn't

25  have that and they lost sales, the question is would those

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1    sales have gone to NuVasive.

2       But if there's other competitors in the marketplace that

3    have a substitute good or an acceptable non-infringing

4    alternative, there's no guarantee that those surgeons would

5    have gone back to NuVasive.  So that's why it's important to

6    look at this in a lost profits analysis.

7    Q    Let me go to DDX4-16.  What options did surgeons have

8    outside of NuVasive's patented technology?

9    A    My understanding is, and I'm going to talk about this in a

10   couple of different ways, that there's alternative nonlateral

11   procedures available in the marketplace.  And we have heard a

12   lot of testimony about this that yes, you can do a lateral

13   procedure, but there's substitutability, and surgeons make

14   different choices.  And you have seen this with the more

15   technical oriented person.  I'm an economist so I can't talk

16   about the medical aspects, but I can take the evidence that's

17   been presented and over that -- overlay that into the damages

18   analysis.  And what we're seeing here is that there were a

19   number of different alternatives, a number of different types

20   of procedures as I use that term in place of the NuVasive

21   lateral technology.

22   Q    You have seen testimony here in this trial several of

23   Mr. Inglish's quote/unquote "diverted surgeons" moved entire

24   practices to Alphatec and do perform ALIF, OLIF and T-LIF

25   procedures?

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1   A   Yes.  And there has been testimony that these are

2   substitutable.

3   Q   Did you hear any evidence from Mr. Inglish that those

4   quote/unquote "diverted surgeons" would not have considered an

5   alternative ALIF, OLIF, or PLIF procedure in the event that

6   Alphatec did not have a lateral offering?

7   A   No.  In fact, my recollection is he didn't really have an

8   opinion on that.  He just said that's not his opinion and he

9   was relying on Dr. Youssef, as I remember it.

10  Q   What if a surgeon exclusively preferred a lateral

11  procedure, were there acceptable non-infringing alternatives

12  available to Alphatec in that situation?

13  A   Yes.  So there's a number of different layers of acceptable

14  non-infringing alternatives.  There can be the other types of

15  procedures, or there can be alternative product offerings in

16  the marketplace that are still lateral procedures as well.  So

17  that's kind of another layer down.

18  Q   Let me turn to DDX4-17.  Can you remind the jury what this

19  non-infringing alternative to Alphatec was?

20  A   So remember when I said we could talk about it from the

21  AlphaTel [sic] side, and if they didn't have the infringing

22  retractor, what could they do.  It was the testimony of

23  Mr. Robinson, the manager of the research and development, that

24  they had the technology, the knowhow, and the capabilities to

25  be make a two-bladed retractor in 2017.

1    Now the way I interpret that as an economist is they have

2    an ability to make a product that wouldn't infringe on

3    NuVasive's technology or patents, and they would be able to

4    make that and give to the marketplace within one year, and I

5    think he was talking one year of the February 2017 date.

6    Q    Have you seen evidence in this case in the preparation of

7    your opinion that a change to this system, this two-bladed

8    retractor, would have been acceptable to Alphatec's customers?

9    A    Yes, I've seen that.  And as an economist, you would look

10   at the market.  There's what's being accepted in the market.

11   And my understanding there's a lot of two-bladed retractors

12   being sold in the marketplace.

13   Q    Let's take a look at the marketplace.  DDX4-18.  Have

14   two-bladed retractors been used and were they being used in the

15   lateral market in the 2017-2018 time period?

16   A    Yes.  So these are just some market share figures showing

17   that, for example, Medtronic had a two-bladed retractor, and

18   they had a 17.6 percent share of the lateral market in 2018.

19   Then to the right of that is another large company, Stryker,

20   and they had a two-bladed retractor and they had a 17 percent

21   market share in 2018.

22   Q    Has Alphatec ever offered a two-bladed retractor for

23   lateral procedures?

24   A    Yes.  My understanding is that they have a new one out now

25   that was launched in June 2020.

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1  Q   Can you remind the jury how this non-infringing two-bladed

2  retractor impacts the lost profits analysis?

3  A   Again, the issue is in the absence of the infringement

4  would AlphaTel [sic] have sold less, would NuVasive --

5  Q   Alphatec.

6  A   Would Alphatec have sold less and would NuVasive have sold

7  more.  And when there's alternatives, if Alphatec was able to

8  have an alternative product, they could have kept those

9  customers even though they don't have an allegedly infringing

10  retractor, or in the alternative if they didn't keep the

11  customers, there's no guarantee those surgeons would go back to

12  NuVasive because they would have options such as Medtronic or

13  Stryker.

14  Q   Yes.  Let's talk about that.  DDX4-20.  You mentioned

15  earlier there are many competitors in LLIF market; is that

16  right?

17  A   Yes.

18  Q   What does this tell you whether but for Alphatec's alleged

19  infringement, NuVasive would have otherwise made Alphatec

20  sales?

21  A   Well, these were all players in the market.  And you can

22  see the Medtronic, Globus, Stryker, the Zimmer Biomet.  We've

23  heard all of these, DePuy, K2M, in the testimony of prior

24  witnesses.  So, again, I've been taking the technical testimony

25  and putting it in the economic framework of what's the

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1    implication for damages.

2    Q   Let me move to DDX4-21 and talk about the third reason

3    NuVasive has failed to prove lost profits in this case.  Can

4    you remind the jury what a functional unit was in the context

5    of Mr. Inglish's framework for lost profits?

6    A   Yeah.  Essentially a functional unit, I know there was a

7    construct there between Dr. Youssef and Mr. Inglish as to a

8    functional unit.  These are different components that they

9    claimed were functional units, interdependent, kind of work

10   together.

11   Q   How does Mr. Inglish use functional units in his lost

12   profits analysis?

13   A   Well, the easiest way to think about this is once he has a

14   definition of a functional unit, then he goes to over to

15   Alphatec's sales records to see if the surgeons -- it would

16   have been more complicated than this.  But to see if those

17   surgeons that have purchased the equivalent of what he's

18   calling those functional units.

19   Q   You've mentioned the functional unit definition lacks

20   support.  Can you explain that?

21   A   Yes.  Because he's using something different than what

22   Dr. Youssef testified to.

23   Q   Mr. Inglish says he relied on Dr. Youssef for the

24   definition of a functional unit, correct?

25   A   Yes.

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1  Q   Let me turn to DDX4-22.  What was Dr. Youssef's testimony

2  in this trial as to whether the shim is part of a functional

3  unit?

4  A   As we can see here, this is from the trial transcript that

5  he said he agreed.  He says, "I'm agreeing with you that the

6  shim is part of the functional unit."

7  Q   Is Mr. Inglish's functional unit definition consistent with

8  the technical opinion that Dr. Youssef testified to at trial?

9  A   No.  So when he took the concept of a functional unit and

10 then tried to translate that to sales records, he actually did

11 not include the shim.

12 Q   And has Mr. Inglish's definition of the functional unit

13 changed over time?

14 A   Yes.

15 Q   How so?

16 A   Well, in his earlier reports, he has some reports in 2019

17 and '20 he basically had functional units listed on the left

18 side of the chart here, but when he got to his final report,

19 the 2021 report, he did not include the shim.

20 Q   And let me go to DDX4-24.  How did Mr. Inglish's changed

21 opinion excluding the shim from his functional unit impact the

22 claimed damages to the benefit of NuVasive?

23 A   It -- by taking the shim out, there were less components he

24 had to match into the Alphatec sales records of surgeons.  So

25 that ended up increasing claimed lost profit damages by over a

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1  million dollars.

2  Q    Do you remember Mr. Inglish explaining that to the jury?

3  A    Yes, I do.

4  Q    And so if the jury concludes that Mr. Inglish's functional

5  unit definition is not supported by Dr. Youssef's testimony, is

6  lost profit an appropriate remedy?

7  A    No.  There's a mismatch between what their technical expert

8  is saying and what Mr. Inglish is doing.

9  Q    Before moving on to the next topic, can you summarize your

10 conclusion?

11 A    Based on my review of the evidence and the analyses I've

12 performed and the review of Mr. Inglish's work products, I

13 don't believe that he has established that lost profits is an

14 appropriate remedy if the jury finds that the patents-in-suit

15 are valid and infringe.

16         ATTORNEY NISBET:  I would like to transition to

17 another section.

18         THE COURT:  Do you want to take the rest of your

19 morning break?  Break now or keep going?  Now?  Now.  Fine.

20 Its 1:15.  Why don't we all try to get back here at 1:35.

21    (Jury in afternoon recess at 1:15)

22    (Court in session at 1:36 p.m.)

23         THE COURT:  Is everybody settled?  All right.

24 Counsel, you may continue.

25

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1   BY ATTORNEY NISBET:

2   Q   We have been discussing why lost profits have not been an

3   appropriate remedy in the case.  You also mentioned if they

4   were, Mr. Inglish's lost profits are overstated.  Can you tell

5   the jury how you came to that conclusion?

6   A   So what I did was after I did my analysis where I

7   demonstrated that they were not an appropriate remedy, lost

8   profits, I took a step back and said okay, let me look at what

9   Mr. Inglish did and see what are some of the criticisms I have

10  of what he did, and make some adjustments and see what happens

11  to the number because I thought the jury would be interested in

12  that if they were leaning in that way what would be an adjusted

13  number to what he's calculated.

14  Q   What assumptions, in your view, must be adjusted?

15  A   As we have sort of talked about and seen in the evidentiary

16  record, there's no proof that diverted surgeons which he

17  quantifies or calculates based on those functional units that

18  those were diverted due to the infringement, so you'd have to

19  come up with an alternative way of handling that.  And one

20  alternative way of handling that, and even Mr. Inglish kind of

21  admitted this, is instead of doing this diverted surgeon

22  approach, you can do what's called a market share allocation

23  approach.  In other words, allocate some of the accused sales

24  based on relevant market shares.  And so you can look at that.

25      But what he did in some of his calculations was used a

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1   market share that was too high, so I made adjustments there.

2   And then also, I took out -- there were some issues of him

3   calculating lost profits on certain products, implants that

4   didn't match what he said he was calculating.  It was very

5   clear, he said he was looking at the alleged infringement of

6   the independent 1s of the three patents-in-suit, but he ended

7   up doing calculations that weren't restricted just to that

8   claim or those independent claims.  So those are the

9   adjustments I made.

10  Q   Let me move to DTX4-26.  Before we talk about the three

11  adjustments you mentioned in detail, can you remind the jury

12  the amount of Mr. Inglish's lost profits?

13  A   So Mr. Inglish was opining to NuVasive's lost profits to

14  total $10,512,850.

15  Q   Let's talk about the first issue you raised, Mr. Inglish's

16  diverted surgeon analysis.  Mr. Inglish testified he relied

17  exclusively on to support his opinion on diverted surgeons?

18  A   Yes.

19  Q   Did Dr. Youssef do any analysis or provide any reliable

20  method to support the conclusion that Alphatec diverted

21  NuVasive's surgeons?

22  A   No.  In fact, I looked at Dr. Youssef's testimony and

23  actually heard this in court where he was asked, In your

24  opinion, would surgeons who transitioned from using NuVasive's

25  lateral system to Alphatec's system have been more -- most

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1   likely kept using NuVasive's if Alphatec's was not available.

2   I didn't read that very well, but basically he said would they

3   have gone back to NuVasive, and he said I assume so.  I thought

4   that was an interesting answer.  There's no analytics there.

5   He is just assuming they would have done this.

6   Q   Mr. Inglish used this slide to explain his diverted surgeon

7   analysis to the jury and he testified that the purple people

8   here represented diverted NuVasive surgeons.  I see a lot

9   green.  Does Alphatec only have customers with prior NuVasive

10  experience?

11  A   Well, Mr. Inglish did some assumption that those would have

12  been diverted and he put some additional constraints.  It's

13  interesting, there's 111 purple people and 111 green people

14  there as well, so it's kind of half and half.

15  Q   Mr. Inglish talked a lot about 82 percent of Alphatec's

16  sales being sourced from NuVasive.  Do you recall that

17  testimony?

18  A   Yes.

19  Q   Is that correct?

20  A   You have to understand what he's saying.  It's not

21  82 percent of the customers.  He's saying of all the customers

22  that bought at least one let's say retractor or used one

23  retractor, I'm just trying to make it simple, from Alphatec.

24  If you add all of those together, that's 82 percent of the

25  volume is what he's saying.

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1  Q   Of sales?

2  A   Yes.

3  Q   And did Mr. Inglish testify that 82 percent of Alphatec's

4  customers come from NuVasive?

5  A   No.

6  Q   And what did he mean in describing the 82 percent that had

7  prior NuVasive experience?

8  A   That those customers had bought at least one item from

9  AlphaTel.  Alpha -- we've got to explain to the jury, there's a

10  company in Dallas called AlphaTel, or used to be.  That's why I

11  keep saying AlphaTel instead of Alphatec.  I apologize for

12  that.  I've got it on the brain.

13  Q   Mr. Inglish testified that he did a trend analysis to see

14  whether he thought the sales data supported his diverted

15  surgeon assumption, remember that?

16  A   Yes.

17  Q   Did Mr. Inglish provide the jury with any objective measure

18  or reliable method by which one could replicate his trend

19  analysis?

20  A   Well, not in the sense -- because he was just kind of

21  taking the assumption that if I look at the customers'

22  overlapping sales between Alphatec and NuVasive and there's

23  these substantially similar components, which is sort of his

24  functional unit, how he operationalized that, then he has some

25  other constraints, and then he comes up with the 111 and says

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1   those are the 111 customer surgeons that were diverted from

2   NuVasive.  The problem is when he said he did a trend analysis,

3   he's just looking for NuVasive's sales to these surgeons going

4   down and Alphatec's sales to these surgeons going up or

5   starting, but that doesn't say anything about causation.  That

6   doesn't say what caused those people to move.  It just said

7   sales went down of the surgeons that -- of these surgeons that

8   bought from NuVasive and sales went up when they were buying

9   from Alphatec, but it doesn't prove a causal link.

10  Q   And Mr. Inglish showed the jury a handful of purple and

11  green bar charts to illustrate this trend analysis.  Do all

12  quote/unquote "diverted surgeons" have the pattern that

13  Mr. Inglish showed to the jury?

14  A   No.  In fact, if you remember, he had one chart that had

15  28, I think it was, little bar charts that went all the way

16  across and filled the page, but that was only 28 out of 111,

17  and there's many, many different patterns in the sales records

18  different than the ones he showed the jury.

19  Q   Let me go to DDX4-29.  Is this an example of the sale

20  patterns of the one of the quote/unquote "diverted surgeons"?

21  A   Yes.  So Dr. Wupperman is a claimed diverted surgeon from

22  NuVasive to Alphatec, and you can see if you look at the bottom

23  of the graph that it goes from the fourth quarter of 2016 all

24  the way to past the second waterer of 2020.  And what you can

25  see is that this surgeon ended up decreasing his purchases from

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1   NuVasive way before there were purchases from Alphatec, and so

2   he's counting that as a diverted surgeon and counting all those

3   -- the heights of those green bars as damages; whereas, this

4   really calls into question whether there's that causal link

5   that he's assuming.

6   Q    And does the decrease from 16 to 4 to 3, the period of time

7   where he bought two more implants from NuVasive, does that

8   indicate for some reason Dr. Wupperman was not otherwise

9   satisfied with NuVasive?

10  A    That would be the indication that I would draw from it, but

11  it assuredly calls into question why does that pattern exist.

12  And when you put that together with the other declarations and

13  testimony we've seen about some of the problems at NuVasive,

14  there's most likely something like that going on in the data.

15  Q    Let's go to DDX4-30.  This is another claimed diverted

16  surgeon.  What does the sales pattern of Dr. Hancock say to

17  you?

18  A    This was another diverted surgeon by Mr. Inglish, and he

19  had said that the last sale from NuVasive had to occur within a

20  year before the first sale by Alphatec.  And you can just see

21  right here that that gap is 489 days, which is more than 365.

22  So there was basically an error in his analysis there.  And

23  this isn't the only one.  There were a number of other ones

24  where this occurred as well.

25  Q    In addition to his trend analysis, Mr. Inglish testified he

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1   applied various exclusion criteria to finally land at the 111

2   diverted surgeons.  Do you remember that testimony?

3   A    Yes.

4   Q    Does Mr. Inglish's exclusion criteria explain or provide

5   any evidence to support a causal link between Alphatec's

6   alleged infringement and NuVasive's lost sale?

7   A    No.  It's really just kind of comparing dates or using some

8   metrics, like they had to buy at least five NuVasive implants.

9   But that doesn't go to the causation issue.

10  Q    In total, how does Mr. Inglish's diverted surgeon the

11  approach result in overstated lost profits?

12  A    Well, he's assuming that these are diverted surgeons.  And

13  if he had used an alternative market share allocation approach

14  rather than this approach here, the number would have been

15  substantially less.

16  Q    Let's talk about the market share approach you mentioned.

17  Let me go to DDX4-31.  This was the second reason you

18  identified as to why Mr. Inglish's lost profits were

19  overstated.  Can you remind the jury what this is about?

20  A    Yes.  So the easiest way to think about this is that if you

21  take away the diverted surgeons approach and if you say the

22  accused sales that went to Alphatec would have been distributed

23  differently in the absence of the infringement, one way to do

24  that is based on market shares that companies have in the

25  market.  One could say okay, NuVasive would have gotten its

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1  market share of those accused sales.

2      Now here's where it gets a little complicated is that

3  Mr. Inglish did that but he only did that on the accused sales

4  that weren't part of the diverted surgeons.  What I'm saying

5  here is take that diverted surgeon analysis away because of all

6  the problems with it but apply that market share to all the

7  accused sales and then let's see what happens.  But then you

8  have to make a choice what market share do you use, and we have

9  seen all this testimony about all the alternative procedures

10 that could be done.

11     Mr. Inglish restricted his analysis to NuVasive's lateral

12 market share when we've heard all the testimony about all the

13 other types of procedures that could be used.  So if you used

14 the broader MIS market share, that basically cuts the number in

15 half again.

16 Q   Let me turn to DDX4-32.  Is this testimony from Matt Link

17 what you're referring to?

18 A   Yeah.  It's one of them.  I mean, we've heard it from a

19 number different witnesses, but Mr. Link said that NuVasive's

20 XLIF competes with nonlateral procedures such as ALIF, T-LIF,

21 PLIF, and OLIF.  But the point is, that that's the competition

22 in the marketplace, as we've heard, that there was a lot of

23 competition.  So in this market share allocation approach, as

24 it's called, if you take the accused sales and you're going to

25 allocate any back to NuVasive, you should use the right market

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1   share, and that should be the MIS market share of 16.8 percent.

2   Q    And what would Mr. Inglish's lost profits be if he had used

3   the right market share?

4   A    Well, it would have, again, gone down substantially.

5   Q    Lastly, it is your opinion that NuVasive's lost profits

6   should only be calculated on the disposables at issue accused

7   and not include implants; is that correct?

8   A    Yes.

9   Q    Let me go to DDX4-33.  What is your reasoning for this?

10  A    I go back to what Mr. Inglish said in his testimony is that

11  his calculations were based on the independent claims of the

12  patents.  He didn't do any calculations based on the dependent

13  claims.  So if you stay with the independent claims, my

14  understanding of the accused products is that they include the

15  retractor, the dilators, the shim, and the K-wire.  They don't

16  include the implants.  But when he did his calculation for the

17  independent claims, he actually included implants and that

18  increased the claimed lost profits substantially by bringing in

19  those additional products.

20  Q    And let me got to DDX4-34.  What has the evidence in this

21  case shown as to whether the accused products, the products

22  actually accused according to the independent claims and the

23  implant have different -- whether they have different

24  functional purposes?

25  A    Yeah.  My takeaway, not the technical person, but my -- or

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1   the legal person, but my takeaway is these are not all one

2   functional unit.  That's the point.  So you can't bring in

3   these other products claiming that they're all part of a single

4   functional unit.  So that's the problem with the analysis.

5   Q    And did Dr. Youssef confirm that the retractor and implant

6   had different functions?

7   A    Yes.  And in addition to Dr. Youssef, there were a number

8   of D people who testified as well.

9   Q    What would Mr. Inglish's claimed lost profits be if he did

10  not include implant sales in his calculations and only focused

11  on products actually accused?

12  A    Again, it would decrease substantially his number.

13  Q    Let me go to DDX4-35.  What would Mr. Inglish's claimed

14  lost profits be if all the issues we just discussed were

15  addressed and properly adjusted for?

16  A    So if you make those three changes I was talking about,

17  that $10.5 million number opined to and presented to the jury

18  would decrease to $1,147,100 so it would be an 89 percent

19  decrease.

20  Q    And so let me flip to DDX4-36.  So if you could summarize

21  for the jury what your lost profits opinions are?

22  A    So my lost profits opinion is that he has demonstrated that

23  lost profits is an appropriate remedy in this case.  And I have

24  given the reasons why for that including always thinking back

25  to would Alphatec have sold less, would NuVasive have sold

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1   more, and all that analysis I presented, so no lost profits.

2       But if the jury does consider lost profits, you would at

3   least have to make the adjustments that I have talked about.

4   This doesn't fix everything, but at least if fixes some of the

5   problems with his calculations, and that would lead to a

6   $1,147,100 number.

7   Q   And this $1,147,100 number, that includes sales that would

8   not be subject to lost profits but then would be subject to a

9   reasonable royalty, correct?

10  A   Right.  So the way to think about this is remember what I

11  said at the beginning, my understanding of the law and you'll

12  be -- you'll be -- you'll get guidance on this.  If liability

13  is found or infringement is found and the patents are valid

14  that the patent holder is allowed to at least get a reasonable

15  royalty.  So in this $1.1 million number, there's some lost

16  profits based on NuVasive's market share, but my understanding

17  is they still need to be compensated for the other units as

18  well, so you put a reasonable royalty on those other units.  So

19  the $1.1 million number is a combination of lost profits and

20  reasonable royalty to make sure there is compensation for all

21  of the accused units.

22  Q   I would like to shift focus now, Dr. Ugone, and talk about

23  reasonable royalty damages.

24  A   Okay.

25  Q   Did you and Mr. Inglish agree as to the reasonable royalty

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1   damages should the patents-in-suit be valid and infringed?

2   A    Actually, this was interesting, and I think you heard it on

3   Mr. Inglish's testimony, that we reached the same opinion as to

4   what a reasonable royalty would be.

5   Q    But you do not agree on the claimed lost profits?

6   A    No.

7   Q    Since there's agreement, I'm going try to move through this

8   quickly.  Let me go to DDX4-38.  How do you go about

9   determining a reasonable royalty?

10  A    The easiest way to think about it is a reasonable royalty

11  would be determined using something called the Georgia-Pacific

12  factors as guidance.  That's from a case opinion on how to

13  figure out what a royalty payment would be in this situation

14  given there was never a license.  So somebody's got a patent,

15  they've got intellectual property rights.  If you want to use

16  that technology, you have to pay a royalty fee.  That's the

17  concept.  It's like paying rent on your land, exactly like

18  that.  So the question is, what's going to be the amount of the

19  royalty.

20       Well, there's something called a hypothetical negotiation.

21  A the hypothetical negotiation is okay, NuVasive and Alphatec

22  never got together, they didn't sit down at this table in

23  February 2017, so we don't have any actually results, but we

24  have to assimilate that.  In other words, if the two parties

25  had sat down to negotiate a license agreement what would have

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1  been the amount of the royalty payment for the use of the

2  technology.  That's what a hypothetical negotiation is.  And

3  there's certain assumptions you make when you're doing that

4  process and then you hopefully can converge on to what the

5  royalty payment would have been that parties would have agreed

6  to if they had negotiated a license.

7  Q   And from the economic considerations that you reviewed, how

8  do you determine the reasonable royalty damages in this case?

9  What were the relevant value indicators?

10  A   Yeah.  So the way to think about it is there's 15

11  Georgia-Pacific factors.  Mr. Inglish went through all of them.

12  Since we both converged to the same opinion, I'm not going to

13  take you through all of them, but there was one important

14  indicator of value that we both agreed to, that there was a

15  license agreement that was considered comparable to what would

16  have been going on between NuVasive and Alphatec.  And so we

17  both converged onto the royalty rate in that actual real world

18  license agreement because that's something that the parties,

19  you know, would be discussing at the hypothetical negotiation.

20  Q   And how did you utilize that royalty rate in the Warsaw

21  agreement to come up with your reasonable royalty damages in

22  this case?

23  A   So in this situation, the way to think about it is -- the

24  easiest way to think about it actually is the sales tax.  What

25  you do is you take a percent times a base.  So just like when

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1   you go to the store, you buy a hundred dollars of items,

2   clothes, and you take whatever the sales tax is, you multiply

3   the two together and that would be the payment that goes to the

4   government.  Well, that's completely analogous here.  What's

5   the royalty rate, this agreement was 6 percent that both Mr.

6   Inglish and I agreed to, what's royalty base, what's the dollar

7   amount of the accused products that fall under each of these

8   patents.  So you multiply that together and you get these

9   numbers that are here.

10      So when you do that for the '801 patent only -- so here's

11  how you read this, if only the '801 patent were to be deemed

12  valid and infringed, I'm just giving you some examples, then

13  it's 6 percent time the associated revenues associated with the

14  sales that are infringed -- allegedly infringing under that

15  patent, so it would be $750,163.

16  Q   That's for the '801 patent.  I think you said the '832.

17  A   That's the '801 patent.  If you just look at the '832

18  patent and that's valid and infringed, then that same math

19  gives you $660,915.  And then, finally, if it's just the '531,

20  that same math, just like you're kind of doing a sales tax, but

21  here it's a royalty rate times the accused product dollar

22  volume gives you $794,199.

23      Now because -- here's the one guidance I have to give you,

24  sort of a cautionary note, because there's some overlap of

25  products under each of the accused products in this these

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1    patents, you can't add these numbers together.  So that's why I

2    put down at the bottom these numbers are not to be added

3    together.  If you find all three to be infringed, you have to

4    be sure you don't double count some of the same product sales.

5    That's why I have given you one more slide here.

6    Q    Yes.  And Dr. Ugone, what are the total damages under

7    reasonable royalty if all three patents-in-suit are found valid

8    and infringed?

9    A    $918,414.

10        ATTORNEY NISBET:  Thank you, Your Honor.  No further

11   questions.

12        THE COURT:  Cross.

                          **CROSS-EXAMINATION**

13

14   BY ATTORNEY MORGAN:

15   Q    Hi, Dr. Ugone.

16   A    How are you doing?

17   Q    Good.  I'm Natalie Morgan.  I don't think we have met

18   before.

19   A    No.

20   Q    It's nice to meet you.

21   A    I have seen you in the courtroom.  Nice to meet you.

22   Q    I have seen you as well.  I want to start with a couple of

23   things I think we can establish up front.  First, you agree

24   that Alphatec earned 24.25 million in revenues on its Battalion

25   system sales from February 2017 through September 2020, right?

1  A   Yes, if you include all the components.

2  Q   And that doesn't include anything then for this last year

3  and a half since September 20, right?

4  A   I would agree with that.

5  Q   Okay.  But Alphatec has continued selling its Battalion

6  lateral system since September 2020, right?

7  A   I assume so.  I haven't seen that data, but I have not

8  heard anything that they stopped.

9  Q   Have you been on their website?

10  A   To -- I'm just saying, I haven't seen those numbers.  We

11  have the numbers through, you know, the portion up to

12  September 2020, and that's what we did the calculations on.

13  Q   But you see the system is still their site?  You know

14  they're still offering it, right?

15  A   We might be miscommunicating.  I'm not disputing that.  I'm

16  saying I don't know what the number is.

17  Q   Okay.  So on the same page.  And the 82 percent number that

18  you were talking about on direct, you agree that 82 percent of

19  Alphatec's sales of its lateral system came from surgeons who

20  bought a lateral system from NuVasive, correct?

21  A   Well, at least one.  So there might have been some who

22  bought a lot, some who bought a little.  If you look at all

23  that, it would be 82 percent, yes.

24  Q   But you think the right damages number here is 918,414 for

25  all three patents if infringed, right?

1   A   Yes.

2   Q   So now to make sure we all get your role, you're not a

3   doctor, right?

4   A   Well, I'm a doctor of economics.

5   Q   You're not an MD?

6   A   Ph.D, right.

7   Q   Okay.  So you're not a surgeon and you're not a medical

8   doctor, correct?

9   A   I'll give you that.

10  Q   And you're also not a technical expert.  You're not

11  providing technical opinions?

12  A   Right.  I'm more of an economic market dollar and sense

13  guy.

14  Q   For all your technical -- any technical opinions, you rely

15  on Dr. Sachs, correct?

16  A   I think I would say yes, but I also take into account what

17  other people are saying as well.  But yes, for many of the

18  technical opinions, I was relying on Dr. Sachs.

19  Q   Any expert technical opinions, they all come from Dr.

20  Sachs, correct?

21  A   Well, I want to be careful because I gave some -- you know,

22  I talked a little bit when I saw Dr. Youssef's testimony as

23  well, some of that was not inconsistent with other testimony

24  I've heard.  But, yes, I ultimately if I had questions, and

25  previously a long time ago, I had a discussion with Dr. Sachs.

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1   Q   And you're not a lawyer, right?

2   A   I'll agree with that.

3   Q   And you're a patent damages expert just like Mr. Inglish,

4   who we all heard earlier in the trial?

5   A   Yes.  I actually do much more than that.  But for purposes

6   here, I've described myself as a patent damages person, yes.

7   Q   And one more thing I want to make sure we all agree on, in

8   the assumptions that you made that you talked about at the very

9   beginning of your testimony, you didn't need to assume

10  infringement of the '832 patent because that's already been

11  found to be infringed by Alphatec, right?

12  A   That's my understanding.

13  Q   Okay.  So when a surgeon chooses NuVasive's lateral system

14  to do a lateral procedure, they've chosen a lateral procedure,

15  right?

16  A   I'm going to use a big word that sounds tautological, but,

17  yes.

18  Q   Okay.  Thanks.

19  A   The answer is in the question.

20  Q   You can just answer yes if you agree with me; no, if you

21  don't.  Because I have limited time, that would be great.

22      And when a surgeon chooses Alphatec's lateral system for a

23  procedure, they have also chosen a lateral procedure, right?

24  A   I'm not going to disagree with that.  So I'm not trying to

25  be argumentative or take your time but when they make a choice,

1   there's a lot of different dimensions to that choice.  So, yes,

2   they're choosing a lateral procedure but there's differences in

3   companies, differences in surgeons, salespeople relationships,

4   but I'm not going to disagree that when they made a choice,

5   that's the choice they made.  That's history.

6   Q   They specifically chose a lateral procedure, right?

7   A   That's what I said.  I just said that there was more

8   dimensions to it.

9   Q   And so if a surgeon chooses to use NuVasive's lateral

10  system in a procedure and then chooses to use Alphatec's

11  lateral system, that surgeon has chosen to do a lateral

12  procedure at least twice, correct?

13  A   I'm not going to disagree with that.

14  Q   And those are the surgeons who make up Mr.  Inglish's 111

15  diverted surgeons, right?  They started off purchasing

16  NuVasive's lateral system and then chose Alphatec's lateral

17  system, so they those a lateral system at least twice?

18  A   I think I'll agree with that.  There's really a different

19  question we're trying to answer.  But I'm not going to

20  disagree.

21  Q   Sir, I think you answered my question, okay.  So can we

22  please pull up DDX4-14.  So DDX4-14 is something used in your

23  direct, correct?

24  A   Yes.

25  Q   And you told the jury that Alphatec sales did not begin to

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1  grow until after they hired former NuVasive personnel and

2  representatives beginning in October 2017, correct?

3  A   Well, what I told them was there was flat -- a little bit

4  of declining sales prior to the period of time where there was

5  a hiring of experienced personnel, and then once that takes

6  hold, yes, you see the increase in sales.

7  Q   And so I just have one question for you.  And actually can

8  I switch this to the Elmo?  So you didn't draw the line all the

9  way back to October 2017, right?

10  A   Can move it up just a little bit so I can see that.  And

11  I'm sorry, if I could have your question again?

12  Q   Sure.  You didn't draw the line right here all the way back

13  to October 2017, correct?

14  A   I'll agree with that.

15  Q   But if you had, we would all see that the sales started to

16  increase in October 2017, correct?

17  A   That's when they started hiring more experienced personnel,

18  so I'm not going to disagree with you.

19  Q   All right.  Now Alphatec's commercial launch of its lateral

20  Squadron retractor was actually multiple months after your

21  chart begins in February 2017, right?

22  A   If I understand your question, I believe there was some

23  usage in February 2017, and I've seen some references to a

24  commercial launch in like April 2017, if that's what you're

25  referring to.

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1   Q   Well, actually their commercial wasn't until October 2017,

2   right.

3   A   I think I've seen April.

4   Q   Can you please put up PTX-36.  Dr. Ugone, you're looking

5   at -- do you recognize this is an Alphatec Holdings press

6   release?

7   A   Yes.

8   Q   The report of the third quarter 2017 financials, right?

9   A   Yes.

10  Q   Can we display this to -- Your Honor I ask it be admitted.

11          THE COURT:  Any objection?

12          ATTORNEY NISBET:  No, no objection.

13          THE COURT:  All right.  It's admitted.

14      (Defense Exhibit PTX-36 admitted)

15  BY ATTORNEY MORGAN:

16  Q   This is dated November 9th, 2017, correct?

17  A   Yes.

18  Q   And if we go down to the last bullet there under

19  organizational, commercial, and product highlights, can you

20  highlight that last bullet?  Thank you so much, Mr. Smith.

21      It says commercially launch the Alphatec Squadron lateral

22  retractor, a key component of the Battalion lateral system

23  right, in October?

24  A   That's what it says.  I can't explain why I think I have

25  seen either press releases or even Mr. Link in his declaration

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1   said April 2017.  I don't have an answer for you but I won't

2   dispute the words that are on this.

3   Q   Well, this October is referring to October 2017, right?

4   A   Yes.

5   Q   And Alphatec is not lying in their press release that they

6   made to investors, right?

7   A   That's not what I said.

8   Q   Can we agree that October 17, 2017 was Alphatec's

9   commercial launch of its retractor that is a key component of

10  the Battalion lateral system?

11  A   I accept our representation, but I'm just saying that

12  Mr. Link the former president of NuVasive even in his

13  declaration said April 2017.  So obviously, they were in

14  marketplace although various components could have come out

15  across time.

16  Q   This is not my representation.  This is Alphatec's.  Can we

17  agree that according to this press release, Alphatec is telling

18  the world their commercial launch of their retractor that's the

19  key component of their system was October 2017.  Can we agree

20  on that?

21  A   Yeah, one component.

22  Q   Okay.  So on this graph of yours, what you didn't tell the

23  jury that right here -- can we switch over, please?  Thank you

24  very much.  Going back to DDX4-13, right here, this is the

25  commercial launch of the retractor, right?

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1    A    Given the information that we have, I'll accept your

2    representation.

3    Q    And that's when the sales started to go up, after

4    October 2017?  That's what you said, right?

5    A    Yes.  At the same time, they also started hiring

6    experienced personnel, and that's when NuVasive also got very

7    nervous about Alphatec in the marketplace.

8    Q    And Alphatec continued selling its lateral system all the

9    way to the end of the graph when the sales continued to go up

10   and up and up and up, correct?  All the way through the last

11   date that we have, September 2020, right?

12   A    I'm not going it disagree with that.

13   Q    So you understand that Mr. Inglish identified surgeons that

14   he said were diverted from NuVasive to Alphatec, right, there

15   were 111?

16   A    Yeah.  Based on his definition.

17   Q    And you agree that those diverted surgeons that Mr. Inglish

18   identified purchased NuVasive products and then they purchased

19   Alphatec lateral system?  We agree on that, right?

20   A    There were some other constraints, but I'm not going to

21   disagree.

22   Q    Now you provided your opinions in this case in writing,

23   right?

24   A    Yes.

25   Q    And we call that a report, right?

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1    A    Yeah.

2    Q    Okay.  And you provided all your opinions in there and the

3    reasons and things you rely on, right?

4    A    Yes.

5    Q    And when you did that, you had the names of those 111

6    surgeons that Mr. Inglish identified, right?

7    A    Yeah.  Yes.  Way back in the exhibits, I believe they were

8    there.

9    Q    Right.  And when you provided your opinions in that written

10   report, you said that you had talked to three people about this

11   case, Mr. Aleali, Mr. Robinson --

12   A    Yes.

13   Q    -- and Dr. Sachs?

14   A    Yes.

15   Q    Right?

16   A    Yes.

17   Q    And maybe make sure the microphone is in front of you

18   because I am having a hard time hearing you.  Perfect.

19   Dr. Sachs is one of the Alphatec's experts, right?

20   A    Yes.

21   Q    Mr. Aleali and Mr. Robinson are Alphatec employees, right?

22   A    Correct.

23   Q    Neither Mr.Aleali or Mr. Robinson are former NuVasive

24   employees, correct?

25   A    I believe that to be correct, yes.

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1    Q    You didn't talk to Pat Miles, did you?

2    A    I didn't talk to him directly, no.

3    Q    And you didn't talk to Kelli Howell?

4    A    No.

5    Q    And you didn't talk to any sales representative that came

6    over to Alphatec from NuVasive?

7    A    Not directly, no.

8    Q    And you didn't talk to any one of the 111 surgeons that

9    Mr. Inglish identified?

10   A    I didn't talk to them verbally, but there were other things

11   in the record that gave me information about them.  I want to

12   make sure you understand that there were a lot of things in

13   record.

14   Q    But you didn't talk to them personally?

15   A    I'm sorry, I missed the question.

16   Q    You didn't talk to them personally despite the fact that at

17   that time, they were Alphatec customers?

18   A    I did not talk to them directly for the reasons I said.

19   Q    I think we got your reasons.  Because you didn't talk to

20   Mr. Miles, Ms. Howell, you also didn't put that list of 111

21   names in front of them and ask them to specifically tell you

22   which surgeons supposedly came over solely because of

23   relationship, right?

24   A    Well --

25   Q    Did you do that?

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1  A   I did not do that.  I was evaluating Mr. Inglish's work.

2  He did not do that.

3  Q   You answered my question.  He didn't have -- never mind.  I

4  want to make sure we get something straight.  You agree that

5  NuVasive lost sales to Alphatec.  You just think that the lost

6  sales were because of relationships or some other reason that

7  has nothing to do with the technology, right?

8  A   That there isn't a causal linkage.

9  Q   Okay.  But you know from your work on this case that

10  Alphatec considers personal relationships with surgeons that

11  you're referring to to be no different than a friend telling a

12  surgeon to check something out, and that's because at the end

13  of the day, these surgeons' licenses are on the line.  They

14  have to like the system and they have to the like the product,

15  right?

16  A   I'm going to need your question again.  There were so many

17  predicates in there I don't think I can answer the question

18  because the way you started it off, I'm not sure I agree with

19  everything you said in front of the question.

20  Q   Happy to start again.  You know from your work on this case

21  that Alphatec considers these personal relationships with

22  surgeons to be no different than a friend telling a friend come

23  check this product out, and that's because at the end of the

24  day, these surgeons' licenses are on the line so they have to

25  like the system and they have to like the product, right?

1   A   I can't agree with everything you've said there.  You've

2   said the same predicates.  I mean, they might have in a

3   colloquial way say okay, it's like telling a friend to try our

4   product, but it's much more serious than that.  This is a

5   business we're talking about, and they were hiring experienced

6   salespeople that have good relationships with the surgeons.  So

7   I wouldn't characterize it the way you're characterizing it.

8   Maybe somebody said that in the record, but I think that was

9   just a colloquial way of trying to explain some of these

10  relationships.  But I think it's much more serious than what

11  you said.

12  Q   You don't understand that that's Alphatec's view; is that

13  right?

14  A   My answer still stands that somebody might have described

15  it that way, but I think it's much more serious than that.

16  Q   You considered the deposition transcript of Mr. Aleali,

17  correct?

18  A   It's been a while.  You'll have to remind me, but I think

19  so.

20  Q   He's a product manager for Alphatec?

21  A   Yes.

22  Q   His 2019 deposition transcript sound familiar?  It's list

23  said in a couple of your reports.  I can show them to you if

24  you like?

25  A   I'll accept your representation.

1   Q   Okay.  So if you consider the December 2019 deposition

2   transcript of Mr. Aleali, then you know that he said the

3   following -- actually -- and we are at page 102, lines 8 to

4   page 103, line 1.

5           THE COURT:  Before we go playing anything, let him

6   look at it.

7           THE WITNESS:  I apologize.  I need the pages again.

8   BY ATTORNEY MORGAN:

9   Q   102, line 8 to 103, line 1.

10  A   Okay.  Let me read it real quick.  Okay.  I think I may

11  need to read it again, but I'll take your question.

12          THE COURT:  Go ahead, ask the question.  I don't know

13  what we're doing here.  You asked him if he considered this

14  guy's deposition transcript.  He said he hadn't looked at it,

15  you gave it to him, so what's the question now that he's

16  refreshed his recollection?

17          ATTORNEY MORGAN:  Well, Your Honor, he had previously

18  said that he disagreed that that's what Alphatec said about

19  surgeon relationships.

20          THE COURT:  I'm sorry, maybe I'm looking at the wrong

21  place.  102.  Do I have the wrong page?  Because I'm reading

22  here about markers.

23          ATTORNEY MORGAN:  Yes, Your Honor.  Do you see

24  specifically line 13 to page 103, line 1, the answer.

25          ATTORNEY NISBET:  Your Honor, I would also object to

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1   the characterization that this is Alphatec's position.  This is

2   the deposition testimony of Mike Aleali. He was there as a

3   corporate representative but also in his personal capacity.

4   There is no 30(b)(6) topic on this.

5          ATTORNEY MORGAN:  He's speaking a marketing and sales

6   representative.

7          THE COURT:  Go ahead.  I don't understand how this has

8   anything to do with the question you just asked, but I'm not

9   testifying.

10          So you can try to answer her question.  Go ahead.

11   BY ATTORNEY MORGAN:

12   Q   Let me start again.  So do you recall now Mr. Aleali's

13   testimony where he talked about surgeon relationships being

14   like a friend, and at the end of the day, it's their licenses

15   that matter?

16   A   Can I ask this one question?

17   Q   Yes.

18   A   What date of the depo are we supposed to be seeing?

19   Q   It's up at the top, 2019.

20   A   This is 2020.

21          ATTORNEY MORGAN:  Apologies.  That explains the look

22   of confusion on your face, Your Honor.

23          THE COURT:  Now I see personal relationships.

24          THE WITNESS:  So you want me to read 102, line 8?

25

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1  BY ATTORNEY MORGAN:

2  Q   So my question was that --

3  A   No.  I've got to read it now.

4  Q   Have you read it?

5  A   No.  I'm asking --

6  Q   102, page 8 to page 103 line 1.

7  A   103, line 1?

8  Q   Yes.

9  A   Okay.  I think I'm ready.

10  Q   Okay.  So Mr. Aleali speaking at his deposition explained

11  that the surgeon relationships are like a friend telling a

12  friend to check something out, but at the end of the day,

13  surgeon relationships are on -- their licenses are on the line

14  and so they have to like the product and the system, right?

15  A   He was trying to present it in an easily understandable

16  way, but I don't disagree with the spirit of what he said.

17  Q   And that's exactly what NuVasive is saying, a relationship

18  might get your foot in the door, but you have to have right

19  product and technology to make the sale, right?

20  A   I would agree that there's usually minimal requirements,

21  especially with medical devices that have to be met before you

22  can make the sale, so I'm not disagreeing with that.

23  Q   So let's go on now to DDX -- actually if we could switch to

24  the Elmo, Your Honor.

25      So you showed this to the jury, DDX4-17, in your direct

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1   testimony, correct?

2   A   I'm sorry?

3   Q   You showed this to the jury in your direct testimony,

4   correct?

5   A   Yes.

6   Q   But I think there's a bullet missing, a really important

7   one, isn't there?

8   A   You're going to have to tell me.

9   Q   Sure.  They didn't do it, right?  Because they never

10  actually replaced the Squadron retractor with a two-bladed

11  retractor, correct?

12  A   It is correct that --

13  Q   Okay.  Thank you.

14  A   Well, all right.

15  Q   So now I want to go on to your slide -- you talked about

16  the shim and Mr. Inglish, whether he counted it or not, right?

17  A   As a portion of the functional unit.

18  Q   I just want to make sure, your complaint is that

19  Mr. Inglish counted an Alphatec sale if even if there wasn't a

20  shim present, correct, that's your client?

21  A   Yes.

22  Q   Alphatec's customers are not required to purchase all of

23  the lateral products that may be needed for a lateral procedure

24  in one order, correct?

25  A   I'll agree with that.

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1   Q   So a doctor may do a lateral procedure and the shim may not

2   be purchased on the bill of sale for that particular lateral

3   sale, correct?  Procedure, right?

4   A   I'm not sure if I have your question.

5   Q   Sorry.  Let me repeat it.  So a doctor may do a lateral

6   procedure and -- actually I'll hold this up to help with the --

7   a doctor may do a lateral procedure.  This is DDX-19.  And

8   everything on this might be on a particular sales receipt for

9   the procedure, but the shim may not be there?

10  A   Correct.

11  Q   And your complaint is that he counted this, missing shim,

12  as one the sales, correct?

13  A   Correct.  Because --

14  Q   Thank you.

15  A   -- because he had to find a functional unit and Dr. Youssef

16  had to find a functional unit, and this goes to whether you can

17  include sales beyond what's being accused.

18  Q   Now I want to turn to NuVasive's lateral system.  NuVasive

19  does not separately sell and charge for its lateral retractor?

20  A   Correct.

21  Q   The light cables, shim, dilators, other things like that,

22  they're specifically designed for the NuVasive lateral

23  retractor, right?

24  A   Ask the question again.

25  Q   Sure.  The light cables, dilator, K-wire, and shim, they're

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1   designed for the NuVasive lateral retractor, right?

2            ATTORNEY NISBET:  Foundation, Your Honor.  Objection.

3            THE COURT:  If you can answer.

4   BY ATTORNEY MORGAN:

5   Q   If you feel you can't answer the question, just tell me.

6   A   I was hesitating to me because I thought there was some

7   substitutability, that there's some items you could --

8   Q   Okay.  Let me rephrase.  The light cables, dilators,

9   K-wire, and shim, those things that are used with the lateral

10  retractor, they don't have any independent value without the

11  retractor, correct?

12           ATTORNEY NISBET:  Objection form.

13           THE COURT:  Overruled.  Again though, if you know.

14           THE WITNESS:  I don't think I can answer that

15  question.

16  BY ATTORNEY MORGAN:

17  Q   Your deposition was taken in January of 2021, correct?

18  A   I will accept your representation.  I don't remember the

19  date.

20  Q   It was taken a couple times.  Do you remember giving your

21  deposition?

22  A   Yes, yes.

23  Q   And you swore to tell the truth just like you did today?

24  A   Yes.

25  Q   And you gave truthful answers?

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1    A    To the best of my ability.

2           ATTORNEY MORGAN:  Your Honor, may I approach this time

3    with three copies of identical transcripts?

4           THE COURT:  Yes.

5    BY ATTORNEY MORGAN:

6    Q    I'll ask you to please turn to page 55.  Tell me when

7    you're there.

8    A    I am there.

9    Q    Okay.  Starting at line 23.  Are you there?

10   A    Page 55, line 23?

11   Q    Sorry.  58, line 23.  If I said 55, I misspoke.  58, line

12   23.

13   A    I'm there.

14   Q    Okay.  And you were asked: "Does a light cable, dilator,

15   K-wire, or shim specifically designed for a NuVasive retractor

16   have any independent value without the retractor?"  That was

17   the question you were asked, correct?

18   A    Yes.

19   Q    And the answer you gave: "As I sit here, I think the

20   answer is no."  That's the answer you gave, correct?

21   A    That's the answer I gave and --

22   Q    Okay.  Thank you.  And you agree that the implant is called

23   the currency of the industry, correct?

24   A    Yes.

25   Q    And in the industry, retractors like that provided by

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1   NuVasive and its lateral system are provided for free, right?

2   A    That's my understanding.

3   Q    Alphatec also does not charge for its retractor, right?

4   A    Correct.

5   Q    That's because Alphatec, like NuVasive, earns its revenues

6   on other components of what they're offering to surgeons,

7   correct?

8   A    Yes.

9   Q    It's compensation for providing the retractor for free, is

10  what it earns on the stuff it actually charges for, correct?

11  A    I think I'll agree with that.

12  Q    Thank you for your time, Dr. Ugone.

13            THE COURT:  Any redirect?

14            ATTORNEY NISBET:  Yes, Your Honor.

15                    **REDIRECT EXAMINATION**

16  BY ATTORNEY NISBET:

17  Q    There are a few questions, Dr. Ugone, that counsel

18  indicated she was under some time constraints and didn't really

19  give you an opportunity to answer.  I wanted to circle back to

20  those.  Counsel cut you off when she asked you about the

21  availability of the two-bladed retractor in 2017 and you

22  indicated there was something that you wanted to say about

23  that?  What did you want to say about that?

24  A    Well, there were a couple of things I wanted to say.  One

25  is if there was the issue of this hypothetical negotiation, the

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1   question is in those negotiations what would be a negotiating

2   point that Alphatec could say we could do.  And they would say

3   look, it's going to take me a year, but I can make a different

4   retractor.  So, you know, that would have an impact on the

5   royalty rate as an example.

6       Also on the lost profits calculation, Dr. Inglish is

7   calculating lost profits over the entire time period when they

8   have the knowhow and could have developed a different

9   retractor, so you wouldn't get lost profits over that entire

10  time period because after a year, there would be a different

11  retractor.

12      But to the point where it was noted that I didn't put one

13  more line that they didn't do it with the exclamation point, I

14  think it was, the way I think about it is it would be bad

15  public policy, especially from an economic perspective, that

16  every time someone is accused, they have to change their

17  product because then that would be an incentive for competitors

18  to always be suing each other just to get their rival to change

19  their product.  I'm not going to speak for the law, but there's

20  nothing that says you have to change the product because what

21  if they were found out not to have infringed the patents?  That

22  just doesn't make any sense to put they didn't do it.

23  Q   Thank you, Dr. Ugone.  Counsel insinuated Alphatec first

24  launched its Squadron retractor in October 2017; do you recall

25  that?

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1    A    Yes.

2    Q    And it's your understanding that NuVasive is seeking

3    damages for all sales leading up to October 17, right?

4    A    Yes.

5    Q    That would include sales made in February, March, April,

6    May, June, July, August, September, all those sales, right?

7    A    That's correct.

8    Q    They're seeking lost profits on those sales, right?

9    A    Yes.

10   Q    And you were here yesterday for Scott Robinson's testimony,

11   right?

12   A    Yes.

13   Q    And he was at Alphatec at the time the Squadron retractor

14   launched, right?

15   A    Yes.

16   Q    And he testified it launched in April of 2017, correct?

17   A    Which was consistent with my understanding, yes.

18   Q    And you don't think he lied to the jury, do you?

19   A    No.

20   Q    And he cited a document and he used a document DTX-410.  If

21   you can put that up on the screen for me.  This was a press

22   release dated April 7th, 2017 where Alphatec is launching the

23   Battalion lateral system with the Squadron retractor to support

24   minimally invasive lateral access procedures.  Would you mind

25   putting that up for the jury.  This has been admitted into

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1  evidence, my apologies.

2     We talked about this press release officially announcing to

3  the world that Alphatec had launched its Squadron retractor,

4  correct?

5  A   Yes.

6  Q   So Alphatec didn't launch it in October 2017, according to

7  this press release and Mr. Robinson's testimony, they launched

8  it in April 2017, right?

9  A   Yes.

10 Q   And that would be consistent with the damages period

11 NuVasive is seeking lost profits on, right?

12 A   Correct.

13 Q   Can you put up DTX-736 at page 24.  Sorry.  DTX-736 at

14 00024, last page.  This was the declaration of Matt Link we

15 looked at in your direct examination; do you remember that?

16 A   Yes.

17 Q   Do you recall if this declaration was signed under the

18 penalty of perjury?

19 A   Yes.

20 Q   And Mr, Link, he was a former NuVasive president, right?

21 A   Correct.

22 Q   And in his declaration he said, "I understand from news

23 reports that Alphatec first launched its lateral product in

24 April 2017."  Do you see that?

25 A   Yes.  And that's what I was testifying to.  That's what I

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1  remembered.

2  Q   And you don't think he would have lied under the penalty of

3  perjury, right?

4  A   No, no.

5  Q   Can you please turn to Mr. Inglish's 2020 -- November 20th,

6  2020 expert report, please?  Can you please turn to paragraph

7  106.  Now Mr. Inglish, he was NuVasive's expert, right?

8  A   Yes.

9  Q   And he reviewed the information and data that was presented

10  to him in this case, right?

11  A   Correct.

12  Q   He put together several expert reports, right?

13  A   Yes.

14  Q   And he testified here?

15  A   Yes.

16  Q   And you review his expert reports, right?

17  A   Yes.

18  Q   This paragraph, let me read it to the jury.  In the

19  paragraph of his expert report he wrote "as discussed in the

20  press release and earnings call below, Alphatec introduced the

21  LLIF platform in April 2017."  Do you see that?

22  A   Yes.

23  Q   It your understanding the LLIF platform included the

24  Squadron retractor?

25  A   Yes.

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1    Q   Let's look at the press release PTX-36.  Now this was the

2    press release that counsel showed you to demonstrate that

3    despite seeking damages well before October 2017 to suggest to

4    you that the launch the Squadron retractor was October 2017,

5    right?

6    A   That's how I took the questions.

7    Q   Okay.  And this, unlike the testimony the jury heard and

8    the declaration from the former NuVasive president Matt Link,

9    this wasn't created under the penalty of perjury, right?

10   A   I assume not.

11   Q   Right.  It's a press release.  As part of this press

12   release, do you have any understanding as to whether this was

13   part of a new branding for Alphatec?

14   A   Actually I can't speak to that.

15   Q   Let me draw you to the paragraph right above comparison of

16   financial results.  "So as part of this new branding in this

17   press release, it states I'm especially "-- this is a message

18   from the Alphatec CEO at the time, Terry Rich.  "I'm especially

19   excited to welcome Pat Miles, one of the spine industries most

20   respected leaders to our team."  Do you see that?

21   A   I do.

22   Q   No further questions.

23           THE COURT:  Any redirect or recross?

24                    **RECROSS-EXAMINATION**

25

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1  BY ATTORNEY MORGAN:

2  Q   Sir, I think you just said that you don't think it would be

3  a good idea if there was a rule that you had to change your

4  product because you might be later found to infringe when

5  you're accused -- sorry.  Strike that.

6      I think you said that it wouldn't be a good rule if you're

7  accused of infringement that you have to change your product

8  because you might be later found to not have infringed?  Did I

9  paraphrase that right?

10 A   What I was trying to say is that actually there would be

11 perverse incentives if every time you were accused, especially

12 if you didn't think you were infringing, but every time you

13 were accused that you had to change your product into something

14 else.

15 Q   Right.

16 A   I think that would create interesting dynamics in the

17 marketplace.

18 Q   But here Alphatec has been found to infringe the '832

19 patent, correct?

20 A   Well --

21 Q   Correct?  We established that at the beginning of my cross.

22 A   I'm going to say yes, but you know there's more.

23 Q   Okay.  And even after that, they didn't replace the

24 Squadron retractor with a two-bladed retractor, correct; is

25 that right?

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1  A   Correct.  But you know why.

2        THE COURT:  I'll give you one more follow-up.

3                 **FURTHER REDIRECT EXAMINATION**

4  BY ATTORNEY NISBET:

5  Q   Dr. Ugone, you indicated there was more to that answer.

6  What else is there?

7  A   Well, the patent could be found to be invalid, in which

8  case no wrongful conduct.

9  Q   Thank you.

10        THE COURT:  Now we're done.  All right.  Sir, thank

11  you.  You can step down.

12        I'd like to use the last 15 or 20 minutes if you have

13  someone you want to start.  I don't want to waste the time.

14        ATTORNEY NISBET:  Your Honor, I think we can

15  accommodate at least a few of those minutes with the deposition

16  of Eric Finley.  He is a former NuVasive employee and an

17  inventor on the named patents.

18        THE COURT:  Are there any exhibits related to

19  Mr. Finley?

20        ATTORNEY NISBET:  Good question.  I think the answer

21  is no.  I stand corrected.  DTX-657.

22        THE COURT:  You can step down, sir.  Thank you, you're

23  done.  I thought I said that, but maybe you didn't hear me.

24  Yes, you are excused.

25        THE CLERK:  Counsel, are you asking that be entered?

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1          THE COURT:  Any objection on that exhibit?

2          ATTORNEY MORGAN:  Your Honor, I'm sorry.  Can we take

3     it up after, Your Honor?

4          THE COURT:  No.  We're going to ha play the

5     deposition, so.

6          ATTORNEY MORGAN:  Your Honor, we don't have any

7     objection.

8          THE COURT:  It's admitted.

9        (Defense Exhibit DTX-657 admitted)

10         THE COURT:  You can play the deposition.

11       (Segment of Eric Finley's deposition testimony presented to

12    the jury.)

13         THE COURT:  We don't need to start if there's nothing

14    else.  That's short enough.  Then we'll just be done.

15         ATTORNEY NISBET:  I think we'll be done, Your Honor.

16         THE COURT:  Ladies and gentlemen, that concludes the

17    evidence for today.  I do want to -- so because I promised this

18    case would be in your hands by Thursday and to make up for what

19    was a slightly slow start with jury selection last week, on

20    Thursday this week, instead of our 8:30 to 3:00, we will start

21    at 8:30, but you need to be prepared to be here until probably

22    4:00, maybe 4:30 to make sure we can get you instructed and

23    they have time to do their whole closing.  We will provide

24    lunch that day so instead of having two 20 or 30-minute breaks,

25    we'll have a ten minute, a lunch break, and a ten minute just

1    to make sure there's enough time to get everything wrapped up

2    to you by Thursday.  I just wanted give you a heads up on that.

3    See you tomorrow.  Tomorrow is regular, 8:30 to 3:00.

4         (Jury excused at 2:46 p.m.)

5         THE COURT:  All right.  The jury has recessed.  I

6    need -- before I can give you time, the time I can attribute

7    not counting the hour and eight minutes of deposition time, I

8    recorded, we've got 4 hours and 38 minutes for the plaintiffs

9    and 7 hours and 48 minutes for the defendants.  So I just don't

10   know how to subtract your depo times for today.

11        ATTORNEY NISBET:  Yes, Your Honor.  We talked.

12   NuVasive should get 15 minutes, and we should get the rest.

13        THE COURT:  Okay.  So that leave you with four hours

14   and 23 minutes and the rest.  That's just under six hours for

15   Alphatec.  All right.  Who am I meeting with to do jury

16   instructions?

17        ATTORNEY WICKRAMASEKERA:  Mr. Rob Kang for Alphatec.

18        ATTORNEY FOEDEMAN:  We have some folks here who can

19   handle that for us.  We have tried to address this limiting

20   instruction.  I think probably the best thing is if I just hand

21   up our proposal.  Just a reminder, this has to do with other

22   litigations that were referenced.  What I am mainly concerned

23   of and what I flagged at motions in limine is the outcome of

24   the case.  That's what I'm really trying to hem in.  I don't

25   think that's relevant.  Not the existence of the case.

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1          THE COURT:  Obviously the existence isn't because you

2    went into it with Dr. Ugone -- not Dr. Ugone, sorry.  The

3    expert -- he testified for Medtronic.  So they've heard there's

4    been litigation involved here.  Frankly, I'll take a look, but

5    I really think that this is more significant to you than to

6    anybody else in the room and, specifically, the jury.  I just

7    with all the testimony they've heard over all these days, I

8    don't think this had any significant impact with them.

9          ATTORNEY FOEDEMAN:  Yeah.  I'll hand it up.  I think

10   the second sentence is probably the one that would be relevant

11   to the question of how are we going to describe the outcome.

12         ATTORNEY WICKRAMASEKERA:  Your Honor, just for the

13   record, I disagree with the instruction.  We can address it

14   when you're ready to speak, but I think it's inaccurate.  There

15   is going to be a lot about that litigation that's going to

16   discussed.  So after Your Honor has a chance to look, we can

17   address this issue either later today or in the morning.

18         We also have a limiting instruction that we'll be

19   providing for the statements in opening -- the improper

20   statements in opening regarding our failure to seek a

21   reexamination on the '801 even though we had stipulated at

22   NuVasive's request not to do so.  So we will be providing that

23   as well.

24         THE COURT:  All right.  I'll see about folding this

25   in.  I mean, they are going to be instructed again that they

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1   have to consider the claims against the accused products, the

2   prior art against the claims, and not commercial comparisons or

3   litigation comparisons or any of that.  So probably maybe

4   something very generic that covers it might get folded into

5   just here's what you have to consider as a jury.

6           ATTORNEY FOEDEMAN:  Great.

7           THE COURT:  You look like you have something you want

8   to say, or you're just jury instructions?  Okay.  I'm going to

9   go get my packet.  You know what?  Why don't we do it in my

10  chambers since it's not going to be on the record.  So the

11  people reviewing jury instructions with me can join me in

12  chambers.

13      (Court in recess at 2:50 p.m.)

14       CERTIFICATE OF OFFICIAL STENOGRAPHIC COURT REPORTER

15  I, Mauralee Ramirez, federal official stenographic court
    reporter, in and for the United States District Court for the
16  Southern District of California, do hereby certify that
    pursuant to Section 753, Title 28, United States Code that to
17  the best of my ability, the foregoing is a true and correct
    transcript of the stenographically reported proceedings held in
18  the above-entitled matter and that the transcript page format
    is in conformance with the regulations of the Judicial
19  Conference of the United States.

20        Dated this 18th day of March 2022

21        S/ Mauralee Ramirez
          Mauralee Ramirez, CSR No. 11674, RPR
22        Federal Official Stenographic Court Reporter

23

24

25

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1                            INDEX

2                    INDEX TO WITNESSES

3  DEFENDANTS          DIRECT   CROSS   REDIRECT   RECROSS

4  Barton L. Sachs

5    Attorney Kang       8                 98

6    Attorney Devine            64                   --

7  Keith Ugone

8    Attorney Nisbet   109              167, 173

9    Attorney Morgan          147                 172

10

11 WITNESSES OFFERED BY VIDEO                          PAGE

12 John English                                        100

13 Matt Link                                           100

14 Paul McClintock                                     100

15 Eric Finley                                         175

16

17                          EXHIBITS

18 PLAINTIFFS                                      ADMITTED

19   PTX-36

20   PTX-644                                            7

21   PTX-650                                            7

22 DEFENDANT                                       ADMITTED

23   DTX-657                                          175

24   DTX-698                                           61

25   DTX-736                                          100

18CV0347-CAB MARCH 8, 2022, JURY TRIAL VOLUME 6,

1                          INDEX (continued)

2                        EXHIBITS (continued)

3   DEFENDANT                                              ADMITTED

4     DTX-741                                                100

5     DTX-914                                                 56

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25